IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| FRIENDLY ICE CREAM CORPORATION, *et al.*,[1] | ) Case No. 11-13167 (___) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER
## (1) AUTHORIZING THE DEBTORS TO (A) CONTINUE USING THE CASH MANAGEMENT SYSTEM, (B) MAINTAIN EXISTING BANK ACCOUNTS AND BUSINESS FORMS, AND (C) CONTINUE INTERCOMPANY ARRANGEMENTS AND (2) GRANTING INTERCOMPANY CLAIMS ADMINISTRATIVE PRIORITY

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this motion (this "Motion") for the entry of an order (the "Order"), substantially in the form attached hereto as **Exhibit A**, authorizing the Debtors to (a) continue using their existing cash management system, bank accounts, and business forms and (b) continue performing ordinary course intercompany transactions. In support of this Motion, the Debtors respectfully state as follows.[2]

### Jurisdiction and Venue

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Friendly Ice Cream Corporation (3130); Friendly's Restaurants Franchise, LLC (3693); Friendly's Realty I, LLC (2580); Friendly's Realty II, LLC (2581); and Friendly's Realty III, LLC (2583). The location of the Debtors' corporate headquarters and the Debtors' service address is: 1855 Boston Road, Wilbraham, Massachusetts 01095.

[2] The facts and circumstances supporting this Motion are set forth in the Declaration of Steven C. Sanchioni, Executive Vice President, Chief Financial Officer, Treasurer, and Assistant Secretary of Friendly Ice Cream Corporation, in Support of the Debtors' Chapter 11 Petitions and First Day Motions (the "First Day Declaration"), filed contemporaneously herewith.

3. The statutory bases for the relief requested herein are sections 363, 364, 365, 503, 507, 1107(a), and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 6003 and 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2015-2 and 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules").

## Relief Requested[3]

4. The Debtors seek entry of an order authorizing them to (a) continue to use, with the same account numbers, all of the Bank Accounts in their Cash Management System, (b) treat the Bank Accounts for all purposes as accounts of the Debtors as debtors in possession, (c) open new debtor-in-possession accounts, if needed, (d) use, in their present form, all correspondence and business forms (including check stock, letterhead, purchase orders, and invoices) and other documents related to the Bank Accounts existing immediately before the Petition Date, without reference to the Debtors' status as debtors in possession, and (e) continue performing Intercompany Transactions in the ordinary course of business.

5. The Debtors further request that the Court authorize the Debtors' banks where the Debtors' Bank Accounts are located to (a) continue to maintain, service, and administer the Bank Accounts, and (b) debit the Bank Accounts in the ordinary course of business on account of (i) checks drawn on the Bank Accounts that are presented for payment at such banks or exchanged for cashier's checks prior to the Petition Date, (ii) checks or other items deposited in the Bank Accounts prior to the Petition Date that have been dishonored or returned unpaid for any reason (including associated fees and costs), to the same extent the Debtors were responsible for such items prior to the Petition Date, and (iii) undisputed, outstanding service charges owed

---

[3] Capitalized terms used in this section shall have the meanings set forth elsewhere in this Motion.

to such banks as of the Petition Date on account of the maintenance of the Debtors' Cash Management System, if any.

## Background

6. As described in the First Day Declaration, the Debtors are a leading full-service, family-oriented restaurant chain and provider of ice cream products in the Eastern United States. The Debtors' operations include approximately 490 restaurants located in 16 states. In addition to their restaurant operations, the Debtors manufacture a complete line of premium ice cream products distributed to more than 7,000 supermarkets and other third party retail locations in 48 states. The Debtors and their affiliates maintain their national headquarters in Wilbraham, Massachusetts, and employ over 10,000 workers across the country. In the first eight months of 2011, the Debtors' generated $329.7 million in revenue and $8.6 million in adjusted EBITDA.

