## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| FRIENDLY ICE CREAM CORPORATION, *et al.*,[1] | ) Case No. 11-13167 (___) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

### DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE PAYMENT OF PREPETITION (A) WAGES, SALARIES, AND OTHER COMPENSATION, (B) REIMBURSABLE EMPLOYEE EXPENSES, AND (C) EMPLOYEE MEDICAL AND SIMILAR BENEFITS

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this motion (this "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Order"), authorizing, but not directing, the Debtors to (a) pay prepetition wages, salaries, and other compensation, taxes, withholdings, and related costs, and reimbursable employee expenses, (b) pay and honor obligations relating to employee medical, insurance and other benefits programs, and (c) continue their employee medical, insurance and other benefits programs on a postpetition basis. In support of this Motion, the Debtors respectfully state as follows.[2]

### Jurisdiction and Venue

1.     The United States Bankruptcy Court for the District of Delaware (the "Court")

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Friendly Ice Cream Corporation (3130); Friendly's Restaurants Franchise, LLC (3693); Friendly's Realty I, LLC (2580); Friendly's Realty II, LLC (2581); and Friendly's Realty III, LLC (2583). The location of the Debtors' corporate headquarters and the Debtors' service address is: 1855 Boston Road, Wilbraham, Massachusetts 01095.

[2]   The facts and circumstances supporting this Motion are set forth in the Declaration of Steven C. Sanchioni, Executive Vice President, Chief Financial Officer, Treasurer, and Assistant Secretary of Friendly Ice Cream Corporation, in Support of the Debtors' Chapter 11 Petitions and First Day Motions (the "First Day Declaration"), filed contemporaneously herewith.

has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The statutory bases for the relief requested herein are sections 105(a), 362, 363, and 507(a)(4)-(5) of title 11 of the United States Code (the "Bankruptcy Code"), Rules 6003, 7062, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules").

## Relief Requested[3]

4.     By this Motion, the Debtors seek entry of an order authorizing, but not directing, the Debtors to: (a) pay prepetition claims and honor obligations owing pursuant to the Unpaid Compensation, Uncashed Checks, Deductions, Payroll Taxes, Incentive Programs, and the Independent Contractor and Temporary Employee Compensation; (b) continue reimbursing and honor any prepetition obligations relating to the Reimbursable Expenses, Automobile Benefits, and the Leased Automobile Expenses; and (c) continue the Employee Benefit Programs in the ordinary course of business and pay any prepetition obligations relating thereto (collectively, the "Employee Wages and Benefits").

5.     The Debtors also seek authority, but not direction, to modify, change, and discontinue any of the Employee Wages and Benefits and to implement new programs, policies, and benefits, in the ordinary course of business during these chapter 11 cases, in their sole discretion, and without the need for further Court approval, subject to applicable law.

---

[3]     Capitalized terms used in this section shall have the meanings set forth elsewhere in this Motion.

## Background

6. As described in the First Day Declaration, the Debtors are a leading full-service, family-oriented restaurant chain and provider of ice cream products in the Eastern United States. The Debtors' operations include approximately 490 restaurants located in 16 states. In addition to their restaurant operations, the Debtors manufacture a complete line of premium ice cream products distributed to more than 7,000 supermarkets and other third party retail locations in 48 states. The Debtors and their affiliates maintain their national headquarters in Wilbraham, Massachusetts, and employ over 10,000 workers across the country. In the first eight months of 2011, the Debtors' generated $329.7 million in revenue and $8.6 million in adjusted EBITDA.

7. In recent years, the restaurant industry—including the Debtors' businesses—has been hurt by the significant U.S. economic downturn and increased food costs. New advertising campaigns and cost-cutting programs implemented by the Debtors have successfully mitigated certain negative effects on their businesses; however, the Debtors have not been immune to the effects of the economy and rising food prices, and their financial performance has suffered significantly.

8. As the Debtors' liquidity position deteriorated, the Debtors struggled to meet their debt service obligations and failed to satisfy financial covenants under their prepetition revolving credit agreement, resulting in a default. Prior to their chapter 11 filing, the Debtors successfully negotiated a forbearance agreement with their senior secured lenders and a further extension of credit under their prepetition subordinated secured note in order to explore available restructuring alternatives. After careful review and extensive negotiations, the Debtors determined that a chapter 11 filing, coupled with an expedited operational restructuring and an

3

efficient sale of the Debtors' assets, was the best and most efficient way to maximize a return for the Debtors, their estates, and all parties in interest.

9. On the date hereof (the "Petition Date"), each of the Debtors filed a petition with the Court under chapter 11 of the Bankruptcy Code to permit them to restructure their balance sheets and operations to restore profitability. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated. Concurrently with the filing of this Motion, the Debtors have requested procedural consolidation and joint administration of these chapter 11 cases.

### Debtors' Workforce and Wage and Benefit Obligations

10. As of the Petition Date, the Debtors employ approximately 10,300 employees (together with the Independent Contractors and Temporary Employees, defined below, the "Employees"). Approximately 9,800, or 95 percent, of the Employees are paid on an hourly basis ("Hourly Employees"), and the remaining 500, or five percent, of the Employees are paid on a salaried basis ("Salaried Employees"). The Debtors' workforce is not unionized and none of the Debtors are party to any collective bargaining agreements.

11. In addition to their Employees, the Debtors supplement their workforce by utilizing certain independent contractors (the "Independent Contractors"). The Independent Contractors include individuals who provide certain consulting, real estate, human resources, retail, and information technology services for the Debtors. In each case, the Debtors procure the services of the Independent Contractors through individualized contracts that set forth the terms of each Independent Contractor's retention, including remuneration. On occasion, the Debtors

4

also supplement their workforce with temporary employees (the "Temporary Employees"), as set forth below.

## I.    Wages, Salaries, and Compensation.

### A.    Unpaid Compensation.

12.    In the ordinary course of business, the Hourly Employees are generally paid weekly on Friday for the week ended the previous Sunday, receiving paychecks, paycards, or direct deposit every Friday or Monday depending on the state in which the Employee works. In the ordinary course of business, the Salaried Employees are generally paid semi-monthly on a current basis, receiving direct deposit or paycard on both the 15th day of the month and on the last business day of the month.

