**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| FRIENDLY ICE CREAM CORPORATION, *et al.*,[1] | ) Case No. 11-13167 (___) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO PAY CERTAIN PREPETITION CLAIMS (A) ARISING UNDER THE PERISHABLE AGRICULTURAL COMMODITIES ACT, (B) OF SHIPPERS, WAREHOUSEMEN, AND OTHER LIEN CLAIMANTS, AND (C) ARISING UNDER SECTION 503(B)(9) OF THE BANKRUPTCY CODE AND (II) GRANTING CERTAIN RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this motion (this "Motion") for the entry of an order (the "Order"), substantially in the form attached hereto as **Exhibit A**, authorizing the Debtors to pay (a) all claims arising, or of the type, under the Perishable Agricultural Commodities Act of 1930 ("PACA") to PACA vendors (the "PACA Vendors," whose claims shall be identified as "PACA Claims"), (b) prepetition claims of certain shippers and warehousemen (collectively, the "Shipping Vendors," whose claims shall be identified as the "Shipping Claims"), as well as other prepetition claims upon which a lien may arise (collectively, the "Lien Claimants," whose claims shall be identified as "Lien Claims"), and (c) all claims arising under section 503(b)(9) of the Bankruptcy Code (as

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Friendly Ice Cream Corporation (3130); Friendly's Restaurants Franchise, LLC (3693); Friendly's Realty I, LLC (2580); Friendly's Realty II, LLC (2581); and Friendly's Realty III, LLC (2583). The location of the Debtors' corporate headquarters and the Debtors' service address is: 1855 Boston Road, Wilbraham, Massachusetts 01095.

defined below), in the ordinary course of business as such claims come due.  In support of this

Motion, the Debtors respectfully state as follows.[2]

## Jurisdiction and Venue

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 105(a), 363,

503(b)(9), 507(a)(2), 1107(a), and 1108 of title 11 of the United States Code

(the "Bankruptcy Code"), Rule 6003 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules"), and Rule 9013-1(m) of the Local Rules of Bankruptcy Practice and

Procedure for the United States Bankruptcy Court for the District of Delaware (the "Local

Bankruptcy Rules").

## Relief Requested

4.      By this Motion, the Debtors seek entry of an order authorizing, but not directing,

the Debtors to pay the PACA Claims, Shipping Claims, Lien Claims, and claims arising under

section 503(b)(9) of the Bankruptcy Code.

## Background

5.      As described in the First Day Declaration, the Debtors are a leading full-service,

family-oriented restaurant chain and provider of ice cream products in the Eastern United States.

The Debtors' operations include approximately 490 restaurants located in 16 states.  In addition

---

[2]    The facts and circumstances supporting this Motion are set forth in the Declaration of Steven C. Sanchioni, Executive Vice President, Chief Financial Officer, Treasurer, and Assistant Secretary of Friendly Ice Cream Corporation, in Support of the Debtors' Chapter 11 Petitions and First Day Motions (the "First Day Declaration"), filed contemporaneously herewith.

DOCS_DE:173749.1/68700.001

to their restaurant operations, the Debtors manufacture a complete line of premium ice cream products distributed to more than 7,000 supermarkets and other third-party retail locations in 48 states. The Debtors and their affiliates maintain their national headquarters in Wilbraham, Massachusetts, and employ over 10,000 workers across the country. In the first eight months of 2011, the Debtors' generated $329.7 million in revenue and $8.6 million in adjusted EBITDA.

6.    In recent years, the restaurant industry—including the Debtors' businesses—has been hurt by the significant U.S. economic downturn and increased food costs. New advertising campaigns and cost-cutting programs implemented by the Debtors have successfully mitigated certain negative effects on their businesses; however, the Debtors have not been immune to the effects of the economy and rising food prices, and their financial performance has suffered significantly.

7.    As the Debtors' liquidity position deteriorated, the Debtors struggled to meet their debt service obligations and failed to satisfy financial covenants under their prepetition revolving credit agreement, resulting in a default. Prior to their chapter 11 filing, the Debtors successfully negotiated a forbearance agreement with their senior secured lenders and a further extension of credit under their prepetition subordinated secured note in order to explore available restructuring alternatives. After careful review and extensive negotiations, the Debtors determined that a chapter 11 filing, coupled with an expedited operational restructuring and an efficient sale of the Debtors' assets, was the best and most efficient way to maximize a return for the Debtors, their estates, and all parties in interest.

