# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FRIENDLY ICE CREAM CORPORATION, *et al.*,[1] | ) | Case No. 11-13167 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## DEBTORS' MOTION FOR ENTRY OF (A) AN ORDER APPROVING BIDDING PROCEDURES AND NOTICE PROCEDURES AND (B) AN ORDER (I) APPROVING THE ASSET PURCHASE AGREEMENT, INCLUDING EXPENSE REIMBURSEMENT; (II) AUTHORIZING THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE ASSETS OF THE DEBTORS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS; (III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (IV) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this motion (this "Motion")[2] for the entry of an (a) order, substantially in the form attached hereto as **Exhibit A** (the "Bidding Procedures Order"), (i) approving bid and notice procedures (the "Bidding Procedures") and bid protections; and (b) an order, substantially in the form attached hereto as **Exhibit B** (the "Sale Order"), (i) approving an asset purchase agreement, substantially in the form attached hereto as **Exhibit C** (the "Asset Purchase Agreement"), for the sale of all of the assets of the Debtors to Sundae Group Holdings II, LLC (the "Purchaser"), or to the Successful Bidder to be identified at the Auction, (ii) authorizing the sale of all or

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Friendly Ice Cream Corporation (3130); Friendly's Restaurants Franchise, LLC (3693); Friendly's Realty I, LLC (2580); Friendly's Realty II, LLC (2581); and Friendly's Realty III, LLC (2583). The location of the Debtors' corporate headquarters and the Debtors' service address is: 1855 Boston Road, Wilbraham, Massachusetts 01095.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Asset Purchase Agreement, or the Bidding Procedures, as applicable.

substantially all of the assets of the Debtors free and clear of all liens, claims, encumbrances, and other interests (collectively, the "Claims and Interests"), and (iii) authorizing the assumption and assignment of certain executory contracts and unexpired leases (the "Assigned Contracts") to the Purchaser or the Successful Bidder. In support of this Motion, the Debtors respectfully state as follows.[3]

## Jurisdiction and Venue

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory bases for the relief requested herein are sections 105(a), 363, 365, 503 and 507 of the Bankruptcy Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Rules 2002, 3007, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 6004-1 and 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules").

## Background

4. As described in the First Day Declaration, the Debtors are a leading full-service, family-oriented restaurant chain and provider of ice cream products in the Eastern United States. The Debtors' operations include approximately 490 restaurants located in 16 states. In addition to their restaurant operations, the Debtors manufacture a complete line of premium ice cream

---

[3] The facts and circumstances supporting this Motion are set forth in the Declaration of Steven C. Sanchioni, Executive Vice President, Chief Financial Officer, Treasurer, and Assistant Secretary of Friendly Ice Cream Corporation, in Support of the Debtors' Chapter 11 Petitions and First Day Motions (the "First Day Declaration"), filed contemporaneously herewith.

2

products distributed to more than 7,000 supermarkets and other third party retail locations in 48 states. The Debtors and their affiliates maintain their national headquarters in Wilbraham, Massachusetts, and employ over 10,000 workers across the country. In the first eight months of 2011, the Debtors' generated $329.7 million in revenue and $8.6 million in adjusted EBITDA.

5.      In recent years, the restaurant industry—including the Debtors' businesses—has been hurt by the significant U.S. economic downturn and increased food costs. New advertising campaigns and cost-cutting programs implemented by the Debtors have successfully mitigated certain negative effects on their businesses; however, the Debtors have not been immune to the effects of the economy and rising food prices, and their financial performance has suffered significantly.

6.      As the Debtors' liquidity position deteriorated, the Debtors struggled to meet their debt service obligations and failed to satisfy financial covenants under their prepetition revolving credit agreement, resulting in a default. Prior to their chapter 11 filing, the Debtors successfully negotiated a forbearance agreement with their senior secured lenders and a further extension of credit under their prepetition subordinated secured note in order to explore available restructuring alternatives. After careful review and extensive negotiations, the Debtors determined that a chapter 11 filing, coupled with an expedited operational restructuring and an efficient sale of the Debtors' assets, was the best and most efficient way to maximize a return for the Debtors, their estates, and all parties in interest.

7.      On the date hereof (the "Petition Date"), each of the Debtors filed a petition with the Court under chapter 11 of the Bankruptcy Code to permit them to restructure their balance sheets and operations to restore profitability. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the

3

Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated. Concurrently with the filing of this Motion, the Debtors have requested procedural consolidation and joint administration of these chapter 11 cases.

**The Debtors' Efforts to Sell Substantially All of Their Assets and Raise New Financing**

8.     Prior to the Petition Date, the Debtors and their advisors explored multiple restructuring alternatives, including the sale of all or specific portions of the Debtors' operations, a new debt infusion, and a comprehensive restructuring of the Debtors' balance sheet. To assist the Debtors' board of directors in their evaluation of strategic alternatives, the Debtors retained investment banker Duff & Phelps Securities, LLC ("Duff & Phelps"). With the help of Duff & Phelps, the Debtors began to explore the sale of all or specific portions of the Debtors' operations, and developed a list of parties who they believed may potentially be interested in a purchase of the Debtors's assets and who the Debtors reasonably believed would have the financial resources to execute the purchase.

9.     The Purchaser is an affiliate of the holder (the "PIK Noteholder") of approximately $267.7 million in secured indebtedness under the Debtors' Subordinated Secured Promissory Note dated January 11, 2008 (the "Secured Promissory Note"). Purchaser indicated an interest in acquiring the Debtors' assets through a credit bid (by way of an assignment from the PIK Noteholder) of the secured debt holdings under the Secured Promissory Note. To facilitate an orderly sale process, an affiliate of Purchaser also agreed to fund the Debtors' postpetition financing needs, through a 100% participation in the Debtors' proposed senior secured debtor-in-possession credit agreement (the "DIP Credit Agreement"). The Debtors are separately seeking this Court's approval of the DIP Credit Agreement, which, if approved, will provide the Debtors with postpetition revolving loans and letter of credit capacity in a principal

4

amount not to exceed approximately $50.6 million on an interim basis and approximately $71.3 million on a final basis.

10.     To ensure the Debtors receive the highest and best offer for the sale of substantially all of their assets, the Debtors, together with Duff & Phelps, will launch a marketing process for the sale of the Debtors' assets and contact a number of potential strategic investors and financial investors that might be interested in purchasing the Debtors' assets. To the extent the Debtors receive competitive offers, based on certain qualification criteria described in detail below, the Debtors will host an auction to determine the highest and best bid for the Debtors' assets. The primary purpose of the sale process will be to provide for a sale of substantially all of the Debtors' assets and operations (the "Acquired Assets"), as a going concern, to the party that submits the highest and best offer in accordance with the Bidding Procedures (as defined more fully below).

**The Asset Purchase Agreement**

11.     As described above, the Debtors have been in extensive negotiations with the Purchaser regarding the terms of a possible acquisition. These negotiations culminated in the execution of the Asset Purchase Agreement with the Purchaser. The Debtors believe that, subject to the receipt of higher and better proposals through the Bidding Procedures, the Asset Purchase Agreement represents the best alternative currently available to the Debtors.

**The Proposed Expense Reimbursement**

12.     The Asset Purchase Agreement provides for an expense reimbursement of $1,000,000 (the "Expense Reimbursement"). As set forth in the Asset Purchase Agreement, the Expense Reimbursement is payable only in narrow circumstances. Specifically, all as further described in the Asset Purchase Agreement, if the Asset Purchase Agreement is terminated

5

pursuant to Section 11.1(b) or Section 11.1(c) of the Asset Purchase Agreement, then Purchaser shall be deemed to have earned the Expense Reimbursement.

