# EXHIBIT C

**Asset Purchase Agreement**

ASSET PURCHASE AGREEMENT

dated as of October _____, 2011

among

SUNDAE GROUP HOLDINGS II, LLC

and

FRIENDLY ICE CREAM CORPORATION

and

THE OTHER SELLERS NAMED HEREIN

**TABLE OF CONTENTS**

Page

ARTICLE 1    DEFINITIONS......................................................................................1

    1.1    Certain Terms Defined..........................................................................1
    1.2    Interpretation......................................................................................11

ARTICLE 2    PURCHASE AND SALE OF THE ACQUIRED ASSETS .......................11

    2.1    Purchase and Sale of Assets................................................................11
    2.2    Excluded Assets..................................................................................12
    2.3    Assumption of Liabilities....................................................................13
    2.4    Excluded Liabilities ...........................................................................14
    2.5    Assignment and Assumption of Contracts............................................17
    2.6    Excluded Asset Amendments..............................................................19

ARTICLE 3    CONSIDERATION ...............................................................................19

    3.1    Purchase Price....................................................................................19
    3.2    Allocation of Purchase Price...............................................................20

ARTICLE 4    REPRESENTATIONS AND WARRANTIES OF SELLERS....................20

    4.1    Organization.......................................................................................20
    4.2    Authorization of Agreement ...............................................................20
    4.3    Conflicts; Consents of Third Parties....................................................21
    4.4    Title to Acquired Assets .....................................................................22
    4.5    Contracts ...........................................................................................22
    4.6    Property..............................................................................................22
    4.7    Intellectual Property...........................................................................22
    4.8    Taxes.................................................................................................22
    4.9    Employee Benefit Plans......................................................................23
    4.10   Labor Matters.....................................................................................23
    4.11   Environmental Matters .......................................................................23
    4.12   Insurance............................................................................................23
    4.13   No Brokers or Finders.........................................................................23
    4.14   Litigation; Proceedings.......................................................................24
    4.15   Board Approval and Recommendations................................................24
    4.16   Compliance with Laws .......................................................................24
    4.17   Warranties Are Exclusive ...................................................................24

ARTICLE 5    REPRESENTATIONS AND WARRANTIES OF PURCHASER .............24

    5.1    Organization.......................................................................................24
    5.2    Authorization and Validity .................................................................25
    5.3    No Conflict or Violation.....................................................................25
    5.4    Consents and Approvals......................................................................25
    5.5    Financial Capability............................................................................25
    5.6    No Other Representations and Warranties.............................................25

ARTICLE 6    COVENANTS AND OTHER AGREEMENTS.........................................25

    6.1    Pre-Closing Covenants of Sellers .......................................................25

| | | |
|---|---|---|
| 6.2 | Pre-Closing Covenants of Purchaser | 28 |
| 6.3 | Other Covenants of Sellers and Purchaser | 28 |
| 6.4 | Employment Covenants and Other Undertakings | 29 |
| 6.5 | Non-Assignment of Contracts | 31 |
| 6.6 | Casualty | 31 |
| 6.7 | Name Change | 31 |
| 6.8 | Alternate Transactions | 32 |

| | | |
|---|---|---|
| ARTICLE 7 | TAXES | 32 |
| 7.1 | Taxes Related to Purchase of Acquired Assets | 32 |
| 7.2 | Waiver of Bulk Sales Laws | 32 |

| | | |
|---|---|---|
| ARTICLE 8 | BANKRUPTCY COURT MATTERS | 32 |
| 8.1 | Motions | 32 |
| 8.2 | Assigned Contracts | 32 |
| 8.3 | Procedure | 33 |
| 8.4 | Purchaser Protections | 33 |

| | | |
|---|---|---|
| ARTICLE 9 | CONDITIONS PRECEDENT TO PERFORMANCE BY THE PARTIES | 33 |
| 9.1 | Conditions Precedent to Performance by Sellers | 33 |
| 9.2 | Conditions Precedent to the Performance by Purchaser | 34 |

| | | |
|---|---|---|
| ARTICLE 10 | CLOSING AND DELIVERIES | 35 |
| 10.1 | Closing | 35 |
| 10.2 | Sellers' Deliveries | 35 |
| 10.3 | Purchaser's Deliveries | 36 |

| | | |
|---|---|---|
| ARTICLE 11 | TERMINATION | 36 |
| 11.1 | Conditions of Termination | 36 |
| 11.2 | Effect of Termination | 37 |
| 11.3 | Expense Reimbursement | 38 |

| | | |
|---|---|---|
| ARTICLE 12 | MISCELLANEOUS | 38 |
| 12.1 | Survival | 38 |
| 12.2 | Further Assurances | 38 |
| 12.3 | Successors and Assigns | 38 |
| 12.4 | Governing Law; Jurisdiction | 39 |
| 12.5 | Expenses | 39 |
| 12.6 | Severability | 39 |
| 12.7 | Notices | 39 |
| 12.8 | Amendments; Waivers | 40 |
| 12.9 | Entire Agreement | 40 |
| 12.10 | Seller Disclosures | 40 |
| 12.11 | Headings | 40 |
| 12.12 | Electronic Delivery; Counterparts | 41 |

**TABLE OF CONTENTS**
(continued)

12.13   Waiver of Jury Trial ............................................................................................ 41
12.14   Third Party Beneficiaries ..................................................................................... 41

## EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Assignment and Assumption Agreement |
| Exhibit B | Form of Bankruptcy Sale Order |
| Exhibit C | Form of Bidding Procedures Order |
| Exhibit D | Form of Bill of Sale |
| Exhibit E | Form of Domain Name Assignment |
| Exhibit F | Form of Trademark Assignment |

## SCHEDULES

| | |
|---|---|
| Schedule 1.1(a) | Permitted Liens |
| Schedule 2.2(f) | Other Acquired Assets |
| Schedule 2.3(f) | Other Assumed Liabilities |
| Schedule 2.4(a)(xxiv) | Other Excluded Liabilities |
| Schedule 2.5(a) | Assignable Contracts Permitted to be Rejected |
| Schedule 4.3(a) | Conflicts |
| Schedule 4.3(b) | Consents of Third Parties |
| Schedule 4.4 | Title to Acquired Assets |
| Schedule 4.5 | Contracts |
| Schedule 4.6 | Leased Real Property |
| Schedule 4.7 | Intellectual Property |
| Schedule 4.9 | Employee Benefit Plans |
| Schedule 4.12 | Insurance |
| Schedule 4.13 | Brokers or Finders |
| Schedule 4.14 | Litigation; Proceedings |

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of October ____, 2011 (the "Execution Date"), is made by and between (i) Sundae Group Holdings II, LLC, a Delaware limited liability company ("Purchaser"), and (ii) Friendly Ice Cream Corporation, a Massachusetts corporation, and each of its subsidiaries listed on the signature page of this Agreement (each a "Seller" and collectively, "Sellers").

## RECITALS

WHEREAS, Sellers presently conduct the business of (i) operating and franchising casual dining restaurants and ice cream parlors in several states and (ii) manufacturing and distributing ice cream products, and all operations incident thereto (collectively, the "Business");

WHEREAS, on the date hereof (the "Petition Date"), Sellers intend to file voluntary petitions for reorganization relief (the "Bankruptcy Cases") pursuant to Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), and in concert with such filing, seek the entry of an order by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") approving this Agreement and authorizing Sellers to consummate the transactions contemplated hereby and by the other transaction documents;

WHEREAS, Sellers desire to sell, transfer and assign to Purchaser, and Purchaser desires to acquire and assume from Sellers, pursuant to Sections 363 and 365 of the Bankruptcy Code, the Acquired Assets and the Assumed Liabilities as more specifically provided herein;

WHEREAS, the board of directors, board of managers or applicable governing body of each Seller has determined that it is advisable and in the best interests of their respective estates and the beneficiaries of such estates to consummate the transactions provided for herein pursuant to the Bidding Procedures Order and the Bankruptcy Sale Order and has approved this Agreement;

WHEREAS, the transactions contemplated by this Agreement constitute a tax-free reorganization under Section 368(a)(1)(A) of the Code; and

WHEREAS, the transactions contemplated by this Agreement are subject to the approval of the Bankruptcy Court and will be consummated only pursuant to the Bankruptcy Sale Order to be entered in the Bankruptcy Cases.

NOW, THEREFORE, in consideration of the foregoing and their respective representations, warranties, covenants and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, Sellers and Purchaser hereby agree as follows:

## ARTICLE 1
## DEFINITIONS

1.1    Certain Terms Defined.    As used in this Agreement, the following terms have the following meanings:

"Acquired Assets" are those assets described in Section 2.1.

"Additional Employee Payment" means the $630,000 bonus pool, payable by Purchaser to certain key employees of Sellers as set forth in, and subject to the terms and conditions of, those certain letter agreements dated on or about October 4, 2011.

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Agreement" has the meaning set forth in the Preamble.

"Allocation Statement" has the meaning set forth in Section 3.2.

"Alternate Transaction" means a transaction or series of related transactions pursuant to which Sellers (a) accept a bid, other than that of Purchaser, as the highest or best offer, or (b) sell, transfer, lease or otherwise dispose of, directly or indirectly, including through an asset sale, stock sale, merger, reorganization or other similar transaction (by Sellers or otherwise), including a Court-approved stand-alone plan of reorganization or refinancing, all or substantially all of the Acquired Assets (or agrees to do any of the foregoing) in a transaction or series of transactions to a party or parties other than Purchaser or seek to do any of the foregoing as set forth in this clause (b).

"Ancillary Agreement" means any agreement, document or instrument (other than this Agreement) that any Seller or Purchaser, as applicable, enters into or delivers in connection with the consummation of the transactions contemplated hereby.

"Assignable Contract" means any Contract to which any Seller is a party that such Seller is permitted under the Bankruptcy Code to sell and assign other than (a) an Employee Benefit Plan and (b) those Contracts set forth on Schedule 2.5(a).

"Assigned Contracts" has the meaning set forth in Section 2.5(a).

"Assignment and Assumption Agreement" means the Assignment and Assumption Agreement in substantially the form annexed hereto as Exhibit A evidencing the assignment to and assumption by Purchaser of all rights and obligations under the Assigned Contracts.

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Assumption Notice" has the meaning set forth in Section 2.5(d).

"Auction" means the auction for the sale of Sellers' assets conducted by Sellers if, and only if, any Qualified Bid is received pursuant to the Bidding Procedures Order.

"Bankruptcy Cases" has the meaning set forth in the Recitals.

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Bankruptcy Sale Order" means a final order, in all material respects in the form of Exhibit B, entered by the Bankruptcy Court, which Bankruptcy Sale Order shall be acceptable to the Purchaser in its sole discretion.

"Bidding Procedures Motion" means a motion, which may be the Motion, seeking to approve the Bidding Procedures Order.

"Bidding Procedures Order" means a final order, in all material respects in the form of Exhibit C, issued by the Bankruptcy Court that, among other things, establishes procedures for an auction process to solicit competing bids.

"Bill of Sale" means the Bill of Sale in all material respects in the form of Exhibit D conveying to Purchaser title to all of the Acquired Assets.

"Budget" means the budget provided to the administrative agent pursuant to the DIP Credit Agreement.

"Business" has the meaning set forth in the Recitals.

"Business Day" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in New York or Delaware are authorized by Law or other governmental action to close.

"Business Employees" means all of the employees of Sellers whose job function primarily relates to the Business.

"Cash" means all cash (including checks received prior to the Closing, whether or not deposited or cleared prior to the Closing), cash equivalents and short-term investments.

"Cash Payment Amount" has the meaning set forth in Section 3.1(a)(i).

"Casualty" has the meaning set forth in Section 6.6.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. §9601 et seq.), and any regulations promulgated thereunder.

"Claim" has the meaning ascribed by Bankruptcy Code §101(5), including all rights, claims, causes of action, defenses, debts, demands, damages, offset rights, setoff rights, recoupment rights, obligations, and liabilities of any kind or nature under contract, at Law or in equity, known or unknown, contingent or matured, liquidated or unliquidated, and all rights and remedies with respect thereto.

"Closing" has the meaning set forth in Section 10.1.

"Closing Date" has the meaning set forth in Section 10.1.

"COBRA" means the Consolidated Omnibus Budget Reconciliation Act of 1985.

"Code" means the Internal Revenue Code of 1986, as amended, and the regulations issued thereunder.

"Contract" means any agreement, contract, lease, sublease, purchase order, arrangement, license, commitment or other binding arrangement or understanding, whether written or oral, and any amendments, modifications or supplements thereto.

"Credit Bid Amount" has the meaning set forth in Section 3.1(a)(ii).

"Credit Bid Obligations" means the Subordinated Note Document Obligations and the DIP Obligations.

"Credit Documents" means the Pre-Petition Credit Agreement, the Pre-Petition Loan Documents, and the Subordinated Note Documents.

"Creditors' Recovery Amount" means a cash amount (including a wind down budget) negotiated in good faith among Sellers, Purchaser and the committee of unsecured creditors for the benefit of Sellers' estates.

"Cure Amounts" means all amounts, costs and expenses required by the Bankruptcy Court to cure all defaults under the Assigned Contracts so that they may be sold and assigned to Purchaser pursuant to Sections 363 and 365 of the Bankruptcy Code.

"Customer Programs" means those programs implemented in the ordinary course, as approved by the Bankruptcy Court in Sellers' first day motions, to promote customer interest in the Business, including but not limited to warranties and coupon and gift card programs.

"Designation Right Contract" has the meaning set forth in Section 2.5(b).

"Designation Right Period" has the meaning set forth in Section 2.5(d).

"DIP Credit Agreement" means that certain Credit Agreement by and among Sellers, the lenders from time to time party thereto, and Purchaser, as amended, modified or restated.

"DIP Obligations" means all Indebtedness as of the Closing outstanding under the DIP Credit Agreement.

"DIP Orders" means the interim and final orders of the Bankruptcy Court approving Sellers' entry into the DIP Credit Agreement.

"Documents" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, technical documentation (including design specifications, functional requirements, operating instructions, logic manuals and flow charts), user documentation (including installation guides, user manuals, training materials, release notes and working papers), marketing documentation (including sales brochures, flyers, pamphlets, Internet Web pages and any Internet Web page content), cost and pricing information, business plans, quality control records and procedures, blueprints, accounting and tax files, customer files and documents (including credit information), personnel files for employees, supplier lists, records, literature and correspondence, including materials relating to Inventories, services, marketing, advertising, promotional materials, documents evidencing or constituting Intellectual Property, and other similar materials to the extent related to, used in, held for use in, or with respect to, the Business or the Acquired Assets in each case whether or not in electronic form, whether or not physically located on any of the Leased Properties, but excluding (i) personnel files for employees of Sellers who are not hired by Purchaser as of the Closing

Date (except records necessary for Purchaser to provide COBRA coverage if required by Law) and (iii) any materials exclusively related to any Excluded Assets.

"DOJ" has the meaning set forth in Section 6.3(c)(i).

"Domain Name Assignment" means the Domain Name Assignment in all material respects in the form of Exhibit E conveying to Purchaser title to all of the domain names of Sellers.

"Electronic Delivery" has the meaning set forth in Section 12.12.