7. In recent years, the restaurant industry—including the Debtors' businesses—has been hurt by the significant U.S. economic downturn and increased food costs. New advertising campaigns and cost-cutting programs implemented by the Debtors have successfully mitigated certain negative effects on their businesses; however, the Debtors have not been immune to the effects of the economy and rising food prices, and their financial performance has suffered significantly.

8. As the Debtors' liquidity position deteriorated, the Debtors struggled to meet their debt service obligations and failed to satisfy financial covenants under their prepetition revolving credit agreement, resulting in a default. Prior to their chapter 11 filing, the Debtors successfully negotiated a forbearance agreement with their senior secured lenders and a further extension of credit under their prepetition subordinated secured note in order to explore available restructuring alternatives. After careful review and extensive negotiations, the Debtors determined that a chapter 11 filing, coupled with an expedited operational restructuring and an

efficient sale of the Debtors' assets, was the best and most efficient way to maximize a return for the Debtors, their estates, and all parties in interest.

9. On the date hereof (the "Petition Date"), each of the Debtors filed a petition with the Court under chapter 11 of the Bankruptcy Code to permit them to restructure their balance sheets and operations to restore profitability. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated. Concurrently with the filing of this Motion, the Debtors have requested procedural consolidation and joint administration of these chapter 11 cases.

## The Debtors' Cash Management System

10. In the ordinary course of business, the Debtors use an integrated, centralized cash management system to collect, transfer, and disburse funds generated by their operations (the "Cash Management System") and maintain current and accurate accounting records of all daily cash transactions.

11. The Cash Management System—which the Debtors' financial personnel manage from the Debtors' principal executive office in Wilbraham, Massachusetts—is essential to enable the Debtors to centrally control and monitor corporate funds and to ensure cash availability and liquidity. The Cash Management System also ensures that ongoing trade obligations are settled on a timely basis and develops and monitors cash flow forecasts for the Debtors' nationwide operations. Furthermore, the Cash Management System reduces administrative expenses by facilitating the movement of funds and enhances the development of accurate account balance information. The Cash Management System was specifically tailored to enable the Debtors to control and monitor corporate funds, ensure cash availability and liquidity, comply with the

4

requirements of their financing agreements, reduce administrative expenses by facilitating the movement of funds, and enhance the development of accurate account balances and presentment information. These controls are crucial given the significant volume of cash transactions managed through the Cash Management System.

12. The Cash Management System comprises approximately 36 bank accounts, (collectively, with all other bank accounts the Debtors may establish or have established as part of the Cash Management System, the "Bank Accounts") that the Debtors maintain at various banks throughout the United States (collectively, the "Banks"). None of the Bank Accounts bear interest, and the Debtors do not maintain investment accounts for excess cash. A schedule of the Debtors' current Bank Accounts is attached as **Exhibit 1** to **Exhibit A** hereto, and the Bank Accounts are described in more detail below and in the diagram of the Cash Management System attached hereto as **Exhibit B**.

I. **The Cash Management System.**

   A. **Collection Accounts.**

      i. **The Collection Account, the Deposit Accounts, and the Credit Card Account.**

13. The Cash Management System includes a collection account maintained at Wells Fargo (the "Collection Account") into which, at the close of each business day, funds collected in the Deposit Accounts and Credit Card Account (as defined herein) are swept. In addition, cash from the Debtors' retail sales flows into the Collection Account.

14. Cash restaurant sales are deposited into approximately 21 Bank Accounts (the "Deposit Accounts") maintained at the various Banks. Most of these accounts are zero-balance accounts; the rest are manually swept each day, with the exception of *de minimis*

5

DOCS_DE:173742.1/68700.001

balances to cover bank fees or collateral obligations. The Cash Management System transfers cash balances from Deposit Accounts to the Collection Account on a daily basis.

15. Receipts from credit card purchases are collected into an account at Citizens Bank (the "Credit Card Account").[4] When MasterCard, Visa, Discover Card, or American Express transactions are recorded at the point of sale, card issuers deposit corresponding funds into the Credit Card Account within one to three business days. Like the Deposit Account, balances in the Credit Card Account are swept daily into the Collection Account.