13.    On average, the Debtors' gross payroll is approximately $2.3 million per weekly pay period and approximately $1.4 million per semi-monthly pay period. The majority of the Debtors' hourly restaurant Employees are paid by check. All of the Debtors' Salaried Employees, hourly support center Employees, manufacturing Employees, and distribution Employees are paid by direct deposit or paycard. As of the Petition Date, the Debtors estimate they owe approximately $3.2 million on account of accrued wages, salaries, and other cash compensation (including automobile payments and excluding reimbursable expenses, severance, incentives, and vacation pay) that was earned prior to the Petition Date (the "Unpaid Compensation"). The Debtors do not believe that they owe any one Employee Unpaid Compensation in excess of the $11,725 cap imposed by section 507(a)(4) of the Bankruptcy Code.

14.    In addition to the Unpaid Compensation, the Debtors believe that certain Employees may possess checks for prepetition wages, salaries, and other cash compensation that

5

were issued by the Debtors prior to the Petition Date but remain uncashed and outstanding as of the Petition Date (the "Uncashed Checks").

**B.     Gross Pay Deductions, Governmental Withholdings, and Payroll Taxes.**

15.     For each applicable pay period, the Debtors routinely deduct, directly, certain amounts from Employee paychecks, including, without limitation, (a) garnishments, child support and service charges, and similar deductions, (b) other pre- and after-tax deductions payable pursuant to certain of the Employee benefit plans discussed herein (such as an Employee's share of health care benefits and insurance premiums, contributions under flexible spending plans, 401(k) contributions, legally ordered deductions and miscellaneous deductions, including slip resistant and safety shoes), and (c) deductions for a voluntary automotive and homeowners insurance program (collectively, the "Deductions").   On average, the Debtors deduct a total of approximately $120,000 from Employees' paychecks per weekly pay period and a total of approximately $150,000 per semi-monthly pay period, which the Debtors remit to the appropriate third-party recipients.

16.     In addition to the Deductions, federal, state, and local laws require the Debtors to withhold amounts related to federal, state, and local income taxes, Social Security, and Medicare taxes for remittance to the appropriate federal, state, or local taxing authority (collectively, the "Withheld Amounts").   The Debtors must then match from their own funds for Social Security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (together with the Withheld Amounts, the "Payroll Taxes").   In the aggregate, the Payroll Taxes, including both the Employee and employer portions, total approximately $605,000 per weekly pay period and approximately $400,000 per semi-monthly pay period.

6

## C.   Incentive Programs.

17.   Historically, the Debtors have maintained several Employee incentive plans designed to reward non-insider Employees for their contributions in helping the Debtors reach certain stated financial and other goals (collectively, the "Incentive Programs"), each described below:

### i.   The Restaurant Management Incentive Program.

18.   The Debtors offer various incentive programs to certain of their field management-level Employees who meet periodic performance targets set by the Debtors' corporate management (the "Restaurant Management Incentive Program"). None of the eligible Employees are "insiders" as that term is defined in section 101(31) of the Bankruptcy Code. Under the Restaurant Management Incentive Program, eligible field management-level Employees have the ability to earn cash payments based upon achieving certain performance metrics relating to monthly results. Payments under the Restaurant Management Incentive Program are made monthly or quarterly, depending upon the Employee's level, as part of the Debtors' payroll for the applicable period. These payments have a lag time of four to six weeks between the time the payment was earned and when it actually is paid. Approximately 360 Employees are eligible to participate in the Restaurant Management Incentive Program, and in 2010, the Debtors paid approximately $1.6 million in incentive obligations thereunder. As of the Petition Date, the Debtors owe approximately $30,000 in prepetition obligations under the Restaurant Management Incentive Program.

### ii.   The Franchise Incentive Program.

19.   In addition, the Debtors offer an incentive program to certain of their Employees who work with the Debtors' franchisees to assist those franchisees to meet certain quarterly sales

7

targets (the "Franchise Incentive Program"). Payments under the Franchise Incentive Program are generally paid out on a quarterly basis as part of the Debtors' payroll. Approximately 10 Employees are eligible to participate in the Franchise Incentive Program and the Debtors made no payments under the Franchise Incentive Program prior to the Petition Date in 2011. To the extent that any "insider" Employee is eligible to receive incentive payments under the Franchise Incentive Program, the Debtors are not seeking authority to make payments to such insider pursuant to this Motion. As of the Petition Date, the Debtors owe no outstanding prepetition obligations under the Franchise Incentive Program.

### iii. New Restaurant Opening Incentive.

20. Finally, the Debtors offer a new restaurant opening incentive (the "New Restaurant Incentive Program") to the managers of new restaurant openings based on certain performance metrics, including crew certification, guest satisfaction, attainment of budget goals, and percent of sales retained. None of the eligible Employees are "insiders" as that term is defined in section 101(31) of the Bankruptcy Code. Payments under the New Restaurant Incentive Program are calculated approximately eight weeks after the opening of a new restaurant and are generally paid two to four weeks later. As of the Petition Date, the Debtors do not owe any outstanding prepetition amounts on account of the New Restaurant Incentive Program and do not expect to make any payments on account of the New Restaurant Incentive Program during the pendency of these chapter 11 cases.

### D. Supplemental Workforce Obligations.

### i. Independent Contractor Compensation.

21. In the ordinary course of business, the Debtors employ Independent Contractors who perform a variety of tasks that are essential to the Debtors' businesses. The Independent

8

Contractors include individuals who provide certain consulting, real estate, human resources, retail, and information technology services for the Debtors. The Independent Contractors also include brokers that represent the Debtors' product and manage the process of selling with the end consumer. The Debtors remit compensation to the Independent Contractors (the "Independent Contractor Compensation") through their accounts payable process. On average, the Debtors pay a total of approximately $160,000 per month to the Independent Contractors. As of the Petition Date, the Debtors believe that they owe approximately $200,000 to the Independent Contractors for prepetition services.

### ii. Temporary Employee Compensation.

22. On occasion, the Debtors employ the services of Temporary Employees to handle overflow work. The Temporary Employees are procured through temporary staffing agencies, employment web sites, and walk-in inquiries. The Debtors remit compensation for the Temporary Employees to the temporary staffing agencies or to the Temporary Employee directly on a weekly basis through the Debtors' accounts payable system (the "Temporary Employee Compensation"). The Debtors' average monthly spend on Temporary Employee Compensation is *de minimis*. As of the Petition Date, the Debtors estimate that they approximately $18,500 in Temporary Employee Compensation.