8.    On the date hereof (the "Petition Date"), each of the Debtors filed a petition with the Court under chapter 11 of the Bankruptcy Code to permit them to restructure their balance

3

sheets and operations to restore profitability. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated. Concurrently with the filing of this Motion, the Debtors have requested procedural consolidation and joint administration of these chapter 11 cases.

## The Prepetition Claims

9.     As described in detail below, various third parties may be able to assert liens against the Debtors' assets, including the PACA Vendors, Shipping Vendors, and Lien Claimants. In addition, due to the nature of the Debtors' businesses, certain vendors may possess claims entitled to administrative expense priority pursuant to section 503(b)(9) of the Bankruptcy Code.

**A.     PACA Claims.**

10.     To ensure that the Debtors continue to receive a constant supply of fresh fruits and vegetables postpetition, the Debtors seek authority to continue to pay in the ordinary course of business and consistent with their historical practices claims arising, or of the type, under PACA to those vendors who supply the Debtors with fruit and vegetables.[3]

---

[3]     Certain of the Debtors' vendors may also be eligible to assert claims under the Packers and Stockyards Act of 1921 as amended, 7 U.S.C. § 181 *et seq.* ("PASA"), which prescribes the conditions of operations for businesses dealing in livestock. PASA creates a statutory trust scheme which is virtually identical to PACA in respect of delivery of livestock and other eligible goods. *See In re W.L. Bradley Co.*, 75 B.R. 505, 509 (Bankr. E.D. Pa. 1987) ("The Legislative history expressly notes that the [PACA Trust] was modeled on the trust amendment to the Packers and Stockyards Act."). To the extent that any supplier claims fall under PASA, the Debtors submit that it is in the best interests of the Debtors' estates, creditors, and parties in interest to treat such claims in a manner identical to the claims of the PACA Vendors. Accordingly, for the purposes of this Motion and any related orders, any claims arising under PACA shall also incorporate any claims arising under PASA.

4

11. Congress enacted PACA to regulate the sale of "perishable agricultural commodities." 7 U.S.C. § 499a; *see Endico Potatoes, Inc. v. CIT Group/Factoring*, 67 F.3d 1063, 1067 (2d Cir. 1995). Under PACA, the term "perishable agricultural commodity" is generally defined as "fruits and fresh vegetables of every kind and character" "whether or not frozen or packed in ice." 7 U.S.C. § 499a(b)(4). PACA provides various protections to fresh fruit and vegetable sellers, including the establishment of a statutory constructive trust ("PACA Trust") consisting of a purchaser's entire inventory of food or other derivatives of perishable agricultural commodities, the products derived therefrom and the proceeds related to any sale of the commodities or products (collectively, the "PACA Trust Assets"). *See* 7 U.S.C. § 499e(c)(2). Assets subject to a PACA Trust are preserved as a non-segregated floating trust and may be commingled with non-trust assets. However, courts in this district and other districts have consistently held that PACA Trust Assets are not property of a debtor's estate.[4]

12. PACA requires that certain procedural steps be taken by a seller of perishable agricultural commodities in order to preserve its rights as a trust beneficiary. Specifically, a PACA Vendor must provide written notice (a "PACA Notice") to the purchaser of such goods and its intent to preserve the benefits of the PACA Trust. *See In re H.R. Hindle & Co.*, 149 B.R. 775, 785 (Bankr. E.D. Pa. 1993); *In re Richmond Produce Co.*, 112 B.R. 364 (Bankr. N.D. Cal. 1990). Written notice under PACA may be accomplished by either (a) including the statutorily-mandated language on the face of the vendor's invoices or (b) providing written notice to the purchaser of the PACA goods within 30 days after the time payment is due.

---

[4] Cases construing PACA consistently hold that PACA Trust Assets are not property of a debtor's estate under section 541 of the Bankruptcy Code. *See, e.g., Morris Okun, Inc. v. Harry Zimmerman, Inc.*, 814 F. Supp. 346, 348 (S.D.N.Y. 1993); *In re W.L. Bradley*, 75 B.R. at 513.