### Bidding Procedures[4]

13.     The Debtors are in the process of soliciting bids for the Acquired Assets utilizing the Bidding Procedures, substantially in the form attached as **Exhibit 1** to the Bidding Procedures Order. The Bidding Procedures describe, among other things, the assets available for sale, the manner in which bids become "qualified," the coordination of diligence efforts among bidders and the Debtors, the receipt and negotiation of bids received, the conduct of any auction, and the selection and approval of the Successful Bidder. The price to be paid by the Successful Bidder for the Acquired Assets and the terms and conditions for the sale of such assets will be established at the Auction.

14.     The Bidding Procedures (as summarized below) were developed consistent with the Debtors' competing needs to conduct an expedited sale process, to promote participation and active bidding, and to comply with the terms and conditions of the DIP Credit Agreement. Moreover, the Bidding Procedures reflect the Debtors' objective of conducting the Auction in a controlled, but fair and open, fashion, while ensuring that the highest and best bid is generated for the Acquired Assets.

15.     The following sets forth a summary of the key provisions of the Bidding Procedures:

---

[4]     The summary of the Bidding Procedures contained in this Motion is qualified in its entirety by reference to the Bidding Procedures. Any conflict between the terms described in this Motion and the Bidding Procedures shall be resolved in favor of the Bidding Procedures. Moreover, per Local Rule 6004-1(b) and (c)(i), the Debtors are required to highlight certain provisions of this Motion. The Debtors have formatted (using bold and italics) every such required instance.

## Marketing Process

(a)  Contact Parties: The Debtors, in consultation with Duff & Phelps have developed a list of parties (in addition to the Stalking Horse Purchaser) who the Debtors believe may potentially be interested in and who the Debtors reasonably believe would have the financial resources to consummate a competing transaction for the Acquired Assets (any such transaction, an "Alternate Transaction"), which list includes both potential strategic investors and potential financial investors (each, individually, a "Contact Party", and collectively, the "Contact Parties"). The Debtors and Duff & Phelps will contact the Contact Parties to explore their interest in pursuing an Alternate Transaction. The Contact Parties may include parties whom the Debtors or their advisors have previously contacted regarding a transaction, regardless of whether such parties expressed any interest, at such time, in pursuing a transaction. The Debtors will continue to discuss and may supplement the list of Contact Parties throughout the marketing process, as appropriate.

(b)  Information Package: The Debtors may distribute to each Contact Party an "Information Package" comprising: The Debtors may distribute to each Contact Party an "Information Package," comprising:

  (i)  A cover letter;

  (ii)  A copy of these Bidding Procedures and the Motion;

  (iii)  A copy of a confidentiality agreement; and

  (iv)  Such other materials as the Debtors and Duff & Phelps deem appropriate under the circumstances including, but not limited to, preliminary "teaser" information.

(c)  Access to Diligence Materials: To participate in the bidding process and to receive access to due diligence (the "Diligence Materials"), a party must submit to the Debtors an executed confidentiality agreement in the form and substance satisfactory to the Debtors and evidence demonstrating the party's financial capability with respect to an Alternate Transaction as determined by the Debtors. A party who qualifies for access to Diligence Materials shall be a "Preliminary Interested Investor." All due diligence requests must be directed to Duff & Phelps. For any Preliminary Interested Investor who is a competitor of the Debtors or is affiliated with any competitor of the Debtors, the Debtors reserve the right to withhold any Diligence Materials that the Debtors, in their sole discretion, determine are business-sensitive or otherwise not appropriate for disclosure to such Preliminary Interested Investor.

(d)  Due Diligence from Bidders: Each Preliminary Interested Investor and Qualified Bidder (as defined below) shall comply with all reasonable requests for additional information and due diligence access by the Debtors or their advisors regarding such Bidder and its contemplated transaction. Failure by a Preliminary Interested

7

Investor to comply with requests for additional information and due diligence access will be a basis for the Debtors to determine that such bidder is not a Qualified Bidder. Failure by a Qualified Bidder (other than the Stalking Horse Purchaser) to comply with requests for additional information and due diligence access will be a basis for the Debtors to determine that a bid made by such Qualified Bidder is not a Qualified Bid.

## Auction Qualification Process

(a) To be eligible to participate in the Auction (defined below), each offer, solicitation or proposal (each, a "Bid"), and each party submitting such a Bid (each, a "Bidder"), must be determined by the Debtors to satisfy each of the conditions set forth below. A Bid will not be considered qualified for the Auction if such Bid does not satisfy each of the following conditions:

   (i) Good Faith Deposit: Each Bid must be accompanied by a deposit in the amount of $5,000,000 to an interest-bearing escrow account to be identified and established by the Debtors (the "Good Faith Deposit"). The Stalking Horse Purchaser shall not be required to submit a Good Faith Deposit.

   (ii) Bids for Portions of Debtors' Assets: A Bid may offer to purchase all or substantially all of the Debtors' assets or only a portion of the Debtors' assets; provided that the Debtors determine, in their sole discretion, that the aggregate consideration offered by any Bid or combination of Bids for all or substantially all of the Debtors' assets satisfies the "Minimum Bid" requirements set forth in clause (v) below.

   (iii) Same or Better Terms: Each Bid must be on terms that, in the Debtors' business judgment, are the same or better than the terms of the Asset Purchase Agreement.

   (iv) Executed Agreement: Each Bid must be based on the Asset Purchase Agreement and must include executed transaction documents, signed by an authorized representative of such Bidder, pursuant to which the Bidder proposes to effectuate an Alternate Transaction (the "Modified Asset Purchase Agreement"). A Bid shall also include a copy of the Asset Purchase Agreement marked against the Modified Asset Purchase Agreement to show all changes requested by the Bidder (including those related to purchase price and to remove all provisions that apply only to the Stalking Horse Purchaser as the stalking horse bidder such as the Expense Reimbursement provisions contained in the Asset Purchase Agreement).

   (v) Minimum Bid: A Bid of any combination of Bids for all or substantially all of the Debtors' assets must propose a minimum purchase price equal to or greater than $122,600,000 in cash, sufficient to satisfy:

8

a) the balance of the Debtors' postpetition debtor-in-possession financing facility in cash; ***plus***

b) the credit bid of the Stalking Horse Purchaser in cash; ***plus***

c) the Expense Reimbursement in cash; ***plus***

d) the Additional Employee Payment obligation in the Asset Purchase Agreement; ***plus***

e) $ 500,000 in cash.

(vi) <u>Designation of Assigned Contracts and Leases</u>: A Bid must identify any and all executory contracts and unexpired leases of the Debtors that the Bidder wishes to have assumed and assigned to it at closing (together with any Designation Right Contracts that may be assumed and assigned to it in accordance with the governing terms of any applicable asset purchase agreement) pursuant to an Alternate Transaction.

(vii) <u>Assumption of Liabilities</u>: A Bid must provide for the payment or assumption of at least all or substantially all of the Assumed Obligations (as defined in the Asset Purchase Agreement).

(viii) <u>Corporate Authority</u>: A Bid must include written evidence reasonably acceptable to the Debtors demonstrating appropriate corporate authorization to consummate the proposed Alternate Transaction; <u>provided</u> that, if the Bidder is an entity specially formed for the purpose of effectuating the Alternate Transaction, then the Bidder must furnish written evidence reasonably acceptable to the Debtors of the approval of the Alternate Transaction by the equity holder(s) of such Bidder.

(ix) <u>Proof of Financial Ability to Perform</u>: A Bid must include written evidence that the Debtors conclude in their sole discretion (in consultation with their advisors) demonstrates that the Bidder has the necessary financial ability to close the Alternate Transaction and provide adequate assurance of future performance under all contracts to be assumed and assigned in such Alternate Transaction. Such information must include, inter alia, the following:

9

a)    contact names and numbers for verification of financing sources;

b)    evidence of the Bidder's internal resources and proof of unconditional debt or equity funding commitments from a recognized banking institution in the amount of the cash portion of such Bid or the posting of an irrevocable letter of credit from a recognized banking institution issued in favor of the Debtors in the amount of the cash portion of such Bid, in each case, as are needed to close the Alternate Transaction;

c)    the Bidder's current financial statements (audited if they exist) or other similar financial information reasonably acceptable to the Debtors; and

d)    any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors demonstrating that such Bidder has the ability to close the Alternate Transaction.