"Employee Benefit Plans" means all (a) employee pension benefit plans as defined in Section 3(2) of ERISA, (b) employee welfare benefit plans as defined in Section 3(1) of ERISA, and (c) stock option, bonus, deferred compensation, retention, severance, or termination pay plans or policies or any other plans or policies providing for compensation or benefits (including any employment, severance, change in control or similar agreement or any arrangement relating to a sale of the Business), in each case, that is maintained, administered, or contributed to (or with respect to which any obligation to contribute has been undertaken) by a Seller or any ERISA Affiliate and that covers any current or former employee, director, or consultant of any Seller (or their dependents, spouses or beneficiaries).

"Encumbrances" means, to the extent not considered a Lien, any security interest, lien, collateral assignment, right of setoff, debt, obligation, liability, pledge, levy, charge, escrow, encumbrance, option, right of first refusal, restriction (whether on transfer, disposition or otherwise), third party right, right limited to any Seller personally, other agreement term tending to limit any right or privilege of any Seller under any Contract, conditional sale contract, title retention contract, mortgage, lease, deed of trust, hypothecation, indenture, security agreement, easement, license, servitude, proxy, voting trust, transfer restriction under any shareholder or similar agreement, or any other agreement, arrangement, contract, commitment, understanding or obligation of any kind whatsoever, whether written or oral, or imposed by any Law, equity or otherwise.

"Environmental Laws" has the meaning set forth in Section 4.11.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any trade or business (whether or not incorporated) which is treated as a single employer with any Seller under Section 414(b), (c), (m) or (o) of the Code or Section 4001 of ERISA.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Contract" has the meaning set forth in Section 2.5(b).

"Excluded Environmental Liabilities" means any Liability or investigatory, corrective or remedial obligation, whenever arising or occurring, arising under Environmental Laws with respect to Sellers, the Business, the Acquired Assets, the Facilities or the Leased Properties (including any arising from the on-site or off-site Release, threatened Release, treatment, storage, disposal, or arrangement for disposal of Hazardous Materials) whether or not constituting a breach of any representation or warranty herein and whether or not set forth on any schedule attached hereto.

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Execution Date" means has the meaning set forth in the Preamble.

"Expense Reimbursement" means the documented actual, reasonable out-of-pocket costs and expenses (including fees and expenses of counsel) incurred by Purchaser or its Affiliates (other than Sellers) in connection with the negotiation, documentation and implementation of this Agreement and the transactions contemplated hereby and all proceedings incident thereto up to a maximum of $1,000,000.00.

"Facilities" means all facilities at which the Business is conducted including all Leased Real Property.

"FF&E" means all equipment, machinery, fixtures, furniture and other tangible property owned by Sellers located at any of the Facilities (unless sold to any third party in the ordinary course of business and not in violation of this Agreement), stored in any offsite location or used or useful in the operation of the Business or the Acquired Assets (including all such property that is damaged), including all attachments, appliances, fittings, lighting fixtures, signs, doors, cabinets, partitions, mantels, motors, pumps, screens, plumbing, heating, air conditioning, ovens, refrigerators, freezers, refrigerating and cooling systems, waste disposal and storing, wiring, telephones, televisions, monitors, security systems, carpets, floor coverings, wall coverings, office equipments, computers (including point-of-sale terminals and systems), registers and safes, trash containers, meters and scales, combinations, codes and keys, and any other furniture, fixtures, equipment and improvements.

"FTC" has the meaning set forth in Section 6.3(c)(i).

"Governmental Authority" means any federal, state, local court, tribunal, governmental department, agency, board or commission, regulatory, taxing or supervisory authority, or other administrative, governmental or quasi-governmental body, subdivision or instrumentality.

"Hazardous Materials" shall mean (a) any petroleum products or byproducts, radioactive materials, friable asbestos or polychlorinated biphenyls or (b) any waste, material, or substance defined as a "hazardous substance," "hazardous material," or "hazardous waste" or "pollutant" or otherwise regulated under any applicable Environmental Law.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

"Improvements" means, with respect to any Leased Real Property, all buildings, structures, systems, facilities, easements, rights-of-way, privileges, improvements, licenses, hereditaments, appurtenances and all other rights and benefits belonging, or in any way related, to such Leased Real Property.

"Indebtedness" with respect to any Person means any obligation of such Person for borrowed money, and in any event shall include (a) any obligation incurred for all or any part of the purchase price of property or other assets or for the cost of property or other assets constructed or of improvements thereto, other than accounts payable included in current liabilities and incurred in respect of property purchased in the ordinary course of business, (b) the face amount of all letters of credit issued for the account of such Person, (c) obligations (whether or not such Person has assumed or become liable for the payment of such obligation) secured by Liens or Encumbrances, (d) capitalized lease obligations, (e) all guarantees and similar obligations of such Person, (f) all accrued interest, fees and charges in respect of any indebtedness and (g) all prepayment premiums and penalties, and any other fees, expenses, indemnities and other amounts payable as a result of the prepayment or discharge of any indebtedness.

"Insured Liabilities" has the meaning set forth in Section 2.3(d).

"Intellectual Property" means all rights of Sellers and their direct and indirect subsidiaries in and to (a) patents, patent applications and patent disclosures, together with all reissuances, continuations, continuations in part, revisions, extensions, reexaminations, provisionals, divisions, renewals, revivals, and foreign counterparts thereof and all registrations and renewals in connection therewith, (b) trademarks, service marks, trade dress, logos, trade names and corporate names and other indicia of origin and corporate branding, together with all translations, adaptations, derivations and combinations thereof and including all goodwill associated therewith, and all applications, registrations and renewals in connection therewith, (c) works of authorship, copyrightable works, copyrights and all applications, registrations and renewals in connection therewith, (d) mask works and all applications, registrations and renewals in connection therewith, (e) trade secrets, inventions and confidential business information (including recipes, ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, business and marketing plans and proposals, assembly, test, installation, service and inspection instructions and procedures, technical, operating and service and maintenance manuals and data, hardware reference manuals and engineering, programming, service and maintenance notes and logs), (f) Software, (g) Internet addresses, uniform resource locaters, domain names, Websites and Web pages, (h) any and all other intellectual property and proprietary rights, and (i) goodwill related to all of the foregoing, in each case to the extent used or useful in the operation of the Business or related to the Acquired Assets.

"Interest" means "interest" as that term is used in Bankruptcy Code Section 363(f).

"Inventories" means all of Sellers' consumable food and beverages and raw materials and work-in-process therefor and all of Sellers' tangible property used in the preparation of, serving, and cleaning-up from meals or the production, manufacture, packaging, distribution or sale of ice cream and related products, including napkins, silverware, plates and dining ware, cups, mugs, cooking and cleaning utensils, packaging materials, paper products, ingredients, miscellaneous consumables, materials, supplies, inventories and other related items or that are otherwise included in the Acquired Assets and are permitted to be sold and transferred under applicable Law, together with all rights of Sellers against suppliers thereof.

"Law" means any law, statute, ordinance, regulation, rule, code or rule of common law or otherwise of, or any order, judgment, injunction or decree issued, promulgated, enforced or entered by, any Governmental Authority.

"Leased Real Property" means all the land, Improvements, or other interests in real property leased, subleased or licensed by Sellers, all of which are identified on Schedule 4.6 (including any easements, rights or permits appurtenant thereto), at which certain of the Facilities are operated or which is used or useful in connection with the operation of the Business.

"Liability" means any liability (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due and regardless of when asserted), including any liability for Taxes.

"Lien" has the meaning given to that term in the Bankruptcy Code.

"Material Adverse Effect" means a state of facts, event, change or effect with respect to the Business, the Acquired Assets, the Assumed Liabilities or the enforceability of any Assigned Contract that results in or could reasonably be expected to result in a material adverse effect on or change in the results of operations or condition (financial or otherwise) of Sellers, the Acquired Assets or the Business, but excludes any state of facts, event, change or effect caused by events, changes or developments

relating to (a) changes or conditions affecting the industries in which Sellers operate generally; and (b) changes in economic, regulatory or political conditions generally; provided, in each case, that any such change does not have a disproportionate effect on Sellers, the Acquired Assets, or the Business taken as a whole.

"Motion" has the meaning set forth in Section 8.1.

"Orders" means the Bankruptcy Sale Order and the Bidding Procedures Order.

"Organizational Amendments" has the meaning set forth in Section 6.7.

"Other Obligations" means all Indebtedness as of the Closing outstanding under (i) the Subordinated Note Documents and (ii) that certain Amended and Restated Secured Promissory Note, dated as of January 11, 2008, as amended, made by Freeze Group Holding Corp. in favor of Freeze, LLC.

"Permits" means all certificates of occupancy or other certificates, permits, authorizations, filings, approvals and licenses possessed by Sellers, or through which Sellers have rights, that are used, useable or useful in the operation of the Business or the use or enjoyment or benefit of the Acquired Assets.

"Permitted Liens" means: (a) Liens listed on Schedule 1.1(a) for Taxes not yet due or which are being contested in good faith by appropriate proceedings and for which adequate reserves with respect thereto are maintained on the books of Sellers; (b) statutory liens of carriers, warehousemen, mechanics, repairmen, workmen, suppliers or materialmen imposed by law and arising in the ordinary course of business that are not overdue and that do not, individually or in the aggregate, materially affect the ownership, lease, value or use of the affected asset or of the Acquired Assets as a whole; (c) pledges or deposits in connection with workers' compensation, unemployment insurance and other social-security legislation; and (d) all defects, exceptions, restrictions, easements, rights-of-way, restrictions and other similar encumbrances of record other than monetary encumbrances, judgments and monetary liens, as well as zoning, entitlement and other land use regulations by any Governmental Authority that in each case (i) do not in any case, individually or in the aggregate, affect the ownership or lease of nor materially detract from the value or use of the property subject thereto or (ii) materially interfere with the ordinary conduct of the business of Sellers at the property subject thereto.

"Person" means any individual, corporation, partnership, limited liability company, firm, joint venture, association, joint-stock company, trust, unincorporated organization or Governmental Authority or other entity.

"Petition Date" has the meaning set forth in the Recitals.

"Post-Closing Designation Period" has the meaning set forth in Section 2.5(b).

"Pre-Closing Period" means any taxable period or portion thereof beginning before and ending on or before the Closing Date. If a taxable period begins on or prior to the Closing Date and ends after the Closing Date, then the portion of the taxable period that ends on the Closing Date shall constitute a Pre-Closing Period.

"Pre-Petition Credit Agreement" means that certain Second Amended and Restated Revolving Credit Agreement, dated as of June 5, 2008, as amended, by and among Seller, the various lenders from time to time parties thereto, and Wells Fargo Foothill, Inc., as administrative agent for the lenders thereunder.

"Pre-Petition Loan Documents" means the "Loan Documents" as defined in the Pre-Petition Credit Agreement.

"Proceeding" has the meaning set forth in Section 2.4(a)(ix).

"Purchase Price" has the meaning set forth in Section 3.1.

"Purchaser" has the meaning set forth in the Preamble.

"Purchaser Plans" has the meaning set forth in Section 6.4(b).

"Qualified Bid" means competing bids pre-qualified for the Auction in accordance with the Bidding Procedures Order.

"Real Property Leases" means all of Sellers' right, title and interest in all leases, subleases, licenses, concessions and other agreements (written or oral) and all amendments, extensions, renewals, guaranties and other agreements with respect thereto, pursuant to which Sellers hold a leasehold or subleasehold estate in, or are granted a license or other right to use the Leased Real Property.

"Related Person" means, with respect to any Person at any time of determination, all directors, officers, members, managers, stockholders, employees, controlling persons, Affiliates, agents, professionals, attorneys, accountants, lenders, investment bankers or representatives of any such Person.

"Register Cash" means the aggregate amount of Cash located on hand as of the Closing at the Facilities.

"Release" shall have the meaning set forth in CERCLA.

"Sale Hearing" means the hearing to consider the entry of the Bankruptcy Sale Order.

"Schedules" has the meaning set forth in Section 6.1(c).

"Seller" and "Sellers" have the meaning set forth in the Preamble.

"Sellers' Knowledge" means the actual (and not constructive or imputed) knowledge of Harsha Agadi, Steven Sanchioni, Robert Sawyer, Jim Parrish and Tim Hopkins, in each case, without duty of inquiry.

"Senior Secured Obligations" means all Indebtedness as of the Closing outstanding under the Pre-Petition Loan Documents.

"Software" means any computer program, operating system, application, system, firmware or software of any nature, point-of-entry system, peripherals, and data whether operational, active, under development or design, nonoperational or inactive, including all object code, source code, comment code, algorithms, processes, formulae, interfaces, navigational devices, menu structures or arrangements, icons, operational instructions, scripts, commands, syntax, screen designs, reports, designs, concepts, visual expressions, technical manuals, tests scripts, user manuals and other documentation therefor, whether in machine-readable form, virtual machine-readable form, programming language, modeling language or any other language or symbols, and whether stored, encoded, recorded or written on disk, tape, film, memory device, paper or other media of any nature,

and all databases necessary or appropriate in connection with the operation or use of any such computer program, operating system, application, system, firmware or software.

"Subsidiary" means any Person (i) of which a Seller or any Subsidiary of a Seller, directly or indirectly, owns or controls securities or other ownership interests that permit such Seller or Subsidiary of Seller to elect a majority of the board of directors or other Persons performing similar functions or (ii) of which a Seller or any Subsidiary of a Seller, directly or indirectly, owns 50% or more of stock or other equity interests.

"Subordinated Note Documents" means that certain Subordinated Secured Promissory Note, dated as of January 11, 2008, as amended, made by Seller in favor of Purchaser (as assignee of Sundae Group Holdings I, LLC, as assignee of Freeze, LLC, as assignee of Freeze Group Holding Corp.) and all of the Security Agreements (as defined therein).

"Subordinated Note Document Obligations" means all Indebtedness as of the Closing outstanding under the Subordinated Note Documents.

"Tax" or "Taxes" means all taxes, however denominated, including any interest, penalties or additions to tax that may become payable in respect thereof, imposed by any Governmental Authority, whether payable by reason of contract, assumption, transferee liability, operation of Law or Treasury Regulation Section 1.1502-6(a) (or any predecessor or successor thereof or any analogous or similar provision under Law), which taxes shall include all net or gross income, gross receipts, net proceeds, sales, use, ad valorem, value added, franchise, bank shares, withholding, payroll, employment, excise, property, abandoned property, escheat, deed, stamp, alternative or add-on minimum, environmental, profits, windfall profits, transaction, license, lease, service, service use, occupation, severance, energy, sales, use, transfer, real property transfer, recording, documentary, stamp, registration, stock transfer taxes and fees, unemployment, social security, workers' compensation, capital, premium, and other taxes, assessments, customs, duties, fees, levies, or other governmental charges of any nature whatever, whether disputed or not, and other assessments or obligations of the same or a similar nature, whether arising before, on or after the Closing Date.

"Tax Return" means any report, return, information return, filing or other information, including any schedules, exhibits or attachments thereto, and any amendments to any of the foregoing required to be filed or maintained in connection with the calculation, determination, assessment or collection of any Taxes (including estimated Taxes).

"Trademark Assignment" means the Trademark Assignment in all material respects in the form of Exhibit F conveying to Purchaser title to all of the trademarks of Sellers.

"Transaction Taxes" has the meaning set forth in Section 7.1.

"Transferred Employees" has the meaning set forth in Section 6.4(a).