### ii. The Concentration Account and the Other Collection Accounts.

16. The Cash Management System features a concentration account (the "Concentration Account") into which funds collected in the Collection Account and various other collection accounts (the "Other Collection Accounts") are swept. All disbursements are funded from the Concentration Account through other accounts. The Cash Management System automatically draws funds from the Concentration Account into disbursement accounts to fund expenses as discussed more fully below. The Other Collection Accounts include (a) two accounts held in the name of Friendly's Restaurants Franchise, LLC to collect franchise royalties and maintain funds in escrow for franchise marketing and (b) a gift card account at Wells Fargo (the "Gift Card Account") into which the Debtors' gift card processor deposits cash as gift cards are redeemed. The Gift Card Account also serves as a disbursement account from which the Debtors pay liabilities to franchisees when customers redeem gift cards at non-Debtor-owned locations. As such, the Gift Card Account maintains a balance of generally no more than $2.5 million, which is at its highest just before the year-end holiday season.

---

[4] The Debtors do not maintain any Credit Card Accounts at the franchisee-owned locations because all sales receipts are collected by the franchisees. The Debtors only receive royalty and related payments from their franchisees.

6

### B. Disbursement Accounts.

17. As set forth on **Exhibit B**, the Debtors maintain a Bank Account at Wells Fargo that receives cash from the Concentration Account and makes deposits into (a) an account to pay accounts payable liabilities and (b) two accounts for corporate and restaurant employee payroll. In addition, the Debtors maintain disbursement accounts for workmen's compensation liabilities, flex spending payments, and pay card settlement obligations. The Debtors pay the majority of their vendor obligations weekly by check, although certain key vendors are paid via automatic clearing house transactions.

18. The Debtors maintain a disbursement account at Wells Fargo Bank (the "Local Operating Account") that receives funds from the Concentration Account. The Debtors meet vendor and other miscellaneous local operating payables with cash from the Local Operating Account. When local vendors interact with a store location, the store transmits the invoice to the Debtors' corporate headquarters for processing and payment from the Local Operating Account. When a payment is made out of the Local Operating Account, the Cash Management System automatically draws funds from the Concentration Account into the Operating Account. As a result, the Local Operating Account typically does not maintain outstanding balances.

19. Lastly, although not typically used as a disbursement account, the Debtors maintain a reserve account at Wells Fargo with a balance of approximately $10,000. This Bank Account serves as collateral for liabilities incurred in connection with the two corporate credit cards that the Debtors maintain.

### II. The Debtors' Intercompany Transactions.

20. In the ordinary course of business, certain of the Debtors' operating entities maintain business relationships with each other, resulting in intercompany receivables and payables (the "Intercompany Claims"). In particular, except for two Bank Accounts that are held

in the name of Friendly's Restaurants Franchise, LLC to collect franchise royalties and maintain funds in escrow for franchise marketing, all of the Bank Accounts are held in the name of Friendly Ice Cream Corporation. As such, in connection with the daily operation of the Cash Management System, as funds are disbursed throughout the Cash Management System, at any given time there may be Intercompany Claims owing by one Debtor to another (the "Intercompany Transactions").[5]

21. The Debtors submit that the continuation of the Intercompany Transactions is in the best interests of the Debtors' estates and their creditors. The Debtors maintain records of all Intercompany Transactions (including fund transfers) and, therefore, the Debtors are able to ascertain, trace, and account for the Intercompany Transactions. At the same time, though, if the Intercompany Transactions were to be discontinued, the Cash Management System and related administrative controls would be disrupted to the Debtors' detriment. The Debtors will continue to maintain records of Intercompany Transactions in the postpetition period.