## II. Reimbursable Expenses.

23. In the ordinary course of business, the Debtors reimburse Employees for reasonable and customary expenses incurred on behalf of the Debtors in the scope of their employment, including Travel Expenses, Business Development Expenses, Relocation Expenses, Tuition Expenses, and the Automobile Benefit (each as defined herein).

### A. Travel Expenses and Business Development Expenses.

24. The Debtors routinely reimburse expenses of Employees for air travel, meals,

9

parking, automobile mileage, communications (*i.e.*, use of cellular telephone and internet access for business purposes), and other business-related expenses incurred in the scope of their employment on behalf of the Debtors (collectively, the "Travel Expenses"). The Debtors also reimburse Employees for certain expenses related to nominal marketing and business development initiatives (together with the Travel Expenses, the "Travel and Business Development Expenses"). The Debtors' outstanding Travel and Business Development Expenses are incurred by various classes of the Debtors' Employees in carrying out their employment responsibilities. The Debtors rely on the Employees to monitor activity and sales at multiple stores. To effectively monitor stores, the Employees must travel to stores throughout the chain each week. Without continued reimbursement of these expenses, the Employees would be saddled with additional cost, causing personal financial hardship. Any expense reimbursements relative to insiders or senior management are payable pursuant to the above circumstances or were specifically covered in employment agreements.

25.     Although the Debtors request that reimbursement requests be submitted promptly, not all of the Employees do so. Thus, the Debtors are unable to provide a detailed listing of unpaid prepetition Travel and Business Development Expenses at this time because it is likely that Employees will submit requests for expenses incurred prepetition after the Petition Date. Based on historical practice, the Debtors estimate they owe Employees approximately $260,000 on account of prepetition Travel and Business Development Expenses (which amount includes approximately $52,000 owed to Employees in reimbursements on account of the Company Car Benefit, as defined herein).

26.     In addition to the Travel and Business Development Expenses, and in the ordinary course of business, the Debtors provide two Employees corporate credit cards issued by Wells

Fargo for business expense purchases (the "Corporate Credit Cards"). The Debtors pay monthly statements directly to Wells Fargo. Based on historical practice, the Debtors estimate they owe less than $5,000 on account of the Corporate Credit Cards.

**B.      Relocation Expenses.**

27.      In the ordinary course of business, the Debtors also pay or reimburse Employees for relocation expenses incurred at the Debtors' request or for the Debtors' benefit, including but not limited to costs for transportation and storage of household goods and travel expenses from the old home to the new home (collectively, the "Relocation Expenses"). As of the Petition Date, the Debtors owe approximately $92,000 to Employees on account of Relocation Expenses, none of which was due and owing as of the Petition Date.

**C.      Tuition Expenses.**

28.      Additionally, in the ordinary course of business, the Debtors reimburse certain full-time Employees for tuition expenses (the "Tuition Expenses," and together with the Travel and Business Development Expenses and the Relocation Expenses, the "Reimbursable Expenses") through an Employee Development Assistance Program (the "Employee Development Program"). The Employee Development Program was developed to allow eligible Employees to prepare themselves to make greater contributions to the future of the Debtors' businesses. Employee eligibility is based on status, grade, performance, service, and the purpose of the proposed education. Eligible Employees receive full reimbursement up to a maximum amount of $2,500 per year. In 2011, eight Employees participated in the Employee Development program and, as of the Petition Date, the Debtors estimate that they owe approximately $2,000 in Tuition Expenses under the program, none of which is due and owing as of the Petition Date.

**D. Automobile Expenses.**

29.     In the ordinary course of business, the Debtors provide automobile benefits to certain field-level Employees, include retail sales managers, executive, and senior management Employees who use their automobiles for business purposes (the "Company Car Benefit"). The Debtors, at their sole discretion, will evaluate and determine if any vehicle is warranted for any current or future positions. For those employees with the Company Car Benefit, the Debtors reimburse Employees for the costs of repairs, gas, and insurance (the Debtors provide insurance for such vehicle under the Debtors' automobile insurance policy). The Debtors lease Company Car Benefit automobiles through Merchants Automotive Group and Enterprise Fleet Management (the "Leased Automobile Expenses"). As of the Petition Date, the Debtors owe approximately $75,000 and $5,000 to Merchants Automotive Group and Enterprise Fleet Management, respectively, on account of the Leased Automobile Expenses.

30.     Additionally, certain Vice Presidents without a Company Car Benefit receive a monthly cash payment of $900 and certain field employees receive a cash payment of $700 in lieu of a leased automobile (the "Monthly Automobile Stipend," and together with the Company Car Benefit, the "Automobile Benefits"). Approximately eight Employees receive Monthly Automobile Stipends, which total approximately $7,200 per month in the aggregate. As of the Petition Date, the Debtors owed approximately $800 on account of the Monthly Automobile Stipend.

**III.    Employee Benefit Programs.**

31.     In the ordinary course of business, the Debtors maintain various employment benefit plans and policies, including, without limitation, health care, dental and prescription drug plans, flexible spending accounts, workers' compensation benefits, the 401(k) plan, life

insurance coverage, accidental death and dismemberment insurance, supplemental life insurance coverage, short- and long-term disability insurance, and the stock option plan (collectively, the "Employee Benefit Programs"). As of the Petition Date, there were approximately 1,800 Employees and their dependants eligible for the Employee Benefits Programs.[4]

### A. Medical, Dental, and Prescription Drug Plans.

32.     Full-time Employees and certain retired Employees (the "Retirees") are eligible to receive medical, dental, and prescription drug insurance coverage (collectively, the "Health Benefits").[5] Employees pay a portion of their benefits coverage through pre-tax contributions from their paychecks based on the applicable programs and benefits elections.

33.     The Debtors' medical and prescription drug programs (the "Medical and Drug Plans") are self-insured and require the Debtors to pay for all costs arising under such programs, aside from Employee and Retiree contribution deductions, including claims payments and associated administrative costs. Approximately 910 Employees and Retirees participate in the Medical and Drug Plans. Claims, gross of any employee contributions, for Health Benefits are funded on a "pay as you go" basis and average approximately $550,000 per month. During the past six months, the Debtors paid approximately $3.0 million in Employee and Retiree claims under the Medical and Drug Plans. The Debtors estimate that there are accrued and unpaid Medical and Drug Plan claims as of the Petition Date totaling approximately $150,000.

34.     The Medical and Drug Plans are administered by Blue Cross Blue Shield of Florida and its affiliates ("BCBS"). The Debtors pay BCBS a monthly fee of approximately $45,000 to administer claims under the Medical and Drug Plans. As part of the Medical and

---

[4]    The Debtors' Employee Benefits are available to Employees only, subject to any eligibility requirements described herein. Independent Contractors do not participate in the Debtors' Employee Benefits.