5

Beneficiaries of a PACA Trust that adhere to the statutory notice requirements are entitled to prompt payment from the PACA Trust Assets ahead of secured and unsecured creditors of a debtor's estate. *See "R" Best Prod., Inc. v. 646 Corp.*, No. 00-CV-8536, 2002 WL 31453909, at *1 (S.D.N.Y. Oct. 31, 2002). However, a PACA Vendor's failure to comply with the notice requirements renders its claim a general unsecured claim in a debtor's chapter 11 case. *See In re H.R. Hindle*, 149 B.R. at 786.

13.    PACA's application is limited to sales to commission merchants, brokers, and dealers. 7 U.S.C. § 499e(c). "Dealer," as such term is defined in PACA, is "any person engaged in the business of buying or selling in wholesale or jobbing quantities, as defined by the Secretary, any perishable agricultural commodity in interstate or foreign commerce." 7 U.S.C. § 499a(b).

14.    The Debtors believe that a certain portion of the goods purchased from vendors may qualify as "perishable agricultural commodit[ies]" under PACA. As a result, insofar as those vendors abide by the notice requirements of PACA, such vendor will be eligible to assert PACA Claims granting them priority ahead of all other secured and unsecured creditors in the Debtors' chapter 11 cases. Accordingly, payment of PACA Claims at this time will not prejudice or affect the amount available for distributions to other creditors of the Debtors. To ensure that the supply of fresh produce continues unimpeded, it is imperative that the Debtors be authorized to pay all prepetition and postpetition PACA Claims in the ordinary of business and consistent with their historical practices. As of the Petition Date, the Debtors estimate they owe holders of PACA Claims approximately $600,000 in the aggregate for PACA goods delivered

6

prior to the Petition Date; the Debtors expect to be invoiced for substantially all of this amount within 21 days following the Petition Date.

## B.    Shippers and Warehousemen.

15.    In the ordinary course of business, the Debtors contract with a number of certain third-party Shipping Vendors that arrange for the transportation and storage of goods that are essential to the Debtors' businesses and third-party warehouses that store such goods necessary for the day-to-day operation of the Debtors' businesses.  Such items include retail packaged goods, menus, and training materials.  Additionally, the Debtors maintain certain menu and training materials at specific vendor facilities for quick distribution to various training centers and restaurant locations.  Timely delivery of all of these items is vital to the Debtors' efforts to offer a quality, family-friendly dining experience for customers, to maintain quality standards under their franchise agreements, and to ensure that their operations run efficiently.

16.    To store inventory, the Debtors, or, in certain instances, a handful of third-party contractors, secure storage space with certain warehousemen.  The Debtors utilize these third-party warehouse facilities to store goods purchased and owned by the Debtors until the Debtors are able to incorporate those products into their restaurant and retail businesses.  The Debtors must have access to goods to ensure the continued seamless operation of their businesses.

17.    The Debtors believe that, as of the Petition Date, Shipping Vendors are holding Debtors' goods valued at approximately $2.5 million.  The Debtors estimate that, as of the Petition Date, the Shipping Vendors are owed approximately $700,000; the Debtors expect to be invoiced for substantially all of this amount within 21 days following the Petition Date.

7

## C.    Lien Claims.

18.    In the ordinary course of business, the Debtors engage a number of mechanics and other service providers to repair, maintain, and improve the Debtors' store front and restaurant premises.  In addition, under certain state laws, the Debtors' are required to post surety bonds in favor of all dairy vendors to secure payment for products purchased.  The Lien Claimants could potentially assert liens, including mechanic's liens, artisan's liens, and materialman's liens against the Debtors' property for amounts the Debtors owe to them, and, in addition, the dairy vendors could assert liens against their respective surety bonds if they are not paid prepetition amounts owed to them.  Pursuant to section 362(b)(3) of the Bankruptcy Code, the act of perfecting such mechanics' liens and similar liens, to the extent consistent with section 546(b) of the Bankruptcy Code, is expressly excluded from the automatic stay.  Under section 546(b) of the Bankruptcy Code, a debtor's lien avoidance powers "are subject to any generally applicable law that . . . permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection." 11 U.S.C. § 546(b)(1)(A).

19.    The Lien Claims related to maintenance activities constitute a significant portion of the estimated outstanding prepetition amounts owed to Lien Claimants.  If the Debtors are unable to pay these claims, they risk losing access to facilities and equipment that are critical to the continued operation of their businesses, which could immediately and irreparably harm their businesses to the detriment of all stakeholders.