(x)    <u>Contingencies</u>: Each Bid (a) may not contain representations and warranties, covenants, termination rights materially more onerous in the aggregate to the Debtors than those set forth in the Asset Purchase Agreement and (b) may not be conditioned on obtaining financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy in all material respects of specified representations and warranties at the Closing.

(xi)    <u>Irrevocable</u>: Each Bid must be irrevocable through the Auction, <u>provided</u> that if such Bid is accepted as the Successful Bid or the Backup Bid (each as defined herein), such Bid shall continue to remain irrevocable, subject to the terms and conditions of the Bidding Procedures.

(xii)    <u>Bid Deadline</u>: The following parties must receive a Bid in writing, on or before **November 24, 2011 at 4:00 p.m. (prevailing Eastern Time)** or such earlier date as may be agreed to by the Debtors (the "<u>Bid Deadline</u>"): (a) the Debtors, Friendly Ice Cream Corporation, 1855 Boston Road, Wilbraham, Massachusetts 01095, Attn: Robert K. Sawyer; (b) counsel for the Debtors, Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois, 60654, Attn: Ross M. Kwasteniet; (c) counsel to the Committee; (d) counsel to the Stalking Horse Purchaser, Morgan, Lewis & Bockius LLP, 1701 Market Street, Philadelphia, Pennsylvania 19103, Attn: David A. Gerson; (e) counsel to the DIP Agent, Paul Hastings LLP, 600 Peachtree Street, N.E., Suite 2400, Atlanta, Georgia 30308, Attn: Jesse H. Austin, III; and (f) Duff & Phelps, 55 E. 52nd Street, Floor 31, New York, New York 10055, Attn: Joshua Benn and 11150 Santa Monica Boulevard, Floor 6, Los Angeles, California 90025, Attn: Russ Belinsky.

*A Bid received from a Bidder before the Bid Deadline that meets the above requirements for the applicable assets shall constitute a "Qualified Bid" for such assets, and such Bidder shall constitute a "Qualified Bidder" for such assets.* Notwithstanding anything herein to the contrary, the Asset Purchase Agreement submitted by the Stalking Horse Purchaser shall be deemed a Qualified Bid, and the Stalking Horse Purchaser a Qualified Bidder. In addition, the Stalking Horse Purchaser will receive, from each Bidder, a copy of any Bids at the time such Bid is submitted to the Debtors. The Debtors shall inform counsel to the Stalking Horse Purchaser whether the Debtors will consider such Bids to be Qualified Bids no later than three (3) days prior to the Auction.

## Auction

If one or more Qualified Bids solely for the Debtors' assets (other than the Asset Purchase Agreement submitted by the Stalking Horse Purchaser) are received by the Bid Deadline, the Debtors will conduct an auction (the "Auction") to determine the highest and best Qualified Bid or combination of Qualified Bids for any of the Debtors' assets (including the Acquired Assets). This determination shall take into account any factors the Debtors reasonably deem relevant to the value of the Qualified Bid to the estates and may include, among other things, the following: (a) the amount and nature of the consideration; (b) the number, type, and nature of any changes to the Asset Purchase Agreement requested by each Bidder; (c) the extent to which such modifications are likely to delay closing of the sale or sales of the Debtors' assets and the cost to Sellers of such modifications or delay; (d) the total consideration to be received by Sellers; (e) the likelihood of the Bidder's ability to close a transaction and the timing thereof; and (f) the net benefit to the Debtors' estates, taking into account the Stalking Horse Purchaser's right to the Expense Reimbursement (collectively, the "Bid Assessment Criteria"). If no Qualified Bid (other than the Asset Purchase Agreement) is received by the Bid Deadline, the Debtors may determine not to conduct the Auction. Unless otherwise agreed to by the Stalking Horse Purchaser in its sole discretion, only Qualified Bidders may participate in the Auction.

## Procedures for Auction

The Auction shall take place on **December 1, 2011 at 9:00 a.m. (prevailing Eastern Time)** at the offices of counsel for the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, or such other place and time as the Debtors shall notify all Qualified Bidders, including, without limitation, the Stalking Horse Purchaser, the Committee, counsel for the Stalking Horse Purchaser and other invitees. The Auction shall be conducted according to the following procedures:

Only the Debtors and their counsel, members of the Committee and its counsel, the Stalking Horse Purchaser, the DIP Agent, the holder of the Debtors' subordinated secured promissory note, and any other Qualified Bidder, in each case, along with their representatives and counsel, shall attend the Auction in person, and only the Stalking Horse Purchaser, the DIP Agent, the holder of the Debtors' subordinated secured promissory note, and such other Qualified Bidders will be entitled to make any Bids at the Auction. The DIP Agent, on behalf of itself and any other lenders under the Debtors' postpetition debtor-in-possession financing facility and the Debtors' prepetition senior secured credit facility, and the holder of the Debtors'

K&E 19962600

subordinated secured promissory note each reserve the right to make a credit bid (pursuant to section 363(k) of the Bankruptcy Code or other applicable law) at the Auction.

(a) <u>The Debtors Shall Conduct the Auction</u>: The Debtors and their professionals shall direct and preside over the Auction. Other than as expressly set forth herein, the Debtors may conduct the Auction in the manner they determine will result in the highest, best, or otherwise financially superior offer for any of the Debtors' assets. At the start of the Auction, the Debtors shall describe the terms of the highest and best Qualified Bid or Qualified Bids received prior to the Bid Deadline, (each such highest and best Qualified Bid the "<u>Auction Baseline Bid</u>"). Each Qualified Bidder participating in the Auction must confirm that it (a) has not engaged in any collusion with respect to the bidding or sale of any of the assets described herein and (b) has reviewed and understands and accepts the Bidding Procedures.

(i) <u>Terms of Overbids</u>: An "<u>Overbid</u>" is any bid made at the Auction subsequent to the Debtors' announcement of the respective Auction Baseline Bid for such Auction. To submit an Overbid for purposes of this Auction, a Bidder must comply with the following conditions:

(ii) <u>Minimum Overbid Increments</u>: Any Overbid after and above the respective Auction Baseline Bid shall be made in increments valued at not less than $500,000. Additional consideration in excess of the amount set forth in the respective Auction Baseline Bid may include cash and/or noncash consideration and, in the case of a Bid by the Stalking Horse Purchaser, a credit bid of the Expense Reimbursement.

(iii) <u>Stalking Horse Purchaser May Credit Bid Expense Reimbursement</u>: The Stalking Horse Purchaser shall be permitted to bid at the Auction, if any, and shall be permitted to credit bid the full amount of the Expense Reimbursement pursuant to any Overbid in connection with each round of bidding in the Auction.

(iv) <u>Remaining Terms Are the Same as for Qualified Bids</u>: Except as modified herein, an Overbid at the Auction must comply with the conditions for a Qualified Bid set forth above, <u>provided, however,</u> that the Bid Deadline shall not apply. Any Overbid must remain open and binding on the Bidder until and unless the Debtors accept a higher Overbid.

At the Debtors' discretion, to the extent not previously provided (which shall be determined by the Debtors), a Bidder submitting an Overbid at any Auction must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors) demonstrating such Bidder's ability to close the Alternate Transaction proposed by such Overbid.

K&E 19962600

(v) <u>Announcement of Overbids</u>: The Debtors shall announce at the Auction the material terms of each Overbid, the basis for calculating the total consideration offered in each such Overbid.

(vi) <u>Consideration of Overbids</u>: The Debtors reserve the right, in their reasonable business judgment, to make one or more continuances of the Auction to, among other things: facilitate discussions between the Debtors and individual Bidders; allow individual Bidders to consider how they wish to proceed; and give Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors in their reasonable business judgment may require, that the Bidder has sufficient internal resources, or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed Alternate Transaction at the prevailing Overbid amount.