"Trust Fund Taxes" means liabilities for sales, use, withholding, trust fund or other employment related taxes for which officers and directors may have personal liability for non-payment under applicable law.

"WARN Act" means the Worker Adjustment and Retraining Notification Act, as amended, or any similar applicable Law.

1.2     Interpretation. When a reference is made in this Agreement to a section or article, such reference shall be to a section or article of this Agreement unless otherwise clearly indicated to the contrary.

(a)     Whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation."

(b)     The words "hereof," "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement, and article, section, paragraph, exhibit and schedule references are to the articles, sections, paragraphs, exhibits and schedules of this Agreement unless otherwise specified.

(c)     The meaning assigned to each term defined herein shall be equally applicable to both the singular and the plural forms of such term. Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(d)     A reference to any party to this Agreement or any other agreement or document shall include such party's successors and permitted assigns.

(e)     A reference to any legislation or to any provision of any legislation shall include any amendment to, and any modification or reenactment thereof, any legislative provision substituted therefore and all regulations and statutory instruments issued thereunder or pursuant thereto.

(f)     When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(g)     Any reference in this Agreement to $ shall mean U.S. dollars.

(h)     The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

## ARTICLE 2
## PURCHASE AND SALE OF THE ACQUIRED ASSETS

2.1     Purchase and Sale of Assets. Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall purchase, acquire and accept from Sellers, and Sellers shall sell, transfer, assign, convey and deliver to Purchaser, all of Sellers' right, title and interest in, to and under the Acquired Assets, free and clear of all pledges, security interests, Liens, Claims, Interests or Encumbrances (other than Permitted Liens). "Acquired Assets" shall mean all of the, direct or indirect, right, title and interest of Sellers in and to the tangible and intangible assets, properties, rights, claims and Contracts used, useful, or held for use in, or related to, the Business (but excluding Excluded Assets) as of the Closing, including:

(a)     all Register Cash and other Cash;

(b)     all accounts receivable, rebates, refunds (whether related to Taxes or otherwise) and other receivables of Sellers;

(c)     all Inventories;

(d)     all deposits (including, with respect to the Acquired Assets, customer deposits and security deposits (whether maintained in escrow or otherwise) for rent, electricity, telephone or otherwise) and prepaid charges and expenses of Sellers that relate to the Acquired Assets;

(e)     all rights of Sellers under each Real Property Lease included within the Assigned Contracts, in each case together with Sellers' interests in and to all Improvements and fixtures located on the Leased Real Property subject to such Real Property Lease, any other appurtenances thereto, and all of Sellers' rights in respect thereof;

(f)     all FF&E;

(g)     all Intellectual Property;

(h)     all Assigned Contracts;

(i)     all Documents;

(j)     all Permits;

(k)     all rights under or arising out of all insurance policies relating to the Business or the Acquired Assets, unless non-assignable as a matter of Law;

(l)     all rights of Sellers under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees and agents of Sellers or with third parties, including non-disclosure or confidentiality, non-compete, or non-solicitation agreements entered into in connection with the Auction;

(m)     any rights, claims or causes of action of Sellers, including all causes of action arising under Chapter 5 of the Bankruptcy Code, relating to the Business and the Acquired Assets that are against or otherwise involving any counterparty to any Assigned Contract, any post-Closing employees, officers or (subject to the right of the committee of unsecured creditors to investigate in accordance with the DIP Orders) directors of the Business, including Transferred Employees, or any of Sellers' lenders (subject to the right of the committee of unsecured creditors to investigate in accordance with the DIP Orders), landlords or vendors, obligations to whom are assumed by Purchaser;

(n)     all rights of Sellers under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent relating to products sold, or services provided, to Sellers or to the extent affecting any Acquired Assets other than any warranties, representations and guarantees pertaining to any Excluded Assets; and

(o)     all goodwill and other intangible assets associated with the Business and the Acquired Assets, including customer and supplier lists.

2.2     Excluded Assets.  Notwithstanding anything to the contrary in this Agreement, nothing herein shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser, and Sellers shall retain all right, title and interest to, in and under, and all obligations with respect to, the Excluded Assets.  For all purposes of and under this Agreement, and as the same may be amended pursuant to Section 2.5 and Section 2.6, the term "Excluded Assets" shall mean:

(a) any asset of Sellers that otherwise would constitute an Acquired Asset but for the fact that it is conveyed, leased or otherwise disposed of, in the ordinary course of Sellers' business prior to the Closing Date not in violation of this Agreement;

(b) the certificates of incorporation or, as applicable, formation, qualifications to conduct business as a foreign corporation or, as applicable, limited liability company, taxpayer and other identification numbers, seals, stock transfer books, blank stock certificates, corporate books and records of internal corporate or limited liability company proceedings, tax and accounting records, work papers and other records relating to the organization or maintenance of corporate or limited liability company existence of Sellers and any other records that Sellers are required by Law to retain; provided, however, that copies of the foregoing items shall be provided by Sellers to Purchaser following the Closing Date upon Purchaser's request at Purchaser's sole expense;

(c) the rights of Sellers under this Agreement and all consideration payable or deliverable to Sellers under this Agreement, but excluding cash flows under any Assigned Contract or any net profits generated by operation of the Business on or after the Closing Date;

(d) all rights and interests in connection with, and assets of, any Employee Benefit Plan;

(e) the capital stock or other equity interests of any Seller;

(f) the assets listed on Schedule 2.2(f);

(g) all rights under or arising out of insurance policies that are non-assignable as a matter of Law;

(h) all Excluded Contracts;

(i) any Contract that terminates or expires prior to the Closing Date in accordance with its terms or in the ordinary course of business of Sellers;

(j) all rights, claims or causes of action with respect to or arising in connection with Excluded Assets; and

(k) except for the rights, claims or causes of action constituting Acquired Assets pursuant to Section 2.1(m), all rights and powers of a trustee and debtor-in-possession against any Person whatsoever, including all preference or avoidance powers, claims and actions of Sellers, under the Bankruptcy Code, and all claims, actions and remedies arising under Sections 502, 510, 541, 544, 547, 548, 549, 550, 551 and 553, respectively, of the Bankruptcy Code, and the proceeds therefrom.

2.3     Assumption of Liabilities.    Upon the terms and subject to the conditions of this Agreement, Purchaser agrees, effective at the time of the Closing, to assume, pay, perform and discharge the following liabilities and obligations (the "Assumed Liabilities"):

(a) all Cure Amounts due and owing under any Assigned Contracts;

(b) all of Sellers' liabilities and obligations under the Assigned Contracts accruing after the Closing;

(c)     to the extent not already paid or included in the DIP Obligations, all ordinary course liabilities and obligations with respect to the Acquired Assets arising after the Petition Date to the extent (i) relating to conduct of the Business after the Petition Date through the Closing Date (whether billed to Sellers prior to, on or after the Closing Date) and (ii) set forth in the Budget;

(d)     all ordinary course compensation liabilities or other obligations existing as of the Closing Date, which are to be honored by Purchaser in the ordinary course, relating to Transferred Employees existing as of the Closing Date, including accrued vacation, severance, other paid time-off, and accrued gross payroll liabilities and obligations (including payroll taxes accrued and unpaid), including all Liabilities and obligations (i) relating to worker's compensation claims which remain unpaid as of the Closing Date (whether reported or not) or (ii) relating to litigation, including any claims for wrongful termination, any claims under Title VII of the Civil Rights Act of 1964, as amended, or similar state Law, and any whistleblower claims (the Liabilities and obligations referred to in the foregoing clauses (i) and (ii), collectively, the "Insured Liabilities"); provided that Purchaser only assumes the Insured Liabilities to the extent that such Liabilities and obligations are fully covered and actually paid by an insurance policy acquired by Purchaser pursuant to Section 2.1(k); and provided further that the obligations and Liabilities assumed by Purchaser pursuant to this Section 2.3(d) shall not include any Liabilities or obligations (A) related to the Insured Liabilities to the extent such Liabilities and obligations are not fully covered and actually paid by an insurance policy acquired by Purchaser pursuant to Section 2.1(k), (B) relating to the exempt or non-exempt status of any Transferred Employee, or (C) retained by Sellers in accordance with Section 2.4 or Section 6.4(d), and all such Liabilities and obligations identified in the foregoing clauses (A) through (C) shall be Excluded Liabilities;

(e)     all liabilities and obligations relating to amounts required to be paid by Purchaser hereunder (including those specified in Section 2.5);

(f)     those specific Liabilities and obligations of Sellers identified on Schedule 2.3(f) hereto;

(g)     all ordinary course liabilities and obligations existing on the Closing Date with respect to the Customer Programs; and

(h)     all Trust Fund Taxes.

2.4     Excluded Liabilities.

(a)     Except as specifically set forth in Section 2.3, Purchaser shall not assume or be liable for any Claims, Liens, Encumbrances, Interests, Liabilities or other obligations of Sellers of any nature whatsoever, whether presently in existence or arising hereafter (other than the Assumed Liabilities), including the following (collectively, the "Excluded Liabilities"):

(i)     all obligations, Claims, or Liabilities of Sellers that relate to any of the Excluded Assets (including under any Contracts related thereto) or Excluded Contracts;

(ii)     any amounts due or which may become due or owing under the Assigned Contracts with respect to the period prior to Closing;

(iii)     the Excluded Environmental Liabilities (regardless of whether such Liabilities are technically Liabilities of any Seller);

(iv)     all obligations, Claims, or Liabilities of Sellers or for which Sellers or any Affiliate of any Seller could be liable relating to Taxes or with respect to a Pre-Closing Period (including with respect to the Acquired Assets or otherwise), including any Taxes that will arise as a result of the sale of the Acquired Assets or the assumption of the Assumed Liabilities pursuant to this Agreement and any deferred Taxes of any nature;

(v)     all obligations, Claims, or Liabilities for any legal, accounting, investment banking, brokerage or similar fees or expenses incurred by any Seller or any predecessor of any Seller in connection with, resulting from or attributable to the Bankruptcy Cases or the transactions contemplated by this Agreement or otherwise;

(vi)     all Indebtedness of any Seller, except those Obligations that may be assumed by Purchaser under Section 3.1(b);

(vii)     all obligations and Liabilities of Sellers related to the right to or issuance of any capital stock or other equity interest of any Seller, including any stock options or warrants;

(viii)     all obligations and Liabilities of Sellers resulting from, caused by or arising out of, or which relate to, directly or indirectly, the conduct of Sellers or ownership, lease or license of any properties or assets or any properties or assets previously used by Sellers or any predecessor of any Seller, or other actions, omissions, including any amounts due or which may become due or owing under the Assigned Contracts, with respect to the period prior to Closing (other than the Cure Amounts);

(ix)     all obligations and Liabilities of Sellers resulting from, caused by or arising out of, or which relate to, directly or indirectly, the conduct of anyone or ownership, lease or license of any properties or assets or any properties or assets previously used by Sellers or any predecessor of any Seller at any time, or other actions, omissions or events occurring prior to the Closing and which (i) constitute, may constitute or are alleged to constitute a tort, breach of contract or violation of any rule, regulation, treaty or other similar authority or (ii) relate to any and all Claims, disputes, demands, actions, Liabilities, damages, suits in equity or at Law, administrative, regulatory or quasi-judicial proceedings, accounts, costs, expenses, setoffs, contributions, attorneys' fees or causes of action of whatever kind or character ("Proceeding") against Sellers, whether past, present, future, known or unknown, liquidated or unliquidated, accrued or unaccrued, pending or threatened;

(x)     any obligation or Liability arising out of any Proceeding commenced against Sellers or any predecessor of any Seller after the Closing and arising out of, or relating to, any occurrence or event happening prior to, on or after the Closing;

(xi)     all obligations, Claims or Liabilities (whether known or unknown) with respect to the employees or former employees, or both (or their representatives) of Sellers or any predecessor of any Seller arising prior to the Closing Date, including payroll, vacation, sick leave, worker's compensation, unemployment benefits, pension benefits, employee stock option or profit sharing plans, health care plans or benefits (including COBRA), or any other employee plans or benefits or other compensation of any kind to any employee, and obligations of any kind including any Liability pursuant to the WARN Act for any action or inaction prior to the Closing;

(xii)     any obligation or Liability arising under any Employee Benefit Plan or any other employee benefit plan, policy, program, agreement or arrangement at any time maintained, sponsored or contributed to by Sellers or any ERISA Affiliate, or with respect to which Sellers or any ERISA Affiliate has any Liability including with respect to any underfunded pension Liability;

(xiii)   all accounts payable of Sellers arising prior to the Petition Date;

(xiv)   any obligation or Liability arising out of or relating to services or products of Sellers to the extent provided, developed, made or marketed, sold or distributed prior to the Closing;

(xv)   any obligation or Liability under any Assigned Contract which arises after the Closing but which arises out of or relates to any breach that occurred prior to the Closing;

(xvi)   any obligation or Liability under any Contract, mortgage, indenture or other instrument of Sellers not assumed by Purchaser hereunder;

(xvii)   any obligation or Liability under any employment, collective bargaining, severance, retention or termination agreement with any employee, consultant or contractor (or their representatives) of Sellers;

(xviii)   any obligation or Liability arising out of or relating to any grievance by current or former employees of Sellers, whether or not the affected employees are hired by Purchaser;

(xix)   any obligation or Liability to any shareholder or other equity holder of any Seller;

(xx)   any obligation or Liability arising out of or resulting from non-compliance or alleged non-compliance with any Law, ordinance, regulation or treaty by Sellers;

(xxi)   any obligation or Liability for infringement or misappropriation of any intellectual property arising out of or relating to any conduct of any Seller or operation of the Business on or before the Closing;

(xxii)   any obligation or Liability of Sellers under this Agreement or any other document executed in connection herewith;

(xxiii)   any obligation or Liability of Sellers based upon such Person's acts or omissions occurring after the Closing;

(xxiv)   the Liabilities specifically identified and described on Schedule 2.4(a)(xxiv);

(xxv)   any obligation or Liability of Sellers related to the Senior Secured Obligations;

(xxvi)   any obligation or Liability of Sellers related to the Other Obligations; and

(xxvii)   any other Liabilities of Sellers not expressly assumed by Purchaser pursuant to Section 2.3 above.

(b)   The parties acknowledge and agree that disclosure of any obligation or Liability on any Schedule to this Agreement shall not create an Assumed Liability or other Liability of Purchaser, except where such disclosed obligation has been expressly assumed by Purchaser as an Assumed Liability in accordance with the provisions of Section 2.3 hereof.