### III. The Debtors' Existing Business Forms and Checks.

22. In the ordinary course of business, the Debtors use a variety of checks and business forms. To minimize expenses to the Debtors' estates and avoid unnecessarily confusing their employees, customers, and suppliers, the Debtors believe it is appropriate to continue to use all correspondence and business forms (including letterhead, purchase orders, and invoices) as such forms were in existence immediately before the Petition Date—without reference to the Debtors' status as debtors in possession—rather than requiring the Debtors to incur the expense

---

[5] Because the Debtors engage in Intercompany Transactions on a regular basis and such transactions are common among enterprises similar in size and scope to the Debtors' enterprises, the Debtors believe that the Intercompany Transactions are ordinary course transactions within the meaning of section 363(c)(1) of the Bankruptcy Code and, thus, do not require the Court's approval. Nonetheless, out of an abundance of caution, the Debtors are seeking express authority to engage in such transactions on a postpetition basis. The continued performance of the ordinary course Intercompany Transactions is integral to ensuring the Debtors' ability to operate their businesses as debtors in possession.

and delay of ordering entirely new business forms. Accordingly, once existing forms are depleted, the Debtors shall commence printing "Debtor in Possession" on checks the Debtors print themselves, and the Debtors will replace their existing stock of business forms with new forms identifying their status as debtors in possession.

### Basis for Relief

I.  **The Court Should Approve the Debtors' Cash Management System.**

   A.  **The Continued Use of the Debtors' Cash Management System is Essential to the Debtors' Operations and Restructuring Efforts.**

23. As discussed above, the Debtors' business and financial affairs are complex, requiring the Debtors to collect, disburse, and move funds through numerous Bank Accounts in the United States. Pursuant to 28 U.S.C. § 586(a)(3) and the chapter 11 guidelines (the "U.S. Trustee Guidelines") established by the Office of the United States Trustee (the "U.S. Trustee"), debtors in possession may be required to, among other things, (a) establish one debtor-in-possession account for all estate funds required for the payment of taxes (including payroll taxes), (b) close all existing Bank Accounts and open new debtor-in-possession accounts, (c) maintain a separate debtor-in-possession account for cash collateral, and (d) obtain checks that bear the designation "debtor in possession" and reference the bankruptcy case number and type of account.

24. Given the Debtors' corporate and financial structure, it would be difficult and unduly burdensome to establish an entirely new cash management system for each of the Debtors' operating entities. To comply with the U.S. Trustee Guidelines, the Debtors also would need to execute new signatory cards and depository agreements and create a new system for

manually issuing checks and paying postpetition obligations.[6] The delays that would result from opening these accounts, revising cash management procedures, and instructing customers to redirect payments, would disrupt the Debtors' business at this critical time. In addition, requiring the Debtors to maintain separate accounts would decentralize their Cash Management System, which would create unneeded disruption to the Debtors' operations as they attempt to restructure in chapter 11. Compliance with the U.S. Trustee Guidelines would again require the Debtors to restructure their cash management processes at significant administrative cost. Accordingly, the Debtors respectfully request that the Court waive the requirements imposed by the U.S. Trustee Guidelines.

25. The Debtors do not maintain investment accounts for excess cash. Section 345(a) of the Bankruptcy Code authorizes a debtor in possession to deposit or invest money of the estates, "as will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." 11 U.S.C. § 345(a). If deposits or investments are not insured, guaranteed, or backed by the full faith and credit of the U.S. government, section 345(b) of the Bankruptcy Code provides that, unless the Court orders otherwise, the holder of such deposits or investments must obtain a bond in favor of the United States secured by the undertaking of an adequate corporate surety. *Id.* § 345(b). Nonetheless, section 345(b) allows the court to dispense with this limitation "for cause." *Id.* Because the Debtors do not maintain investment accounts for excess cash, the Debtors respectfully request a waiver of the requirements of section 345(b) of the Bankruptcy Code.