[5]    Full-time Employees are eligible for Health Benefits starting on the first day of the month following 60 days of employment.

Drug Plans, the Debtors fund stop-loss insurance through Sun Life Financial ("Sun Life") that provides additional protection against catastrophic claim accumulation above the specific deductible of the Medical and Drug Plans. The Debtors pay approximately $30,000 per month to Sun Life in premiums for stop loss insurance. As of the Petition Date, the Debtors owe approximately $45,000 and $30,000 to BCBS and Sun Life, respectively, for prepetition amounts for administration fees associated with the Medical and Drug Plans and premiums on stop-loss insurance.

35. On any given date, the Debtors have open and unfunded medical claims liability for "incurred but not reported" claims (the "IBNR Claims"). The Debtors estimate that their current liability for IBNR Claims ranges from $600,000 to $750,000, depending upon the methodology used in the reserve calculation. In the event the Medical and Drug Plans are terminated as of the Petition Date, the Debtors will need to arrange for BCBS to manage "run-out claims" for a period of at least six months following termination of the Medical and Drug Plans. The fee to retain BCBS to manage this process is estimated at $125,000 (equivalent to three months of administrative fees). In addition, certain prepetition benefits relating to the Medical and Drug Plans were owed but remain unpaid as of the Petition Date because these obligations have accrued either in whole or in part prior to the Petition Date, but will not become payable in the ordinary course of business until a later date.

36. As a part of the Medical and Drug Plans, the Debtors offer certain "grandfathered" plans for the benefit of Retirees (the "Grandfathered Medical Plans"). Retirees and their eligible dependents who are between the ages of 55 and 65 and who meet certain other eligibility requirements are eligible to participate in the Grandfathered Medical Plans as "early" Retirees. In addition, Retirees and their eligible dependents who are over the age of 65 and who

14

meet the Debtors' requirements for retirement, along with certain other eligibility requirements, are eligible to participate in the Grandfathered Medical Plans. Both groups of Retirees are closed and no other Retirees will be added to the groups. To date, approximately 60 Retirees, 10 of which are "early" Retirees under the age of 65, participate in the Grandfathered Medical Plans.

37.     Also as part of the Medical and Drug Plans, the Debtors offer dental plans to eligible Employees that are self insured and administered by Delta Dental of Massachusetts (the "Dental Plans"). The Debtors pay costs arising under the Dental Plans, aside from employee contribution deductions, including claims cost and associated administrative costs. On account of the Dental Plans, the Debtors pay claims and administrative costs of approximately $60,000 per month to Delta Dental of Massachusetts. During the past six months, the Debtors paid approximately $360,000 in Employee claims under the Dental Plans. As of the Petition Date, the Debtors owe approximately $60,000 in the aggregate to Delta Dental of Massachusetts on account of prepetition administrations fees and claims costs associated with the Dental Plans.

38.     The Debtors also offer a series of limited medical plan options through Cigna Life Insurance Company (the "Limited Medical Plans"). These fully-insured plans are voluntary and funded by the Debtors to minimum state required levels or are funded entirely by participating Employees through deductions from the Employee's paycheck. Approximately 379 Employees participate in the Limited Medical Plans. As of the Petition Date, the Debtors believe that there may be unremitted prepetition amounts owing on account of the Limited Medical Plans of approximately $2,000.

**B.     Flexible Spending and Health Savings Accounts.**

39.     The Debtors also offer Employees the ability to contribute a portion of their pre-tax compensation to flexible spending accounts to pay for eligible out-of-pocket health care

15

and dependent care expenses (the "Flexible Spending Accounts"). There is a $3,000 health care deduction and $5,000 dependant care limit on each of the Flexible Spending Accounts. Currently, approximately 30 Employees maintain Flexible Spending Accounts. The Debtors pay approximately $500 per month to Aetna Life & Casualty ("Aetna") to administer the Flexible Spending Accounts and the Debtors withhold approximately $60,000 annually on account of Employee contributions to the Flexible Spending Accounts. As of the Petition Date, the Debtors owe prepetition amounts of $500 on account of administrative costs relating to the Flexible Spending Accounts and have $2,000 in collections on account of Employee contributions to the Flexible Spending Accounts.

40. The Debtors also offer Employees the ability to contribute a portion of their pre-tax compensation to health savings accounts to pay for eligible out-of-pocket health expenses (the "Health Savings Accounts"). The Debtors make contributions to Health Savings Accounts for those employees participating in the Debtors' high deductible health plans. The Debtors' annual contributions are up to $1,000 per participating Employee. Employees are allowed to contribute annual amounts, inclusive of the Company contribution, up to the legal maximums. Currently, approximately 208 Employees maintain Health Savings Accounts. The Debtors pay approximately $200 per month to HSA Bank to administer the Health Savings Accounts and the Debtors withhold approximately $360,000 annually on account of Employee contributions to the Health Savings Accounts. As of the Petition Date, the Debtors do not believe they owe any outstanding amounts relating to the Health Savings Accounts.

## C. Workers' Compensation.

41. The Debtors provide workers' compensation insurance for their Employees in each state in which they operate (the "Workers' Compensation Program"). The Debtors'

16

Workers' Compensation Program, for all states except Ohio, is administered by New Hampshire Insurance Company (AIG), Illinois National Ins. Co. (AIG) a Chartis Co., and National Union Fire Insurance Company of Pittsburgh, PA - Chartis (collectively, "Chartis"), which pays the Debtors' workers' compensation claims through a self-insured program. In addition, the Debtors administer certain medical only workers compensation claims directly. Chartis holds letters of credit securing the Debtors' self-insured claims exposure. In addition, the Debtors provide excess loss insurance through policies with National Union Fire Insurance Company, Great American Insurance Company, and The Travelers Insurance Companies (together with Chartis, the "Workers' Compensation Insurers"). Prepetition claims under the Workers' Compensation Program are administered by an independent third-party claims administrator, ESIS, Inc. The Debtors' annual insurance cost on account of the Workers' Compensation Program is approximately $5.5 million. The average monthly claims and administrative costs associated with the Workers' Compensation Program is $500,000.