20.    The Lien Claims related to purchased diary products constitute the remaining amount of the estimated outstanding prepetition amounts owed to Lien Claimants.  Given the nature of the Debtors' businesses, any disruption to their dairy supply likely would have a

8

devastating effect on operations, to the substantial detriment of all stakeholders. Accordingly, the Debtors seek authority to pay and discharge, on a case-by-case basis, Lien Claims that the Debtors believe have created, or could give rise to, a lien against the Debtors' property or equipment, regardless of whether such Lien Claimants have already perfected their interests. However, to the extent that the Debtors make any payments with respect to a Lien Claim, no such payment shall be deemed a waiver of the Debtors' rights to challenge the extent, validity, perfection, or possible avoidance of such liens.

21.     The Debtors estimate approximately $5.0 million in Lien Claims related to maintenance and $2.1 million in Lien Claims related to dairy vendors have accrued as of the Petition Date; the Debtors expect to be invoiced for substantially all of this amount within 21 days following the Petition Date.

**D.      Claims Arising Under Section 503(b)(9) of the Bankruptcy Code.**

22.     Certain vendors may be entitled to administrative expense priority under section 503(b)(9) of the Bankruptcy Code to the extent the Debtors received goods delivered within the twenty-day period prior to the Petition Date. Because the Debtors must pay such claims in full to confirm a plan of reorganization, the payment of these claims merely affects the timing of such payments, not the amount. The Debtors seek authority to pay the claims arising under section 503(b)(9) of the Bankruptcy Code in the ordinary course of business to the extent necessary to preserve the going-concern value of the chapter 11 estates. However, to the extent that the Debtors make any payments with respect to such a claim, no such payment shall be deemed a waiver of the Debtors' rights to challenge the extent, validity, perfection, or possible avoidance of such liens.

9

23.     The Debtors estimate approximately $8.5 million in claims arising under section 503(b)(9) of the Bankruptcy Code as of the Petition Date; the Debtors expect to be invoiced for substantially all of this amount within 21 days following the Petition Date.

24.     In sum, the Debtors are requesting the foregoing authority subject to the following caps:

|  | Estimated Payables as of the Petition Date | Relief Sought |
|---|---|---|
| PACA Claims | $600,000 | $600,000 |
| Shipping Claims | $700,000 | $700,000 |
| Lien Claims | $7.1 million | $7.1 million |
| Section 503(b)(9) Claims | $8.5 million | $8.5 million |

### Basis for Relief

**A.     Payment of the PACA Claims, Shipping Claims, and Lien Claims is Warranted Under the Doctrine of Necessity.**

25.     Courts generally acknowledge that, under appropriate circumstances, they may authorize a debtor to pay (or provide special treatment for) certain prepetition obligations. *See, e.g., In re Just for Feet, Inc.*, 242 B.R. 821, 824-25 (Bankr. D. Del. 1999) (noting that, in the Third Circuit, debtors may pay prepetition claims that are essential to the continued operation of the debtor's business); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (granting the debtor the authority to pay prepetition wages); *Armstrong World Indus., Inc. v. James A. Phillips, Inc., (In re James A. Phillips, Inc.)*, 29 B.R. 391, 398 (Bankr. S.D.N.Y. 1983) (granting the debtor the authority to pay prepetition claims of suppliers who were potential

10

lien claimants). When authorizing payments of certain prepetition obligations, courts have relied upon several legal theories rooted in sections 363(b) and 105(a) of the Bankruptcy Code.

26. Consistent with a debtor's fiduciary duties, where there is a sound business purpose for the payment of prepetition obligations, and where the debtor is able to "articulate some business justification, other than the mere appeasement of major creditors," courts have authorized debtors to make such payments under section 363(b) of the Bankruptcy Code. *See, e.g.*, *In re Ionosphere Clubs*, 98 B.R. at 175 (finding that a sound business justification existed to pay prepetition wages); *In re James A. Phillips, Inc.*, 29 B.R. at 397 (relying upon section 363 as a basis to allow a contractor to pay the prepetition claims of suppliers who were potential lien claimants).