(b) <u>Backup Bidder</u>: Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted, the Bidder or Bidders with the next highest or otherwise best Bid or combination of Bids at the Auction, as determined by the Debtors, in the exercise of their business judgment, will be designated as the potential backup bidder (collectively, the "<u>Potential Backup Bidder</u>"). In the event that a Bidder or Bidders other than the Stalking Horse Purchaser are identified by the Debtors as the Potential Backup Bidder, such Bidder or Bidders shall be required to serve as the backup bidder or backup bidders (collectively, the "<u>Backup Bidder</u>"). If the Stalking Horse Purchaser is determined to be the Potential Backup Bidder, the Stalking Horse Purchaser may, in its sole discretion, elect not to serve as the Backup Bidder, and the Debtors may identify the Bidder or Bidders with the next highest or otherwise best Bid or combination of Bids, if any, as the Backup Bidder. The Backup Bidder shall be required to keep its initial Bid or combination of Bids (or if the Backup Bidder submitted one or more Overbids at the Auction, the final respective Overbid) (the "<u>Backup Bid</u>") open and irrevocable until the earlier of 5:00 p.m. (prevailing Eastern Time) on the date that is thirty (30) days after the date of the Auction (the "<u>Outside Backup Date</u>") or the closing of the transaction with the Successful Bidder (defined herein).

Following the Sale Hearing, if the Successful Bidder (defined herein) fails to consummate an approved transaction, because of a breach or failure to perform on the part of such Successful Bidder (defined herein), the Debtors may designate the Backup Bidder to be the new Successful Bidder (defined herein), and the Debtors will be authorized, but not required, to consummate the transaction or transactions, with the Backup Bidder without further order of the Bankruptcy Court. In such case, the defaulting Successful Bidder's deposit shall be forfeited to the Debtors, and the Debtors specifically reserve the right to seek all available damages from the defaulting Successful Bidder (defined herein). The deposit of the Backup Bidder shall be held by the Debtors until the earlier of 72 hours after (i) the closing of the transaction or transactions with the Successful Bidder (defined herein) and (ii) the Outside Backup Date.

13

(c)    Additional Procedures:  The Debtors may announce at the Auction additional procedural rules that are reasonable under the circumstances for conducting the Auction so long as such rules are not inconsistent in any material respect with the Bidding Procedures or the Asset Purchase Agreement.

(d)    Consent to Jurisdiction as Condition to Bidding:  The Stalking Horse Purchaser, all Qualified Bidders, and all Bidders at the Auction shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court to enter an order or orders, which shall be binding in all respects, in any way related to the Debtors, these chapter 11 cases, the Bidding Procedures, the Asset Purchase Agreement, the Auction, or the construction and enforcement of any Alternate Transaction Documents and waived any right to a jury trial in connection with any disputes relating to the Debtors, these chapter 11 cases, the Bidding Procedures, the Asset Purchase Agreement, the Auction, or the construction and enforcement of any Alternate Transaction Documents.

(e)    Sale Is As Is/Where Is:  The Acquired Assets or any other assets of the Debtors sold pursuant to the Bidding Procedures, shall be conveyed at Closing in their then-present condition, **"AS IS, WITH ALL FAULTS, AND WITHOUT ANY WARRANTY WHATSOEVER, EXPRESS OR IMPLIED."**

(f)    Closing the Auction:  The Auction shall continue until there is (a) only one Qualified Bid or combination of Qualified Bids for the Acquired Assets or any other assets of the Debtors sold pursuant to the Bidding Procedures that the Debtors determine in their reasonable business judgment, after consultation with their financial and legal advisors and the Committee, is the highest and best Qualified Bid or combination of Qualified Bids at the Auction for the respective assets.  Thereafter, the Debtors shall select one or more of such Qualified Bids, the combination of which produces the highest and best recovery to the estates, as the overall highest and best Qualified Bid or Bids (each such Bid a "Successful Bid," and each Bidder submitting such Successful Bid, a "Successful Bidder").  In making this decision, the Debtors, in consultation with their financial and legal advisors, shall consider the Bid Assessment Criteria.

The Auction shall close when each Successful Bidder for any such assets submits fully executed sale and transaction documents memorializing the terms of its respective Successful Bid.

Promptly following the Debtors' selection of the Successful Bid and the conclusion of the Auction, the Debtors shall announce the Successful Bid and Successful Bidder and shall file with the Bankruptcy Court notice of the Successful Bid and Successful Bidder.

The Debtors shall not consider any Bids submitted after the conclusion of the Auction.

14

(g)     Expense Reimbursement: Pursuant to the Bidding Procedures Order, the Stalking Horse Purchaser is entitled to the Expense Reimbursement, in an amount of up to $1,000,000, in accordance with the terms of the Asset Purchase Agreement and the Bidding Procedures Order. Pursuant to the Bidding Procedures Order, except for the Stalking Horse Purchaser, no other party submitting an offer or Bid or a Qualified Bid shall be entitled to any expense reimbursement, breakup fee, termination, or similar fee or payment.

## Return of Good Faith Deposit

The Good Faith Deposits of all Qualified Bidders shall be held in one or more interest-bearing escrow accounts by the Debtors, but shall not become property of the Debtors' estates absent further order of the Court. The Good Faith Deposit of any Qualified Bidder that is neither a Successful Bidder nor a Backup Bidder shall be returned to such Qualified Bidder not later than five (5) business days after the Sale Hearing. The Good Faith Deposit of each Backup Bidder, if any, shall be returned to the respective Backup Bidder on the date that is the earlier of 72 hours after (a) the closing of the transaction with the Successful Bidder or Successful Bidders (defined herein) for the assets bid upon by such Backup Bidder and (b) the Outside Backup Date. Upon the return of the Good Faith Deposits, their respective owners shall receive any and all interest that will have accrued thereon. If a Successful Bidder or Successful Bidders timely closes their winning transactions, their respective Good Faith Deposits shall be credited towards their respective purchase prices.

## Reservation of Rights

Except as otherwise provided in the Asset Purchase Agreement, the Bidding Procedures or the Sale Order, the Debtors further reserve the right as they may reasonably determine to be in the best interest of their estates, in consultation with the Committee, to: (a) determine which bidders are Qualified Bidders; (b) determine which Bids are Qualified Bids; (c) determine which Qualified Bid is the highest and best proposal and which is the next highest and best proposal; (d) reject any Bid that is (1) inadequate or insufficient, (2) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code or (3) contrary to the best interests of the Debtors and their estates; (e) waive terms and conditions set forth herein with respect to all potential bidders; (f) impose additional terms and conditions with respect to all potential bidders; (g) extend the deadlines set forth herein; (h) continue or cancel the Auction and/or Sale Hearing in open court without further notice; and (i) modify the Bidding Procedures or implement additional procedural rules that are reasonable under the circumstances for conducting the Auction so long as such rules are not inconsistent in any material respect with the Bidding Procedures or the Asset Purchase Agreement.

## Proposed Assumption Procedures

16.     To facilitate and effect the sale of the Acquired Assets, the Debtors seek authority

to assume and assign certain of the Debtors' executory contracts and unexpired leases (each a

"Contract or Lease" and, collectively, the "Contracts and Leases") designated in the Asset

Purchase Agreement, consistent with the procedures established in the Bidding Procedures Order and the Asset Purchase Agreement. The Debtors propose that the procedures set forth in the Bidding Procedures Order apply whether the Stalking Horse Purchaser or another party is the Successful Bidder.