2.5    Assignment and Assumption of Contracts.

(a)    At Closing, Sellers shall, pursuant to the Bankruptcy Sale Order and the Assignment and Assumption Agreement(s) and other transfer and assignment documents reasonably requested by Purchaser, assume and sell and assign to Purchaser (the consideration for which is included in the Purchase Price), those Assignable Contracts that are set forth on a list (identifying the name, parties and date of each such Contract) provided by Purchaser to Sellers on or before the date which is three (3) days prior to the date set for the Auction (the "Assigned Contracts"); provided, however, that Purchaser shall have the right in its sole and absolute discretion to notify Sellers in writing of any Assigned Contract that it does not wish to assume immediately prior to the commencement of the Sale Hearing. Purchaser will pay all Cure Amounts in connection with the assumption and sale and assignment of Assigned Contracts for which all necessary consents and Bankruptcy Court approval to transfer have been obtained (as agreed to between Purchaser and Sellers or as determined by the Bankruptcy Court), and Purchaser will assume and agree to perform and discharge the Assumed Liabilities under the Assigned Contracts, pursuant to the Assignment and Assumption Agreement; provided, however, that on or before October 15, 2011, Sellers shall provide to Purchaser (i) a schedule setting forth all Cure Amounts for all Assignable Contracts and (ii) a schedule setting forth a description of each such Contract and each other Contract to which any Seller is a party or by which it is bound and that is used in or related to the Business or the Acquired Assets. Such schedule may be Sellers' Schedule G of their Schedules of Assets and Liabilities filed in connection with the Bankruptcy Cases, it being understood that Sellers' reliance upon Schedule G does not relieve Sellers of their obligation to provide additional information to Purchaser, at Purchaser's request, so that Purchaser may exercise its rights under this Section 2.5(a). Subject to the further provisions of this Section 2.5, from and after the date hereof, Sellers shall not reject any Assignable Contract unless otherwise agreed to in writing by Purchaser except for the Assignable Contracts identified in Schedule 2.5(a). Sellers shall provide timely and proper written notice of the motion seeking entry of the Bankruptcy Sale Order to all parties to Assigned Contracts and take all other actions necessary to cause such Assigned Contracts to be assumed by Sellers and assigned to Purchaser pursuant to Section 365 of the Bankruptcy Code, and Purchaser shall, at or prior to Closing, comply with all requirements under Section 365 necessary to assign to Purchaser the Assigned Contracts. Purchaser and Sellers agree there shall be excluded from the Acquired Assets any Assigned Contracts that are not assignable or transferable pursuant to the Bankruptcy Code or otherwise without the consent of any Person other than any Seller, to the extent that such consent shall not have been given prior to the Closing, and the Closing shall proceed with respect to the remaining Acquired Assets without reduction to the Purchase Price, subject to Purchaser's termination right set forth in Section 11.1(c)(ix).

(b)    Purchaser shall have the right, by written notice to Sellers within ten (10) days after the Closing Date (the "Post-Closing Designation Period"), to specify any Assignable Contracts that are not included as Assigned Contracts (each such other Contract, an "Excluded Contract") that shall be held by Sellers and not rejected pursuant to Section 365 of the Bankruptcy Code (any such Contract, a "Designation Right Contract") for the duration of the Designation Right Period (or such shorter period as provided below); provided, that with respect to any such Designation Right Contract (i) Purchaser shall reimburse Sellers and thereby be solely responsible for all costs associated with the continuation by Sellers of such Designation Right Contract (as set forth in a budget reasonably acceptable to Purchaser) for the period from the Closing through the earlier of (A) the date which is ten (10) days following the end of the Designation Right Period (or such earlier date that the Bankruptcy Court may allow for rejection of Contracts or Real Property Leases in the Bankruptcy Cases) and (B) the date which is ten (10) days following Sellers' receipt of written notice from Purchaser authorizing the rejection of such Designation Right Contract (or such earlier date that the Bankruptcy Court may allow for rejection of Contracts or Real Property Leases in the Bankruptcy Cases), (ii) if such Designation Right Contract is a Real Property Lease, then Sellers shall continue to be the employer of the Business Employees that are

employed at the Leased Real Property to which such Real Property Lease relates (except as otherwise determined by Purchaser), (iii) Purchaser and Sellers shall have agreed to transition services arrangements reasonably necessary in connection with such Designation Right Contract, (iv) for the avoidance of doubt, all cash collected by Sellers in respect of, and other benefits deriving from, such Designation Right Contract shall be promptly delivered to Purchaser, and (v) the foregoing shall not affect the validity of the transfer to Purchaser of any other Acquired Asset that may be related to such Designation Right Contract.

(c) Sellers shall have no right to reject or seek to be rejected pursuant to Section 365 of the Bankruptcy Code any Contract during the period beginning on the date hereof and ending upon the expiration of the Post-Closing Designation Period, except (x) with Purchaser's prior written consent or (y) if (i) the costs actually incurred with respect to the continuation of a Designation Right Contract exceed the budgetary amount for such Designation Right Contract approved by Purchaser, (ii) Sellers furnish Purchaser with written notice not less than five (5) days prior to the date on which Sellers seek to reject such Designation Right Contract of Sellers' intention to reject such Designation Right Contract, and (iii) prior to the expiration of the five (5) day period referred to in the immediately preceding clause (ii), Purchaser (A) fails to deliver an Assumption Notice to Sellers and (B) does not agree to reimburse Sellers for all costs associated with the continuation by Sellers of such Designation Right Contract as set forth in a revised budget relating to such Designation Right Contract delivered to Purchaser with the written notice set forth in the immediately preceding clause (ii) of this Section 2.5(c).

(d) As to Designation Right Contracts, Sellers shall not seek to reject such contracts for a period of 210 days following the Petition Date (the "Designation Right Period") unless directed in writing by Purchaser to do so and, as soon as practical after receiving further written notice(s) (each, an "Assumption Notice") from Purchaser during the Designation Right Period requesting assumption and assignment of any Designation Right Contract, Sellers shall, subject to Purchaser's demonstrating adequate assurance of future performance thereunder, take all actions required by the Bankruptcy Sale Order or otherwise that are reasonably necessary to seek to assume and assign to Purchaser pursuant to Section 365 of the Bankruptcy Code any Designation Right Contract(s) set forth in an Assumption Notice, and (i) any applicable cure cost shall be satisfied in accordance with the definition of Assumed Liabilities and (ii) if such Designation Right Contract is a Real Property Lease, then Purchaser may offer the Business Employees that are employed at the Leased Real Property to which such Real Property Lease relates employment, subject to the terms of Section 6.4. Sellers and Purchaser agree and acknowledge that the covenants set forth in Sections 2.5(b) through 2.5(f) shall survive the Closing. Notwithstanding anything in this Agreement to the contrary, on the date any Designation Right Contract is assumed and assigned to Purchaser pursuant to this Section 2.5(d), such Designation Right Contract shall be deemed an Assigned Contract for all purposes under this Agreement.

(e) In addition to Purchaser's payment obligations with respect to Designation Right Contracts, Purchaser shall, to the extent set forth in a budget reasonably acceptable to Purchaser, pay and be solely responsible for all costs associated with the continuation of Excluded Contracts (to the extent not previously rejected) that do not become Designation Right Contracts for the period from the Closing through the date that is ten (10) days following the expiration of the Post-Closing Designation Period (or such earlier date that the Bankruptcy Court may allow for rejection of Contracts or Real Property Leases in the Bankruptcy Cases) (and to the extent any such Contract is a Real Property Lease, Seller shall continue to be the employer of the Business Employees that are employed at the Leased Real Property to which such Real Property Lease relates during such period); provided, however, that, if at any time prior to the end of the Post-Closing Designation Period, Purchaser notifies Sellers that it will not assume any such Excluded Contract or other Assignable Contract in accordance with Section 2.5(c), then Purchaser shall only be responsible for such costs for the period from the later of (x) the date that such notice is received by Sellers and (y) the Closing Date through the tenth (10th) day following the latest of

such dates (or such earlier date that the Bankruptcy Court may allow for rejection of Contracts or Real Property Leases in the Bankruptcy Cases).

(f)     Costs to be paid by Purchaser as provided in, and for the periods specified in, Sections 2.5(b) and 2.5(e) shall include, with respect to the applicable Designation Right Contracts or Excluded Contracts, all employee costs (including termination costs for employees terminated in connection with the rejection of Real Property Leases) as set forth in the budgets referred to in Sections 2.5(b) and 2.5(e).

(g)     Notwithstanding anything to the contrary set forth in this Section 2.5, with respect to any Designation Right Contract that is a Real Property Lease, Purchaser shall provide Sellers with sufficient notice of Purchaser's intention to reject such Designation Right Contract so that Sellers may satisfy any obligations that may arise under the WARN Act.

2.6     Excluded Asset Amendments.     Notwithstanding anything herein to the contrary, Purchaser reserves the right to designate any Acquired Asset, other than an Assigned Contract, as an Excluded Asset at any time during the Designation Right Period. From and after such designation by Purchaser, Sellers shall retain all right, title and interest to, in and under, and all obligations with respect to, such Excluded Asset.

## ARTICLE 3
## CONSIDERATION

3.1     Purchase Price.

(a)     In consideration of the sale of the Acquired Assets to Purchaser, and in reliance upon the representations, warranties, covenants and agreements of Sellers set forth herein, and upon the terms and subject to the conditions hereinafter set forth, the purchase price (the "Purchase Price") for the Acquired Assets shall be:

(i)     the full amount of the Senior Secured Obligations (the "Cash Payment Amount"); plus

(ii)     the difference between (x) $120,000,000 and (y) the sum of the Cash Payment Amount, plus the Creditors' Recovery Amount, plus the Additional Employee Payment (the "Credit Bid Amount"), which may be satisfied, in Purchaser's sole discretion, in whole or in part, in the form of a credit against the Subordinated Note Document Obligations and DIP Obligations in accordance with Section 3.1(b); plus

(iii)     the Creditors' Recovery Amount; plus

(iv)     the Additional Employee Payment; plus

(v)     assumption of the Assumed Liabilities.

(b)     At the Closing, the Purchase Price shall be payable:

(i)     as to the Cash Payment Amount, in cash;

(ii)     as to the Creditors' Recovery Amount, in cash;

(iii)    as to the Additional Employee Payment, such amount shall be reserved on the books and records of Purchaser in accordance with United States generally accepted accounting principles; and

(iv)    as to the balance of the Purchase Price, in Purchaser's sole discretion, with respect to the Credit Bid Amount by (A) delivering to Sellers fully executed releases and waivers from the applicable lenders (including Purchaser or its Affiliates) under the Subordinated Note Documents or the DIP Credit Agreement, as applicable, with respect to all or a part of Sellers' obligations thereunder or (B) with the written consent of the applicable lenders (including Purchaser or its Affiliates) under the Subordinated Note Documents or the DIP Credit Agreement, as applicable, assuming all or a part of Sellers' obligations thereunder on terms reasonably acceptable to Purchaser and providing Sellers with fully executed releases and waivers from the applicable lenders (including Purchaser or its Affiliates) under the Subordinated Note Documents or the DIP Credit Agreement, as applicable, with respect to all of Sellers' obligations thereunder; provided that the Credit Bid Amount is paid in whole pursuant to clause (A), clause (B) or any combination thereof.

(c)    For the avoidance of doubt, at any time, and from time to time, during the Auction, Purchaser may increase the Purchase Price, including by increasing the amount of the Credit Bid to the full amount then outstanding and owing under Subordinated Note Document Obligations and DIP Obligations.

3.2    Allocation of Purchase Price.

(a)    Within the earlier of (i) 120 days after the Closing Date and (ii) 20 days prior to the extended due date of the Tax Returns to which IRS Form 8594 must be attached, Purchaser shall deliver to Sellers a statement (the "Allocation Statement") allocating, for tax purposes, the consideration paid by Purchaser for the Acquired Assets among the Acquired Assets in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder.

(b)    The parties to this Agreement hereby agree to (i) be bound by the Allocation Statement, (ii) act in accordance with the Allocation Statement in connection with the preparation, filing and audit of any Tax Return (including in the filing of IRS Form 8594 and any corresponding other Tax forms) and (iii) take no position inconsistent with the Allocation Statement for any Tax purpose (including in any audit, judicial or administrative proceeding).  Purchaser and Sellers each agree to provide the other promptly with any other information required to complete IRS Form 8594.

**ARTICLE 4**
**REPRESENTATIONS AND WARRANTIES OF SELLERS**

Sellers hereby represent and warrant to Purchaser as of the date hereof and as of the Closing Date:

4.1    Organization.  Each Seller is duly organized, validly existing and in good standing under the Laws of its state of incorporation or formation and has all necessary power and authority to own, lease and operate its properties and to conduct its business in the manner in which its business is currently being conducted.  Except as a result of the commencement of the Bankruptcy Cases, each Seller is qualified to do business and is in good standing in all jurisdictions where it leases real property in connection with the operation of the Business or otherwise conducts the Business.

4.2    Authorization of Agreement.  Subject to entry of the Bankruptcy Sale Order and authorization as is required by the Bankruptcy Court:

(a)    each Seller has, or at the time of execution will have, all necessary power and authority to execute and deliver this Agreement and each Ancillary Agreement to which such Seller is or will become a party and to perform its obligations hereunder and thereunder;

(b)    the execution, delivery and performance of this Agreement and each Ancillary Agreement to which a Seller is or will become a party and the consummation of the transactions contemplated hereby and thereby have been, or at the time of execution will be, duly authorized by all necessary action on the part of such Seller and no other proceedings (shareholder, member or otherwise) on the part of Sellers are necessary to authorize such execution, delivery and performance; and

(c)    this Agreement and each Ancillary Agreement to which a Seller is or will become a party have been, or when executed will be, duly and validly executed and delivered by such Seller and (assuming the due authorization, execution and delivery by the other parties hereto or thereto) this Agreement and each Ancillary Agreement to which a Seller is or will become a party constitutes, or will constitute, when executed and delivered, the valid and binding obligation of such Seller enforceable against such Seller in accordance with its respective terms, subject to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at Law or in equity).

4.3    Conflicts; Consents of Third Parties.

(a)    Except as set forth on Schedule 4.3(a), the execution, delivery and performance by each Seller of this Agreement and each Ancillary Agreement, the consummation of the transaction contemplated hereby and thereby, or compliance by each Seller with any of the provisions hereof or thereof do not, or will not at the time of execution, result in the creation of any Lien or Encumbrance upon the Acquired Assets and do not, or will not at the time of execution, conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of payment, termination, modification, acceleration or cancellation under any provisions of:

(i)    such Seller's certificates of incorporation, bylaws or comparable organizational documents of such Seller;

(ii)    subject to entry of the Bankruptcy Sale Order, any Assigned Contract or Permit to which such Seller is a party or by which any of the Acquired Assets are bound;

(iii)    subject to entry of the Bankruptcy Sale Order, any order, writ, injunction, judgment or decree of any Governmental Authority applicable to such Seller or any of the Permits, licenses, rights, properties or assets of such Seller as of the date hereof; or

(iv)    subject to entry of the Bankruptcy Sale Order, any applicable Law.

(b)    Subject to entry of the Bankruptcy Sale Order, and except (i) for such authorizations, orders, declarations, filings and notices as may be required under the HSR Act and (ii) as set forth on Schedule 4.3(b), no consent, waiver, approval, order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority is required on the part of any Seller in connection with the execution, delivery and performance of this Agreement or any other agreement, document or instrument contemplated hereby or thereby to which it is or will become a party, the compliance by such Seller with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby, or the assignment or conveyance of the Acquired Assets.

4.4    Title to Acquired Assets.  Except as set forth on Schedule 4.4, Sellers have good, valid, marketable and undivided title to the Acquired Assets free and clear of all Liens, Claims, Interests and Encumbrances, other than Permitted Liens, and, subject to entry of the Bankruptcy Sale Order, Purchaser will be vested, to the maximum extent permitted by Sections 363 and 365 of the Bankruptcy Code, with good, valid, marketable and undivided title to the Acquired Assets free and clear of all Liens, Claims, Interests and Encumbrances, other than Permitted Liens.