---

[6] Notwithstanding anything herein to the contrary, the Debtors reserve the right to close their prepetition Bank Accounts and open new accounts as may be necessary in the Debtors' business judgment. The Debtors, however, will give prompt notice to the U.S. Trustee and any official committees that may be appointed in these chapter 11 cases through the monthly operating reports.

10

26. The Court may authorize the Debtors to continue to use their existing Cash Management System, pursuant to section 105(a) of the Bankruptcy Code. Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). As set forth herein, the Debtors submit that approval of the continued use of the Debtors' routine Cash Management System and Bank Accounts is appropriate and justified.

27. Permitting the Debtors to continue using their existing Cash Management System would be consistent with prior precedent of courts in this Circuit. Indeed, courts in the Third Circuit have noted that an integrated cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash." *See, e.g., In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 934 (Bankr. D. Del. 1992), *aff'd in part and rev'd in part*, 997 F.2d 1039 (3d Cir. 1993). The United States Court of Appeals for the Third Circuit has agreed, emphasizing that requiring a debtor to maintain separate accounts "would be a huge administrative burden and economically inefficient." *Columbia Gas*, 997 F.2d at 1061; *see also In re Southmark Corp.*, 49 F.3d 1111, 1114 (5th Cir. 1995) (finding a cash management system allows a debtor "to administer more efficiently and effectively its financial operations and assets").

B. **Maintaining the Existing Cash Management System Will Facilitate a Smooth Transition into Chapter 11 and Will Not Harm Parties in Interest.**

28. The Debtors' continued use of their Cash Management System will facilitate the Debtors' transition into chapter 11 by, among other things, avoiding administrative inefficiencies and expenses and minimizing delays in payment of postpetition debts. The Debtors respectfully submit that parties in interest will not be harmed by the Debtors' maintenance of the existing Cash Management System (including continued use of all Bank Accounts) because the Debtors

11

have implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of obligations incurred prior to the Petition Date. Specifically, with the assistance of their legal and financial professionals, the Debtors have implemented internal control procedures that prohibit payments on account of prepetition debts without the prior approval of the Debtors' finance department. In light of such protective measures, the Debtors submit that maintaining the Cash Management System is in the best interests of the Debtors' estates and creditors.

29. In addition, the Cash Management System is similar to those commonly employed by corporate entities of comparable size and complexity to the Debtors. The Cash Management System provides the Debtors with the ability to (a) quickly create status reports on the location and amount of funds, which, in turn, allows management to track and control such funds, (b) ensure cash availability, and (c) reduce administrative costs through a centralized method of coordinating the collection and movement of funds.

### C. The Court Should Authorize the Debtors to Continue Using Debit, Wire, and Automatic Clearing House Payments.

30. The Debtors request that the Court grant further relief from the U.S. Trustee Guidelines to the extent they require the Debtors to make all disbursements by check. In particular, the U.S. Trustee Guidelines require that all receipts and all disbursements of estate funds must be made by check with a notation representing the reason for the disbursement. In the ordinary course of business, the Debtors conduct transactions by debit, wire, or other similar methods. In addition, a certain percentage of the Debtors' customer receipts are received through automated clearing house direct deposits ("ACH Payments") and wire transfer payments. If the Debtors' ability to conduct transactions by debit, wire, ACH Payment, or other similar methods is impaired, they may be unable to perform under certain contracts, their

business operations may be unnecessarily disrupted, and their estates will incur additional costs. Indeed, the Debtors are required by certain federal and state taxing authorities to submit tax payments electronically through wire or ACH Payments, and failure to do so results in the imposition of penalties.

### D. The Court Should Authorize the Banks to Continue to Maintain, Service, and Administer the Debtors' Bank Accounts in the Ordinary Course of Business.

31. The Debtors submit that parties in interest will not be prejudiced or injured by the Debtors' maintenance of their Bank Accounts in the ordinary course of business. The Debtors strongly believe that replacing their existing Bank Accounts with new accounts as of the Petition Date pursuant to the U.S. Trustee Guidelines would needlessly interrupt their operations and impair their efforts to preserve the value of their estates and reorganize in an efficient manner.