42.     Further, in accordance with applicable state law, the Debtors make certain payments to provide workers' compensation coverage to their Employees pursuant to certain state administered workers' compensation programs (the "State Administered Workers' Compensation Programs"). The Debtors' semi-annual payments in connection with these programs are approximately $1,000. As of the Petition Date, the Debtors do not believe they owe any prepetition amounts on account of the State Administered Workers' Compensation Programs.

43.     The Debtors submit that the continuance of their Workers' Compensation Program is appropriate in the ordinary course of business, but out of an abundance of caution, seek authority to maintain their Workers' Compensation Program in accordance with applicable

17

law postpetition and to pay all premium installments and any retroactive premium adjustments to the Workers' Compensation Insurers or appropriate state agency under the State Administered Workers' Compensation Programs, as they come due in the ordinary course of business for going forward coverage. The Debtors also request the authority to assist the Workers' Compensation Insurers with the administration, processing, settlement, and litigation of any workers' compensation claims from their Employees as appropriate under the terms of their workers' compensation insurance and applicable law.

### D. Paid Vacation and Sick Leave.

#### i. Paid Vacation.

44. The Debtors provide vacation time to their Employees as a paid time off benefit (the "Paid Vacation"). The amount of Paid Vacation available to a particular Employee and the rate at which Paid Vacation accrues are generally determined by the Employee's length of employment and employment level. For certain restaurant Hourly Employees, vacation accrues after one year of service and the completion of 1,900 hours of service. Paid Vacation for this group of Hourly Employees must be taken within the W-2 year following the completion of the service requirement. Certain manufacturing and distribution Employees earn vacation based on years of service. For this group of Employees, vacation begins accruing after the completion of one year of service and must be used before the end of the anniversary year for each such Employee. Vacation benefits for all other Employees are prorated based on full calendar months worked and must be taken within the W-2 year. Employees may not carry forward unused days unless required by state law. When an Employee elects to take Paid Vacation, that Employee is paid his or her regular hourly or salaried rate. An Employee is only entitled to a cash payment for unused Paid Vacation where required by law. Therefore, the total amount of Paid Vacation

18

accrued is typically much larger than any cash vacation accrual payments made by the Debtors. The Debtors estimate that approximately $1.5 million of earned but unused Paid Vacation has accrued as of the Petition Date.

### ii.     Sick Leave.

45.     Upon completion of a three-month waiting period, the Debtors provide sick leave (the "Sick Leave") to their restaurant management and corporate Employees only as a paid time-off benefit. When an Employee elects to take Sick Leave, that Employee is paid his or her regular hourly or salaried rate. Employees may not carry unused days into the next year, and are not paid for unused days upon termination or resignation. The Debtors estimate that approximately $185,000 of earned but unused Sick Leave has accrued as of the Petition Date.

### iii.    Paid Time Off.

46.     In addition, the Debtors provide a set amount of paid time off to certain of their Employees (the "Paid Time Off"). Manufacturing and distribution Employees are granted six days after a three month wait. When an Employee elects to take Paid Time Off, that Employee is paid his or her regular hourly or salaried rate. Employees are required to use their Paid Time Off during the year that they earn it. Employees may not carry unused days into the next year; they are paid for unused days at the end of the W-2 year. The Debtors estimate that approximately $100,000 of earned but unused Paid Time Off has accrued as of the Petition Date.

### iv.     Bereavement Pay.

47.     The Debtors also offer bereavement pay to certain of their Employees (the "Bereavement Pay"). Bereavement Pay may be taken after three months of employment. Store managers and corporate Employees receive up to three days of regular pay for time off due to the death of an immediate family member. Crew Employees are granted up to three days of regular

19

pay for time off due to the death of an immediate family member if they work more than 38 hours per week. The Debtors estimate that the amount of earned but unused Bereavement Pay that has accrued as of the Petition Date is *de minimis*.

### E. 401(k) Retirement Plan.

48. The Debtors maintain a qualified defined contribution savings plan for the benefit of all eligible Employees meeting the requirements of section 401(a) and 401(k) of the Internal Revenue Code who have been employed for six consecutive months (the "401(k) Plan"). Approximately 6,100 Employees participate in the 401(k) Plan. The Debtors estimate that they withhold on average approximately $32,000 each week and $53,000 each semi-monthly period from such Employees' paychecks for 401(k) contributions. The 401(k) Plan permits the Debtors to make a discretionary percentage match contribution in an amount to be determined by the Debtors. As of January 1, 2010, the Debtors do not offer any matching benefits to Employees on account of the 401(k) Plan and do not plan to resume matching in the near future. Milliman Inc. ("Milliman") administers the 401(k) Plan. As of the Petition Date, the Debtors do not believe they owe any prepetition amounts to Milliman on account of Employee contributions to the 401(k) Plan.

### F. Employee Stock Plan.

49. Prior to the Petition Date, the Debtors also maintained an Employee stock plan (the "Employee Stock Plan") which was administered by the Board. Under the Employee Stock Plan, in the discretion of the Board, certain key Employees were granted options to purchase shares of non-voting common stock of debtor-affiliate Freeze Group Holding Corp. The Debtors are not seeking authority to honor obligations under the Employee Stock Plan at this time and reserve their rights with respect to the Employee Stock Plan.

20

### G. Life, Accident, and Disability Insurance.

50.     The Debtors provide certain corporate-level Employees with life, disability, and accident insurance coverage through CIGNA Group Insurance ("CIGNA Insurance"), as described below (collectively, the "Life, Disability, and Accident Insurance").

### i.     Life and Accidental Death and Dismemberment Insurance.

51.     The Debtors provide qualified Employees with term life insurance (the "Life Insurance Coverage"). This coverage generally provides payment of a certain percentage of the Employee's base pay up to a set maximum amount, depending on the Employees' level of employment, to an Employee's beneficiaries. As of the Petition Date, the Debtors provide Life Insurance Coverage to approximately 1,055 Employees. Further, Employees are also offered the opportunity to purchase supplementary voluntary life insurance coverage (the "Supplemental Life Insurance Coverage"). Premiums for the Supplemental Life Insurance Coverage are paid entirely by the electing Employee. The Debtors estimate that approximately 139 Employees have elected to purchase Supplemental Life Insurance Coverage.

52.     The Debtors also provide qualified Employees with accidental death and dismemberment insurance (the "AD&D Insurance Coverage"). This coverage generally provides payment of a certain percentage of the Employee's base pay up to a set maximum amount, depending on the Employee's level of employment, to an Employee or the Employee's beneficiaries. Benefits are determined by a set schedule depending on the severity of the disability. As of the Petition Date, the Debtors provide AD&D Insurance Coverage to approximately 1,055 Employees.