27. Courts have also authorized payment of prepetition claims in appropriate circumstances pursuant to section 105(a) of the Bankruptcy Code. Section 105(a) of the Bankruptcy Code, which codifies the inherent equitable powers of the bankruptcy court, empowers the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Under section 105(a), courts may permit pre-plan payments of prepetition obligations when such payments are essential to the continued operation of the debtor's business and, in particular, where nonpayment of a prepetition obligation would trigger a withholding of goods or services essential to the debtors' business reorganization plan. *See In re UNR Indus.*, 143 B.R. 506, 520 (Bankr. N.D. Ill. 1992) (permitting the debtor to pay prepetition claims of suppliers or employees whose continued cooperation is essential to the debtors' successful reorganization); *In re Ionosphere Clubs*, 98 B.R. at 177 (finding that section 105 empowers bankruptcy courts to

11

authorize payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor).

28.     In addition to the authority granted a debtor in possession under sections 363(b) and 105(a) of the Bankruptcy Code, courts have developed the "doctrine of necessity" or the "necessity of payment" rule, which originated in the landmark case of *Miltenberger v. Logansport, C. & S.W.R. Co.*, 106 U.S. 286 (1882). Since *Miltenberger*, courts have expanded their application of the doctrine of necessity to cover instances of a debtor's reorganization, *see Dudley v. Mealey*, 147 F.2d 268, 271 (2d Cir. 1945) (holding, in a hotel reorganization matter, that the court was not "helpless" to apply the rule to supply creditors where the alternative was the cessation of operations), including the United States Court of Appeals for the Third Circuit, which recognized the doctrine in *In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981).

29.     In *In re Lehigh*, the Third Circuit held that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor. *Id.* (stating that a court may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"); *see also In re Penn Cent. Transp. Co.*, 467 F.2d 100, 102 n.1 (3d Cir. 1972) (holding that the necessity of payment doctrine permits "immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims have been paid"); *In re Just for Feet*, 242 B.R. at 824-25 (noting that debtors may pay prepetition claims that are essential to continued operation of business); *In re Colum. Gas Sys., Inc.*, 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) (same).

12

30.     The necessity of payment doctrine is designed to foster the rehabilitation of a debtor in reorganization cases, which courts have recognized is "the paramount policy and goal of Chapter 11." *In re Ionosphere Clubs*, 98 B.R. at 176; *In re Just For Feet*, 242 B.R. at 826 (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization."); *see also In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code", but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of tool makers as "necessary to avert a serious threat to the Chapter 11 process"); *Burchinal v. Cent. Wash. Bank (In re Adams Apple, Inc.)*, 829 F.2d 1484, 1490 (9th Cir. 1987) (finding that it is appropriate to provide for the "unequal treatment of pre-petition debts when [such treatment is] necessary for rehabilitation . . . ."); 3 COLLIER ON BANKRUPTCY ¶ 105.04[5][a] (15th ed. rev. 2004) (discussing cases in which courts have relied upon the "doctrine of necessity" or the "necessity of payment" rule to pay prepetition claims immediately).

31.     The Debtors submit that the relief requested represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates and is therefore justified under section 363(b), as well as under section 105(a) of the Bankruptcy Code and Bankruptcy Rule 6003. For the reasons set forth below, paying the PACA Claims, Shipping Claims, Lien Claims, and claims arising under section 503(b)(9) of the

13

Bankruptcy Code will benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to continue without interruption.

**B.     Payment of the PACA Claims, Shipping Claims, and Lien Claims Benefits These Estates.**

32.     The relief requested herein is appropriate and warranted under each of the above-described standards.  The authority to satisfy the PACA Claims, Shipping Claims, and Lien Claims in the initial days of these cases without disrupting their operations will send a clear signal to the marketplace, including key suppliers and customers, that the Debtors are willing and, importantly, able to conduct business as usual during their chapter 11 cases.

33.     The Debtors' operations also require the seamless coordination of many unrelated third-parties at every stage in the supply chain.  Collectively, the Debtors' supply chain ensures that the Debtors receive all of the food, products, and supplies necessary to operate their businesses and provide their customers with the high-quality food and ice cream expected under the Friendly's brand.  Any significant disruption in the Debtors' supply chain, such as a vendor halting delivery of certain necessary goods and/or services, could result in the Debtors' not having sufficient food, products, and supplies to operate their businesses.   Given the highly-competitive local and regional family restaurant and quick-service restaurant markets, such a result could cause a devastating impact on the Debtors' businesses and significantly impair their restructuring efforts.

34.     Moreover, Shipping Vendors and Lien Claimants may be entitled under applicable non-bankruptcy law to assert certain possessory liens on the Debtors' goods, merchandise, or finished products in their possession (notwithstanding the automatic stay under section 362 of the Bankruptcy Code) in an attempt to secure payment of their prepetition claim.