17.     The proposed Assumption Procedures are as follows:

a)     **Notice**. As soon as practicable after entry of the Bidding Procedures Order, the Debtors will serve the notice attached as **Exhibit 3** to the Bidding Procedures Order (the "Cure Notice") on the Contract Parties.

b)     **Content of Cure Notice**. The Cure Notice will contain the following information: (i) the title of the Contract to be assumed; (ii) the name of the counterparty to the Contract; (iii) any applicable cure amounts, whether arising prepetition or postpetition (the "Cure Amount"); and (iv) the deadline by which any such Contract counterparty must object.

c)     **Objections**. Objections to the proposed Cure Amount and adequate assurance of future performance of obligations to the Contract Parties must: (i) be in writing; (ii) set forth the nature of the objector's claims against or interests in the Debtors' estates, and the basis for the objection and the specific grounds therefore; (iii) comply with the Bankruptcy Rules and the Local Bankruptcy Rules and Orders of this Court; and (iv) be filed with the Court and served upon the Debtors, the Stalking Horse Purchaser, and the U.S. Trustee, so as to be received no later than **4:00 p.m. (Eastern time) on November 24, 2011.**

d)     **Effects of Filing an Objection to a Cure Notice**. A properly filed and served objection to a Cure Notice will reserve such objecting party's rights against the Debtors with respect to the relevant cure objection, but will not constitute an objection to the remaining relief requested in the motion.

## Relief Requested

18.     The Debtors respectfully request the entry of (a) an order (i) approving the Bidding Procedures and the Bid Protections; and (b) an order (i) approving the sale of the Acquired Assets to the Purchaser or the Successful Bidder, (ii) authorizing the sale of all or

substantially all of the assets of the Debtors free and clear of all Claims and Interests and (iii) authorizing the assumption and assignment of the Assigned Contracts to the Purchaser or the Successful Bidder.

**Basis for Relief**

I.     **<u>The Bidding Procedures Are Appropriate and in the Best Interests of the Debtors, Their Estates, and Their Creditors.</u>**

   A.     **The Proposed Notice of the Bidding Procedures Is Appropriate.**

   19.     The Debtors seek to sell the Acquired Assets through a well-publicized sale and Auction. The Debtors and Duff & Phelps have developed a list of Contact Parties who will receive a copy of the Information Package, and will contact the Contact Parties to explore their interest in pursuing an Alternate Transaction. The list of Contact Parties was specifically designed to encompass those parties who the Debtors believe may be potentially interested in pursuing an Alternate Transaction and who the Debtors reasonably believe may have the financial resources to consummate an Alternate Transaction. The Bidding Procedures are designed to elicit bids from one or more parties and to encourage a robust auction of the Acquired Assets, maximizing the value for the Debtors' estates and their creditors.

   20.     Under Bankruptcy Rule 2002(a) and (c), the Debtors are required to notify creditors of the proposed sale of the Acquired Assets, including a disclosure of the time and place of any auction, the terms and conditions of a sale, and the deadline for filing any objections.

   21.     Therefore, in addition to the Contact Parties, the Debtors propose to publish the notice attached as **<u>Exhibit 2</u>** to the Bidding Procedures Order (the "<u>Sale Notice</u>") in *The Wall Street Journal*, national edition, within five business days after entry of the Bidding Procedures

17

Order. The Debtors will also serve the notice of this Motion on the Notice Parties (as defined below).

22.     The Debtors believe that the foregoing notice is sufficient to provide effective notice of the Bidding Procedures and the Auction to potentially interested parties in a manner designed to maximize the chance of obtaining the broadest possible participation in the Debtors' marketing process, while minimizing costs to the estates. Accordingly, the Debtors respectfully request that the Court find that the proposed notice procedures set forth in this Motion are sufficient, and that no other or further notice of the Bidding Procedures or the Auction is required.

### B.     The Bidding Procedures Are Appropriate and Will Maximize Value.

23.     Bidding procedures should be approved when they provide a benefit to the debtor's estate by maximizing the value of the debtor's assets. *See In re Edwards*, 228 B.R. 552, 361 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate.").

24.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (debtor in possession "had a fiduciary duty to protect and maximize the estate's assets"); *Official Comm. of Unsecured Creditors of Cybergenics, Corp v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003) (same); *Four B. Corp. v. Food Barn Stores, Inc. (In re Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand").

25.     To that end, courts uniformly recognize that procedures to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions. *See In re O'Brien Envtl. Energy, Inc.*,

18

181 F.3d 527, 537 (3d Cir. 1999); *see also Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (bidding procedures "encourage bidding . . . maximize the value of the debtor's assets").

26. The Debtors believe that the Bidding Procedures will establish the parameters under which the value of the Alternate Transaction may be tested at the Auction. The Bidding Procedures will increase the likelihood that the Debtors will receive the greatest possible consideration because they will ensure a competitive and fair bidding process.

27. The Debtors also believe that the Bidding Procedures will promote active bidding from seriously interested parties and will dispel any doubt as to the best and highest offer reasonably available for the Acquired Assets. The Bidding Procedures will allow the Debtors to conduct the Auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close an Alternate Transaction. The Debtors believe that the Bidding Procedures will encourage bidding, that they are consistent with other procedures previously approved by courts in this and other districts and that the Bidding Procedures are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings. *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d at 537; *see also In re Dura Auto. Sys., Inc.*, No. 06-11202 (Bankr. D. Del. July 14, 2007); *In re New Century TRS Holdings, Inc.*, No. 07-10416 (Bankr D. Del. Apr. 20, 2007); *In re Three A's Holdings, L.L.C.*, No. 06-10886 (Bankr. D. Del. Sept. 7, 2006).

28. Thus, the Bidding Procedures are reasonable, appropriate and within the Debtors' sound business judgment under the circumstances because the Bidding Procedures are designed to maximize the value to be received by the Debtors' estates.

### C. The Initial and Subsequent Overbids Are Appropriate.

29. One important component of the Bidding Procedures is the "overbid" provision. Once the Debtors determine the Auction Baseline Bid and hold the Auction, all *subsequent Overbids must be made in increments of at least $500,000 higher than the Auction Baseline Bid and then continue in minimum increments of at least $500,000 (the "Minimum Overbid"); provided that the Debtors shall retain the right to modify the bid increment requirements at the Auction.*

30. The Debtors believe that such Minimum Overbid is reasonable under the circumstances, and will enable the Debtors to maximize the value for such assets while limiting any chilling effect in the marketing process. The overbid increment is also consistent with such increments previously approved by courts in this District. *See In re Dura Auto. Sys., Inc.*, No. 06-11202 (Bankr. D. Del. July 24, 2007) (approving $750,000 increment); *In re New Century TRS Holdings, Inc.*, No. 07-10416 (Bankr D. Del. Apr. 20, 2007) (approving $500,000 increment); *In re Three A's Holdings, L.L.C.*, No. 06-10886 (Bankr. D. Del. Sept. 7, 2006) (approving $500,000 increment).

### D. The Expense Reimbursement is Reasonable and Appropriate.

31. The Expense Reimbursement was negotiated at arms'-length and in good faith and is necessary to secure the Purchaser's participation in the Debtors' sale process. Without the Purchaser's participation as a stalking horse bidder the Debtors would be unable to secure the proposed DIP financing. The Debtors have determined that pursuing a going-concern sale transaction is in the best interests of the Debtors, their creditors, and their estates, and therefore submit that agreeing to the Expense Reimbursement represents an appropriate exercise of the Debtors' business judgment.

K&E 19962600

32.     Bankruptcy courts have approved bidding incentives, including traditional breakup fees and expense reimbursement provisions, under the business judgment rule, which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment. *See, e.g., In re Integrated Res.*, 147 B.R. at 662 (approving termination fee plus reimbursement of expenses); *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may be "legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking"). The Debtors submit that the Expense Reimbursement is reasonable, legitimately necessary to convince the Purchaser to go forward with the Asset Purchase Agreement, and that granting the Expense Reimbursement represents a valid exercise of the Debtors' business judgment.

### E.     The Proposed Notice Procedures for the Assigned Contracts and the Identification of Related Cure Amounts Are Appropriate.