4.5    Contracts.  Schedule 4.5 sets forth a complete list, as of the date hereof, of all Contracts to which any Seller is a party or by which it is bound and that are used in or related to the Business or the Acquired Assets.  Purchaser has received true and complete copies of such Contracts and any and all amendments, modifications, supplements, exhibits and restatements thereto and thereof in effect as of the date of this Agreement.

4.6    Property.  Sellers do not own any real property.  Schedule 4.6 sets forth the title and parties to, and date of, each of the Real Property Leases and the full street address of each Leased Real Property.  Purchaser has received true and complete copies of the Real Property Leases and any and all amendments, modifications, supplements, exhibits and restatements thereto and thereof in effect as of the date of this Agreement.  Upon entry of the Bankruptcy Sale Order and payment of the Cure Amounts, if any, in respect of each Real Property Lease, (i) no Seller will be in breach or default of its obligations under such Real Property Lease, (ii) no condition will exist that with notice or lapse of time or both would constitute a default under such Real Property Lease, and (iii) to Sellers' Knowledge, no other party to such Real Property Lease is or will then be in breach or default thereunder.

4.7    Intellectual Property.  Except as set forth on Schedule 4.7, (i) with respect to any Intellectual Property owned by any Seller (as opposed to Intellectual Property of which any Seller is a licensee), Sellers have all right, title and interest to all Intellectual Property, without any conflict known to any Seller with the rights of others, (ii) no Person other than Sellers has the right to use the Intellectual Property owned by Sellers, and (iii) Sellers have the valid right to use, pursuant to a license, sublicense or other agreement, any Intellectual Property used in Sellers' Business that is owned by a party other than Sellers.

4.8    Taxes.

(a)    Each Seller has filed all material Tax Returns that it was required to file.  All such Tax Returns were correct and complete in all material respects.  All material Taxes owed by any Seller (whether or not shown on any Tax Return) have been paid.  No Seller is the beneficiary of any extension of time within which to file any Tax Return.  With respect to each Seller, no claim has ever been made by a Governmental Authority in a jurisdiction where such Seller does not file Tax Returns that such Seller is or may be subject to taxation by that jurisdiction.

(b)    Each Seller has withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other third party, and all Forms W-2 and 1099 (or any other applicable form) required with respect thereto have been properly completed and timely filed.

(c)    There is no dispute or claim concerning any Tax Liability of any Seller claimed or raised by any authority in writing or, to Sellers' Knowledge, orally.  No Seller has waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency.

4.9     Employee Benefit Plans.  Schedule 4.9 sets forth a list of each Employee Benefit Plan. No Seller or any ERISA Affiliate has maintained, sponsored, or contributed to an Employee Benefit Plan that is subject to Title IV of ERISA within the last six years or, in any way, directly or indirectly, has any liability with respect to such a plan. All Employee Benefit Plans are being administered in compliance, in all material respects, with, where applicable, ERISA and the Code, and the regulations promulgated thereunder. Each Employee Benefit Plan that is intended to be qualified under Section 401(a) of the Code has received a favorable determination letter upon which Sellers may rely, or has pending or has time remaining in which to file an application for such determination from the United States Internal Revenue Service.

4.10     Labor Matters.

(a)     No Seller is a party to any collective bargaining agreement or has any relationship with any labor organization.  There is no labor strike, slowdown, work stoppage or other material labor dispute relating to Sellers pending or, to Sellers' Knowledge, threatened against any Seller. No union organizing or decertification efforts are underway or, to Sellers' Knowledge, threatened, and no other question concerning representation exists.

(b)     No Seller has received notice of any material employment-related charge or material complaint against any Seller before the Equal Employment Opportunity Commission, the Department of Labor, the National Labor Relations Board or any other Governmental Authority and no Seller has received any notice of any material threatened employment-related charge or complaint against any Seller any such Governmental Authority.

(c)     With respect to this transaction, any notice required under any Law or collective bargaining agreement has been given, and all bargaining obligations with any employee representative have been, or prior to the Closing will be, satisfied.  No Seller has implemented any mass layoff of employees that could implicate the WARN Act or similar state, local or foreign Laws or Regulations.

4.11     Environmental Matters.  The Acquired Assets are in material compliance with all applicable Laws, regulations, or other legal requirements relating to the protection of the environment or human health and safety as it relates to Hazardous Materials ("Environmental Laws"); (b) no Seller has received written notice of any Proceeding relating to or arising under Environmental Laws with respect to the Acquired Assets or the Business, nor, to Sellers' Knowledge, are any of the same being threatened in writing against any Seller or any real property owned, operated, or leased by any Seller; (c) no Seller has received any written notice of, or entered into, any obligation, order, settlement, judgment, injunction, or decree involving outstanding requirements relating to or arising under Environmental Laws; and (d) there has been no Release of any Hazardous Material into the environment at, onto, or from any property owned or leased by any Seller which would reasonably be expected to result in material Liability, costs or Claims relating to any Environmental Law.

4.12     Insurance.  Sellers maintain the insurance policies set forth on Schedule 4.12, which Schedule sets forth all insurance policies covering the property, assets, employees and operations of the Business (including policies providing property, casualty, liability and workers' compensation coverage). Such policies are in full force and effect and except as set forth on Schedule 4.12, will continue in full force and effect immediately following the Closing. Sellers have paid all premiums on such policies due and payable prior to the Execution Date. Sellers have not done anything by way of action or inaction that invalidates any such policies in whole or in part.

4.13     No Brokers or Finders.  No agent, broker, finder or investment or commercial banker, or other Person or firm engaged by, or acting on behalf of, any of Sellers in connection with the negotiation,

execution or performance of this Agreement or the transactions contemplated by this Agreement, other than as set forth on Schedule 4.13, the fees and expenses of which Sellers shall bear, is or will be entitled to any brokerage or finder's or similar fees or other commissions as a result of this Agreement or such transaction.

4.14     Litigation; Proceedings. Except as set forth in Schedule 4.14, there is no material claim, action, suit, Proceeding, complaint, charge, hearing, grievance or arbitration pending or, to Sellers' Knowledge, threatened against or related to the Business, whether at Law or in equity, whether civil or criminal in nature or by or before any arbitrator or Governmental Authority, nor are there any investigations relating to the Business, pending or, to Sellers' Knowledge, threatened by or before any arbitrator or any Governmental Authority. None of the Acquired Assets is subject to any judgment, injunction, order, consent, or decree of any Governmental Authority or any settlement agreement with any Person.

4.15     Board Approval and Recommendations. The board of directors, board of managers or applicable governing body of each Seller has determined that, based upon its consideration of the available alternatives, and subject to the approval of the Bankruptcy Court and the provisions in this Agreement regarding the solicitation of and ability to accept Alternate Transactions, a sale, assignment and assumption of the Acquired Assets and the Assumed Liabilities pursuant to this Agreement under Sections 105, 363 and 365 of the Bankruptcy Code is in the best interests of such Seller.

4.16     Compliance with Laws. To Sellers' Knowledge, each Seller (i) has complied with, is in compliance with and has operated the Business in compliance with all applicable Laws in all material respects, and (ii) holds all material Permits, concessions, grants, licenses, easements, variances, exemptions, consents, orders, franchises, authorizations and approvals of all Governmental Authorities necessary for the lawful conduct of the Business and is in compliance with all of the foregoing in all material respects. Since August 30, 2007, no Seller has received any written notice or other written communication from any Governmental Authority or other Person (i) asserting any violation of, or failure to comply with, any requirement of any Permit or (ii) notifying a Seller of the non-renewal, revocation or withdrawal of any Permit. Each Seller is in material compliance with the terms of the Permits.

4.17     Warranties Are Exclusive. EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, SELLERS MAKE NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN RESPECT OF THE BUSINESS OR ANY OF THEIR ASSETS (INCLUDING THE ACQUIRED ASSETS), LIABILITIES (INCLUDING THE ASSUMED LIABILITIES) OR OPERATIONS, INCLUDING, WITH RESPECT TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, OR NON-INFRINGEMENT, AND ANY SUCH OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED AND NONE SHALL BE IMPLIED AT LAW OR IN EQUITY. PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT PURCHASER IS PURCHASING THE ACQUIRED ASSETS ON AN "AS IS, WHERE IS" BASIS AFTER GIVING EFFECT TO THE TERMS CONTAINED HEREIN.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Sellers as follows:

5.1     Organization. Purchaser is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware and has all requisite limited liability

company power and authority to own its properties and assets and to conduct its business as now conducted.

5.2    <u>Authorization and Validity</u>. Purchaser has, or at the time of execution will have, all necessary limited liability company power and authority to execute and deliver this Agreement and any Ancillary Agreement to which Purchaser is or will become a party and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement and any Ancillary Agreement to which Purchaser is or will become a party and the performance of Purchaser's obligations hereunder and thereunder have been, or at the time of execution will be, duly authorized by all necessary action by Purchaser. This Agreement and each Ancillary Agreement to which Purchaser is or will become a party have been, or at the time of execution will be, duly executed by Purchaser and constitute, or will constitute, when executed and delivered, Purchaser's valid and binding obligations, enforceable against it in accordance with their respective terms except as may be limited by bankruptcy or other Laws affecting creditors' rights and by equitable principles.

5.3    <u>No Conflict or Violation</u>. The execution, delivery and performance by Purchaser of this Agreement and any Ancillary Agreement to which Purchaser is or will become a party do not or will not at the time of execution (a) violate or conflict with any provision of the organizational documents of Purchaser, (b) violate any provision of applicable Law, or any order, writ, injunction, judgment or decree of any court or Governmental Authority applicable to Purchaser, or (c) violate or result in a breach of or constitute (with due notice or lapse of time, or both) an event of default or default under any Contract to which Purchaser are party or by which Purchaser is bound or to which any of Purchaser's properties or assets are subject.

5.4    <u>Consents and Approvals</u>. No consent, waiver, authorization or approval of any Person and no declaration to or filing or registration with any Governmental Authority is required in connection with the execution and delivery by Purchaser of this Agreement and each Ancillary Agreement to which Purchaser are or will become a party or the performance by Purchaser of its obligations hereunder or thereunder, except for applicable requirements under the HSR Act.

5.5    <u>Financial Capability</u>. Purchaser (i) has as of the date of this Agreement, and will have at Closing, sufficient funds or financing available to pay the Cash Payment Amount and any expenses incurred by Purchaser in connection with the transactions contemplated by this Agreement and the Ancillary Agreements, (ii) has as of the date of this Agreement, and will have at Closing, the resources and capabilities (financial or otherwise) to perform Purchaser's obligations hereunder and (iii) has not incurred any obligation, commitment, restriction or Liability of any kind, that would impair or adversely affect such resources and capabilities.

5.6    <u>No Other Representations and Warranties</u>. Except for the representations and warranties contained in this <u>Article 5</u>, neither Purchaser nor any other Person makes any other express or implied representation or warranty on behalf of Purchaser.

## ARTICLE 6
## COVENANTS AND OTHER AGREEMENTS

6.1    <u>Pre-Closing Covenants of Sellers</u>. Sellers covenant to Purchaser that, during the period from and including the Execution Date through and including the Closing Date or the earlier termination of this Agreement:

    (a)    <u>Cooperation</u>. Sellers shall use commercially reasonable efforts to obtain, and assist Purchaser in obtaining, at no cost to Purchaser (other than Cure Amounts payable at or after the

Closing), such consents, waivers or approvals of any third party or Governmental Authority required for the consummation of the transactions contemplated hereby, including the sale and assignment of the Acquired Assets. Sellers shall take, or cause to be taken, all commercially reasonable actions and to do, or cause to be done, all things necessary or proper, consistent with applicable Law, to consummate and make effective as soon as possible the transactions contemplated hereby. To the extent reasonably requested by Purchaser, Sellers shall introduce the Purchaser to the landlords under the Real Property Leases and any other Person with whom any Seller does business in connection with the Business and permit Purchaser to have discussions with such landlords and other Persons about the Business or any Contract related to the Business.

(b)     Access to Records and Properties. Sellers shall (i) provide Purchaser and its Related Persons reasonable access, upon reasonable notice and at reasonable times, to the Facilities, offices and personnel of Sellers and to the books and records of Sellers, related to the Business or the Acquired Assets or otherwise reasonably requested by Purchaser if reasonably necessary to comply with the terms of this Agreement or the Ancillary Agreements or any applicable Law, including access to perform field examinations and inspections of inventories, Facilities and equipment of the Business; (ii) furnish Purchaser with such financial and operating data and other information with respect to the condition (financial or otherwise), businesses, assets, properties or operations of Sellers related to the Business as Purchaser shall reasonably request; and (iii) permit Purchaser to make such reasonable inspections and copies thereof as Purchaser may require; provided, however, that Purchaser shall use commercially reasonable efforts to prevent any such inspection from unreasonably interfering with the operation of the Sellers' normal business operations or the duties of any employee of Sellers.

(c)     Disclosure Schedules and Supplements. Sellers shall notify Purchaser of, and shall supplement or amend the disclosure schedules (the "Schedules") to this Agreement with respect to, any matter that (i) arises after the Execution Date and that, if existing or occurring at or prior to such delivery of the Schedules, would have been required to be set forth or described in the Schedules to this Agreement or (ii) makes it necessary to correct any information in the Schedules to this Agreement or in any representation and warranty of Sellers that has been rendered inaccurate thereby. Each such notification and supplementation, to the extent known, shall be made no later than two (2) Business Days after discovery thereof and no later than three (3) days before the date set for the Closing by the parties. No such supplement or amendment to the Schedules to this Agreement shall be deemed to cure any inaccuracy of any representation or warranty made in this Agreement.