32. Thus, the Debtors respectfully request that the Court authorize the Banks to continue to maintain, service, and administer the Bank Accounts as accounts of the Debtors as debtors in possession, without interruption and in the ordinary course of business. In this regard, the Banks should be authorized to receive, process, honor, and pay any and all checks, ACH Payments, and other instructions, and drafts payable through, drawn, or directed on such Bank Accounts after the Petition Date by holders, makers, or other parties entitled to issue instructions with respect thereto; *provided* that any check, advice, draft, or other notification that the Debtors advised the Banks to have been drawn, issued, or otherwise presented prior to the Petition Date may be honored only to the extent authorized by order of the Court.

33. The Debtors further request that the Court authorize the Banks to accept and honor all representations from the Debtors as to which checks, drafts, wires, or ACH Payments should be honored or dishonored consistent with any order of the Court and governing law, whether such checks, drafts, wires, or ACH Payments are dated prior to or subsequent to the

Petition Date. The Debtors also request that, to the extent the Banks honor a prepetition check or other item drawn on any account that is the subject of this Motion either (a) at the direction of the Debtors, (b) in a good faith belief that the Court has authorized such prepetition check or item to be honored, or (c) as a result of an innocent mistake made despite the above-described protective measures, the Banks, as applicable, will not be deemed to be liable to the Debtors or to their estates on account of such prepetition check or other item honored postpetition. The Debtors respectfully submit that such relief is reasonable and appropriate because the Banks are not in a position to independently verify or audit whether a particular item may be paid in accordance with a Court order or otherwise.

34. In the ordinary course, the Banks charge, and the Debtors will pay, honor, or allow the deduction from the appropriate account, certain service charges and other fees, costs, and expenses (collectively, the "Bank Fees"). The Debtors respectfully request that the Court authorize the Banks to (a) continue to charge the Debtors the Bank Fees and (b) charge-back returned items to the Bank Accounts, whether such items are dated prior to, on, or subsequent to the Petition Date, in the ordinary course of business. The Debtors further request that the Court order that liens on any of the Bank Accounts granted to creditors will not have priority over the Bank Fees, as applicable, at which the applicable Bank Account is located.

35. In similar large chapter 11 cases, courts in this district regularly have waived the U.S. Trustee Guidelines and allowed large corporate debtors to maintain ordinary course banking activities, including deduction of ordinary course banking fees, on the grounds that they are impractical and potentially detrimental to a debtor's postpetition business operations and restructuring efforts. *See, e.g., In re Neb. Book Co.*, Case No. 11-12005 (PJW) (Bankr. D. Del. June 28, 2011); *In re L.A. Dodgers LLC*, No. 11-12010 (KG) (Bankr. D. Del. June 28, 2011); *In*

*re Ambassadors Int'l, Inc.*, No. 11-11002 (KG) (Bankr. D. Del. Apr. 5, 2011); *In re Local Insight Media Holdings, Inc.*, No. 10-13677 (Bankr. D. Del. Nov. 19, 2010); *In re OTC Holdings Corp.*, No. 10-12636 (Bankr. D. Del. Aug. 27, 2010); *In re NEC Holdings Corp.*, No. 10-11890 (Bankr. D. Del. July 13, 2010); *In re MiddleBrook Pharms., Inc.*, No. 10-11485 (Bankr. D. Del. May 4, 2010); *In re Atrium Corp.*, No. 10-10150 (Bankr. D. Del. Jan. 21, 2010); *In re Int'l Aluminum Corp.*, No. 10-10003 (Bankr. D. Del. Jan. 6, 2010).[7]

## II. The Court Should Authorize the Debtors to Continue Using their Existing Business Forms.

36. The Debtors submit that parties in interest will not be prejudiced if the Debtors are authorized to continue to use their business forms substantially in the forms existing immediately prior to the Petition Date. As set forth above, the Debtors will begin printing "Debtor in Possession" on all checks generated by their accounting system and will order new business forms with a "Debtor in Possession" designation once their existing stocks are depleted. The Debtors submit that such efforts protect the interests of parties conducting business with the Debtors on a postpetition basis while, at the same time, avoiding unnecessary expenses and administrative delays at this critical time. With respect to checks, which the Debtors print themselves, the Debtors will begin printing these checks with a "Debtor in Possession" designation within sixty days of the Petition Date.