DOCS_DE:173752.1/68700.001

###### ii. Disability Benefits.

53.     The Debtors provide certain restaurant and corporate-level Employees with short term disability benefits ("Short-Term Disability Coverage"). Qualified Employees are eligible for Short Term Disability Coverage, which generally pays 60% of the Employee's base pay, upon sickness or other disability that prevents the Employee from performing the duties of his or her occupation. The Short Term Disability Coverage covers approximately 1,630 Employees.

54.     Further, the Debtors provide certain qualified Employees with long-term disability benefits (the "Long-Term Disability Coverage"). The Long-Term Disability Coverage pays 60% of the Employee's base pay up to 104 weeks or age 65, depending on the Employee's level of employment, in the event that an Employee is disabled for 90 consecutive days. The Long-Term Disability Coverage covers approximately 997 Employees.

55.     The Debtors pay approximately $34,000 per month to Pacific Life and CIGNA Insurance in premiums for Life, Disability, and Accident Insurance. As of the Petition Date, the Debtors owe approximately $25,000 in outstanding prepetition amounts to Pacific Life and CIGNA Insurance on account of the Life, Disability, and Accident Insurance.

### H.     Severance.

56.     In the ordinary course of business, the Debtors maintain a policy of offering severance payments to certain Employees who have been involuntarily terminated in connection with a business decision or other restructuring initiative (the "Severance Program"). There is no formal severance policy. Under the Severance Program, certain non-insider Employees, including information-technology and payroll Employees, are parties to prepetition severance agreements under which they will be entitled to severance payments postpetition upon

22

termination of their employment. Certain other employees may become parties to similar severance agreements postpetition (collectively, the "Severance Agreements").

57.    The Debtors believe it is critical to maintaining Employee morale and loyalty that they be authorized to continue providing severance benefits to Employees who do not qualify as "insiders," as that term is defined in section 101(31) of the Bankruptcy Code, in the ordinary course of business after the Petition Date, including the authority to enter into new Severance Agreements. The Debtors cannot afford for such Employees to leave their jobs while the Debtors continue to need their services during this critical process and there is no guarantee that the Debtors could attract new employees of comparable quality and character. Moreover, even if otherwise available, a new employee would lack the unique knowledge and historical perspective of the Debtors possessed by the Employees. By granting the relief requested herein, Employees are assured that they will have the same benefits available inside bankruptcy that they had prior to the Petition Date.

58.    As of the Petition Date, the Debtors owe approximately $300,000 to non-insider Employees who were terminated prior to the Petition Date on account of the Severance Program or other severance arrangements (the "Unpaid Severance"). The Debtors are not seeking authority to make any prepetition or postpetition payments to insiders on account of the Severance Program.[6]

---

[6]    To the extent the Debtors propose to make severance payments to any insiders, the Debtors will seek separate approval from this Court prior to making any such payments.

## Basis for Relief

**I.     Sufficient Cause Exists to Authorize the Debtors to Honor Employee Wage and Benefit Obligations.**

**A.     Certain of the Employee Wages and Benefits are Entitled to Priority Treatment.**

59.     Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle the majority of Unpaid Compensation and other Employee related obligations to priority treatment.  To confirm a chapter 11 plan, the Debtors must pay priority claims in full.  *See* 11 U.S.C. § 1129(a)(9)(B) (requiring payment of certain allowed unsecured claims for (a) wages, salaries, or commissions, including vacation, severance, and sick pay earned by an individual, and (b) contributions to an employee benefit plan).  Thus, granting the relief sought herein affects only the timing of payments to Employees, and does not negatively affect recoveries for general unsecured creditors.  Indeed, the Debtors submit that payment of Employee claims at this time enhances value for the benefit of all interested parties.

**B.     Payment of Certain of the Employee Wages and Benefits is Required by Law.**

60.     The Debtors also seek authority to pay Deductions and Payroll Taxes to the appropriate entities.  These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from Employees' paychecks.  Indeed, certain Deductions, including contributions to the Employee Benefits programs and child support and alimony payments, are not property of the Debtors' estates because the Debtors have withheld such amounts from Employees' paychecks on another party's behalf.  *See* 11 U.S.C. § 541(b).  Further, federal and state laws require the Debtors to withhold certain tax payments from Employees' paychecks and to pay such amounts to the appropriate taxing authority.  *See* 26 U.S.C. §§ 6672 and 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92,

24

95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes). Because the Deductions and Payroll Taxes are not property of the Debtors' estates, the Debtors request that the Court authorize them to transmit the Deductions and Payroll Taxes to the proper parties in the ordinary course of business.

61.     Similarly, state laws require the Debtors to maintain the Workers Compensation Program. If the Debtors fail to maintain the Workers Compensation Program, state laws may prohibit the Debtors from operating in those states. Payment of all workers compensation amounts, therefore, is crucial to the Debtors' continued operations.

## II.     Payment of the Employee Wages and Benefits is Warranted Under the Doctrine of Necessity.

62.     Courts generally acknowledge that it is appropriate to authorize the payment (or other special treatment) of prepetition obligations in appropriate circumstances. *See, e.g., In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (granting authority to pay prepetition wages); *see also Armstrong World Indus., Inc. v. James A. Phillips, Inc., (In re James A. Phillips, Inc.)*, 29 B.R. 391, 398 (S.D.N.Y. 1983) (granting authority to pay prepetition claims of suppliers who were potential lien claimants). In authorizing payments of certain prepetition obligations, courts have relied on several legal theories, rooted in sections 363(b) and 507 of the Bankruptcy Code.

63.     Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, debtors in possession are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners." *In re CoServ, L.L.C.*, 273

25

B.R. 487, 497 (Bankr. N.D. Tex. 2002). Implicit in the fiduciary duties of any debtor in possession is the obligation to "protect and preserve the estate, including an operating business's going-concern value." *Id.* Some courts have noted that there are instances in which a debtor can fulfill this fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." *Id.* The CoServ court specifically noted that the preplan satisfaction of prepetition claims would be a valid exercise of the debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate . . . ." *Id.*

64.     Consistent with a debtor's fiduciary duties, courts have also authorized payment of prepetition obligations under section 363(b) of the Bankruptcy Code where a sound business purpose exists for doing so. *See, e.g., In re Ionosphere Clubs*, 98 B.R at 175 (discussing prior order authorizing payment of prepetition wage claims pursuant to section 363(b); relief appropriate where payment was needed to "preserve and protect its business and ultimately reorganize, retain its currently working employees and maintain positive employee morale."); *see also Armstrong*, 29 B.R. at 397 (relying on section 363 to allow contractor to pay prepetition claims of suppliers who were potential lien claimants because the payments were necessary for general contractors to release funds owed to debtors). Specifically, the business judgment standard requires that a debtor "articulate some business justification, other than the mere appeasement of major creditors." *In re Ionosphere Clubs*, 98 B.R. at 175.