14

As described above, under section 362(b)(3) of the Bankruptcy Code, the act of perfecting such liens, to the extent consistent with section 546(b) of the Bankruptcy Code, is expressly excluded from the automatic stay.[5]  As a result, the Debtors anticipate that certain of the Shipping Vendors and Lien Claimants may assert and/or perfect liens, simply refuse to turn over goods in their possession, or stop performing their ongoing obligations.  Even absent a valid lien, to the extent certain Shipping Vendors or Lien Claimants have possession of the Debtors' inbound inventory or outbound products, mere possession or retention could severely disrupt the Debtors' operations.

## C.  Payment of Allowed PACA Claims In the Ordinary Course of Business Is Warranted.

35.    The prompt and full payment of PACA Claims should be authorized by this Court.  As described above, assets governed by PACA do not constitute property of the Debtors' estates.  *See In re Kornblum & Co.*, 81 F.3d 280, 284 (2d Cir. 1995); *Morris Okun, Inc. v. Harry Zimmerman, Inc.*, 814 F. Supp. 346, 348 (S.D.N.Y. 1993).  As a result, the distribution of assets to the holders of PACA Claims falls outside the priority scheme set forth in the Bankruptcy Code, and such holders are entitled to payment from the PACA Trust ahead of the Debtors' other creditors.  *See, e.g., In re Magic Rests., Inc.*, 205 F.3d 108, 110 (3d Cir. 2000); *Consumers Produce Co. v. Volante Wholesale Produce, Inc.*, 16 F.3d 1374, 1377-78 (3d Cir. 1994).  Moreover, the disposition of PACA Trust Assets is subject to the jurisdiction of the bankruptcy court.  *See Monterey Mushrooms, Inc. v. Carolina Produce Distribs., Inc.*, 110 B.R. 207, 209 (W.D.N.C. 1990); *Allied Growers Co-Op, Inc. v. United Fruit & Produce Co.*, 86 B.R. 14, 16

---

[5]    *See* 11 U.S.C. § 546(b)(1)(A) (a debtor's lien avoidance powers "are subject to any generally applicable law that . . . permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection").

(Bankr. D. Conn. 1988). Accordingly, the relief requested herein does not prejudice the Debtors' creditors or any party in interest in the chapter 11 cases.

36.     Furthermore, payment of allowed PACA Claims will inure to the benefit of the Debtors' estates by preserving goodwill between the Debtors and the PACA Vendors. Any delays in satisfying amounts owed to PACA Vendors could adversely affect the Debtors' ability to obtain fresh produce, thereby undercutting the Debtors' reorganization prospects. Failing to pay allowed PACA Claims in the ordinary course of business could subject the Debtors to numerous claims and adversary proceedings, including motions by PACA Vendors for relief from the automatic stay and/or injunctive relief, which would result in the unnecessary expenditure of time, effort, and money by the Debtors.

37.     Lastly, in certain circumstances, officers or directors of a corporate entity who are in a position to control trust assets but breach the fiduciary duty to preserve those assets may be held personally liable under PACA. *See Sunkist Growers, Inc. v. Fisher*, 104 F.3d 280, 283 (9th Cir. 1997); *see also Golman-Hayden Co., Inc. v. Fresh Source Produce, Inc.*, 217 F.3d 348, 350 (5th Cir. 2000) (court will inquire (a) whether the individual's involvement with the corporation was sufficient to establish legal responsibility and (b) whether the individual, in failing to exercise any appreciable oversight of the corporation's management, breached a fiduciary duty owed to the PACA creditors, to determine personal liability). Thus, to the extent that any valid obligations arising under PACA remain unsatisfied by the Debtors, the Debtors' officers and directors may be subject to lawsuits during the pendency of these chapter 11 cases. Any such lawsuit (and the ensuing potential liability) would distract the Debtors and their officers and directors in their attempt to implement a successful reorganization strategy and, moreover, could

16

lead to the assertion of substantial indemnification claims under the Debtors' governing documents, employment agreements, and applicable laws to the detriment of all of the Debtors' stakeholders.