33.     As part of the Motion, the Debtors also seek authority under sections 105(a) and 365 to assume and assign the Assigned Contracts to the Successful Bidder. In addition, the Debtors request the authority to determine, within 210 days of the Petition Date, which of the Contracts that may be assigned but that are not included as Assigned Contracts (the "Designation Right Contracts") they will assume or reject, in accordance with the procedures detailed in the Asset Purchase Agreement. The Bidding Procedures specify the process by which the Debtors will serve Cure Notices and the procedures and deadline for counterparties to Assigned Contracts to file and serve Cure Amount Objections.

34.     Except as may otherwise be agreed to in the Successful Bid or by the parties to an Assigned Contract, at the closing of the sale, the Successful Bidder shall cure those defaults under the Assigned Contracts that need to be cured in accordance with section 365(b) of the

21

Bankruptcy Code, by (a) payment of the undisputed cure amount and/or (b) reserving amounts with respect to any disputed cure amounts.

## II. Approval of the Proposed Sale Transaction Is Appropriate and in the Best Interests of the Estates.

### A. The Sale of the Acquired Assets is Authorized by Section 363 of the Bankruptcy Code as a Sound Exercise of the Debtors' Business Judgment.

35. Section 363 of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property of the estate, courts routinely authorize sales of a debtor's assets if such sale is based upon the sound business judgment of the debtor. *See Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 174 (D. Del. 1991).

36. Courts typically consider the following factors in determining whether a proposed sale satisfies this standard: (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was given to interested parties; (c) whether the sale will produce a fair and reasonable price for the property; and (d) whether the parties have acted in good faith. *See In re Delaware & Hudson Ry. Co.*, 124 B.R. at 176; *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987).

37. A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve the value of assets for the estate, its creditors or interest holders. *See, e.g., In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143 (3d Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983).

K&E 19962600

38.     Furthermore, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). There is a presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." *In re Integrated Res.*, 147 B.R. at 656 (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code. Indeed, when applying the business judgment standard, courts show great deference to a debtor's business decisions. *See Pitt v. First Wellington Canyon Assocs. (In re First Wellington Canyon Assocs.)*, 1989 WL 106838, at *3 (N.D. Ill. 1989) ("Under this test, the debtor's business judgment . . . must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion.").

39.     The value of the Acquired Assets will be tested through the Auction pursuant to the Bidding Procedures. Consequently, the fairness and reasonableness of the consideration to be paid by the Successful Bidder ultimately will be demonstrated by adequate "market exposure" and an open and fair auction process — the best means for establishing whether a fair and reasonable price is being paid.

40.     Thus, the Debtors submit that the Asset Purchase Agreement with the Successful Bidder will constitute the highest and best offer for the Acquired Assets, and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative. As such, the Debtors' determination to sell the Acquired Assets through an Auction

23

process and subsequently to enter into the Asset Purchase Agreement with the Successful Bidder will be a valid and sound exercise of the Debtors' business judgment. The Debtors will submit evidence at the Sale Hearing to support these conclusions. Therefore, the Debtors request that the Court make a finding that the proposed sale of the Acquired Assets is a proper exercise of the Debtors' business judgment and is rightly authorized.

**B.     The Sale of the Acquired Assets Free and Clear of Claims and Interests Is Authorized by Section 363(f) of the Bankruptcy Code.**

41.     The Debtors further submit that it is appropriate to sell the Acquired Assets free and clear of all Claims and Interests, pursuant to section 363(f) of the Bankruptcy Code, with any such Claims and Interests attaching to the net sale proceeds of the Acquired Assets, as and to the extent applicable. Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests, and encumbrances if:

(a)     applicable nonbankruptcy law permits sale of such property free and clear of such interests;

(b)     such entity consents;

(c)     such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

(d)     such interest is in bona fide dispute; or

(e)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

42.     This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

43.     Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five (5) requirements will suffice to permit the sale of the

Acquired Assets "free and clear" of all Claims and Interests. *In re Dundee Equity Corp.*, 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. March 6, 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); *Citcorp Homeowners Servs., Inc. v. Eliot (In re Eliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same); *Michigan Emp't Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that section 363(f) of the Bankruptcy Code is written in the disjunctive; holding that the court may approve the sale "free and clear" provided at least one of the subsections of section 363(f) of the Bankruptcy Code is met).

44.     The Debtors believe that one or more of the tests of section 363(f) of the Bankruptcy Code will be satisfied with respect to the transfer of the Acquired Assets pursuant to the Asset Purchase Agreement.  In particular, the Debtors believe that at least section 363(f)(2) of the Bankruptcy Code will be met because each of the parties holding liens on the Acquired Assets, if any, will consent, or absent any objection to this Motion, will be deemed to have consented to, the sale and transfer of the Acquired Assets.[5]

45.     Any lienholder also will be adequately protected by having its liens, if any, attach to the sale proceeds received by the Debtors for the sale of the Acquired Assets to the Successful Bidder, in the same order of priority, with the same validity, force and effect that such creditor had prior to such sale, subject to any claims and defenses the Debtors and their estates may possess with respect thereto.   Accordingly, section 363(f) of the Bankruptcy Code

---

[5]     Notwithstanding anything to the contrary herein, the DIP Agent shall have consent rights to approve any Transaction that is not an Acceptable Sale Transaction (as defined in the DIP Order).

authorizes the sale and transfer of the Acquired Assets free and clear any such Claims and Interests.

**C. The Acquired Assets and Assigned Contracts Should Be Sold Free and Clear of Successor Liability.**

46. Under the terms of the Asset Purchase Agreement, the Successful Bidder likely will not be liable for any of the Debtors' liabilities as a successor to the Debtors' businesses or otherwise, unless expressly assumed. Extensive case law exists providing that claims against a winning bidder are directed to the proceeds of a free and clear sale of property and may not subsequently be asserted against a buyer.

47. Although section 363(f) of the Bankruptcy Code provides for the sale of assets "free and clear of any interests," the term "any interest" is not defined anywhere in the Bankruptcy Code. *Folger Adam Sec. v. DeMatteis/MacGregor JV*, 209 F.3d 252, 257 (3d Cir. 2000). In the case of *In re Trans World Airlines. Inc.*, 322 F.3d 283, 288-89 (3d Cir. 2003), the Third Circuit specifically addressed the scope of the term "any interest." The Third Circuit observed that while some courts have "narrowly interpreted that phrase to mean only in rem interests in property," the trend in modern cases is towards "a more expansive reading of 'interests in property' which 'encompasses other obligations that may flow from ownership of the property.'" *Id.* at 289 (citing 3 *Collier on Bankruptcy* 363.06[1]). As determined by the Fourth Circuit in *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 581-82 (4th Cir. 1996), a case cited approvingly and extensively by the Third Circuit in *Folger*, the scope of section 363(f) is not limited to in rem interests. Thus, the Third Circuit in *Folger* stated that *Leckie* held that the debtors "could sell their assets under § 363(f) free and clear of successor liability that otherwise would have arisen under federal statute." *Folger*, 209 F.3d at 258.

K&E 19962600

48.     Courts have consistently held that a buyer of a debtor's assets pursuant to a section 363 sale takes free from successor liability resulting from pre-existing claims. *See The Ninth Ave. Remedial Grp. v. Allis-Chalmers Corp.*, 195 B.R. 716, 732 (Bankr. N.D. Ind. 1996) (stating that a bankruptcy court has the power to sell assets free and clear of any interest that could be brought against the bankruptcy estate during the bankruptcy); *MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 837 F.2d 89, 93-94 (2d Cir. 1988) (channeling of claims to proceeds consistent with intent of sale free and clear under section 363(f) of the Bankruptcy Code); *In re New England Fish Co.*, 19 B.R. 323, 329 (Bankr. W.D. Wash. 1982) (transfer of property in free and clear sale included free and clear of Title VII employment discrimination and civil rights claims of debtor's employees); *In re Hoffman*, 53 B.R. 874, 876 (Bankr. D.R.I. 1985) (transfer of liquor license free and clear of any interest permissible even though the estate had unpaid taxes); *American Living Sys. v. Bonapfel (In re All Am. of Ashburn, Inc.)*, 56 B.R. 186, 190 (Bankr. N.D. Ga. 1986) (product liability claims precluded on successor doctrine in a sale of assets free and clear); *WBQ P'ship v. Va. Dept. of Med. Assistance Servs. (In re WBQ P'ship)*, 189 B.R. 97, 104-05 (Bankr. E.D. Va. 1995) (Commonwealth of Virginia's right to recapture depreciation is an "interest" as used in section 363(f)).[6]

49.     The purpose of an order purporting to authorize the transfer of the Acquired Assets would be frustrated if claimants thereafter could use the transfer as a basis to assert claims against the Successful Bidder.  Under section 363(f) of the Bankruptcy Code, the

---

[6]  Even courts concluding that section 363(f) of the Bankruptcy Code does not empower them to convey assets free and clear of claims have nevertheless found that section 105(a) of the Bankruptcy Code provides such authority. *See Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) (stating that the absence of specific authority to sell assets free and clear of liens poses no impediment to such a sale, as such authority is implicit in the court's equitable power when necessary to carry out the provisions of title 11).