(d)     Conduct of Business Prior to Closing. Except as expressly contemplated by this Agreement or with Purchaser's prior written consent (which consent shall not unreasonably be withheld), and except to the extent expressly required or permitted under the DIP Credit Agreement, the Bankruptcy Code, other applicable Law or any ruling or order of the Bankruptcy Court:

(i)     Sellers shall not take any action that would constitute or result in an Event of Default (as defined therein) under the DIP Credit Agreement;

(ii)     Sellers shall not directly or indirectly sell or otherwise transfer, or offer, agree or commit (in writing or otherwise) to sell or otherwise transfer, any of the Acquired Assets other than the sale of Inventory in the ordinary course of business or the use of cash collateral in accordance with the DIP Credit Agreement or the DIP Orders;

(iii)     Sellers shall not permit, offer, agree or commit (in writing or otherwise) to permit, any of the Acquired Assets to become subject, directly or indirectly, to any Lien, Claim, Interest or Encumbrance, except for Permitted Liens, Liens granted in connection with the DIP Credit Agreement and Liens set forth on Schedule 4.4;

(iv)     Sellers shall not enter into any transaction or take any other action that could be reasonably expected to cause or constitute a breach of any representation or warranty made by Sellers in this Agreement;

(v)     Sellers shall notify Purchaser promptly in writing of any Material Adverse Effect;

(vi)     Sellers shall not make any promise or representation, oral or written, or otherwise, (1) to increase the annual level of compensation payable or to become payable by Sellers to any of their directors or Business Employees, (2) to grant, or establish or modify any targets, goals, pools or similar provisions in respect of, any bonus, benefit or other direct or indirect compensation to or for any director or Business Employee, or increase the coverage or benefits available under any (or create any new) Employee Benefit Plan, or (3) to enter into any employment, deferred compensation, severance, consulting, non-competition or similar agreement (or amend any such agreement) to which any Seller is a party or involving a director or Business Employee of Sellers, except, in each case, as required by Law, or as required by any plans, programs or agreements existing on the Execution Date and disclosed on Schedule 4.9;

(vii)     Sellers shall comply in all material respects with all Laws applicable to Sellers or having jurisdiction over the Business or any Acquired Asset;

(viii)     Sellers shall not enter into any Contract material to Sellers (individually or taken as a whole) to which any Seller is a party or by which it is bound and that are used in or related to the Business or the Acquired Assets (other than in the ordinary course of the Business) or assume, amend, modify or terminate any Contract to which any Seller is a party or by which it is bound and that are used in or related to the Business or the Acquired Assets (including any Assigned Contract), or fail to exercise any renewal right with respect to any Contract (including any Real Property Lease) that by its terms would otherwise expire (other than in the ordinary course of the Business and, provided that, as to any Contract (including any Real Property Lease), any such renewal does not constitute an assumption of such Contract (including any Real Property Lease) absent designation as an Assigned Contract pursuant to the terms of this Agreement);

(ix)     Sellers shall not cancel or compromise any material debt or claim or waive or release any right of Sellers that constitutes an Acquired Asset;

(x)     Sellers shall not enter into any commitment for capital expenditures except pursuant to the Budget;

(xi)     Sellers shall not assign, sublet, pledge, encumber, terminate, amend or modify in any manner any lease for Leased Real Property;

(xii)     Sellers shall use commercially reasonable efforts to (1) conduct the Business in substantially the same manner as conducted as of the date of this Agreement and only in the ordinary course, (2) preserve the existing business organization and management of the Business intact, (3) keep available the services of the Business Employees, to the extent reasonably feasible, (4) maintain the existing relations with customers, distributors, suppliers, creditors, business partners, employees and others having business dealings with the Business, to the extent reasonably feasible, and (5) refrain from changing in any material respect any of their product prices or pricing policies (e.g., discount policies) for any of their products except as shall be necessary to meet competition or customer requirements;

(xiii)  Sellers shall at all times maintain, preserve and protect all of their material Intellectual Property, and preserve all the remainder of their material property (including all improvements and all tangible Personal Property, including all FF&E), in use or useful in the conduct of the Business and keep the same in good repair, working order and condition (taking into consideration ordinary wear and tear) and from time to time make, or cause to be made, all necessary or appropriate repairs, replacements and improvements thereto consistent with industry practices, so that the business carried on in connection therewith may be properly and advantageously conducted at all times; and

(xiv)  Sellers shall not take, or agree, commit or offer (in writing or otherwise) to take, any actions in violation of the foregoing.

6.2  <u>Pre-Closing Covenants of Purchaser</u>.  Purchaser covenants to Sellers that, during the period from the Execution Date through and including the Closing or the earlier termination of this Agreement:

(a)  <u>Cooperation</u>.  Purchaser shall take, or cause to be taken, all commercially reasonable actions and to do, or cause to be done, all things necessary or proper, consistent with applicable Law, to consummate and make effective as soon as possible the transactions contemplated hereby; <u>provided</u>, that the foregoing shall not require Purchaser to participate as a bidder in the Auction.

(b)  <u>Adequate Assurances Regarding Assigned Contracts and Required Orders</u>.  With respect to each Assigned Contract, Purchaser shall provide adequate assurance of the future performance of such Assigned Contract by Purchaser.  Purchaser shall take such actions as may be reasonably requested by Sellers to assist Sellers in obtaining the Bankruptcy Court's entry of the Bankruptcy Sale Order and any other order of the Bankruptcy Court reasonably necessary to consummate the transactions contemplated by this Agreement.

(c)  <u>Sufficient Funds</u>.  Purchaser shall ensure that, on the Closing Date and for the duration of the Designation Right Period, Purchaser will have access to sufficient funds to pay Cure Amounts respecting the Assigned Contracts and all of its fees and expenses incurred in connection with the transactions contemplated hereby.

(d)  <u>Permits</u>.  Purchaser shall use commercially reasonable efforts to cooperate with Sellers to obtain or consummate the transfer to Purchaser of any Permit required to own or operate the Acquired Assets under applicable Laws.

6.3  <u>Other Covenants of Sellers and Purchaser</u>.

(a)  <u>Personally Identifiable Information</u>.  Purchaser shall honor and observe, in connection with the transactions contemplated by this Agreement, any and all policies of Sellers in effect on the Petition Date prohibiting the transfer of personally identifiable information about individuals and otherwise comply with the requirements of Section 363(b)(l)(A) of the Bankruptcy Code.

(b)  <u>Access to Records and Properties after Closing</u>.  Following Closing, Purchaser and Sellers agree to permit their respective representatives to have access, at reasonable times and in a manner so as not to unreasonably interfere with their normal business operations, to the books and records acquired pursuant to this Agreement (or, in the case of Purchaser, books and records relating to the Business that constitute Excluded Assets) so as to enable Purchaser and Sellers to prepare Tax, financial or court filings or reports, to respond to court orders, subpoenas or inquiries, investigations, audits or other proceedings of Governmental Authorities, to reconcile and resolve claims, to facilitate the wind-down of Sellers' estates and the Bankruptcy Cases, and to prosecute and defend legal actions or for other

like purposes. If either party desires to dispose of any such records, such party shall, prior to such disposition, provide the other party with a reasonable opportunity to remove such of the records to be disposed of at the removing party's expense. If reasonably requested by Sellers, Purchaser shall provide Sellers with office or storage space in Purchaser's facilities at no cost to Sellers for a period not to exceed six months provided Sellers execute an agreement, in form and substance satisfactory to Purchaser, setting forth the terms under which Sellers will be permitted access to such facilities.

      (c)    <u>Antitrust Notification.</u>

      (i)    Sellers and Purchaser shall, as promptly as practicable but in no event later than November 7, 2011, file with (i) the United States Federal Trade Commission (the "<u>FTC</u>") and the United States Department of Justice ("<u>DOJ</u>"), the notification and report form required for the transactions contemplated hereby and any supplemental information requested in connection therewith pursuant to the HSR Act, which forms shall specifically request early termination of the waiting period prescribed by the HSR. Each of Sellers and Purchaser shall furnish to each other's counsel such necessary information and reasonable assistance as the other may request in connection with its preparation of any filing or submission that is necessary under the HSR Act. Purchaser shall pay the filing fee.

      (ii)    Sellers and Purchaser shall use their commercially reasonable efforts to promptly obtain any clearance required under the HSR Act for the consummation of this Agreement and the transactions contemplated hereby and shall keep each other apprised of the status of any communications with, and any inquiries or requests for additional information from, the FTC and the DOJ and shall comply promptly with any such inquiry or request; Purchaser shall agree to any structural or conduct relief.

      (iii)    The parties hereto commit to instruct their respective counsel to cooperate with each other and use commercially reasonable efforts to facilitate and expedite the identification and resolution of any such issues and, consequently, the expiration of the applicable HSR Act waiting period at the earliest practicable date. Said commercially reasonable efforts and cooperation include counsel's undertaking (i) to keep each other appropriately informed of communications from and to personnel of the reviewing antitrust authority, and (ii) to confer with each other regarding appropriate contacts with and response to personnel of said antitrust authority.

    6.4    <u>Employment Covenants and Other Undertakings.</u>

      (a)    <u>Employees.</u> Purchaser shall have the right, but not the obligation, to employ or engage as contractors any or all of the Business Employees as Purchaser determines in its sole and absolute discretion. Any Business Employees actually employed by Purchaser are referred to herein as "<u>Transferred Employees.</u>" The terms of employment offered to any Business Employees (including compensation and benefits) shall be determined by Purchaser in its sole and absolute discretion. Purchaser shall deliver a list of the Business Employees it intends to hire no later than five (5) days prior to the date of the Sale Hearing. Immediately prior to the Closing, the employment of all of the Transferred Employees shall be terminated by the applicable Seller. Subject to obtaining any employee consents required by Law with respect to disclosure of health related information, Sellers shall deliver to Purchaser on or before the Closing Date all personnel files and employment records relating to the Transferred Employees (including completed I-9 forms and attachments with respect to all Transferred Employees, except for such employees as Sellers certify in writing are exempt from such requirement).

      (b)    <u>Purchaser Employee Benefit Plans.</u> At Closing, Purchaser shall make available or establish one or more employee benefit plans for the Transferred Employees and their dependents.

Purchaser shall credit (i) each Transferred Employee with his or her service with Sellers, to the same extent such service would have been credited had such service been with Purchaser, and (ii) the Transferred Employees with all service recognized by Sellers under employee plans as service with Purchaser for purposes of eligibility to participate and vesting under all employee benefit plans, programs and policies of Purchaser, whether now existing or hereafter adopted (the "Purchaser Plans"). The Purchaser shall waive any coverage waiting period, pre-existing condition and actively-at-work requirements that have been satisfied under corresponding plans of Sellers and shall provide that any eligible expenses incurred before the Closing Date by a Transferred Employee (and his or her dependents) during the calendar year of the Closing and disclosed to Purchaser by such Transferred Employee shall be taken into account for purposes of satisfying the applicable deductible, coinsurance and maximum out-of-pocket provisions, and applicable annual or lifetime maximum benefit limitations of Purchaser Plans. Nothing in this Section 6.4 or any other provision of this Agreement shall be construed to modify, amend, or establish any benefit plan, program or arrangement or in any way affect the ability of the parties hereto or any other Person to modify, amend or terminate any of its benefit plans, programs or arrangements.

(c)     Sellers Employee Benefit Plans.    Except as otherwise specified in this Agreement, Sellers shall retain (i) all Liabilities and obligations in respect of their past, present and future employees, including the Business Employees, under applicable Laws and (ii) all Liabilities and obligations under any "employee benefit plan" within the meaning of Section 3(3) of ERISA and any other employee benefit plan or program maintained or contributed to by a Seller or any ERISA Affiliate, including any Employee Benefit Plans, and Purchaser shall have no Liability or obligation whatsoever under the Employee Benefit Plans nor shall Purchaser assume the sponsorship of the Employee Benefit Plans.

(d)     Other Obligations.    Except as otherwise required by Law, specified in this Agreement, or otherwise agreed in writing by Purchaser or its Affiliates (other than Sellers), neither Purchaser nor its Affiliates shall be obligated to provide any severance, separation pay, or other payments or benefits, including any key employee retention payments, to any employee of Sellers on account of any termination of such employee's employment on or before the Closing Date, and such benefits (if any) shall remain obligations of Sellers.

(e)     Forms W-2 and W-4.    Sellers and Purchasers shall adopt the "standard procedure" for preparing and filing IRS Forms W-2 (Wage and Tax Statements) and Forms W-4 (Employee's Withholding Allowance Certificate) regarding the Transferred Employees. Under this procedure, Sellers (so long as they remain in existence) shall keep on file all IRS Forms W-4 provided by the Transferred Employees for the period required by applicable law concerning record retention and Purchasers will obtain new IRS Forms W-4 with respect to each Transferred Employee.

(f)     No Right to Continued Employment.    Nothing contained in this Agreement shall confer upon any Transferred Employee any right with respect to continuance of employment by Purchaser, nor shall anything herein interfere with the right of Purchaser to terminate the employment of any Transferred Employees at any time, with or without notice, or restrict Purchaser, in the exercise of its business judgment in modifying any of the terms or conditions of employment of the Transferred Employees after the Closing.

(g)     Employee Communications.    Prior to making any written or oral communications to the Business Employees pertaining to compensation or benefit matters that are affected by the transactions contemplated by this Agreement, Sellers shall provide Purchaser with a copy of the intended communication.

6.5    Non-Assignment of Contracts.  Notwithstanding anything herein to the contrary, this Agreement shall not constitute an agreement to assign any Assigned Contract or any Permit, if, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, an attempted assignment thereof, without the consent of any other Person party thereto, would constitute a breach thereof or in any way negatively affect the rights of Purchaser (unless the restrictions on assignment would be rendered ineffective pursuant to Sections 9-406 through 9-409, inclusive, of the Uniform Commercial Code, as amended), as the assignee of such Assigned Contract or Permit, as the case may be, thereunder.  If, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, such consent or approval is required but not obtained, neither Sellers nor Purchaser shall be in breach of this Agreement nor shall the Purchase Price be adjusted or the Closing delayed, provided that Sellers shall cooperate with Purchaser without further consideration, in any reasonable arrangement designed to provide Purchaser with all of the benefits of or under any such Assigned Contract or Permit, including but not limited to enforcement for the benefit of Purchaser of any and all rights of Sellers against any Person party to the Assigned Contract or Permit arising out of the breach or cancellation thereof by such Person; provided, however, that after Closing, Purchaser shall be responsible for all payment and other obligations under, and for all costs of enforcing rights under, such Assigned Contract or Permit to the same extent as if such Assigned Contract or Permit had been assigned.  Any assignment to Purchaser of any Assigned Contract or Permit that shall, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, require the consent or approval of any Person for such assignment as aforesaid shall be made subject to such consent or approval being obtained.  For the avoidance of doubt, nothing in this Section 6.5 shall be deemed to alter any rights of the Purchaser under Section 11.1(c)(ix) of this Agreement.

6.6    Casualty.  If, between the date of this Agreement and the Closing, any of the Acquired Assets shall be destroyed or damaged in whole or in part by fire, earthquake, flood, other casualty or any other cause ("Casualty"), then Purchaser shall have the option to: (a) acquire such Acquired Assets on an "as is" basis and take an assignment from Sellers of all insurance proceeds payable to Sellers in respect of the Casualty, or (b) in the event that the Casualty would have a Material Adverse Effect, terminate this Agreement and the transactions contemplated hereby.

6.7    Name Change.  At Closing, Sellers will deliver to Purchaser a duly and properly authorized and executed evidence (in form and substance satisfactory to Purchaser) as to the amendment of such Sellers' organizational documents (collectively, the "Organizational Amendments") changing each Seller's name to another name which does not include the words "Friendly's," "Ice Cream" or any of the names set forth on the signature pages to this Agreement.  Upon the Closing, each Seller hereby irrevocably authorizes Purchaser to file the Organizational Amendments with the applicable Secretary of State of each Seller's jurisdiction of incorporation or formation and in each State in which each such Seller is qualified to do business on each such Seller's behalf.  Furthermore, after the Closing, each Seller shall discontinue the use of its current name (and any other trade names currently utilized by any of Sellers) and shall not subsequently change its name to or otherwise use or employ any name which includes the words "Friendly's" or "Ice Cream" without the prior written consent of Purchaser.  From and after the Closing, each of Sellers covenants and agrees not to use or otherwise employ any of the trade names, corporate names, "doing business as" or fictitious name registrations or similar Intellectual Property rights utilized by any of Sellers in the conduct of the Business, which rights shall be included in the Acquired Assets purchased hereunder. Sellers further covenant and agree to use commercially reasonable efforts to cease using the trade names, corporate names, "doing business as" or fictitious name registrations or similar Intellectual Property rights utilized by any Seller in the conduct of the Business on buildings and signage on the respective Leased Real Property subject to a Real Property Lease which is an Excluded Contract as soon as reasonably practicable within a period not to exceed two months after the later of (i) the Closing Date and (ii) the rejection of such Real Property Lease.  Immediately after Closing, Sellers shall prosecute a motion to change the caption of the Bankruptcy Cases to another

caption which reflects the new name of each Seller and does not include the words "Friendly's," "Ice Cream" or any of the names set forth on the signature pages to this Agreement.