37. Parties doing business with the Debtors undoubtedly will be aware of their status as debtors in possession and, thus, changing business forms is unnecessary and unduly burdensome. In other large cases, courts in this district have allowed debtors to use their prepetition business forms without the "debtor in possession" label, at least until the debtors'

---

[7] Because of the voluminous nature of the orders cited herein, such orders are not attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

existing business form stock was depleted. *See, e.g., In re Neb. Book Co.*, Case No. 11-12005 (PJW) (Bankr. D. Del. June 28, 2011); *In re L.A. Dodgers LLC*, No. 11-12010 (KG) (Bankr. D. Del. June 28, 2011); *In re Ambassadors Int'l, Inc.*, No. 11-11002 (KG) (Bankr. D. Del. Apr. 5, 2011); *In re Local Insight Media Holdings, Inc.*, No. 10-13677 (Bankr. D. Del. Nov. 19, 2010); *In re OTC Holdings Corp.*, No. 10-12636 (Bankr. D. Del. Aug. 27, 2010); *In re NEC Holdings Corp.*, No. 10-11890 (Bankr. D. Del. July 13, 2010); *In re MiddleBrook Pharms., Inc.*, No. 10-11485 (Bankr. D. Del. May 4, 2010); *In re Atrium Corp.*, No. 10-10150 (Bankr. D. Del. Jan. 21, 2010); *In re Int'l Aluminum Corp.*, No. 10-10003 (Bankr. D. Del. Jan. 6, 2010).[8]

38.     The Debtors represent that if the relief requested herein is granted, the Debtors will implement appropriate mechanisms to ensure that no payments will be made on account of debts incurred prior to the Petition Date (other than those authorized by the Court). To prevent the inadvertent, unauthorized payment of prepetition claims, the Debtors will work closely with the Banks to ensure that appropriate procedures are in place to prevent checks that were issued prepetition from being honored without the Court's approval.

### III. The Court Should Authorize the Debtors to Continue Performing Intercompany Transactions and Grant Administrative Superpriority Status to Intercompany Claims.

39.     As described above, in the ordinary course of business, the Debtors' various entities maintain business relationships with each other, resulting in intercompany receivables and payables in the ordinary course of business. If the Intercompany Transactions are discontinued, a number of services provided by and among the Debtors' entities would be disrupted. Moreover, discontinuing the Intercompany Transactions could impair the Debtors' ability to pay benefits to their employees, and make timely payments to certain vendors.

---

[8] Because of the voluminous nature of the orders cited herein, such orders are not attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

Accordingly, the Debtors believe that continuation of the Intercompany Transactions is in the best interests of the Debtors' estates and their creditors, and seek authority to enter into such Intercompany Transactions in the ordinary course of business.

40. Additionally, the Debtors respectfully request that, pursuant to section 364(c)(1) of the Bankruptcy Code, all Intercompany Claims arising after the Petition Date be accorded superpriority status, with priority over any and all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, subject and subordinate only to valid liens and security interests, including the secured claims, if any, of the Debtors' prepetition and postpetition secured lenders. Notably, administrative expense treatment for intercompany claims, as requested here, has been granted in other comparable chapter 11 cases in this district and in other districts. *See, e.g., In re Ambassadors Int'l, Inc.*, No. 11-11002 (KG) (Bankr. D. Del. Apr. 5, 2011); *In re Local Insight Media Holdings, Inc.*, No. 10-13677 (Bankr. D. Del. Nov. 19, 2010); *In re OTC Holdings Corp.*, No. 10-12636 (Bankr. D. Del. Aug. 27, 2010); *In re NEC Holdings Corp.*, No. 10-11890 (Bankr. D. Del. July 13, 2010); *In re MiddleBrook Pharms., Inc.*, No. 10-11485 (Bankr. D. Del. May 4, 2010); *In re Atrium Corp.*, No. 10-10150 (Bankr. D. Del. Jan. 21, 2010); *In re Int'l Aluminum Corp.*, No. 10-10003 (Bankr. D. Del. Jan. 6, 2010).[9]