65.     In addition, the Court may authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code. Section 105(a) of the Bankruptcy Code, which codifies the inherent equitable powers of the bankruptcy court, empowers the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Under section 105(a),

courts may permit pre-plan payments of prepetition obligations when essential to the continued operation of the debtor's business. Specifically, the Court may use its power under section 105(a) to authorize payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity"). *In re NVR L.P.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992).

66.     The United States Court of Appeals for the Third Circuit recognized the "necessity of payment" doctrine in *In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981). The Third Circuit held that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor. *Id.* (stating a court may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"); *see also In re Motor Coach Indus. Int'l, Inc.*, No. 09-078, 2009 WL 330993, at *3 (D. Del. Feb. 10, 2009) (denying a stay pending appeal on the grounds that there is not a serious basis to challenge the doctrine of necessity in the Third Circuit); *In re Penn Cent. Transp. Co.*, 467 F.2d 100, 102 n.1 (3d Cir. 1972) (holding that the necessity of payment doctrine permits "immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims have been paid"); *In re Just for Feet, Inc.*, 242 B.R. 821, 824–845 (Bankr. D. Del. 1999) (noting that the Third Circuit permits debtors to pay prepetition claims that are essential to continued operation of business); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) (same).

67.     The necessity of payment doctrine is designed to foster a debtor's rehabilitation, which courts have recognized is "the paramount policy and goal of Chapter 11." *Id.*; *see also In re Just For Feet*, 242 B.R. at 826 (finding that payment of prepetition claims to certain trade

27

vendors was "essential to the survival of the debtor during the chapter 11 reorganization"); *In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code," but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of tool makers as "necessary to avert a serious threat to the Chapter 11 process"); *Burchinal v. Cent. Wash. Bank (In re Adams Apple, Inc.)*, 829 F.2d 1484, 1490 (9th Cir. 1987) (recognizing that allowance of "unequal treatment of pre-petition debts when necessary for rehabilitation . . ." is appropriate); *Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.)*, 80 B.R. 279, 287 (S.D.N.Y. 1987) (authorizing payment of prepetition worker's compensation claims on grounds that the fundamental purpose of reorganization and equity powers of bankruptcy courts "is to create a flexible mechanism that will permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately"); 3 COLLIER ON BANKRUPTCY, 105.04[5][a] (15th ed. rev. 2004) (discussing cases in which courts have relied on the "doctrine of necessity" or the "necessity of payment" rule to pay prepetition claims immediately).

68.     Courts also have permitted postpetition payment of prepetition claims pursuant to section 105(a) in other situations, such as if nonpayment of a prepetition obligation would trigger a withholding of goods or services essential to the debtors' business reorganization plan. *See In re Ionosphere Clubs*, 98 B.R. at 177 (finding that section 105 empowers bankruptcy

28

courts to authorize payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor).

69.     This flexible approach is particularly critical where prepetition creditors—here, the Employees and related third parties—provide vital goods or services to a debtor that would be unavailable if the debtor did not satisfy its prepetition obligations. For example, in *In re Structurlite Plastics Corp.*, 86 B.R. 922, 931 (Bankr. S.D. Ohio 1988), the bankruptcy court stated that "a bankruptcy court may exercise its equity powers under § 105(a) [of the Bankruptcy Code] to authorize payment of pre-petition claims where such payment is necessary 'to permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately.'" *Id.* (citation omitted). The court explained that "a per se rule proscribing the payment of pre-petition indebtedness may well be too inflexible to permit the effectuation of the rehabilitative purposes of the Code." *Id.* at 932.

70.     The Debtors submit that the relief requested represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates and is therefore justified under section 363(b), as well as under section 105(a) of the Bankruptcy Code and Bankruptcy Rule 6003. Paying prepetition wages, employee benefits and similar items will benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to continue without interruption. Indeed, the Debtors believe the without the relief requested herein being granted, their Employees may seek alternative opportunities, perhaps with the Debtors' competitors. Such a development would deplete the Debtors' workforce, thereby hindering the Debtors' ability to meet their customer obligations and, likely, diminishing stakeholder confidence in the Debtors' ability to successfully reorganize. The loss of valuable Employees and resulting recruiting of new personnel that would be necessary to find

29

replacements (and the costs attendant thereto) would be distracting at this crucial time when the Debtors need to focus on stabilizing their business operations. Accordingly, there can be no doubt that the Debtors must do their utmost to retain their workforce by, among other things, continuing to honor all wage, benefit and related obligations, including the wages and benefits that accrued prepetition.

71.     In addition, the majority of the Debtors' Employees rely exclusively on their compensation, benefits and reimbursement of expenses to satisfy their daily living expenses. Consequently, these Employees will be exposed to significant financial difficulties if the Court does not permit the Debtors to honor their Employee Wages and Benefits. Moreover, failure to satisfy such obligations will jeopardize Employee morale and loyalty at a time when Employee support is critical to the Debtors' businesses. Furthermore, if the Court does not authorize the Debtors to honor their various obligations under the insurance programs, the Employees will not receive health coverage and, thus, may become obligated to pay certain health care claims in cases where the Debtors have not paid the respective insurance providers. The loss of health care coverage will result in considerable anxiety for Employees (and likely attrition) at a time when the Debtors need such Employees to perform their jobs at peak efficiency. Similarly, if the Debtors are unable to pay the outstanding reimbursable expenses, Employees will be forced to shoulder a significant financial burden and will be reluctant to undertake essential business activities going forward that require them to incur out-of-pocket expenses, which could hamper the Debtors' reorganization. Additionally, as set forth above, Employee attrition would cause the Debtors to incur additional expenses to find appropriate and experienced replacements, severely disrupting the Debtors' operations at a critical juncture.