38.     Courts in this district and other districts have granted similar relief with respect to the treatment of PACA Claims in other chapter 11 cases to the relief being requested herein. *See, e.g.*, *In re VI Acquisition Corp.*, No. 08-10623 (Bankr. D. Del. Apr. 4, 2008); *In re Buffets Holdings, Inc.*, No. 08-10141 (Bankr. D. Del. Feb. 13, 2008)*; In re The Great Atl. & Pac. Tea Co.*, No. 10-24549 (Bankr. S.D.N.Y. Dec. 15, 2010); *In re Uno Rest. Holdings Corp.*, No. 10-10209 (Bankr. S.D.N.Y. Jan. 20, 2010); *In re BI-LO, LLC*, No. 09-02140 (Bankr. D.S.C. Apr. 9, 2009); *In re Winn-Dixie Stores, Inc.,* No. 05-11063 (Bankr. S.D.N.Y. Mar. 22, 2005); *In re Bashas' Inc.*, No. 09-16050 (Bankr. D. Ariz. July 24, 2009).[6]

**D.     Paying the PACA Claims, Shipping Claims, and Lien Claims Now Will Not Affect Creditor Recovery.**

39.     The relief requested herein will not affect the recovery of creditors in these chapter 11 cases. As stated above, assets governed by PACA do not constitute property of the Debtors' estates. Holders of PACA Claims are entitled to payment from the PACA Trust ahead of the Debtors' other creditors. The Debtors' requested relief affects only the timing of the PACA Claims payment and will not prejudice the recovery of other creditors. Additionally, in instances where the amounts owed to Shipping Vendors or Lien Claimants is less than the value of the goods that could be held to secure a Shipping Claim or Lien Claim, such parties are arguably fully-secured creditors of the Debtors' estates. In such instances, payment now only

---

[6] Because of the voluminous nature of the orders cited herein, such orders are not attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

provides such parties with what they would be entitled to receive under a plan of reorganization, only without any interest costs that might otherwise accrue during these chapter 11 cases.

**E.    The Court Should Allow the Debtors to Pay Claims Arising Under Section 503(b)(9) of the Bankruptcy Code in the Ordinary Course of Business.**

40.    Certain vendors may be entitled to request an administrative expense priority claim under section 503(b)(9) of the Bankruptcy Code to the extent the Debtors received goods delivered within the twenty-day period prior to the Petition Date. *See* 11 U.S.C. § 503(b)(9) ("[a]fter notice and a hearing, there shall be allowed administrative expenses . . . including . . . the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business."). Indeed, because such claims are entitled to preferential status under section 503(b)(9) of the Bankruptcy Code, the Debtors must pay the claims in full to confirm a plan of reorganization. *See* 11 U.S.C. § 1129(a)(9)(A) (requiring payment in full of claims entitled to priority). Although section 503(b)(9) of the Bankruptcy Code does not specify a time for payment of these expenses, bankruptcy courts have the discretion to allow for distributions to administrative claimants prior to confirmation if the debtor has the ability to pay and there is a need to pay. Indeed, nothing in the Bankruptcy Code prohibits the Debtors from paying such claims sooner if they choose to do so, or this Court from exercising its discretion to authorize the postpetition payment of such obligations prior to confirmation of a chapter 11 plan.

41.    Thus, payment of claims arising under section 503(b)(9) affects the timing, but not the amount, of such payment. As a result, the Debtors respectfully submit that they should have the authority to pay such claims, in the ordinary course of business, during the pendency of the chapter 11 cases, to the extent necessary to preserve the going-concern value of the chapter

DOCS_DE:173749.1/68700.001

11 estates. Since the enactment of section 503(b)(9) of the Bankruptcy Code, courts in this

jurisdiction have exercised their discretion and have authorized the payment of prepetition claims

under section 503(b)(9) of the Bankruptcy Code at the outset of a chapter 11 case. *See, e.g.,*

*In re Stallion Oilfield Servs. Ltd.*, No. 09-13562 (Bankr. D. Del. Nov. 16, 2009); *In re Visteon*

*Corp.*, No. 09-11786 (Bankr D. Del. June 19, 2009); *In re Buffets Holdings, Inc.*, No. 08-10141

(Bankr. D. Del. Feb. 13, 2008); *In re Pope & Talbot, Inc.*, No. 07-11738 (Bankr. D. Del.