Successful Bidder is entitled to know that the Acquired Assets are not infected with latent claims that will be asserted against the Successful Bidder after the proposed transaction is completed.

50.     *Accordingly, consistent with the above-cited case law, the order approving the sale of the Acquired Assets should state that the Successful Bidder is not liable as a successor under any theory of successor liability, for Claims or Interests that encumber or relate to the Acquired Assets.*

**D.      The Successful Bidder is a Good Faith Purchaser and is Entitled to the Full Protection of Section 363(m) of the Bankruptcy Code, and the Transfer and Sale of the Acquired Assets Does Not Violate Section 363(n) of the Bankruptcy Code.**

51.     Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). While the Bankruptcy Code does not define "good faith," the Third Circuit in *In re Abbotts Dairies of Pa., Inc.* held that:

> [t]he requirement that a [buyer] act in . . . good faith speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [proposed buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

788 F.2d at 147 (citation omitted).

52.     As such, a party would have to show fraud or collusion between the Successful Bidder and the Debtors or other Bidders to demonstrate a lack of good faith. *See Kabro Assocs. of West Islip, L.L.C. v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269, 276 (2d Cir. 1997) ("[t]ypically, the misconduct that would destroy a [buyer]'s good faith

28

status at a judicial sale involves fraud, collusion between the [buyer] and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders"); *see also In re Angelika Films, 57th, Inc.*, 1997 WL 283412, at *7 (S.D.N.Y. 1997); *In re Bakalis*, 220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998).

53.     By the time of execution of the Asset Purchase Agreement, the Debtors and the Successful Bidder will have engaged in thorough arms'-length negotiations over the terms of the Asset Purchase Agreement. In addition, the Successful Bidder will have complied with the terms and conditions of the Bidding Procedures Order.

54.     Moreover, in this case, there will be absolutely no fraud or improper insider dealing of any kind. The Debtors will ensure that the Asset Purchase Agreement does not constitute an avoidable transaction pursuant to section 363(n) of the Bankruptcy Code, and, as a result, the Successful Bidder should receive the protections afforded good faith purchasers by section 363(m) of the Bankruptcy Code. Accordingly, the Debtors request that the Court make a finding at the Sale Hearing that the Asset Purchase Agreement reached with the Successful Bidder was at arms-length and is entitled to the full protections of section 363(m) of the Bankruptcy Code.

**E.      Proposed Sale is Consistent with Section 363(b)(1)(A) of the Bankruptcy Code and the Debtors' Existing Privacy Policy.**

55.     Section 363(b)(1) of the Bankruptcy Code provides:

> The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate, except that if the debtor in connection with offering a product or a service discloses to an individual a policy prohibiting the transfer of personally identifiable information about individuals to persons that are not affiliated with the debtor and if such policy is in effect on the date of the commencement of the case, then the trustee may not sell or lease personally identifiable information to any person unless—

29

(A) such sale or such lease is consistent with such policy or

(B) after appointment of a consumer privacy ombudsman in accordance with section 332 [of the Bankruptcy Code], and after notice and a hearing, the court approves such sale or such lease

56.     The sale of the Acquired Assets is consistent with the Debtors' existing privacy policy. Accordingly, the Court should authorize the Debtors' sale of the Acquired Assets without requiring the appointment of a consumer privacy ombudsman.

### F.     Credit Bidding Should Be Authorized under Section 363(k) of the Bankruptcy Code.

57.     A secured creditor is allowed to "credit bid" the amount of its claim in a sale. Section 363(k) of the Bankruptcy Code provides, in relevant part, that unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of the sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property." 11 U.S.C. § 363(k). Even if a secured creditor is undersecured as determined in accordance with section 506(a) of the Bankruptcy Code, section 363(k) allows such secured creditor to bid the total face value of its claim and does not limit the credit bid to the claim's economic value. *See Cohen v. KB Mezzanine Fund II, LP (In re Submicron Sys. Corp.)*, 432 F.3d 448, 459-60 (3d Cir. 2006) (explaining that "[i]t is well settled among district court and bankruptcy courts that creditors can bid the full face value of their secured claims under section 363(k)").

*58.*     The Purchaser, by way of an assignment from the PIK Noteholder, is entitled to credit bid some or all of the claims for the PIK Noteholder's collateral pursuant to section 363(k) of the Bankruptcy Code. *Because the PIK Noteholder holds claims that are secured by substantially all of the Acquired Assets, and the PIK Noteholder has assigned Purchaser the right to credit bid its secured claims, the Purchaser should be allowed to credit bid the face*

30

*value of any of PIK Noteholder's secured claims in order to effectuate the transactions under the Asset Purchase Agreement.*

> **G.** **Assumption and Assignment of the Assigned Contracts Is Authorized by Section 365 of the Bankruptcy Code.**

59.     Sections 365(a) and (b) of the Bankruptcy Code authorize a debtor in possession to assume, subject to the court's approval, executory contracts or unexpired leases of the debtor. Under section 365(a) of the Bankruptcy Code, a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing that:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee —
>
> > (A)    cures or provides adequate assurance that the trustee will promptly cure, such default . . .;
> >
> > (B)    compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
> >
> > (C)    provide adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(l).

60.     The standard applied by the Third Circuit in determining whether an executory contract or unexpired lease should be assumed is the "business judgment" test, which requires a debtor to determine that the requested assumption or rejection would be beneficial to its estate. *See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984) (describing business judgment test as "traditional") (superceded in part by 11 U.S.C. § 1113).

61.    Courts generally will not second-guess a debtor's business judgment concerning the assumption of an executory contract. *See In re Decora Indus., Inc.*, 2002 WL 32332749, at *8 (D. Del. 2002); *Official Comm. for Unsecured Creditors v. Aust (In re Network Access Solutions, Corp.*, 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule"); *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard"); *see also Phar Mor, Inc. v. Strouss Bldg. Assocs.*, 204 B.R. 948, 952 (N.D. Ohio 1997) ("Courts should generally defer to a debtor's decision whether to reject an executory contract.") (citation omitted).[7]

62.    In the present case, the Debtors' assumption and assignment of the Assigned Contracts to the Successful Bidder will meet the business judgment standard and satisfies the requirements of section 365 of the Bankruptcy Code.    As discussed above, the transactions contemplated by the Asset Purchase Agreement will provide significant benefits to the Debtors' estates.    Because the Debtors cannot obtain the benefits of any Asset Purchase Agreement without the assumption of the Assigned Contracts, the assumption of these Assigned Contracts is undoubtedly a sound exercise of the Debtors' business judgment.

63.    Further, a debtor in possession may assign an executory contract or an unexpired lease of the debtor if it assumes the agreement in accordance with section 365(a) of the Bankruptcy Code, and provides adequate assurance of future performance by the assignee, whether or not there has been a default under the agreement. *See* 11 U.S.C. § 365(f)(2).