6.8     Alternate Transactions.  Subject to Section 11.3, nothing in this Agreement shall restrict Sellers' right to pursue one or more Alternate Transactions, including marketing Sellers' assets or providing due diligence materials, as contemplated by the Bid Procedures Order.

## ARTICLE 7
## TAXES

7.1     Taxes Related to Purchase of Acquired Assets.  All Taxes, including all state and local Taxes in connection with the transfer of the Acquired Assets, and all recording and filing fees (collectively, "Transaction Taxes"), that are imposed by reason of the sale, transfer, assignment and delivery of the Acquired Assets shall be borne by Purchaser.  Purchaser and Sellers shall cooperate to (a) determine the amount of Transaction Taxes payable in connection with the transactions contemplated under this Agreement, (b) provide all requisite exemption certificates, and (c) prepare and file any and all required Tax Returns for or with respect to such Transaction Taxes with any and all appropriate taxing authorities.

7.2     Waiver of Bulk Sales Laws.  To the greatest extent permitted by applicable Law, Purchaser and Sellers hereby waive compliance by Purchaser and Sellers with the terms of any bulk sales or similar Laws in any applicable jurisdiction in respect of the transactions contemplated by this Agreement. Purchaser shall indemnify Sellers from and hold Sellers harmless from and against any Liabilities, damages, costs and expenses (including reasonable attorneys' fees) resulting from or arising out of (i) the parties' failure to comply with any such bulk sales Laws in respect of the transactions contemplated by this Agreement or (ii) any action brought or levy made as a result thereof.  The Bankruptcy Sale Order shall exempt Sellers and Purchaser from compliance with any such Laws.

## ARTICLE 8
## BANKRUPTCY COURT MATTERS

8.1     Motions.  Sellers shall file with the Bankruptcy Court, within one (1) Business Day after the execution and delivery of this Agreement, a motion or motions (the "Motion") seeking the Bankruptcy Court's approval of the Bidding Procedures Order (which shall include a provision permitting payment of the Expense Reimbursement in accordance with this Agreement) and the Bankruptcy Sale Order.  Sellers shall affix a true and complete copy of this Agreement to the Motion filed with the Bankruptcy Court. The Motion shall request, among other things, (i) the scheduling of the date for the Auction to be commenced no later than 60 days after the Petition Date, and the date for the Sale Hearing to be not more than three (3) Business Days after the Auction, (ii) the entry of the Bidding Procedures Order in all material respects on the terms set forth in Exhibit C and (iii) the entry of the Bankruptcy Sale Order in all material respects on the terms set forth in Exhibit B.

8.2     Assigned Contracts.  Sellers shall serve on all counterparties to those Contracts which may be designated as Assigned Contracts pursuant to Section 2.5 a notice specifically stating that Sellers are or may be seeking the assumption and assignment of the Assigned Contracts and shall notify such parties of the deadline for objecting to the Cure Amounts, which deadline shall not be less than four days prior to the Auction.  In cases in which Sellers are unable to establish that a default exists, the relevant Cure Amount shall be set at $0.00.  The Motion shall reflect Purchaser's agreement to perform from and after the Closing under the Assigned Contracts, which, subject to Court approval shall be the only adequate assurance of future performance necessary to satisfy the requirements of Section 365 of the Bankruptcy Code in respect of the assignment to Purchaser of such Assigned Contracts.

8.3    Procedure.  Subject to its obligations as a debtor-in-possession, Sellers shall promptly make any filings, take all actions and use all commercially reasonable efforts to obtain any and all relief from the Bankruptcy Court that is necessary or appropriate to consummate the transactions contemplated by this Agreement and the Ancillary Agreements.  To the extent practicable under the circumstances, Sellers shall provide Purchaser with drafts of any and all pleadings and proposed orders to be filed or submitted in connection with this Agreement for Purchaser's prior review and comment and shall to the extent that such comments relate to the Acquired Assets cooperate with Purchaser to make reasonable changes.  Sellers agree to diligently prosecute the entry of the Bidding Procedures Order and the Bankruptcy Sale Order.  In the event the entry of the Bidding Procedures Order or the Bankruptcy Sale Order shall be appealed, Sellers and Purchaser shall use their respective reasonable efforts to defend such appeal.  Notwithstanding the foregoing, any resulting changes to this Agreement or any Ancillary Agreement or any resulting changes to the Orders shall be subject to Purchaser's approval in its sole discretion.

8.4    Purchaser Protections.  Sellers shall pay to Purchaser the Expense Reimbursement pursuant to the terms and conditions set forth in Section 11.3 hereof.

## ARTICLE 9
## CONDITIONS PRECEDENT TO PERFORMANCE BY THE PARTIES

9.1    Conditions Precedent to Performance by Sellers.    The obligation of Sellers to consummate the transactions contemplated by this Agreement is subject to the fulfillment, at or before the Closing, of the following conditions, any one or more of which (other than the conditions contained in Section 9.1(c) and Section 9.1(d)) may be waived by Sellers, in their sole discretion:

(a)    Representations and Warranties of Purchaser.  The representations and warranties of Purchaser made in this Agreement that are qualified by a materiality standard, in each case, shall be true and correct in all respects on and as of the Closing Date, and the representations and warranties of Purchaser made in this Agreement that are not qualified by a materiality standard, in each case, shall be true and correct in all material respects on and as of the Closing Date.

(b)    Performance of the Obligations of Purchaser.  Purchaser shall have performed in all material respects all obligations required under this Agreement or any Ancillary Agreement to which it is party that are to be performed by it at or before the Closing (except with respect to (i) the obligation to pay the Purchase Price in accordance with the terms of this Agreement (which shall be paid at the Closing) and (ii) any obligations qualified by materiality, which obligations shall be performed in all respects as required under this Agreement).

(c)    Bankruptcy Court Approval.  The Bankruptcy Sale Order shall have been entered on or prior to December 23, 2011 and shall not be subject to a stay.

(d)    No Violation of Orders.  No preliminary or permanent injunction or other order of any court or Governmental Authority or Law that prevents the consummation of the transactions contemplated hereby shall be in effect.

(e)    Bidding Procedures Order.  The Bidding Procedures Order shall have been entered in the Bankruptcy Cases.

(f)    Assumption, Sale and Assignment of Contracts.  Subject to Section 6.5, the Assignable Contracts designated hereunder as Assigned Contracts shall be so assumed, sold and assigned to Purchaser by order of the Bankruptcy Court.

(g) HSR. All waiting periods under the HSR Act applicable to this Agreement shall have expired or been terminated.

(h) Deliveries. Purchaser shall have made the deliveries referenced in Section 10.3.

For avoidance of doubt, there shall be no conditions precedent to Sellers' obligation to consummate the transactions contemplated by this Agreement, except for those conditions precedent specifically set forth in this Section 9.1.

9.2 Conditions Precedent to the Performance by Purchaser. The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the fulfillment, at or before the Closing, of the following conditions, any one or more of which (other than the conditions contained in Section 9.2(c) and Section 9.2(d), except as expressly provided therein) may be waived by Purchaser, in its sole discretion:

(a) Representations and Warranties of Sellers. The representations and warranties of Sellers made in this Agreement that are qualified by a materiality standard, in each case, shall be true and correct in all respects on and as of the Closing Date, and the representations and warranties of Purchaser made in this Agreement that are not qualified by a materiality standard, in each case, shall be true and correct in all material respects on and as of the Closing Date.

(b) Performance of the Obligations of Sellers. Sellers shall have performed in all material respects all obligations required under this Agreement or any Ancillary Agreement to which each of them is party that are to be performed by them at or before the Closing (except with respect to any obligations qualified by materiality, which obligations shall be performed in all respects as required under this Agreement).

(c) Bankruptcy Court Approval. On or prior to December 23, 2011, the Bankruptcy Sale Order shall have been entered in form and substance acceptable to Purchaser in its sole discretion and shall not be subject to a stay and the Bankruptcy Court shall have provided such other relief as may be necessary or appropriate to allow the consummation of the transactions contemplated by this Agreement, including the valid transfer of all Assigned Contracts. The Bankruptcy Sale Order shall have become a final and nonappealable order, unless this condition has been waived in writing by Purchaser in its sole discretion.

(d) No Violation of Orders. No preliminary or permanent injunction or other order of any court or Governmental Authority or Law that prevents the consummation of the transactions contemplated hereby shall be in effect.

(e) Credit Bid Approval. The Bankruptcy Court shall have entered an order, binding on all parties in interest in the Bankruptcy Cases, unconditionally allowing, authorizing and approving the bid by Purchaser contemplated by this Agreement pursuant to Section 363(k) of the Bankruptcy Code of a credit against the secured Claims of Purchaser in the Bankruptcy Cases under the Subordinated Note Documents and the DIP Credit Agreement in an amount equal to the Credit Bid Amount.

(f) Bidding Procedures Motion. On the Petition Date, the Bidding Procedures Motion in form and substance acceptable to Purchaser in its sole discretion shall have been filed in the Bankruptcy Cases.

(g)     Bidding Procedures Order.  On or prior to October 31, 2011, the Bidding Procedures Order in form and substance acceptable to Purchaser in its sole discretion shall have been entered in the Bankruptcy Cases.

(h)     Material Adverse Effect.  There shall not have occurred a Material Adverse Effect.

(i)     Assumption, Sale and Assignment of Contracts.  Subject to Section 6.5, the Assignable Contracts designated hereunder as Assigned Contracts shall be so assumed, sold and assigned to Purchaser by order of the Bankruptcy Court reasonably satisfactory to Purchaser.

(j)     HSR.  All waiting periods under the HSR Act applicable to this Agreement shall have expired or been terminated.

(k)     Deliveries.  Sellers shall have made the deliveries referenced in Section 10.2.

For avoidance of doubt, there shall be no conditions precedent to Purchaser's obligation to consummate the transactions contemplated by this Agreement, except for those conditions precedent specifically set forth in this Section 9.2.

**ARTICLE 10**
**CLOSING AND DELIVERIES**

10.1     Closing.  The consummation and effectuation of the transactions contemplated hereby pursuant to the terms and conditions of this Agreement (the "Closing") shall be held two (2) Business Days after the date that all conditions to the parties' obligations to consummate the transactions contemplated herein have been satisfied (the "Closing Date") (except for closing conditions that by their terms can only be satisfied on the Closing Date) or, if applicable, waived by the appropriate party or parties, at 10:00 a.m., local time, at the offices of Morgan, Lewis & Bockius LLP, 1701 Market Street, Philadelphia, Pennsylvania 19103, or on such other date or at such other place and time as may be mutually agreed to in writing by the parties.  All proceedings to be taken and all documents to be executed and delivered by all parties at the Closing shall be deemed to have been taken and executed simultaneously and no proceedings shall be deemed to have been taken nor documents executed or delivered until all have been taken, executed and delivered.

10.2     Sellers' Deliveries.  At the Closing:

(a)     the sale, transfer, assignment, conveyance and delivery by Sellers of the Acquired Assets to Purchaser shall be effected by the execution and delivery by Sellers of (i) the Bill of Sale, (ii) the Assignment and Assumption Agreement, (iii) the Domain Name Assignment, (iv) the Trademark Assignment and (v) such other Ancillary Agreements (including additional bills of sale, endorsements, assignments and other instruments of transfer and conveyance) as requested by Purchaser in form and substance reasonably satisfactory to Purchaser;

(b)     Sellers shall deliver all keys to the Facilities that are included in the Acquired Assets, combinations to any safes thereon and passwords for all computers thereon and any security devices therein;

(c)     Sellers shall deliver an officer's certificate, duly executed by an officer of Sellers, certifying the matters set forth in Section 9.2(a) and Section 9.2(b), in form and substance reasonably satisfactory to Purchaser;

(d)     Each Seller shall deliver a non-foreign affidavit dated as of the Closing Date in form and substance required under Treasury Regulations issued pursuant to Section 1445 of the Code so that Purchaser is exempt from withholding any portion of the Purchase Price;

(e)     Sellers shall deliver possession of the Acquired Assets;

(f)     Sellers shall deliver duly and properly authorized and executed Organizational Amendments; and

(g)     Sellers shall deliver a certified copy of the Bankruptcy Sale Order.

10.3    Purchaser's Deliveries.  At the Closing,

(a)     Purchaser shall pay the Cash Payment Amount and Creditors' Recovery Amount, in cash;

(b)     Purchaser shall credit the remaining portion of the Purchase Price against the Subordinated Note Document Obligations and DIP Obligations and shall provide the releases referenced in Section 3.1(b) (which shall be reasonably satisfactory in form and substance to Sellers);

(c)     Purchaser shall deliver an officer's certificate, duly executed by an officer of Purchaser, certifying the matters set forth in Section 9.1(a) and Section 9.1(b), in form and substance reasonably satisfactory to Sellers;

(d)     Purchaser shall execute and deliver to Sellers the Assignment and Assumption Agreement; and

(e)     Purchaser shall execute and deliver to Sellers such other instruments of assignment and assumption of Assigned Contracts reasonably satisfactory in form and substance to Sellers.

## ARTICLE 11
## TERMINATION

11.1    Conditions of Termination.  This Agreement may be terminated only in accordance with this Section 11.1.  This Agreement may be terminated at any time before the Closing as follows:

(a)     by mutual written consent of Sellers and Purchaser;

(b)     automatically and without any action or notice by either Sellers to Purchaser, or Purchaser to Sellers, immediately upon:

(i)     the issuance of a final and nonappealable order, decree, or ruling or any other action by a Governmental Authority to restrain, enjoin or otherwise prohibit the transfer of the Acquired Assets contemplated hereby; or

(ii)    the consummation of an Alternate Transaction.

(c)     by Purchaser:

(i)     if the Bidding Procedures Order shall not have been entered by October 31, 2011, unless agreed to in writing by Purchaser;

(ii)     if the Auction has not concluded within 60 days after the Petition Date, unless agreed to in writing by Purchaser;

(iii)     if the Bankruptcy Court has not entered the Bankruptcy Sale Order by December 23, 2011 (or such later date as Purchaser may have designated in writing to Sellers);

(iv)     if there has been a material violation or breach by any Seller of any material representation, warranty or covenant contained in this Agreement which (x) has rendered the satisfaction of any condition to the obligations of Purchaser impossible or is not curable or, if curable, has not been cured within ten (10) business days following receipt by Sellers of written notice of such breach from Purchaser, and (y) has not been waived by Purchaser;

(v)     at any time after December 31, 2011, if the Closing shall not have occurred and such failure to close is not caused by or the result of Purchaser's breach of this Agreement;

(vi)     if, prior to the Closing Date, Sellers' Bankruptcy Cases shall be converted into a case under Chapter 7 of the Bankruptcy Code or dismissed, or if a trustee or examiner with expanded powers is appointed in the Bankruptcy Cases;

(vii)     if any Event of Default (as defined in the DIP Credit Agreement) shall have occurred, subject to any applicable cure period, or the Purchaser's obligations under the DIP Credit Agreement are terminated;

(viii)     if either of the interim or final order authorizing and approving the DIP Credit Agreement has not been entered within the time periods set forth therein, unless agreed to in writing by Purchaser; or

(ix)     if there shall be excluded from the Acquired Assets any Assigned Contract that is not assignable or transferable pursuant to the Bankruptcy Code or otherwise without the consent of any Person other than Sellers, to the extent that such consent shall not have been given prior to the Closing and such Assigned Contract shall, in the opinion of Purchaser in its absolute discretion, prevent Purchaser from effectively operating the Business;

(x)     if Sellers disclose, or Purchaser otherwise discovers, the existence of a Material Adverse Effect; or

(xi)     if Purchaser so elects in writing pursuant to Section 6.6 hereof.