41. At any given time, there may be balances due and owing by and among the Debtors' various entities. The Debtors, through the Banks, maintain records of, and are able to ascertain, trace, and account for, the Intercompany Transactions. Moreover, the Debtors and the Banks will continue to maintain such records, including records of all current intercompany accounts receivables and payables, in the postpeition period. Thus, the Debtors respectfully

---

[9] Because of the voluminous nature of the orders cited herein, such orders are not attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

request that the Court authorize the Debtors to continue Intercompany Transactions in the ordinary course of business.

### The Requirements of Bankruptcy Rule 6003 Have Been Satisfied

42. As described above, the Debtors are seeking authority pursuant to the order to continue to operate the Cash Management System. Under Bankruptcy Rule 6003, this Court may authorize the relief requested herein within the 21-day period after the Petition Date because such relief is necessary to avoid immediate and irreparable harm to the Debtors' estates. *See* FED. R. BANKR. PROC. 6003 (b), (c). Immediate and irreparable harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990) (discussing the elements of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001).

43. Because of the complexity of the Debtors' operations, any disruption to the Cash Management System would seriously harm the Debtors and their estates. Without the Cash Management System, the Debtors would be unable to track incoming receipts and make on-time payments, thereby precluding the Debtors from determining their current liquidity. This, along with the possibility that third parties would refuse to provide essential services in the event the Debtors failed to remit payment, could cause a diminution in the value of the Debtors' estates to the detriment of all parties in interest. As a result, immediate and irreparable harm would result without the relief requested herein being granted on an interim basis. Accordingly, the Debtors respectively submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003(b) and (c) and seek authority to continue to operate the Cash Management System.

DOCS_DE:173742.1/68700.001

## Satisfaction of Bankruptcy Rules 6004(a) and 6004(h)

44. To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## Notice

45. Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the agent for the Debtors' prepetition secured lenders and the agent for the Debtors' proposed postpetition debtor-in-possession financing facility; (c) the indenture trustee for the Debtors' prepetition unsecured noteholders; (d) the top 20 unsecured creditors; and (e) any party that may have a particular interest in this Motion. As this Motion is seeking "first day" relief, within two business days of the hearing on this Motion, the Debtors will serve copies of this Motion and any order entered in respect to this Motion as required by Local Bankruptcy Rule 9013-1(m). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

46. No prior request for the relief sought in this Motion has been made to this or any other court.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtors respectfully request that the Court enter an order granting the relief requested herein and granting such other further relief as is just and proper.

Dated: October 5, 2011
Wilmington, Delaware

**PACHULSKI STANG ZIEHL & JONES LLP**

/s/ Laura Davis Jones
Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Kathleen P. Makowski (DE Bar No. 3648)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:   (302) 652-4100
Facsimile:    (302) 652-4400
Email:          ljones@pszjlaw.com
                    tcairns@pszjlaw.com
                    kmakowski@pszjlaw.com

- and -

James A. Stempel (*pro hac vice* admission pending)
Ross M. Kwasteniet (*pro hac vice* admission pending)
Jeffrey D. Pawlitz (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:    (312) 862-2200
Email:          james.stempel@kirkland.com
                    ross.kwasteniet@kirkland.com
                    jeffrey.pawlitz@kirkland.com

*Proposed Co-Counsel to the Debtors
and Debtors in Possession*

K&E 19691292