DOCS_DE:173752.1/68700.001

72. For all of the foregoing reasons, the relief requested herein will benefit the Debtors' estates and creditors by allowing the Debtors' business operations to continue without interruption. The importance of a debtor's employees to its operations has been recognized by courts in this district in granting relief similar to the relief requested herein. *See, e.g., In re Barnes Bay Dev., Ltd.*, No. 11-10792 (PJW) (Bankr. D. Del. Mar. 21, 2011); *In re Appleseed's Intermediate Holdings LLC*, No. 11-10160 (KG) (Bankr. D. Del. Feb. 18, 2011); *In re OTC Holdings Corp.*, No. 10-12636 (BLS) (Bankr. D. Del. Aug. 27, 2010); *In re Stallion Oilfield Servs. Ltd.*, No. 09-13562 (BLS) (Bankr. D. Del. Nov. 16, 2009); *In re Visteon Corp.*, No. 09-11786 (CSS) (Bankr. D. Del. May 29, 2009); *In re Masonite Corp.*, No. 09-10844 (PJW) (Bankr. D. Del. Apr. 14, 2009); *In re Portola Packaging, Inc.*, No. 08-12001 (CSS) (Bankr. D. Del. Aug. 29, 2008); *In re Hines Horticulture, Inc.*, No. 08-11922 (KJC) (Bankr. D. Del. Aug. 22, 2008); *In re Pierre Foods Inc.*, No. 08-11480 (KG) (Bankr. D. Del. July 16, 2008); *In re ACG Holdings, Inc.*, No. 08-11467 (CSS) (Bankr. D. Del. July 16, 2008); *In re Tropicana Entm't, LLC*, No. 08-10856 (KJC) (Bankr. D. Del. May 6, 2008); *In re Leiner Health Prods. Inc.*, No. 08-10446 (KJC) (Bankr. D. Del. Apr. 9, 2008); *In re Wickes Holdings, LLC*, No. 08-10212 (KJC) (Bankr. D. Del. Feb. 5, 2008); *In re Pope & Talbot, Inc.*, No. 07-11738 (CSS) (Bankr. D. Del. Nov. 21, 2007).[7]

III. **Cause Exists to Authorize the Debtors' Financial Institutions to Honor Checks and Electronic Fund Transfers.**

73. The Debtors have sufficient funds to remit the amounts described herein in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to debtor in possession financing. Also, under the Debtors' existing cash

---

[7] Because of the voluminous nature of the orders cited herein, such orders are not attached to this Motion. Copies of these orders are available upon request of the Debtors' counsel.

DOCS_DE:173752.1/68700.001

management system, the Debtors have made arrangements to readily identify checks or wire transfer requests as relating to an authorized payment in respect of the relief requested herein. Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently and the Court should authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor and pay any and all checks or wire transfer requests in respect of the relief requested herein.

## The Requirements of Bankruptcy Rule 6003 are Satisfied

74.     Pursuant to Bankruptcy Rule 6003, the Court may grant relief regarding a motion to pay all or part of a prepetition claim within 21 days after the Petition Date if the relief is necessary to avoid immediate and irreparable harm. Immediate and irreparable harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990) (discussing the elements of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001).

75.     Moreover, Bankruptcy Rule 6003 authorizes the Court to grant the relief requested herein to avoid harm to the Debtors' customers and other third parties. Unlike Bankruptcy Rule 4001, Bankruptcy Rule 6003 does not condition relief on imminent or threatened harm to the estate alone. Rather, Bankruptcy Rule 6003 speaks of "immediate and irreparable harm" generally. *Cf.* Bankruptcy Rule 4001(b)(2), (c)(2) (referring to "irreparable harm to the *estate*") (emphasis added). Indeed, the "irreparable harm" standard is analogous to the traditional standards governing the issuance of preliminary junctions. *See* 9 COLLIER ON BANKRUPTCY ¶ 4001.06[3] (discussing source of "irreparable harm" standard under Rule 4001(c)(2)). Courts will routinely consider third party interests when granting such relief.

32

*See, e.g., Capital Ventures Int'l v. Argentina*, 443 F.3d 214, 223 n.7 (2d Cir. 2006); *see also Linnemeir v. Bd. of Trs. of Purdue Univ.*, 260 F.3d 757, 761 (7th Cir. 2001).

76.     As described above, the Debtors' Employees are integral to their operations. Failure by the Debtors to satisfy their obligations with respect to their Employees in the ordinary course of business during these chapter 11 cases will jeopardize Employee loyalty and trust, possibly causing Employees to leave the Debtors' employ and severely disrupting the Debtors' operations at a critical juncture. Moreover, the Debtors' Employees rely on their compensation, benefits, and reimbursement of expenses to pay their living expenses and the effect could be financially ruinous if the Debtors cannot pay them in the ordinary course of business. Accordingly, the Debtors submit that they have satisfied the requirements of Bankruptcy Rule 6003 to support immediate payment of the Employee Wages and Benefits.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

77.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## Notice

78.     Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the agent for the Debtors' prepetition secured lenders and the agent for the Debtors' proposed postpetition debtor-in-possession financing facility; (c) the indenture trustee for the Debtors' prepetition unsecured noteholders; (d) the top 20 unsecured creditors; and (e) any party that may have a particular interest in this Motion. As this Motion is seeking "first

33

day" relief, within two business days of the hearing on this Motion, the Debtors will serve copies of this Motion and any order entered in respect to this Motion as required by Local Bankruptcy Rule 9013-1(m). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### **No Prior Request**

79.     No prior request for the relief sought in this Motion has been made to this or any other court.

*[Remainder of Page Intentionally Left Blank]*

DOCS_DE:173752.1/68700.001

WHEREFORE, the Debtors respectfully request that the Court enter an order granting the relief requested herein and granting such other and further relief as is just and proper.

Dated: October 5, 2011

Wilmington, Delaware

**PACHULSKI STANG ZIEHL & JONES LLP**

_Laura Davis Jones_

Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Kathleen P. Makowski (DE Bar No. 3648)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:     (302) 652-4100
Facsimile:      (302) 652-4400
Email:            ljones@pszjlaw.com
                      tcairns@pszjlaw.com
                      kmakowski@pszjlaw.com

- and -

James A. Stempel (*pro hac vice* admission pending)
Ross M. Kwasteniet (*pro hac vice* admission pending)
Jeffrey D. Pawlitz (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200
Email:            james.stempel@kirkland.com
                      ross.kwasteniet@kirkland.com
                      jeffrey.pawlitz@kirkland.com

*Proposed Co-Counsel to the Debtors
and Debtors in Possession*