Nov. 21, 2007); *In re Tweeter Home Entm't Group, Inc.*, No. 07-10787 (Bankr. D. Del. June 13,

2007); *In re Pliant Corp.*, No. 06-10001 (Bankr. D. Del. Feb. 8, 2006); *In re Werner Holding Co.*

*(DE), Inc.*, No. 06-10578 (Bankr. D. Del. June 13, 2006); *In re Dura Auto. Sys., Inc.*, No. 06-

11202 (Bankr. D. Del. Oct. 31, 2006).[7] Indeed, in granting a request for similar relief, at least

one judge in this District asked an objecting United States Trustee, "[a]rguably, would you agree

that the debtor would be able to pay the 503(b)(9) claims without Court approval?" Transcript of

Hearing Held on Oct. 31, 2006, at 24:14-16, *In re Dura Auto.*, No. 06-11202 (approving payment

of claims under section 503(b)(9) of the Bankruptcy Code as part of "first day" relief).

### Cause Exists to Authorize the Debtors' Financial Institutions to Honor Checks and Electronic Fund Transfers.

42. The Debtors have sufficient funds to remit the amounts described herein in the

ordinary course of business by virtue of expected cash flows from ongoing business operations

and anticipated access to debtor in possession financing. Also, under the Debtors' existing cash

management system, the Debtors have made arrangements to readily identify checks or wire

transfer requests as relating to an authorized payment in respect of the relief requested herein.

---

[7] Because of the voluminous nature of the orders cited herein, such orders are not attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

DOCS_DE:173749.1/68700.001

Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently and the Court should authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor and pay any and all checks or wire transfer requests in respect of the relief requested herein.

**The Requirements of Bankruptcy Rule 6003 Are Satisfied**

43.    Under Bankruptcy Rule 6003, this Court may authorize the Debtors to satisfy the PACA Claims, Shipping Claims, Lien Claims, and claims arising under section 503(b)(9) of the Bankruptcy Code because such relief is necessary to avoid immediate and irreparable harm. Immediate and irreparable harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990) (discussing the elements of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001(c)(2)).

44.    As described above, and in the First Day Declaration, the continuity and viability of the Debtors' business operations relies heavily on the uninterrupted delivery of essential food, products, and supplies. The failure of any vendor to deliver essential food, products, or supplies or to render services to the Debtors would have immediate and detrimental consequences to their businesses and would decrease value to the detriment and prejudice of all of the Debtors' stakeholders. The Debtors cannot risk even the perception that their restaurants will offer anything but the highest level of food and beverage quality and quantity for the duration of these chapter 11 cases. Moreover, it is the Debtors' business judgment that continuation of their positive relationship with the PACA Vendors, Shipping Vendors, Lien Claimants, and holders of claims arising under section 503(b)(9) of the Bankruptcy Code is critical to their continued

20

operations and greatly increases the likelihood of a successful reorganization. Accordingly, the Debtors respectfully submit that the relief requested herein is necessary to avoid immediate and irreparable harm and, therefore, Bankruptcy Rule 6003 is satisfied.

## Satisfaction of Bankruptcy Rule 6004(a) and 6004(h)

45.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h)

## Notice

46.     Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known:  (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the agent for the Debtors' prepetition secured lenders and the agent for the Debtors' proposed postpetition debtor-in-possession financing facility; (c) the indenture trustee for the Debtors' prepetition unsecured noteholders; and (d) the top 20 unsecured creditors. As this Motion is seeking "first day" relief, within two business days of the hearing on this Motion, the Debtors will serve copies of this Motion and any order entered in respect to this Motion as required by Local Bankruptcy Rule 9013-1(m).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

47.     No prior request for the relief sought in this Motion has been made to this or any other court.

*[Remainder of Page Intentionally Left Blank]*

21

WHEREFORE, the Debtors respectfully request that the Court enter orders granting the relief requested herein and granting such other and further relief as is just and proper.

Dated: October 5, 2011
Wilmington, Delaware

**PACHULSKI STANG ZIEHL & JONES LLP**

Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Kathleen P. Makowski (DE Bar No. 3648)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400
Email:        ljones@pszjlaw.com
              tcairns@pszjlaw.com
              kmakowski@pszjlaw.com

- and -

James A. Stempel (*pro hac vice* admission pending)
Ross M. Kwasteniet (*pro hac vice* admission pending)
Jeffrey D. Pawlitz (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        james.stempel@kirkland.com
              ross.kwasteniet@kirkland.com
              jeffrey.pawlitz@kirkland.com

*Proposed Co-Counsel to the Debtors
and Debtors in Possession*