---

[7]    Further, "[n]othing in the Code suggests that the debtor may not modify its contracts when all parties to the contracts consent." *In re Network Access Solutions, Corp.*, 330 B.R. at 74 (citations omitted). While "[s]ection 363 of the Bankruptcy Code allows a debtor to . . . modify contracts . . . [t]o the extent they are outside the ordinary course of business, court approval is necessary." *Id.*  Regardless, "[t]here is . . . no discernable difference in the notice requirements or standard for approval under section 363 or 365." *Id.*

K&E 19962600

Significantly, among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g., In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (stating that adequate assurance of future performance is present when the prospective assignee of a lease from the debtor has financial resources and has expressed willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding).

64.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *EBG Midtown South Corp. v. McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.)*, 139 B.R. 585, 592 (S.D.N.Y. 1992) (citations omitted), *aff'd*, 993 F.2d 300 (2d Cir. 1993); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

65.     Pursuant to the Bidding Procedures, the Debtors will require potential Bidders to provide evidence constituting adequate assurance of future performance, to be provided to counterparties to Assigned Contracts upon their request.     Moreover, counterparties to Assigned Contracts will have the opportunity to object to adequate assurance of future performance by any of the Bidders.     Accordingly, the Debtors submit that the assumption and assignment of the Assigned Contracts as set forth herein should be approved.

66.     In addition, under section 365(d)(4), the Debtors are allotted an initial 120-day period to assume or reject nonresidential real property leases.     A court may grant an extension of up to an additional 90 days after the initial 120-day period for cause shown.     Courts have recognized the benefits to granting additional time under section 365(d)(4) of the Bankruptcy Code. *See, e.g., In re Channel Home Ctrs., Inc.*, 989 F.2d 682, 687-88 (3d Cir. 1993), *cert.*

K&E 19962600

*denied*, 510 U.S. 865 (1993). As the Third Circuit Court of Appeals has stated, "nothing prevents a bankruptcy court from granting an extension because a particular debtors needs additional time to determine whether the assumption or rejection of particular leases is called for by the plan of reorganization that it is attempting to develop." *Channel Home Ctrs.*, 989 F.2d at 689. Here, the Debtors' request to determine within 210 days of the Petition Date which of the Designation Right Contracts to assume or reject is appropriate where the Debtors require additional time to determine whether the assumption or rejection of certain leases is in the best interest of the Debtors' and their estates.

67. To assist in the assumption, assignment and sale of the Assigned Contracts, the Debtors also request that the Sale Order provide that anti-assignment provisions in the Assigned Contracts shall not restrict, limit or prohibit the assumption, assignment and sale of the Assigned Contracts and are deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

68. Section 365(f)(1) of the Bankruptcy Code permits a debtor to assign unexpired leases and contracts free from such anti-assignment restrictions, providing, in pertinent part, that:

> [N]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection . . . .

11 U.S.C. § 365(f)(1).

69. Section 365(f)(1) of the Bankruptcy Code, by operation of law, invalidates provisions that prohibit, restrict, or condition assignment of an executory contract or unexpired lease. *See, e.g., Coleman Oil Co., Inc. v. The Circle K Corp. (In re The Circle K Corp.)*, 127 F. 3d 904, 910-11 (9th Cir. 1997) ("no principle of bankruptcy or contract law precludes us from permitting the Debtors here to extend their leases in a manner contrary to the leases' terms, when

34

to do so will effectuate the purposes of section 365") *cert. denied*, 522 U.S. 1148 (1998). Section 365(f)(3) of the Bankruptcy Code goes beyond the scope of section 365(f)(1) of the Bankruptcy Code by prohibiting enforcement of any clause creating a right to modify or terminate the contract or lease upon a proposed assumption or assignment thereof. *See, e.g., In re Jamesway Corp.*, 201 B.R. 73 (Bankr. S.D.N.Y. 1996) (section 365(f)(3) of the Bankruptcy Code prohibits enforcement of any lease clause creating right to terminate lease because it is being assumed or assigned, thereby indirectly barring assignment by debtor; all lease provisions, not merely those entitled anti-assignment clauses, are subject to court's scrutiny regarding anti-assignment effect).

70.    Other courts have recognized that provisions that have the effect of restricting assignments cannot be enforced. *See In re Rickel Home Ctrs., Inc.*, 240 B.R. 826, 831 (D. Del. 1998) ("In interpreting Section 365(f) [sic], courts and commentators alike have construed the terms to not only render unenforceable lease provisions which prohibit assignment outright, but also lease provisions that are so restrictive that they constitute de facto anti-assignment provisions."). Similarly, in *In re Mr. Grocer, Inc.*, the court noted that:

> [the] case law interpreting § 365(f)(l) of the Bankruptcy Code establishes that the court does retain some discretion in determining that lease provisions, which are not themselves ipso facto anti-assignment clauses, may still be refused enforcement in a bankruptcy context in which there is no substantial economic detriment to the landlord shown, and in which enforcement would preclude the bankruptcy estate from realizing the intrinsic value of its assets.

77 B.R. 349, 354 (Bankr. D.N.H. 1987). Thus, the Debtors request that any anti-assignment provisions be deemed not to restrict, limit or prohibit the assumption, assignment and sale of the Assigned Contracts and be deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

35

## H. Relief Under Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate.

71.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 10 days after the entry of the order, unless the court orders otherwise." Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign and executory contract or unexpired lease . . . is stayed until the expiration of 10 days after the entry of the order, unless the court orders otherwise." The Debtors request that any order approving the Asset Purchase Agreement and assumption and assignment of the Assigned Contracts be effective immediately by providing that the ten-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

72.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the ten-day stay period, the leading treatise on bankruptcy suggests that the ten-day stay should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to procedure." 10 *Collier on Bankruptcy* ¶ 6004.10 (15th rev. ed. 2006). Furthermore, *Collier* suggests that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

73.     *To maximize the value received for the Acquired Assets, the Debtors seek to close the transactions contemplated by the Asset Purchase Agreement as soon as possible after the Sale Hearing. Accordingly, the Debtors respectfully request that the Court waive the ten-day stay period under Bankruptcy Rules 6004(h) and 6006(d).*

36

## **Notice**

74.     Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the agent for the Debtors' prepetition secured lenders and the agent for the Debtors' proposed postpetition debtor-in-possession financing facility; (c) the indenture trustee for the Debtors' prepetition unsecured noteholders; (d) the top 20 unsecured creditors; and (e) any party that may have a particular interest in this Motion. Following the first day hearing in this case, this Motion will be served on those persons who have requested notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure. The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

## **No Prior Request**

75.     No prior request for the relief sought in this Motion has been made to this or any other court.

*[Remainder of Page Intentionally Left Blank]*

K&E 19962600

WHEREFORE, for the reasons set forth herein and in the First Day Declaration, the Debtors respectfully request that the Court enter (a) an order approving the Bidding Procedures and the Expense Reimbursement; (b) an order (i) approving the Asset Purchase Agreement between the Debtors and the Successful Bidder to acquire the Acquired Assets, (ii) authorizing the sale of the Acquired Assets free and clear of all Claims and Interests, and (iii) authorizing the assumption and assignment of the Assigned Contracts to the Successful Bidder; and (c) granting such other and further relief as is just and proper.

Dated: October 5, 2011
      Wilmington, Delaware

PACHULSKI STANG ZIEHL & JONES LLP

_____

Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Kathleen P. Makowski (DE Bar No. 3648)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:   (302) 652-4100
Facsimile:   (302) 652-4400
Email:   ljones@pszjlaw.com
          tcairns@pszjlaw.com
          kmakowski@pszjlaw.com

- and -

James A. Stempel (*pro hac vice* admission pending)
Ross M. Kwasteniet (*pro hac vice* admission pending)
Jeffrey D. Pawlitz (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:   (312) 862-2200
Email:   james.stempel@kirkland.com
          ross.kwasteniet@kirkland.com
          jeffrey.pawlitz@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*