(d)     by Sellers:

(i)     if there has been a material violation or breach by Purchaser of any agreement or any representation or warranty contained in this Agreement which (A) has rendered the satisfaction of any condition to the obligations of Sellers impossible or is not curable or, if curable, has not been cured within ten (10) days following receipt by Purchaser of written notice of such breach from Sellers, and (B) has not been waived by Sellers; or

(ii)     at any time after January 31, 2012, if the Closing shall not have occurred and such failure to close is not caused by or the result of Sellers' breach of this Agreement.

11.2     Effect of Termination.     In the event of termination pursuant to Section 11.1, this Agreement shall become null and void and have no effect and neither party shall have any Liability to the

other (other than those provisions of Section 6.6, Article 11 and Article 12 that expressly survive termination or obligations to be performed on or after the Closing), except that Purchaser or Sellers shall be liable to the other party for any damages suffered by such party on account of any prior material or willful breach hereof by Purchaser or Sellers, as applicable.

11.3    Expense Reimbursement.

(a)    If this Agreement is terminated pursuant to Section 11.1(b) or Section 11.1(c), then Purchaser shall be deemed to have earned the Expense Reimbursement.  The Expense Reimbursement shall be paid in cash, without further order of the Bankruptcy Court, promptly following termination pursuant to Section 11.1(b) or Sellers' receipt of notice of termination pursuant to Section 11.1(c), as the case may be.

(b)    The Expense Reimbursement shall be a super-priority administrative expense priority obligation under Section 364(c)(1) of the Bankruptcy Code with priority over all expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code, subject to any super-priority claims of Sellers' post-petition lenders, and in all circumstances subject to the rights of the lenders under the Pre-Petition Loan Documents.

(c)    Sellers hereby acknowledge that the obligation to pay the Expense Reimbursement (to the extent due hereunder) shall survive the termination of this Agreement, and shall have super-priority administrative status against Sellers and their respective estates.

## ARTICLE 12
## MISCELLANEOUS

12.1    Survival.  No representations, warranties, covenants and agreements of Sellers and Purchaser made in this Agreement shall survive the Closing Date except where, and only to the extent that, the terms of any such covenant or agreement expressly provide for obligations extending after the Closing.

12.2    Further Assurances.  At the request and the sole expense of the requesting party, Purchaser or Sellers, as applicable, shall execute and deliver, or cause to be executed and delivered, such documents as Purchaser or Sellers, as applicable, or their respective counsel may reasonably request to effectuate the purposes of this Agreement and the Ancillary Agreements.  Each party shall use commercially reasonable efforts to take, or cause to be taken, all other actions and to do, or cause to be done, all other things reasonably necessary, proper or advisable to consummate and make effective as promptly as practicable the transactions contemplated hereby.

12.3    Successors and Assigns.

(a)    Purchaser shall have the right to assign to any one or more Affiliates any of its rights or obligations under this Agreement, any Ancillary Agreement or any other document or instrument, in whole or in part (including the right to acquire any of the Acquired Assets).

(b)    Purchaser shall have the right to assign this Agreement or any of its rights or obligations hereunder as collateral to any lender of Purchaser, and Sellers will sign a consent with respect thereto if so requested by Purchaser or its lender; provided, however, that no such assignment shall relieve Purchaser of its obligations to Sellers hereunder.

(c)     Sellers shall not assign this Agreement or any of their rights or obligations hereunder and any such assignment shall be void and of no effect.  This Agreement shall inure to the benefit of and shall be binding upon the successors and permitted assigns of the parties hereto, including any trustee appointed in any of the Bankruptcy Cases or subsequent Chapter 7 cases and Sellers, if the Bankruptcy Cases are dismissed.

12.4     Governing Law; Jurisdiction.   This Agreement shall be construed, performed and enforced in accordance with, and governed by, the Laws of the State of Delaware (without giving effect to the principles of conflicts of law thereof), except to the extent that the Laws of such State are superseded by the Bankruptcy Code or other applicable federal Law.  For so long as Sellers are subject to the jurisdiction of the Bankruptcy Court, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court.  After Sellers are no longer subject to the jurisdiction of the Bankruptcy Court, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent to the jurisdiction of, any state or federal court having competent jurisdiction in Delaware.

12.5     Expenses.  Except as otherwise provided in this Agreement, each of the parties shall pay their own expenses in connection with this Agreement and the transactions contemplated hereby, including any legal and accounting fees and commissions or finder's fees, whether or not the transactions contemplated hereby are consummated.  Purchaser shall pay the cost of all surveys, title insurance policies and title reports ordered by Purchaser.

12.6     Severability.  In the event that any part of this Agreement is declared by any court or other judicial or administrative body to be null, void or unenforceable, a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, said provision shall survive to the extent it is not so declared, and all of the other provisions of this Agreement shall remain in full force and effect only if, after excluding the portion deemed to be unenforceable and the application of any provision so substituted, the remaining terms shall provide for the consummation of the transactions contemplated hereby in substantially the same manner as originally set forth at the later of (a) the Execution Date and (b) the date this Agreement was last amended.

12.7     Notices.

(a)     All notices, requests, demands, consents and other communications under this Agreement shall be in writing and shall be deemed to have been duly given (i) on the date of service, if served personally on the party to whom notice is to be given; (ii) on the day after delivery to Federal Express or similar overnight courier or the Express Mail service maintained by the United States Postal Service addressed to the party to whom notice is to be given, if served via Federal Express or similar overnight courier or Express Mail service; (iii) on the date sent by facsimile, with confirmation of transmission, if sent during normal business hours of the recipient, if not, then on the next Business Day; or (iv) on the third day after mailing, if mailed to the party to whom notice is to be given, by first class mail, registered or certified, postage prepaid and properly addressed, to the party as follows:

If to Sellers:          c/o Friendly Ice Cream Corporation
                        1855 Boston Road
                        Wilbraham, MA  01095
                        Attn:   Harsha V. Agadi
                        Fax:    (413) 543-3282

with copy to (which shall not constitute notice):

>Kirkland & Ellis LLP
>300 North LaSalle
>Chicago, IL 60654
>Attn:   Ross M. Kwasteniet
>Fax:    (312) 862-2200

If to Purchaser:     Sundae Group Holdings II, LLC
>5200 Town Center Circle, Suite 600
>Boca Raton, FL 33486
>Attn:   Jared Wien and C. Deryl Couch
>Fax:    (561) 394-0540

with copy to (which shall not constitute notice):

>Morgan, Lewis & Bockius LLP
>1701 Market Street
>Philadelphia, PA 19103
>Attn: David A. Gerson
>Fax: (215) 963-5001

(b)     Any party may change its address or facsimile number for the purpose of this Section 12.7 by giving the other parties written notice of its new address in the manner set forth above.

12.8     Amendments; Waivers. This Agreement may be amended or modified, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by Purchaser and Sellers, or in the case of a waiver, by the party waiving compliance. Any waiver by any party of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall not be deemed to be or construed as a furthering or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

12.9     Entire Agreement. This Agreement and the other Ancillary Agreements contain the entire understanding between the parties with respect to the transactions contemplated hereby and supersede and replace all prior and contemporaneous agreements and understandings, oral or written, with regard to such transactions.

12.10     Seller Disclosures. After notice to and consultation with Purchaser, Sellers shall be entitled to disclose, if required by applicable Law or by order of the Bankruptcy Court, this Agreement and all information provided by Purchaser in connection herewith to the Bankruptcy Court, the United States Trustee, parties in interest in the Bankruptcy Cases and other Persons bidding on assets of Sellers. Other than statements made in the Bankruptcy Court (or in pleadings filed therein), Sellers shall not issue (prior to, on or after the Closing) any press release or make any public statement or public communication with respect to the Agreement or transactions contemplated thereby without the prior written consent of Purchaser, which shall not be unreasonably withheld or delayed.

12.11     Headings. The article and section headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

12.12   Electronic Delivery; Counterparts.   This Agreement and any signed agreement or instrument entered into in connection with this Agreement, and any amendments hereto or thereto, may be executed in one or more counterparts, all of which shall constitute one and the same instrument. Any such counterpart, to the extent delivered by means of a facsimile machine or by .pdf, .tif, .gif, .peg or similar attachment to electronic mail (any such delivery, an "Electronic Delivery") shall be treated in all manner and respects as an original executed counterpart and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. At the request of any party hereto, each other party hereto or thereto shall re-execute the original form of this Agreement and deliver such form to all other parties. No party hereto shall raise the use of Electronic Delivery to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of Electronic Delivery as a defense to the formation of a contract, and each such party forever waives any such defense, except to the extent such defense relates to lack of authenticity.

12.13   Waiver of Jury Trial.

(a)     EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY LITIGATION, ACTION, PROCEEDING, CROSS-CLAIM, OR COUNTERCLAIM IN ANY COURT (WHETHER BASED ON CONTRACT, TORT, OR OTHERWISE) ARISING OUT OF, RELATING TO OR IN CONNECTION WITH (i) THIS AGREEMENT OR THE VALIDITY, PERFORMANCE, INTERPRETATION, COLLECTION OR ENFORCEMENT HEREOF OR (ii) THE ACTIONS OF SUCH PARTY IN THE NEGOTIATION, AUTHORIZATION, EXECUTION, DELIVERY, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT HEREOF. EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN THEIR RELATED FUTURE DEALINGS. EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH LEGAL COUNSEL OF ITS OWN CHOOSING, OR HAS HAD AN OPPORTUNITY TO DO SO, AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS, HAVING HAD THE OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL.

(b)     THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS, OR MODIFICATIONS TO THIS AGREEMENT. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT WITHOUT A JURY.

12.14   Third Party Beneficiaries.   No provision of this Agreement (including Section 6.4) is intended to confer upon any Person other than the parties hereto any rights or remedies hereunder.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

**PURCHASER:**

SUNDAE GROUP HOLDINGS II, LLC

By: _____
Name: Jared Wien
Its: Vice President

**SELLERS:**

FRIENDLY ICE CREAM CORPORATION

By: _____
Name: Harsha V. Agadi
Title: Chief Executive Officer and President

FRIENDLY'S RESTAURANTS FRANCHISE, LLC

By: _____
Name: Harsha V. Agadi
Title: Chief Executive Officer and President

FRIENDLY'S REALTY I, LLC

By: _____
Name: Harsha V. Agadi
Title: Chief Executive Officer and President

FRIENDLY'S REALTY II, LLC

By: _____
Name: Harsha V. Agadi
Title: Chief Executive Officer and President

FRIENDLY'S REALTY III, LLC

By: _____
Name: Harsha V. Agadi
Title: Chief Executive Officer and President

**[Signature page to Asset Purchase Agreement]**

**Exhibit A**

**<u>Form of Assignment and Assumption Agreement</u>**

See attached.

# FORM OF

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (this "Assignment and Assumption Agreement"), dated as of _____ __, 2011, is made and entered into by and among Friendly Ice Cream Corporation, a Massachusetts corporation, Friendly's Restaurants Franchise, LLC, a Delaware limited liability company, Friendly's Realty I, LLC, a Delaware limited liability company, Friendly's Realty II, LLC, a Delaware limited liability company, and Friendly's Realty III, LLC, a Delaware limited liability company (each, an "Assignor" and collectively, "Assignors"), and Sundae Group Holdings II, LLC, a Delaware limited liability company ("Assignee").

## R E C I T A L S

WHEREAS, Assignors and Assignee are parties to that certain Asset Purchase Agreement, dated as of October __, 2011 (the "Purchase Agreement"), pursuant to which Assignors have agreed to sell, and Assignee has agreed to purchase the Acquired Assets; and

WHEREAS, pursuant to the Bankruptcy Sale Order and to the extent permitted by applicable Law, on the terms and subject to the conditions set forth in the Purchase Agreement, Assignors have agreed to assign to Assignee all of Assignors' right, title and interest in, to and under the Acquired Assets and Assignee has agreed to assume and timely perform, pay and discharge in accordance with their respective terms, the Assumed Liabilities.

NOW, THEREFORE, in consideration of the foregoing and of the consideration set forth in the Purchase Agreement, the parties hereto agree as follows:

1. Capitalized terms used herein and not defined shall have the meanings assigned to them in the Purchase Agreement.

2. This Assignment and Assumption Agreement is executed, delivered and accepted pursuant to, and is subject to, the Purchase Agreement. The Purchase Agreement shall at all times govern the rights and duties of the parties with respect to the Acquired Assets and Assumed Liabilities. If there is any conflict between the terms and provisions of this Assignment and Assumption Agreement and those of the Purchase Agreement, the terms of the Purchase Agreement shall control.

3. On the terms and subject to the conditions set forth in the Purchase Agreement, effective on and as of the Closing Date, each Assignor hereby sells, transfers, assigns, conveys and delivers to Assignee, and Assignee hereby purchases, acquires and accepts from each Assignor, all of Assignors' right, title and interest in, to and under the Acquired Assets. Nothing herein contained shall be deemed to sell, transfer, assign, convey or deliver the Excluded Assets to Assignee, and Assignors shall retain all right title and interest to, in and under the Excluded Assets.

4.     Pursuant to the Bankruptcy Sale Order and to the extent permitted by applicable Law, on the terms and subject to the conditions set forth in the Purchase Agreement, effective on and as of the Closing Date, Assignee hereby assumes and agrees to timely perform, pay and discharge in accordance with their respective terms, the Assumed Liabilities.

5.     Upon the terms and subject to the conditions contained herein, Assignors and Assignee agree (i) to use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to effect, consummate, make effective, confirm or evidence the transactions contemplated by this Assignment and Assumption Agreement, and (ii) to execute any documents, instruments or conveyances of any kind which may be reasonably necessary or advisable to carry out any of the transactions contemplated by this Assignment and Assumption Agreement.

6.     This Assignment and Assumption Agreement will be binding from and after its execution upon Assignors and Assignee and their respective successors and assigns.

7.     This Assignment and Assumption Agreement may not be amended or waived except in a writing executed by the party against which such amendment or waiver is sought to be enforced.  No course of dealing between or among any persons having any interest in this Assignment and Assumption Agreement will be deemed effective to modify or amend any part of this Assignment and Assumption Agreement or any rights or obligations of any person under or by reason of this Assignment and Assumption Agreement.

8.     This Assignment and Assumption Agreement may be executed in one or more counterparts, all of which shall constitute one and the same instrument.  Any such counterpart, to the extent delivered by means of an Electronic Delivery shall be treated in all manner and respects as an original executed counterpart and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

9.     This Assignment and Assumption Agreement shall be construed, performed and enforced in accordance with, and governed by, the Laws of the State of Delaware (without giving effect to the principles of conflicts of Laws thereof).

**[SIGNATURE PAGE TO FOLLOW]**