## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| FRIENDLY ICE CREAM CORPORATION, *et al.*,[1] | ) Case No. 11-13167 (___) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

## DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
## (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING,
## (II) AUTHORIZING USE OF CASH COLLATERAL, (III) GRANTING ADEQUATE
## PROTECTION TO PREPETITION SECURED PARTIES, AND
## (IV) GRANTING LIENS AND SUPERPRIORITY CLAIMS

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this motion (this "Motion") for entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "Interim DIP Order"), and a final order (the "Final DIP Order," and together with the Interim DIP Order, the "DIP Orders"),[2] (a) authorizing the Debtors to obtain postpetition financing on a senior secured, priming, superpriority basis; (b) authorizing the Debtors to use Cash Collateral (as defined herein); and (c) granting adequate protection to certain Prepetition Secured Parties (as defined herein) for the priming of their existing liens on the Prepetition Collateral (as defined herein) and the Debtors' use of the Cash Collateral. In support of this Motion, the Debtors respectfully state as follows.[3]

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Friendly Ice Cream Corporation (3130); Friendly's Restaurants Franchise, LLC (3693); Friendly's Realty I, LLC (2580); Friendly's Realty II, LLC (2581); and Friendly's Realty III, LLC (2583). The location of the Debtors' corporate headquarters and the Debtors' service address is: 1855 Boston Road, Wilbraham, Massachusetts 01095.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the DIP Facility Agreement (as defined herein) or the DIP Orders (as defined herein), as applicable.

[3] The facts and circumstances supporting this Motion are set forth in the Declaration of Steven C. Sanchioni, Executive Vice President, Chief Financial Officer, Treasurer, and Assistant Secretary of Friendly Ice Cream Corporation, in Support of the Debtors' Chapter 11 Petitions and First Day Motions (the "First Day

## Jurisdiction

1.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The statutory bases for the relief requested herein are sections 105, 361, 362, 363, and 364 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules").

## Introduction

4.     Prior to filing these chapter 11 cases, the Debtors successfully negotiated the approximately $71.3 million postpetition financing package provided by the DIP Facility (as defined herein) with their existing secured creditors.  Through a parallel process, the Debtors' successfully obtained a stalking-horse bid for the sale of substantially all of their assets.[4]  The DIP Facility, coupled with cash flow from operations, will permit the Debtors to fund the administration of these chapter 11 cases and implement the efficient, public process through which the Debtors intend to sell their businesses as a going concern.

---

Declaration"), filed contemporaneously herewith.  Additionally, shortly hereafter, the Debtors will file the Declaration of Ryan S. Bouley in Support of Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Adequate Protection to Prepetition Secured Parties, and (IV) Granting Liens and Superpriority Claims (the "Bouley Declaration").

[4]     The stalking horse bidder is an affiliated entity of the Debtors' equity owner.  Additional information on the Debtors' organizational structure is set forth in the First Day Declaration.

2

5. Without access to the DIP Facility, the Debtors could experience a liquidity shortfall and would be deprived of the capital necessary to operate their businesses. The DIP Facility will provide the funding necessary to allow the Debtors to, among other things, maintain their businesses in the ordinary course, thereby preserving value for the benefit of all creditor constituencies through the consummation of any sale of the Debtors' businesses. The DIP Facility also will enhance the Debtors' ability to minimize disruption to their businesses and instill confidence in their various creditor constituencies, including customers, employees, vendors, and service providers. In sum, approval of the DIP Facility is necessary to avoid erosion of value and to accomplish a seamless transition into chapter 11 and, ultimately, to new ownership through a public sale process.

## Summary of Relief Requested

6. By this Motion, the Debtors request entry of the DIP Orders, which among other things, provide the Debtors with the following relief:[5]

- <u>Cash Collateral</u>: authority to use the Debtors' cash on hand, cash proceeds of Prepetition Collateral (as defined herein), and other cash that constitutes the Prepetition Lenders' "cash collateral," as that term is defined in section 363(a) of the Bankruptcy Code (the "<u>Cash Collateral</u>");

- <u>DIP Facility</u>: authority to obtain postpetition revolving loans in a principal amount not to exceed $50,628,664 on an interim basis, and $71,378,664 on a final basis (the "<u>DIP Facility</u>") and other financial accommodations, pursuant to the terms and conditions of the Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement, substantially in the form attached hereto as **Exhibit B** (the "<u>DIP Facility Agreement</u>"). Borrowings under the DIP Facility will be used, among other things, for payment of (a) postpetition operating expenses and other working capital and financing requirements of the Borrower subject to the 13-Week Budget or as otherwise agreed to by the Required Lenders, (b) certain transaction and bankruptcy fees, costs and expenses, (c) the Carve-Out, (d) Prepetition claims (including under the Prepetition Loan Document) to the extent consistent with the 13-Week Budget,

---

[5] This summary is qualified in its entirety by reference to the actual DIP Facility Documents (including as such DIP Facility Documents may be amended in connection with the syndication of the DIP Facility) and the DIP Orders. The DIP Facility Documents and the DIP Orders shall control if there is any conflict between them and this summary.

approved by the Required Lenders in their Permitted Discretion and allowed by the Bankruptcy Court and (e) upon entry of the Final Order, to repay all amounts outstanding under the Prepetition Credit Agreement and the other Prepetition Loan Documents;

- Letters of Credit: authority to issue new letters of credit as well as cause certain letters of credit under that certain Second Amended and Restated Revolving Credit Agreement (as amended, restated, supplemented or otherwise modified on or prior to the Petition Date, the "Prepetition Secured Credit Agreement"), dated as of June 5, 2008 (collectively, with any letters of credit thereafter deemed under the DIP Facility Agreement, the "Letters of Credit") issued and outstanding prior to the closing date of the DIP Facility (the "Effective Date") to be deemed as issued upon entry of the Interim DIP Order.

- DIP Facility Documents: authority to execute and deliver the DIP Facility Agreement and all agreements, documents, and instruments contemplated by each (collectively, the "DIP Facility Documents"), and to take all actions necessary, appropriate, or required to comply with the Debtors' obligations thereunder and under the DIP Orders, including obligations to pay certain fees and expenses (including, without limitation, reasonable fees and expenses of counsel and financial advisors) owed to the DIP Agent and the DIP Lenders thereunder;

- DIP Liens and Claims: authority to grant the DIP Agent, for its own benefit and the benefit of the DIP Lenders, senior, first priority, priming DIP liens on the Collateral (as defined in the Interim DIP Order) securing, and the superpriority claims in respect of, the DIP Facility (the "DIP Liens");

- Adequate Protection: approval of the Adequate Protection (as defined herein) to be provided to the Prepetition Agent, the Prepetition Lenders, and the Subordinated Noteholder (each as defined herein and, collectively, the "Prepetition Secured Parties") to protect the Prepetition Secured Parties' interests in the personal and real property of such Debtors constituting "Collateral" under, and as defined in, the Prepetition Secured Credit Agreement and the Subordinated Note (as defined herein) (collectively, together with the Cash Collateral, the "Prepetition Collateral"); and

- Final Hearing: a date for a hearing on this Motion to consider entry of the Final DIP Order, to be held no sooner than 14 days after the date of service of this Motion, and no later than 30 days after the Petition Date.

K&E 20022500

## Summary of Principal Terms of DIP Facility

7.   Pursuant to Bankruptcy Rules 4001(b), (c), and (d), and Local Bankruptcy Rule 4001-2, the following is a concise statement and summary of the proposed material terms of the DIP Facility Documents and DIP Orders:[6]

| MATERIAL TERMS OF DIP FACILITY | |
|---|---|
| **Parties to DIP Facility Agreement**<br><br>*FED. R. BANKR. P. 4001(c)(1)(B)* | **Debtor Parties**:<br><br>Borrower:      Friendly Ice Cream Corporation (the "Borrower")<br><br>Guarantor:      Friendly's Restaurants Franchise, LLC (the "Guarantor," and together with the Borrower, the "Loan Parties")<br><br>Administrative Agent:      Wells Fargo Capital Finance, LLC (in such capacity, the "DIP Agent")<br><br>DIP Lenders:      The banks and other financial institutions or entities from time to time parties to the DIP Facility Agreement (collectively with the DIP Agent, the "DIP Lenders")[7] |
| **Maturity**<br><br>*FED. R. BANKR. P. 4001(c)(1)(B)* | The earliest to occur of (a) the date on which all of the Obligations have been indefeasibly repaid in full and the Commitments have terminated, (b) April 2, 2012, (c) 5 days following the Petition Date if the Interim Order has not been entered by the Bankruptcy Court by such date, (d) 45 days following the Petition Date if the Final Order has not been entered by the Bankruptcy Court by such date, (e) the date on which the Interim Order expires, unless the Final Order shall have been entered and become effective by such date, (f) the date a plan of reorganization confirmed in any Chapter 11 Case becomes effective that does not provide for the payment in full of all amounts owed to the Administrative Agent and the Lenders under this Credit Agreement and the other Loan Documents on such effective date, (g) the date of the closing of a sale of all or substantially all of Borrower's assets pursuant to Section 363 of the Bankruptcy Code, (h) the effective date of a confirmed plan of reorganization for Borrower in any case commenced pursuant to Chapter 11 of the Bankruptcy Code, (i) the date of a conversion pursuant to Chapter 7 of any of the Chapter 11 Cases and (j) the date of the termination of all of the Commitments (whether by acceleration or otherwise) in accordance with this Credit Agreement.<br><br>(DIP Facility Agreement § 1.1) |
| **Purpose**<br><br>*FED. R. BANKR. P.* | The Borrower will use the proceeds of the Loans after the Effective Date in a manner consistent with the 13-Week Budget (subject to any variances otherwise permitted under §10) for payment of (a) postpetition operating expenses and other working capital |

---

[6]   This concise statement is qualified in its entirety by reference to the applicable provisions of the DIP Facility Documents (as may be amended or modified) or the DIP Orders, as applicable. To the extent there exists any inconsistency between this concise statement and the provisions of the DIP Facility Documents or the DIP Orders, the provisions of the DIP Facility Documents or the DIP Orders, as applicable, shall control.

[7]   Pursuant to a participation agreement, an affiliate of the Debtors' equity owner holds a participation interest in the DIP Facility.

K&E 20022500

| MATERIAL TERMS OF DIP FACILITY | |
|---|---|
| *4001(c)(1)(B)* | and financing requirements of the Borrower subject to the 13-Week Budget or as otherwise agreed to by the Required Lenders, (b) certain transaction and bankruptcy fees, costs and expenses, (c) the Carve-Out, (d) Prepetition claims (including under the Prepetition Loan Document) to the extent consistent with the 13-Week Budget, approved by the Required Lenders in their Permitted Discretion and allowed by the Bankruptcy Court and (e) upon entry of the Final Order, to repay all amounts outstanding under the Pre-Petition Credit Agreement and the other Prepetition Loan Documents.<br><br>(DIP Facility Agreement § 7.17.1) |
| **Interest Rates**<br><br>*FED. R. BANKR. P. 4001(c)(1)(B)* | **Interest Rate for Base Rate Loans.** Base Rate plus 3.00 percent per annum.<br><br>**Interest Rate for Eurodollar Rate Loans.** Eurodollar Rate plus 5.00 percent per annum.<br><br>**Default Interest Rate.** Then-applicable rate plus 2.00 percent.<br><br>(DIP Facility Agreement §§ 2.5, 5.10) |
| **Commitments**<br><br>*FED. R. BANKR. P. 4001(c)(1)(B); LBR 4001-2(a)(ii)* | Total aggregate revolving loan commitment of $71,378,664.<br><br>(DIP Facility Agreement § 1.1) |
| **Letters of Credit**<br><br>*FED. R. BANKR. P. 4001(c)(1)(B)* | Subject to the terms and conditions of the DIP Facility Agreement, the Issuing Lender agrees to issue letters of credit for the account of the Borrower or to purchase participations or execute indemnities or reimbursement obligations with respect to letters of credit issued by an Underlying Issuer for the account of the Borrower. The Issuing Lender shall have no obligation to issue a Letter of Credit if, among other things, the issuance of such requested Letter of Credit would cause the Letter of Credit usage under the DIP Facility Agreement to exceed $8 million. The Issuing Lender may, but shall not be obligated to, issue a Letter of Credit (i) if such Letter of Credit is (A) to be denominated in a currency other than Dollars, (B) supports the obligations of the Borrower or its Subsidiaries in respect of (1) a lease of real property or (2) an employment contract, or (ii) at any time that one or more of the Lenders is a Defaulting Lender.<br><br>(DIP Facility Agreement § 4.1) |
| **Funding Conditions**<br><br>*FED. R. BANKR. P. 4001(c)(1)(B); LBR 4001-2(a)(ii)* | Conditions precedent to initial borrowings under the DIP Facility include: (i) each of the DIP Facility Documents shall have been duly executed and delivered by the respective parties thereto, shall be in full force and effect and shall be in form and substance reasonably satisfactory to each of the DIP Lenders; (ii) the DIP Agent shall have received, among other things, the applicable fee letters and flow of funds agreement; (iii) the DIP Agent shall have received a copy of the initial 13-Week Budget; (iv) the Court shall have entered the Interim DIP Order no later than five (5) days after the Petition Date; (v) all of the First Day Orders shall have been entered in the Chapter 11 Cases and shall be in form and substance reasonably satisfactory to the DIP Agent; (vi) upon entry of the Interim DIP Order (or the Final DIP Order, when applicable) by the Court, and subject to the terms thereof, the Security Documents shall be effective to create in favor of the DIP Agent a legal, valid and enforceable first priority (except for Permitted Liens entitled to priority under applicable law) security interest in and Lien upon the Collateral; all filings, recordings, deliveries of instruments |

6

| | |
|---|---|
| | and other actions necessary or desirable in the opinion of the DIP Agent to protect and preserve such security interests shall have been duly effected; and the DIP Agent shall have received evidence of the foregoing in form and substance satisfactory to the DIP Agent; (vii) the DIP Agent shall have received: (A) a certificate from the Secretary of each of the Borrower and each Guarantor (x) attesting to the resolutions of each party's board of directors authorizing its execution, delivery, and performance of the DIP Facility Agreement and the other DIP Facility Documents, (y) authorizing specific officers of the Borrower to execute the same, and (z) attesting to the incumbency and signatures of such specific officers of the Borrower; (B) copies of each of the Borrower's and each Guarantor's governing documents, as amended, modified, or supplemented to the Effective Date, certified by the Secretary of such party; and (C) a certificate of status with respect to each of the Borrower and each Guarantor, dated within 15 days of the Effective Date, such certificate to be issued by the appropriate officer of the jurisdiction of organization of such party, which certificate shall indicate that such Person is in good standing in such jurisdiction; (viii) the DIP Agent shall have received one or more opinions of the Borrower's and the Guarantor's respective counsel, each in form and substance reasonably satisfactory to the DIP Agent; (ix) the Sun Guaranty (as defined in the Prepetition Secured Credit Agreement) shall have been amended by the parties thereto by a duly executed amendment in form and substance reasonably satisfactory to the DIP Agent; (x) the DIP Agent shall have received a certificate, dated the Effective Date and signed by an authorized officer of the Borrower containing customary closing certifications, in form and substance satisfactory to the DIP Agent; (xi) the DIP Agent and each DIP Lender shall have completed such Patriot Act, OFAC/PEP and customary background searches as they shall require, the results of which shall be satisfactory to DIP Agent and each DIP Lender; (xii) the Borrower shall have paid all fees (including all Fees), costs, expenses and taxes then payable pursuant to the DIP Facility Documents; (xiii) the DIP Agent shall have received such legal and business diligence, other documents and instruments as shall be reasonably required by it in connection with the DIP Facility Agreement and the transactions contemplated thereby.<br><br>(DIP Facility Agreement § 11) |
| **Fees**<br><br>*FED. R. BANKR. P. 4001(c)(1)(B)* | **Commitment Fee.** 0.50 percent times the average daily amount during each calendar month or portion thereof by which the Applicable Amount exceeds the outstanding amount of Revolving Credit Loans during such calendar month.<br><br>(DIP Facility Agreement § 2.2)<br><br>**Letter of Credit Fees.** Issuance fee of 2.00 percent per annum times the Daily Balance of the undrawn amount of all outstanding Letters of Credit; fronting fee as set forth in DIP Agent fee letter.<br><br>(DIP Facility Agreement § 4.3)<br><br>Certain other confidential fees as set forth in DIP Agent fee letter. |
| **Liens, Priorities and Adequate Protection**<br><br>*FED. R. BANKR. P. 4001(c)(1)(B)(i), (ii); LBR 4001-2(a)(i)(B)* | By the DIP Facility Agreement, the Borrower (and, by its execution of the Guaranty, each Guarantor) represents, warrants, covenants and agrees that: (a) the priority of the DIP Agent's and DIP Lenders' Liens on the Collateral owned by the Loan Parties shall be as set forth in the DIP Orders; (b) in accordance with Section 364(c)(1) of the Bankruptcy Code, the Obligations shall constitute claims with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113, 1114 or any other |

provision of the Bankruptcy Code and shall be payable from and have recourse to all Collateral, including all pre- and postpetition property of the Debtors and all proceeds thereof; and (c) upon entry of the Interim DIP Order, the DIP Agent and DIP Lenders will be granted valid and perfected security interests and Liens on the Collateral, subject in each case to the Carve-Out, as follows (i) pursuant to Section 364(c)(2) of the Bankruptcy Code, a first priority perfected Lien on and security interest in all of the Debtors' right, title and interest in, to and under all Collateral that is not otherwise subject to or encumbered by a validly perfected unavoidable security interest or lien on the Petition Date, (ii) pursuant to section 364(c)(3) of the Bankruptcy Code, a junior perfected Lien on and security interest in all of the Debtors' right, title and interest in, to and under all Collateral that is subject to or encumbered by a validly perfected, unavoidable security interest or Lien on the Petition Date or subject to a Lien or security interest in existence on the Petition Date that is perfected subsequent thereto as permitted by Section 546(b) of the Bankruptcy Code (other than the priming Liens and security interests granted pursuant to clause (iii) below) and (iii) pursuant to Section 364(d)(1) of the Bankruptcy Code, a first priority, senior, priming, perfected Lien on and security interest in all of the Debtors' right, title and interest in, to and under the Collateral that is subject to or encumbered by a validly perfected, unavoidable security interest or Lien on the Petition Date or subsequently perfected thereafter.

(DIP Facility Agreement § 2.12)

The Prepetition Secured Parties are entitled, pursuant to sections 362, 363(e), and 364(d)(1) of the Bankruptcy Code, to adequate protection of their interests in their respective Prepetition Collateral, including the Cash Collateral, for and equal in amount to the aggregate diminution in the value of the Prepetition Secured Parties' security interests in the Prepetition Collateral (which diminution in value shall be calculated in accordance with section 506(a) of the Bankruptcy Code) as a result of, among other things, the Debtors' sale, lease or use of the Cash Collateral and any other of the Prepetition Collateral, the priming of the Prepetition Secured Parties' security interests and liens in the Prepetition Collateral by the DIP Agent and the DIP Lenders pursuant to the DIP Facility Documents and the Interim DIP Order, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code or otherwise. As adequate protection, subject to the Investigation Rights set forth in paragraph 6 of the Interim DIP Order, the Prepetition Secured Parties shall receive the following (collectively the "Adequate Protection"):

(a) Pay Down. Upon the closing of the DIP Facility, all cash collected by the debtors in the ordinary course of their operations or from the sale of any assets of the Debtors shall be paid to the Prepetition Agent to pay down the Prepetition First Lien Indebtedness as provided for in the Interim DIP Order.

(b) Adequate Protection Liens. As security for and to the extent there is a diminution in the value of the Prepetition Secured Parties' interests in the Prepetition Collateral (whether the reason for such diminution is as a result of, arises from, or is attributable to, any or all of the imposition of the automatic stay (including, without limitation, any diminution in value of such interests in the Prepetition Collateral prior to any Prepetition Secured Party seeking vacation of the automatic stay or the Court granting such relief), the priming of the Prepetition Liens, the use of Cash Collateral or the physical deterioration, consumption, use, sale, lease, disposition, shrinkage, or decline in market value of the Prepetition Collateral), (i) the Prepetition Agent, on behalf of the Prepetition Lenders, and (ii) the Subordinated Noteholder, respectively, are granted replacement liens (the "Replacement Liens") in the Collateral, which Replacement Liens are valid, binding, enforceable and fully perfected as of the Petition Date without the necessity of the execution, filing or recording by the Debtors or any Prepetition

8

Secured Party of mortgages, security agreements, pledge agreements, financing statements, or other agreements, and which shall be subordinate only to the Carve-Out, the DIP Liens and the Permitted Prior Liens and shall be equivalent to a lien granted under section 364(c) of the Bankruptcy Code, and which Replacement Liens shall cover assets, interest, and proceeds of the Debtors that are or would be collateral under the Prepetition Secured Financing Documents if not for section 552(a) of the Bankruptcy Code, and all cash and cash equivalents (with the exception of the Avoidance Actions and proceeds thereof). The Replacement Liens shall rank in the same relative priority and rights as do the respective security interests and liens under the Prepetition Secured Financing Documents as of the Petition Date and pursuant to the Intercreditor Agreement.

(c) *Prepetition Secured Party Administrative Claim.* As further adequate protection of the interests of the Prepetition Agent and the Prepetition Lenders against any diminution in value of such interests in the Prepetition Collateral (whether the reason for such diminution is as a result of, arises from, or is attributable to, any or all of the imposition of the automatic stay (including, without limitation, any diminution in value of such interests in the Prepetition Collateral prior to any Prepetition Secured Party seeking vacation of the automatic stay or the Court granting such relief), the priming of the Prepetition Liens, the use of Cash Collateral or the physical deterioration, consumption, use, sale, lease, disposition, shrinkage, or decline in market value of the Prepetition Collateral), the Prepetition Agent, on behalf of the Prepetition Lenders, is hereby granted in each of the Cases an allowed administrative claim (the "Prepetition Lenders Administrative Claim") under Bankruptcy Code section 507(b) with respect to all Adequate Protection obligations. Such Prepetition Lenders Administrative Claim shall have priority over all administrative expense claims and unsecured claims against the Debtors or their estates, not existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to section 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 726 (to the extent permitted by law), 1113 and 1114; provided, however, the Prepetition Lenders Administrative Claim shall be junior and subordinate only to the DIP Facility Superpriority Claim, the Carve-Out and any Permitted Prior Liens. The Prepetition Lenders Administrative Claim shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (with the exception of the Avoidance Actions and the proceeds thereof).

(d) *Access.* The Prepetition Secured Parties shall be afforded (i) any financial information or periodic reporting that is provided to, or required to be provided to, the DIP Agent or the DIP Lenders (or their advisors) pursuant to the DIP Facility Documents, and (ii) reasonable access to the Collateral and the Debtors' business premises, during normal business hours, for purposes of verifying the Debtors' compliance with the terms of the Interim DIP Order as it pertains to the Prepetition Secured Parties and as otherwise permitted under the Prepetition Secured Financing Documents.

(e) *Allowance of Claims.* The claims arising from or in connection with the Prepetition Secured Indebtedness are hereby deemed "allowed claims" within the meaning of section 502 of the Bankruptcy Code.

(f) *Right to Credit Bid.* Upon entry of the Final Order providing for such relief but subject in all respects to the terms of the Intercreditor Agreement and applicable law, (i) the Prepetition Agent (on behalf of the Prepetition Lenders) and (ii) the Subordinated Noteholder, respectively, shall have the right to "credit bid" the allowed amount of the Prepetition Lenders' or the Subordinated Noteholder's claims, respectively, during any

9

<table>
<tr><td></td><td>sale of all or substantially all of the Prepetition Collateral, including without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any reorganization plan subject to confirmation under section 1129(b)(2)(A)(ii)-(iii) of the Bankruptcy Code.

(g) Accrual of Interest on Subordinated Note. During the pendency of the Cases, interest will continue to accrue on the Subordinated Note as provided in the Subordinated Note Documents; provided, however, that accrued and unpaid interest shall not be paid by the Debtors from the proceeds of the DIP Facility or Cash Collateral so long as any obligations remain outstanding and unpaid under the DIP Facility or the commitments thereunder have not terminated.

(i) Reservation of Rights of Prepetition Secured Parties. Subject to the terms of the Intercreditor Agreement, any Prepetition Secured Party may request further or different adequate protection, and the Debtors or any other party may contest any such request; provided that such further or different adequate protection shall at all times be subordinate and junior to the claims and liens of the DIP Agent and the DIP Lenders granted under the Interim DIP Order and the DIP Facility Documents. Except as expressly provided in the Interim DIP Order, nothing contained in the Interim DIP Order (including, without limitation, the authorization of the use of any Cash Collateral) shall impair or modify any rights, claims or defenses available in law or equity to any Prepetition Secured Party, the DIP Agent or any DIP Lender.

Upon entry of the Final DIP Order, the Debtors shall promptly pay to the Prepetition Agent from Cash Collateral or Advances under the DIP Facility amounts accrued and as they may come due in connection with the Prepetition First Lien Indebtedness, including, without limitation, payment of interest charged on the Prepetition First Lien Indebtedness, fees, expenses, charges, letter of credit fees, and commissions (the "Adequate Protection Payments").

(Interim DIP Order ¶¶ 13, 14)</td></tr>
<tr><td>**Carve-Out**

*LBR 4001-2(a)(i)(F)*</td><td>(a) As used in the Interim DIP Order, the term "Carve-Out" shall mean, collectively: (i) the unpaid fees payable to the U.S. Trustee and Clerk of the Bankruptcy Court pursuant to section 1930 of title 28 of the United States Code (the "U.S. Trustee and Clerk Fees"); (ii) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an amount not exceeding $50,000; (iii) to the extent allowed at any time, whether by interim order, procedural order or otherwise (whether such allowance occurs before or after the Carve-Out Trigger Date, as defined below), all unpaid fees, disbursements, costs and expenses (collectively, the "Professional Fees") actually incurred at any time before the business day immediately following the Carve-Out Trigger Date (including amounts actually incurred but not invoiced or approved prior to such day) by (x) the Debtors' professionals pursuant to section 327 of the Bankruptcy Code and (y) any professional of the official committee of unsecured creditors appointed in these Cases pursuant to section 1103 of the Bankruptcy Code (if appointed, the "Committee") (the Committee's professionals together with the Debtors' professionals, the "Professional Persons") in an amount not to exceed $150,000 during the first thirty (30) days from the Petition Date; (iv) the reasonable Professional Fees of Professional Persons actually incurred on and after the business day immediately following the Carve-Out Trigger Date, to the extent allowed at any time, whether by interim order, procedural order or otherwise, in an aggregate amount not to exceed $500,000. As used in the Interim DIP Order, "Carve-Out Trigger Date" shall mean the date on which the DIP Agent provides written notice to the Debtors and lead counsel to the Debtors, with a copy of such notice to lead counsel for the Committee (if appointed), the U.S. Trustee, and counsel to the Subordinated Noteholder, that the</td></tr>
</table>

Carve-Out is invoked, which notice may be delivered only following the occurrence and during the continuation of an Event of Default under the DIP Facility and the acceleration of all of the obligations under the DIP Facility. The Carve-Out Trigger Date shall be deemed to have occurred, regardless of whether notice has been delivered by the DIP Agent, upon the Revolving Credit Loan Maturity Date (as that term is defined in DIP Facility Credit Agreement).

(b) Subject to the terms and conditions of the DIP Facility Documents and the Interim DIP Order, prior to the business day following the Carve-Out Trigger Date, the Debtors shall be permitted to pay all allowed Professional Fees actually incurred (including on an interim basis) as the same may be due and payable, and such payments shall not reduce or be deemed to reduce the amount of the Carve-Out specified in clause (a)(iii) above. The Debtors shall deliver to the DIP Agent on a weekly basis a report setting forth the accrued Professional Fees (the "Accrued Professional Fees") and the accrued U.S. Trustee and Clerk Fees (the "Accrued U.S. Trustee and Clerk Fees") for the prior week.

(c) On a weekly basis the Debtors shall request Advances under the DIP Facility in such amounts that would be sufficient to satisfy the Professional Fees and the U.S. Trustee and Clerk Fees set forth in the 13-Week Budget for the prior week, with such Advances to be held in a segregated account (the "Carve-Out Reserve Account") by the Debtors, to be applied to the Professional Fees and the U.S. Trustee and Clerk Fees when due and payable (the "Carve-Out Segregated Funds") and as allowed by the Bankruptcy Court; provided, however, that in the event the Accrued Professional Fees and the Accrued U.S. Trustee and Clerk Fees for any one-week period exceed the Professional Fees and the U.S. Trustee and Clerk Fees set forth in the 13-Week Budget for the corresponding week, the Debtors shall promptly request additional Advances in such amounts necessary to satisfy the excess Accrued Professional Fees and Accrued U.S. Trustee and Clerk Fees for such one-week period, which shall be held in the Carve-Out Reserve Account as Carve-Out Segregated Funds. Without in any way limiting the Debtors' ability to use the Carve-Out Segregated Funds in the Carve-Out Reserve Account to pay the allowed Professional Fees and the U.S. Trustee and Clerk Fees as provided for in the Interim DIP Order, the Carve-Out Segregated Funds shall remain encumbered by and subject to the DIP Facility Liens, the Replacement Liens and the Prepetition Liens. To the extent the Carve-Out Segregated Funds in the Carve-Out Reserve Account exceed the allowed Professional Fees and the U.S. Trustee and Clerk Fees authorized to be paid consistent with the Interim DIP Order, any such remaining amounts shall be (i) subject to the DIP Facility Liens, the Replacement Liens and the Prepetition Liens but subject to the prior payment of the Carve-Out and (ii) promptly returned to the DIP Agent for the benefit of the DIP Lenders without further notice or order of the Court.

(d) Notwithstanding anything in the Interim DIP Order or in any other order by the Court to the contrary, no Prepetition Collateral, Collateral, Cash Collateral, amounts borrowed under the DIP Facility Documents, proceeds of any of the foregoing, or any portion of the Carve-Out shall include, apply to, or be available for, any fees or expenses incurred by any party, including the Debtors or the Committee (if appointed), in connection with (i) the initiation or prosecution of any claims, causes of action, adversary proceedings, or other litigation against the DIP Agent, any DIP Lender, or any Prepetition Secured Party, including, without limitation, challenging the amount, validity, extent, perfection, priority, characterization, or enforceability of, or asserting any defense, counterclaim, or offset to, the Postpetition Indebtedness, the DIP Facility Superpriority Claims, or the DIP Facility Liens, (ii) asserting (A) any claims or causes of action against the DIP Agent, any DIP Lender, or any Prepetition Secured Party,

|  | including, without limitation, claims or actions to hinder or delay the assertion or enforcement of the DIP Facility Liens or Replacement Liens, or realization on the Collateral, in accordance with the DIP Facility Documents or the Interim DIP Order by the DIP Agent, any DIP Lender, or any Prepetition Secured Party, or (B) any Avoidance Actions against any DIP Agent, any DIP Lender, or any Prepetition Secured Party, or (iii) the initiation or prosecution of any claims, causes of action, adversary proceedings, or other litigation against any Prepetition Secured Party, including, without limitation, challenging the amount, validity, extent, perfection, priority, or enforceability of, or asserting any defense, counterclaim, or offset to, the Prepetition Secured Indebtedness, any Prepetition Secured Financing Document, or the Adequate Protection granted in the Interim DIP Order; provided, however, that the Committee (if appointed) shall be authorized to use up to an aggregate amount of $50,000 to (i) investigate the liens, claims and interests of the Prepetition Secured Parties and (ii) negotiate and/or contest the terms or entry of the Final Order.

(e) Notwithstanding anything in the Interim DIP Order to the contrary, the foregoing shall not be construed as consent to the allowance of any Professional Fees and shall not affect the right of the Debtors, the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, the Committee, the U.S. Trustee, or other parties-in-interest to object to the allowance and payment of any Professional Fees. Payment of any portion of the Carve-Out shall not, and shall not be deemed to, (x) reduce any Debtor's obligations owed to the DIP Agent or any DIP Lender or any Prepetition Secured Party or (y) except as expressly provided in the Interim DIP Order, subordinate, modify, alter or otherwise affect any of the liens and security interests of such parties on and in the Collateral or Prepetition Collateral (or their respective claims against the Debtors). The Carve-Out shall be senior and prior to the payment of the obligations owed to the DIP Agent, the DIP Lenders, any Prepetition Secured Party or other party-in-interest, whether arising as a result of the obligations under the DIP Facility obligations, adequate protection obligations or any pre-petition obligations, but shall be limited or reduced by any applicable budgets or similar limitations set forth in the DIP Facility Documents. |
| --- | --- |
| **Payments on Prepetition Debt**<br><br>*FED. R. BANKR. P. 4001(c)(1)(B)(ii)* | Upon the closing of the DIP Facility, all cash collected by the debtors in the ordinary course of their operations or from the sale of any assets of the Debtors shall be paid to the Prepetition Agent to pay down the Prepetition First Lien Indebtedness as provided for in the Interim DIP Order.<br><br>Upon entry of the Final DIP Order, the Debtors shall promptly pay to the Prepetition Agent from Cash Collateral or Advances under the DIP Facility amounts accrued as they may come due in connection with the Prepetition First Lien Indebtedness, including, without limitation, payment of interest charged on the Prepetition First Lien Indebtedness, fees, expenses, charges, letter of credit fees, and commissions.<br><br>(Interim DIP Order ¶¶ 13(a), 14) |
| **Covenants**<br><br>*FED. R. BANKR. P. 4001(c)(1)(B)* | **Affirmative Covenants**. Usual and customary for financings of this type, including, without limitation: punctual payment of obligations under the DIP Facility Documents; delivery of financial statements, cash flow forecasts, and variance reports; hosting of lender conference calls; preservation of corporate existence; maintenance of properties, insurance, and corporate books and records; compliance with laws; and further assurances with respect to collateral.<br><br>(DIP Facility Agreement, §§ 8.1–8.18)<br><br>**Negative Covenants**. Usual and customary for financings of this type, including, without limitation, limitations on liens, investments, indebtedness (including |

|  | guarantees), fundamental changes, changes to the nature of the business, mergers or dispositions of assets, restricted payments, modifications of material documents, transactions with affiliates, sale and leaseback transactions, changes in fiscal periods, negative pledge clauses, subsidiary distributions, lines of business, chapter 11 claims, and financial covenants.<br><br>(DIP Facility Agreement §§ 9.1–9.19) |
| --- | --- |
| **Limitations**<br><br>*LBR 4001-2(a)(ii)* | Upon entry of the Final DIP Order, to the extent granted therein, with the exception of the Carve-Out and except as otherwise permitted by the DIP Facility Documents or the Interim DIP Order, neither the Collateral nor the DIP Agent, any DIP Lender, the Prepetition Secured Parties, nor any of their claims, shall be subject to any costs or expenses of administration that have been, or may be incurred at any time, pursuant to sections 105, 506(c) or 552(b) of the Bankruptcy Code, or otherwise, by the Debtors or any other party-in-interest. Until entry of the Final DIP Order no action, inaction, or acquiescence by the DIP Agent, any DIP Lender, or any Prepetition Secured Party shall be deemed to constitute consent for any "surcharge" of the Collateral. Effective upon entry of the Final Order, the "equities of the case" exception contained in section 552(b) of the Bankruptcy Code shall be deemed waived with respect to the Collateral. None of the DIP Agent, any DIP Lender, or the Prepetition Secured Parties shall be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral or Prepetition Collateral.<br><br>(Interim DIP Order ¶ 9)<br><br>The Borrower will use the proceeds of the Loans after the Effective Date in a manner consistent with the 13-Week Budget (subject to any variances otherwise permitted under § 10 of the DIP Facility Agreement) for payment of (a) post-petition operating expenses and other working capital and financing requirements of the Borrower subject to the 13-Week Budget or as otherwise agreed to by the Required Lenders, (b) certain transaction and bankruptcy fees, costs and expenses, (c) the Carve-Out, (d) Pre-Petition claims (including under the Prepetition Loan Document) to the extent consistent with the 13-Week Budget, approved by the Required Lenders in their Permitted Discretion and allowed by the Bankruptcy Court and (e) upon entry of the Final Order, to repay all amounts outstanding under the Pre-Petition Credit Agreement and the other Prepetition Loan Documents. The Borrower shall not be permitted to use the proceeds of the Loans or proceeds of Collateral: (i) to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to: (A) the interests of the Agents and Lenders or their rights or remedies under this Credit Agreement, the other Loan Documents or the Financing Orders, or (B) the interests of the Prior Agents and Prior Lenders or their rights or remedies under the Pre-Petition Loan Documents, including, without limitation, for the payment of any services rendered by the professionals retained by the Borrower or any Committee in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration or similar relief (x) invalidating, setting aside, avoiding or subordinating, in whole or in part, the Prior Lender Obligations or the Liens securing same, or the Obligations or the Liens securing same, (y) for monetary, injunctive or other similar relief against any Prior Lender or Prior Agents or any Lender or agent or their respective collateral, or (z) preventing, hindering or otherwise delaying the exercise by any Prior Lender, Prior Agents, Lender or Agents of any rights and remedies under the Financing Orders, the Pre-Petition Loan Documents, the Loan Documents or applicable law, or the enforcement or realization (whether by foreclosure, |

| | |
|---|---|
| | credit bid, further order of the court or otherwise) by any or all of the Prior Lenders, the Prior Agents, the Lenders and the Agents upon any of their collateral; (ii) to make any distribution under a plan of reorganization in the Chapter 11 Cases; (iii) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body that has not been approved by either the Bankruptcy Court or the Administrative Agent; (iv) to pay any fees or similar amounts to any Person who has proposed or may propose to purchase interests in Borrower or any Guarantor (including so-called "topping fees" and similar amounts) without the prior written consent of the Administrative Agent and the Required Lenders; or (v) to pay any amounts under the Management Agreement, the Subordinated PIK Notes or the Senior Notes. Notwithstanding anything to the contrary § 7.17.1 of the DIP Facility Agreement, the Borrower may pay the fees and expenses incurred by the Committee to the extent authorized by the Bankruptcy Court.<br><br>(DIP Facility Agreement § 7.17.1) |
| **Events of Default**<br><br>*FED. R. BANKR. P. 4001(c)(1)(B); LBR 4001-2(a)(ii)* | Usual and customary for financings of this type, including, without limitation, non-payment of principal, interest and fees, defaults under affirmative and negative covenants, breaches of representations and warranties, non-payment of certain obligations under capitalized leases, incurrence of certain ERISA liability, change of control, seeking or entry of any order granting superpriority claims to other creditors, relief from automatic stay, failure to comply with bankruptcy orders, and invalidation of superpriority claims.<br><br>(DIP Facility Agreement § 13) |
| **Acknowledgements**<br><br>*FED. R. BANKR. P. 4001(c)(1)(B)(iii)* | The Debtors make certain customary admissions and stipulations with respect to (a) the aggregate amount of prepetition indebtedness owing to the Prepetition Secured Parties, (b) the validity, enforceability and priority of the liens and security interests granted to the Prepetition Secured Parties, (c) the binding nature of the obligations under the Prepetition Secured Credit Agreement and the Subordinated Note in respect of the Debtors, and (d) the waiving of claims and defenses against the Prepetition Secured Parties regarding the obligations under the Prepetition Loan Documents (Interim DIP Order, ¶¶ E, 6); <u>provided</u> that, until the later of (a) sixty (60) days (or, with respect to any investigation regarding the Subordinated Note, seventy-five (75) days) following formation of the Committee or (b) if no Committee is formed, seventy-five (75) days (or, with respect to any investigation regarding the Subordinated Note, ninety (90) days) following entry of the Interim DIP Order, the Committee or, if no Committee has been formed, any party-in-interest with standing (other than the Prepetition Agent, the Prepetition Lenders, the Subordinated Noteholder and its affiliate), shall be entitled to investigate the validity, amount, perfection, priority, and enforceability of the Prepetition Liens and Prepetition Secured Indebtedness, or to assert any other claims or causes of action held by the Debtors' estates against any Prepetition Secured Party.<br><br>(Interim DIP Order ¶ 6) |
| **Automatic Stay**<br><br>*FED. R. BANKR. P. 4001(c)(1)(B)(iv)* | The automatic stay is modified as to the Prepetition Secured Parties to allow implementation of the Adequate Protection, without further notice or order of the Court.<br><br>(Interim DIP Order ¶ 13(h))<br><br>Any automatic stay otherwise applicable to the DIP Agent and the DIP Lenders is hereby modified so that after the occurrence and during the continuation of any Event of Default (subject to any applicable grace periods) under the DIP Facility Documents, and delivery by the DIP Agent of written notice of its intent to exercise remedies (a |

| MATERIAL TERMS OF DIP FACILITY | |
|---|---|
| | "Remedies Notice") in each case given to the Debtors and their counsel, counsel to the Subordinated Noteholder, counsel to the Committee (if appointed) and the U.S. Trustee, the DIP Agent shall be entitled to exercise its rights and remedies in accordance with the DIP Facility Agreement without further order of this Court beginning five (5) business days following delivery of the Remedies Notice to the extent set forth in the DIP Orders.<br><br>(Interim DIP Order ¶ 20) |
| **Waivers and Consents**<br><br>*FED. R. BANKR. P. 4001(c)(1)(B)(v), (vii–x)* | **Non-Bankruptcy Law.** The DIP Liens, Adequate Protection liens and other interests granted to the DIP Agent, the DIP Lenders or the Prepetition Secured Parties are deemed valid, binding, enforceable, and fully perfected as of the date of the Interim DIP Order.<br><br>(Interim DIP Order ¶¶ 4, 13(b))<br><br>**Indemnification.** Usual and customary for financings of this type, including that Borrower shall indemnify and hold harmless the DIP Agent, its affiliates and DIP Lenders in their respective capacities as such from and against any and all liabilities, losses, damages and expenses of every nature and character arising out of the DIP Facility Agreement or any of the other DIP Facility Documents or the transactions contemplated hereby.<br><br>(DIP Facility Agreement § 16.3)<br><br>**Sections 506(c) and 552(b).** Upon entry of the Final DIP Order, to the extent granted therein, with the exception of the Carve-Out and except as otherwise permitted by the DIP Facility Documents or the Interim DIP Order, neither the Collateral nor the DIP Agent, any DIP Lender, the Prepetition Secured Parties, nor any of their claims, shall be subject to any costs or expenses of administration that have been, or may be incurred at any time, pursuant to sections 105, 506(c) or 552(b) of the Bankruptcy Code, or otherwise, by the Debtors or any other party-in-interest. Until entry of the Final DIP Order no action, inaction, or acquiescence by the DIP Agent, any DIP Lender, or any Prepetition Secured Party shall be deemed to constitute consent for any "surcharge" of the Collateral. Effective upon entry of the Final Order, the "equities of the case" exception contained in section 552(b) of the Bankruptcy Code shall be deemed waived with respect to the Collateral. None of the DIP Agent, any DIP Lender, or the Prepetition Secured Parties shall be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral or Prepetition Collateral.<br><br>(Interim DIP Order ¶ 9) |

## Key Provisions

8.     The DIP Facility includes certain provisions the Debtors are required to highlight pursuant to Local Bankruptcy Rule 4001-2(a)(i). As discussed in detail herein, the Debtors believe these provisions are reasonable in light of the facts and circumstances of these chapter 11 cases and should be approved.

- **Local Bankruptcy Rule 4001-2(a)(i)(B) – Validity, Perfection, and Amount of Prepetition Obligations, Interim DIP Order at ¶¶ E, 6.** As part of the Interim DIP Order, the Debtors agree and stipulate that the Prepetition Secured Credit Agreement and the Subordinated Note are legal, valid, and binding agreements and obligations of the Debtors, and the liens granted thereunder constitute valid, binding, enforceable, and properly perfected liens, subject only to the permitted exceptions under the Prepetition Loan Documents and the Subordinated Notes. Additionally, the Debtors have waived, discharged, and released any right they may have to challenge any of their obligations under the Prepetition Loan Documents or the Subordinated Note.

- **Local Bankruptcy Rule 4001-2(a)(i)(B) – Committee Challenge Period, Interim DIP Order at ¶ 6.** Until the later of (a) sixty (60) days (or, with respect to any investigation regarding the Subordinated Note, seventy-five (75) days) following formation of the Committee or (b) if no Committee is formed, seventy-five (75) days (or, with respect to any investigation regarding the Subordinated Note, ninety (90) days) following entry of the Interim DIP Order, the Committee or, if no Committee has been formed, any party-in-interest with standing (other than the Prepetition Agent, the Prepetition Lenders, the Subordinated Noteholder and its affiliate), shall be entitled to investigate the validity, amount, perfection, priority, and enforceability of the Prepetition Liens and Prepetition Secured Indebtedness, or to assert any other claims or causes of action held by the Debtors' estates against any Prepetition Secured Party.

- **Local Bankruptcy Rule 4001-2(a)(i)(C) – Waiver of Section 506(c) Claims, Interim DIP Order at ¶ 10.** Upon entry of the Final DIP Order, to the extent granted therein, with the exception of the Carve-Out and except as otherwise permitted by the DIP Facility Documents or the Interim DIP Order, neither the Collateral nor the DIP Agent, any DIP Lender, the Prepetition Secured Parties, nor any of their claims, shall be subject to any costs or expenses of administration that have been, or may be incurred at any time, pursuant to section 506(c) of the Bankruptcy Code, or otherwise, by the Debtors or any other party-in-interest. Until entry of the Final DIP Order no action, inaction, or acquiescence by the DIP Agent, any DIP Lender, or any Prepetition Secured Party shall be deemed to constitute consent for any "surcharge" of the Collateral.

- **Local Bankruptcy Rule 4001-2(a)(i)(E) – Use of Postpetition Debt from Prepetition Creditor to Pay Such Prepetition Creditors' Prepetition Debt, Interim DIP Order at ¶¶ 13(a), 14.** The Interim DIP Order provides that the Debtors may use the proceeds of the DIP Facility to pay interest and certain fees, expenses, charges, letter of credit fees, and commissions that are obligations under the Prepetition Secured Credit Agreement. The DIP Facility does not provide that (and the Debtors do

16

not intend that) proceeds of the DIP Facility will be used immediately to pay all outstanding obligations under the Prepetition Secured Credit Agreement. Nonetheless, the DIP Facility includes a "creeping roll-up" feature: upon the closing of the DIP Facility, all cash collected by the Debtors in the ordinary course of their operations or from the sale of any assets of the Debtors shall be paid to the Prepetition Agent to pay down the Prepetition First Lien Indebtedness.

- **Local Bankruptcy Rule 4001-2(a)(i)(F) – Treatment of Committee Professionals, Interim DIP Order at ¶ 5.** The Interim DIP Order provides that the allowed fees and expenses of any official committee are included in the Carve-Out in an amount not to exceed $150,000 during the first thirty (30) days from the Petition Date. As discussed above, the DIP Liens are subject and subordinate to the Carve-Out.

### Background

9. As described in the First Day Declaration, the Debtors are a leading full-service, family-oriented restaurant chain and provider of ice cream products in the Eastern United States. The Debtors' operations include approximately 490 restaurants located in 16 states. In addition to their restaurant operations, the Debtors manufacture a complete line of premium ice cream products distributed to more than 7,000 supermarkets and other third party retail locations in 48 states. The Debtors and their affiliates maintain their national headquarters in Wilbraham, Massachusetts, and employ over 10,000 workers across the country. In the first eight months of 2011, the Debtors' generated $329.7 million in revenue and $8.6 million in adjusted EBITDA.

10. In recent years, the restaurant industry—including the Debtors' businesses—has been hurt by the significant U.S. economic downturn and increased food costs. New advertising campaigns and cost-cutting programs implemented by the Debtors have successfully mitigated certain negative effects on their businesses; however, the Debtors have not been immune to the effects of the economy and rising food prices, and their financial performance has suffered significantly.

11.     As the Debtors' liquidity position deteriorated, the Debtors struggled to meet their debt service obligations and failed to satisfy financial covenants under their prepetition revolving credit agreement, resulting in a default. Prior to their chapter 11 filing, the Debtors successfully negotiated a forbearance agreement with their senior secured lenders and a further extension of credit under their prepetition subordinated secured note in order to explore available restructuring alternatives.     After careful review and extensive negotiations, the Debtors determined that a chapter 11 filing, coupled with an expedited operational restructuring and an efficient sale of the Debtors' assets, was the best and most efficient way to maximize a return for the Debtors, their estates, and all parties in interest.

12.     On the date hereof (the "Petition Date"), each of the Debtors filed a petition with the Court under chapter 11 of the Bankruptcy Code to permit them to restructure their balance sheets and operations to restore profitability. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated. Concurrently with the filing of this Motion, the Debtors have requested procedural consolidation and joint administration of these chapter 11 cases.

## I.     Prepetition Indebtedness.

13.     As of the Petition Date, the Debtors have outstanding debt obligations in the aggregate principal amount of approximately $289.3 million (excluding approximately $14.9 million in issued and unfunded letters of credit), consisting primarily of approximately (a) $21.5 million in secured debt under the first lien senior secured credit facility, (b) not less than $260 million, inclusive of accrued and unpaid interest and prepayment premiums, in a

K&E 20022500

subordinated secured promissory note, and (c) $7.8 million in principal amount of 8.375-percent unsecured notes.

## A. Revolving Credit Facility.

14.     Friendly Ice Cream Corporation, as borrower, and Friendly's Restaurants Franchise, LLC as guarantor, Wells Fargo Capital Finance, Inc. (f/k/a Wells Fargo Foothill, Inc.), as administrative agent (the "Prepetition Agent"), and the lenders party thereto (collectively, the "Prepetition Lenders") are parties to that certain Second Amended and Restated Credit Agreement, dated as of June 5, 2008 (as amended, supplemented, or otherwise modified from time to time, the "Prepetition Secured Credit Agreement"). The Prepetition Secured Credit Agreement matures in April 2012 and provides for up to $49 million of revolving credit. The obligations under the Prepetition Secured Credit Agreement are secured by substantially all of the assets and capital stock of Friendly Ice Cream Corporation, Freeze Operations Holding Corp., and Friendly's Restaurants Franchise, LLC pursuant to that certain Omnibus Amendment to Security Documents, dated as of February 27, 2009. As of the Petition Date, the Debtors had approximately $21.5 million of principal amount outstanding and $14.9 million in letters of credit outstanding under the Prepetition Secured Credit Agreement (excluding unpaid interest and accrued and unpaid fees).

## B. Subordinated Secured Promissory Note Due 2013.

15.     Friendly Ice Cream Corporation is obligated to Sundae Group Holdings I, LLC (the "PIK Noteholder") pursuant to that certain Subordinated Secured Promissory Note, dated as of January 11, 2008, (as amended, supplemented, or otherwise modified from time to time, the "Secured Promissory Note"). The PIK Noteholder is majority owned, indirectly, by one or more affiliates of Sun Capital Partners, Inc. Certain co-investors, including the Debtors' Chief Executive Officer, are minority owners of the PIK Noteholder. The Debtors' ultimate majority

equity holders are also affiliates of Sun Capital Partners, Inc.  On September 9, 2011, Freeze, LLC (as successor to the original lender under the Secured Promissory Note, Freeze Group Holding Corp.) assigned its right, title, and interest in the Secured Promissory Note to the PIK Noteholder in exchange for, among other things, the agreement by the PIK Noteholder to lend an additional $2 million under the PIK Note to fund the Debtors' operations and a commitment to lend certain additional amounts.  Pursuant to this commitment, the PIK Noteholder subsequently lent an additional $2 million on September 26, 2011, and a further $2 million on September 30, 2011, for an aggregate of $6 million since the assignment. Under the Secured Promissory Note, Friendly Ice Cream Corporation issued a secured promissory note due January 11, 2013 in the original principal amount of $100 million, with interest paid in-kind at a floating rate tied to an EBITDA grid which was subsequently amended to a flat rate of 12 percent (the "PIK Note").  On March 11, 2008 and June 5, 2008, the principal amount of the PIK Note was increased by $26.5 million and $19.5 million, respectively.  The current amount outstanding under the PIK Note is approximately $267.7 million.

16.     The PIK Note is junior in interest to the Prepetition Secured Credit Agreement, pursuant to that certain Intercreditor and Subordination Agreement, dated June 5, 2008, between Wells Fargo Foothill, Inc. and Freeze Group Holding Corp.  The Secured Promissory Note is guaranteed by Freeze Operations Holding Corp. and Friendly's Restaurant Franchise, LLC, and is secured by substantially all of the assets of Friendly Ice Cream Corporation, Freeze Operations Holding Corp., and Friendly's Restaurant Franchise, LLC.

**C.      8.375-Percent Senior Subordinated Notes Due 2012.**

17.     Friendly Ice Cream Corporation, as issuer, Friendly's Restaurants Franchise, as guarantor, and The Bank of New York, as indenture trustee, are parties to that certain Indenture, dated as of March 8, 2004 (as supplemented by the First Supplemental Indenture, dated August

20

8, 2007) (the "Note Indenture"). Under the Note Indenture, Friendly Ice Cream Corporation issued a total of approximately $175 million in unsecured 8.375-Percent Senior Subordinated Notes due June 15, 2012 (the "Notes") to holders (the "Noteholders"). On July 26, 2007, pursuant to that certain Offer to Purchase and Consent Solicitation Statement, Friendly Ice Cream Corporation commenced a tender offer for the Notes whereby Noteholders of approximately $167,196,000 of Notes agreed to tender their Notes. As of the Petition Date, approximately $7.8 million in principal balance (excluding accrued interest) on the Notes remains outstanding.

### D.    Other Liens.

18.    In the ordinary course of business, the Debtors have incurred certain secured indebtedness, including obligations secured by purchase money security interests and mechanics' liens, as permitted under the Prepetition Secured Credit Facility and the Subordinated Note. These permitted encumbrances will not be subject to the DIP Liens.

## II.    The Debtors' Marketing Efforts for Postpetition Financing.[8]

19.    As described in the First Day Declaration, the Debtors began restructuring negotiations with their existing secured creditors in the summer of 2011. As a result of these negotiations, and in order to permit the Debtors time to explore potential restructuring alternatives, on August 31, 2011, the Debtors entered into a forbearance agreement with the Prepetition Lenders, under which the Prepetition Lenders agreed to forbear from exercising their contractual and legal rights and remedies with respect to certain defaults under the Prepetition Secured Credit Agreement.

---

[8]    This subsection describes the Debtors' efforts to obtain financing, the basis on which the Debtors determined that the proposed financing is on the best terms available, and the material facts bearing on the issue of whether the credit is being extended in good faith.

20.     After securing this forbearance, the Debtors and their legal and financial advisors considered available alternatives to the currently contemplated chapter 11 sale process. In the months prior to the Petition Date, the Debtors worked closely with their advisors to consider the capital markets, as well as explore options with creditors in the Debtors' existing capital structure, in an effort to address their debt service obligations. It became clear that an out-of-court solution to the Debtors' liquidity and debt burden issues would not be available.

21.     Once it became clear that such an out-of-court refinancing was not viable, the Debtors and their advisors entered into extensive, arm's-length negotiations with the Prepetition Agent regarding the terms of potential debtor-in-possession financing. Based on their evaluation of all available alternatives, and due to the Prepetition Agent's extensive knowledge of the Debtors' business, the Debtors determined that the existing Prepetition Lenders offered the best potential for debtor-in-possession financing to ensure that the Debtors would have sufficient liquidity to continue operations and to preserve the value of their estates.

22.     The Debtors recognized that any attempt to secure debtor-in-possession financing from any source outside the Debtors' existing capital structure may have required the consent of the Debtors' Prepetition Lenders and Subordinated Noteholder as a condition to effectiveness, or would have required a contested priming fight in the first day of these chapter 11 cases. Accordingly, to avoid this high risk of distracting (and potentially extremely costly) priming and adequate protection disputes, the Debtors determined that a DIP Facility from the existing Prepetition Lenders was the most viable alternative.

23.     After duly considering other potential sources of debtor-in-possession financing, the Debtors' advisors believe that the DIP Facility is the best debtor-in-possession financing

22

package available to the Debtors. The DIP Facility provides an attractive financing package, with market terms comparable to those in similar debtor-in-possession financing packages.

## Basis for Relief

I. **The Debtors Should Be Authorized to Obtain Postpetition Financing through the DIP Facility Documents.**

    A. **Entering into the DIP Facility Documents Is an Exercise of the Debtors' Sound Business Judgment.**

24.    The Court should authorize the Debtors, as an exercise of the Debtors' sound business judgment, to enter into the DIP Facility Documents, obtain access to the DIP Facility, and to continue using the Cash Collateral.

25.    Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances as described in greater detail below. Provided that an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance with its sound business judgment in obtaining such credit. *See, e.g., Trans World Airlines, Inc. v. Travellers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment."); *In re Barbara K. Enters., Inc.*, No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[c]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or

its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of postpetition financing requires, inter alia, an exercise of "sound and reasonable business judgment."); *see also Bray v. Shenandoah Fed. Sav. & Loan Assoc. (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (stating that "[t]he statute imposes no duty to seek from every possible lender before concluding that such credit is unavailable").

26.     Specifically, to determine whether the business judgment standard is met, a court is "required to examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code.") (citation omitted).

27.     Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Garland Corp.*, 6 B.R. 456, 461 (B.A.P. 1st Cir. 1980) (secured credit under section 364(c)(2) authorized, after notice and a hearing, upon showing that unsecured credit unobtainable); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *Ames*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

28.     The Debtors' execution of the DIP Facility Documents is an exercise of their sound business judgment that warrants approval by the Court.  Prior to the Petition Date, the Debtors and their advisors undertook an analysis of the Debtors' projected financing needs during the pendency of these chapter 11 cases, and determined that the Debtors would require significant postpetition financing to support their operational and restructuring activities. Further, while the Debtors' vendors typically allow the Debtors to purchase goods on credit, the Debtors' ability to continue this practice is dependent upon their having access to sufficient liquidity to assure business counterparties that the Debtors are not a credit risk.  Accordingly, the Debtors negotiated the DIP Facility Documents with the DIP Lenders in good faith, at arm's-length, and with the assistance of their advisors, to obtain the required postpetition financing on terms favorable to the Debtors.  Based on the advice of counsel and other professionals, and the Debtors' own analysis, the Debtors have determined in their sound business judgment that the DIP Facility Documents provide a greater amount of financing on more favorable terms than any other reasonably available alternative.  The Debtors' advisors have canvassed the market to find interested parties to participate in the debtor-in-possession financing and have assisted the Debtors in negotiations to obtain the best terms available to ensure that the DIP Facility was fully subscribed.

29.     Specifically, as noted above, the DIP Facility will provide the Debtors with access to up to approximately $50.6 million immediately after entry of the Interim DIP Order and up to an aggregate amount of approximately $71.3 million after entry of the Final DIP Order, which the Debtors and their advisors have independently determined should be sufficient to demonstrate their credit-worthiness to their vendors and other business counterparties and

K&E 20022500

support the Debtors' ongoing operations and reorganization activities through the pendency of these chapter 11 cases.

### B.  The Debtors Should Be Authorized to Obtain Postpetition Financing on a Senior Secured and Superpriority Basis.

30.  Section 364 of the Bankruptcy Code authorizes a debtor to obtain, in certain circumstances, postpetition financing on a secured or superpriority basis, or both. Specifically, section 364(c) of the Bankruptcy Code provides, in pertinent part, that the Court, after notice and a hearing, may authorize a debtor that is unable to obtain credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code to obtain credit or incur debt:

> (1)  with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code];
>
> (2)  secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3)  secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

31.  To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis. *Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986). "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.*; *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense). When few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to

K&E 20022500

conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n. 4 (N.D. Ga. 1989); *see also Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received).

32.     The Debtors' and Duff & Phelps's discussions with various potential sources of debtor-in-possession financing revealed that such financing on a junior or unsecured basis was not available.  The Debtors' significant secured debt obligations and lack of unencumbered assets precludes them from obtaining postpetition financing in the amount they require on terms other than on a secured and superpriority basis.  The Court should therefore authorize the Debtors to provide the DIP Agent, on behalf of itself and the other DIP Lenders, senior liens on the Debtors' unencumbered property as provided in section 364(c)(2) of the Bankruptcy Code, and junior liens on the Debtors' property that is subject to valid, perfected, and unavoidable liens in existence immediately prior to the Petition Date (other than the Permitted Encumbrances) or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code, as provided in section 364(c)(2) of the Bankruptcy Code; as well as to grant the Debtors' repayment obligations under the DIP Facility Documents superpriority administrative expense status as provided for in section 364(c)(1) of the Bankruptcy Code.

**C.      The Debtors Should Be Authorized to Obtain Postpetition Financing Secured by First Priority Priming Liens.**

33.     In addition to authorizing financing under section 364(c) of the Bankruptcy Code, courts also may authorize a debtor to obtain postpetition credit secured by a lien that is senior or

equal in priority to existing liens on the encumbered property, without the consent of the existing lienholders, if the debtor cannot otherwise obtain such credit and the interests of existing lienholders are adequately protected. *See* 11 U.S.C. § 364(d)(1).

34.     When determining whether to authorize a debtor to obtain credit secured by a "priming" lien as authorized by section 364(d) of the Bankruptcy Code, courts focus on whether the transaction will enhance the value of the Debtors' assets.   Courts consider a number of factors, including, without limitation:

(a)     whether alternative financing is available on any other basis (i.e., whether any better offers, bids or timely proposals are before the court);

(b)     whether the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtors' business;

(c)     whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtors and proposed lender(s); and

(d)     whether the proposed financing agreement was negotiated in good faith and at arm's length and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors.

*See, e.g., Ames Dep't Stores*, 115 B.R. at 37–39; *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003); *Farmland Indus.*, 294 B.R. at 862–79, *In re Lyondell Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. Mar. 5, 2009); *Barbara K. Enters.*, 2008 WL 2439649 at *10; *see also* 3 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶ 364.04[1] (16th ed.). The DIP Facility Documents satisfy each of these factors.

35.     *First*, as described above, the Debtors and their advisors determined that the DIP Lenders offered the best option for obtaining the postpetition financing the Debtors require.  The Debtors conducted arm's-length negotiations with the DIP Lenders regarding the terms of the DIP Facility, and those agreements reflect the most favorable terms on which the DIP Lenders

28

were willing to offer financing. The Debtors are not able to obtain financing on equal or better terms from the DIP Lenders other than financing secured by first priority priming liens.

36.     **Second**, the Debtors need the funds to be provided under the DIP Facility to preserve the value of their estates for the benefit of all creditors and other parties in interest. Specifically, the Debtors need the funds to be provided under the DIP Facility to maintain operations and signal to their suppliers and other vendors that they are credit-worthy and that their vendors can and should continue to provide their products to the Debtors on substantially the same credit terms as during the prepetition period. Absent the DIP Facility and use of the Cash Collateral, the Debtors will be unable to operate their business or prosecute these chapter 11 cases, and the Debtors' vendors may refuse to provide the goods (and credit) the Debtors' businesses require.

37.     Were the Debtors' vendors to require the Debtors to pay for all goods in advance, it could result in an immediate liquidity crisis and detriment to the Debtors' businesses, which could erode the Debtors' significant going-concern value. Moreover, without access to the DIP Facility, the Debtors would have no feasible way to weather any such liquidity event. Providing the Debtors with the liquidity necessary to preserve their going-concern value through the pendency of these chapter 11 cases is in the best interest of all stakeholders.

38.     **Third**, upon entry of the Final DIP Order, the DIP Facility will provide the Debtors with access to approximately $71.3 million in postpetition financing, which the Debtors and their advisors have independently determined is sufficient and necessary to allow the Debtors to maintain their operations and their relationships with key constituents notwithstanding the commencement of these chapter 11 cases. The DIP Orders also provide the Debtors with continued use of the Cash Collateral, which will maintain the Debtors' ability to

K&E 20022500

access liquidity in the same accounts as prior to the Petition Date, without the disruption or delay that would result if the Debtors were required to set aside that cash and re-fund their accounts with new postpetition borrowings. Accordingly, the terms of the DIP Facility Documents and the DIP Orders are reasonable and adequate to support the Debtors' operations and restructuring activities through the pendency of these chapter 11 cases.

39. *Fourth*, as described in greater detail above and in the First Day Declaration, the Debtors and the DIP Lenders negotiated the DIP Facility Documents in good faith and at arm's-length, and the Debtors' entry into the DIP Facility Documents is an exercise of their sound business judgment and is in the best interests of their estates, creditors, and other parties in interest.

40. *Fifth*, as described below, the Debtors will provide Adequate Protection for the Prepetition Secured Parties' interests in the Prepetition Collateral in a manner consistent with the terms agreed to by such parties pursuant to the DIP Facility Agreement, the Intercreditor Agreement, the Prepetition Secured Credit Agreement, and the Subordinated Note. Furthermore, the Debtors' existing secured creditors have consented to (a) the use of Cash Collateral; (b) the priming liens provided under the DIP Facility; and (c) the Adequate Protection.

**D.    The Interests of the Prepetition Lenders Are Adequately Protected.**

41. A debtor may obtain postpetition credit "secured by a senior or equal lien on property of the estate that is subject to a lien only if" the debtor, among other things, provides "adequate protection" to those parties whose liens are primed. *See* 11 U.S.C. § 364(d)(1)(B). What constitutes adequate protection is decided on a case-by-case basis, and adequate protection may be provided in various forms, including payment of adequate protection fees, payment of interest, or granting of replacement liens or administrative claims. *See, e.g.*, *In re Continental Airlines Inc.*, 154 B.R. 176, 180–181 (Bankr. D. Del. 1993); *In re Columbia Gas Sys., Inc.*, Nos.

30

91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("the determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case"); *In re Realty Sw. Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted).

42.     The Debtors have offered a fair and reasonable adequate protection package to the Prepetition Secured Parties (collectively, the "Adequate Protection"). The Prepetition Secured Parties shall receive Adequate Protection including, without limitation, the following:

- a pay down of the obligations under the Prepetition Secured Credit Agreement of all cash collected by the Debtors in the ordinary course of their operations or from the sale of any assets;

- valid, binding, enforceable, and fully perfected replacement liens in the Collateral, subordinate only to the Carve-Out, the DIP Liens and the Permitted Prior Liens;

- in the case of the Prepetition Agent, on behalf of the Prepetition Lenders, allowed administrative claims under Bankruptcy Code section 507(b) with respect to all Adequate Protection obligations, having priority over all administrative expense claims and unsecured claims against the Debtors or their estates, not existing or hereafter arising, of any kind or nature whatsoever, subordinate only to the DIP Facility Superpriority Claim, the Carve-Out and any Permitted Prior Liens;

- (a) any financial information or periodic reporting that is provided to, or required to be provided to, the DIP Agent or the DIP Lenders (or their advisors) pursuant to the DIP Facility Documents, and (b) reasonable access to the Collateral and the Debtors' business premises, during normal business hours, for purposes of verifying the Debtors' compliance with the terms of the DIP Orders as it pertains to the Prepetition Secured Parties and as otherwise permitted under the Prepetition Secured Financing Documents;

- allowance of the claims arising from or in connection with the Prepetition Secured Indebtedness within the meaning of section 502 of the Bankruptcy Code;

- subject to the terms of the Intercreditor Agreement and applicable law, the right to "credit bid" the allowed amount of the Prepetition Lenders' or the Subordinated

Noteholder's claims, as the case may be, during any sale of all or substantially all of the Prepetition Collateral;

- in the case of the Subordinated Noteholder, the continued accrual of interest on the Subordinated Note as provided in the Subordinated Note Documents; provided, however, that accrued and unpaid interest shall not be paid by the Debtors from the proceeds of the DIP Facility or Cash Collateral so long as any obligations remain outstanding and unpaid under the DIP Facility or the commitments thereunder have not terminated; and

- in the case of the Prepetition Lenders, upon entry of the Final DIP Order, payment of amounts accrued as they may come due in connection with the Prepetition First Lien Indebtedness, including, without limitation, payment of interest, fees, expenses, charges, letter of credit fees, and commissions.

43.    The Adequate Protection summarized above and set forth in the DIP Orders is fair and reasonable, and is sufficient to satisfy the requirements of section 364(d)(1)(B) of the Bankruptcy Code.  Significantly, the Prepetition Agent and the Subordinated Noteholder have consented to the Adequate Protection to be provided to the Prepetition Lenders and the Subordinated Noteholder, respectively.  Accordingly, the Court should find that the Adequate Protection is fair and reasonable and satisfies the requirements of section 364(d)(1)(B) of the Bankruptcy Code.

## II.    The Debtors Should Be Authorized to Use the Cash Collateral.

44.    Section 363(c) of the Bankruptcy Code restricts a debtor's use of a secured creditor's cash collateral.  Specifically, that provision provides, in pertinent part, that:

The trustee may not use, sell, or lease cash collateral . . . unless—

(A)    each entity that has an interest in such cash collateral consents; or

(B)    the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2).  Further, section 363(e) provides that "on request of an entity that has an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or

32

without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). The Debtors have satisfied the requirements of sections 363(c)(2) and (e), and should be authorized to use the Cash Collateral.

45. *First*, the use of Cash Collateral here is consensual. Pursuant to the DIP Facility Documents, the Prepetition Agent has consented to the Debtors' use of the Cash Collateral. In addition, the Subordinated Noteholder has consented to the Debtors' use of Cash Collateral.

46. Moreover, even if the Subordinated Noteholder had not consented, pursuant to the Intercreditor Agreement among the Prepetition Secured Parties, the Prepetition Agent's consent should control. Courts in this jurisdiction and others have generally held that intercreditor agreements are enforceable. *See In re Elec. Components Int'l, Inc.*, No. 10-11054, 2010 WL 66347116, at *8 (Bankr. D. Del. Apr. 27, 2010) (finding an "intercreditor agreement constitutes a 'subordination agreement' under section 510 and is enforceable on its terms"); *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 140 (Bankr. D.N.J. 2010) (finding section 510 provides that a "subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law"); *In re Curtis Ctr. Ltd. P'ship*, 192 B.R. 648, 660 (Bankr. E.D. Pa. 1996) (finding "the language of the subordination agreement is plain and unambiguous. The terms of this Prepetition agreement are fully enforceable in this Bankruptcy case pursuant to 11 U.S.C. § 510(a)"); *see also In re Boston Generating, LLC*, 440 B.R. 302, 318 (Bankr. S.D.N.Y. 2010) (finding an "[i]ntercreditor [a]greement is an enforceable agreement under section 510(a) of the Bankruptcy Code to the extent that it is a subordination agreement"); *In re Erickson Retirement Cmty, LLC*, 425 B.R. 309, 314 (Bankr. N.D. Tex. 2010) (finding "subordination agreements are fully enforceable"); *Ion Media Networks, Inc.*, 419 B.R. 585, 595 (Bankr. S.D.N.Y. 2009) (finding intercreditor agreements are

33

enforceable contracts under section 510(a) "and the Court will not disturb the bargained-for rights and restrictions governing the second lien debt"); *In re Aerosol Packaging, LLC*, 362 B.R. 43, (Bankr. N.D. Ga. 2006) (finding that "unless the [s]ubordination [a]greement is not enforceable under applicable nonbankruptcy law, the [s]ubordination [a]greement should be enforced by its terms.").

47. *Second*, even in the absence of consent, the Prepetition Secured Parties' interests in the Cash Collateral are adequately protected in satisfaction of section 363(e) of the Bankruptcy Code.[9] As described above, the Debtors are providing the Prepetition Lenders with Adequate Protection, which is fair and reasonable, and adequately protects the Prepetition Lenders' interests in the Prepetition Collateral from diminution caused by the DIP Facility, including by the Debtors' use of the Cash Collateral pursuant to the terms thereof. Accordingly, the Court should authorize the Debtors to use the Cash Collateral under section 363(c)(2) of the Bankruptcy Code.

### III. The Debtors Should Be Authorized to Pay the Fees Required by the DIP Agent Under the DIP Facility Documents.

48. Under the DIP Facility Documents, the Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Agent. In particular, as noted above, the Debtors have agreed to pay a Commitment Fee[10] of 0.50 percent times the average daily amount during each calendar month or portion thereof by which the Applicable Amount exceeds the outstanding amount of Revolving Credit Loans during such calendar month. The Debtors have also agreed to certain Letter of Credit Fees, including an issuance fee of 2.00 percent per annum times the daily

---

[9]     The Debtors are not aware of any entity other than the Debtors and the Prior Lenders that has or purports to have an interest in the Cash Collateral.

[10]    An affiliate of the Debtors' equity owner shall share in the Commitment Fee.

balance of undrawn outstanding Letters of Credit. Additional, reasonable fees are outlined in the DIP Agent fee letter.

49.     Courts routinely authorize debtors to pay fees similar to those the Debtors propose to pay, where the associated financing is, in the debtor's business judgment, beneficial to the debtors' estates—indeed, the fees here are significantly smaller than fees approved in many other cases.[11] *See, e.g., In re Sea Launch Co., L.L.C.*, No. 09-12153 (Bankr. D. Del. May 12, 2010) (approving 3.75-percent DIP break-up fee); *In re Aleris Int'l. Inc.*, No. 09-10478 (Bankr. D. Del. Mar. 18, 2009) (approving 3.5-percent exit fee and 3.5% front-end net adjustment against each lender's initial commitment); *In re Dura Auto. Sys., Inc.*, No. 06-11202 (Bankr. D. Del. Jan. 30, 2008) (approving a 2.5-percent fee related to refinancing and extending a postpetition financing facility); *see also In re Great Atl. & Pac. Tea Co.*, No. 10-24549 (Bankr. S.D.N.Y. Jan. 11, 2011) (approving 3-percent letter of credit fee); *In re InSight Health Servs. Holdings Corp.*, No. 10-16564 (Bankr. S.D.N.Y. Jan. 4, 2011) (approving 2.5-percent DIP closing fee); *In re Neff Corp.*, No. 10-12610 (Bankr. S.D.N.Y. June 30, 2010) (approving 3.1-percent DIP and exit facility fee); *In re Reader's Digest Ass'n*, No. 09-23529 (Bankr. S.D.N.Y. Oct. 6, 2009) (approving 3-percent exit fee); *In re Lear Corp.*, No. 09-14326 (Bankr. S.D.N.Y. Aug. 4, 2009) (approving 5.0-percent up front fee and a 1.0-percent exit/conversion fee); *In re Gen. Growth Props., Inc.*, No. 09-11977 (Bankr. S.D.N.Y. May 14, 2009) (approving 3.75-percent exit fee); *In re Tronox Inc.*, No. 09-10156 (Bankr. S.D.N.Y. Feb. 9, 2009) (approving an up-front 3-percent facility fee). Accordingly, the Court should authorize the Debtors to pay the fees provided under the DIP Facility Documents in connection with entering into those agreements.

---

[11]   Because of the voluminous nature of the orders cited herein, they are not attached to the Motion. Copies of these orders are available on request of the Debtors' proposed counsel.

## IV.    The DIP Lenders Should Be Deemed Good Faith Lenders under Section 364(e).

50.    Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

51.    As explained in detail herein and in the First Day Declaration, the DIP Facility Documents are the result of the Debtors' reasonable and informed determination that the DIP Lenders offered the most favorable terms on which to obtain needed postpetition financing, and of extended arm's-length, good faith negotiations between the Debtors and the DIP Lenders. The terms and conditions of the DIP Facility Documents are fair and reasonable, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party to the DIP Facility Documents other than as described herein.  Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

## V.    Modification of the Automatic Stay Is Warranted.

52.    The proposed Interim DIP Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit

K&E 20022500

the DIP Agent to exercise, upon the occurrence and during the continuation of any Event of Default, all rights and remedies provided for in the DIP Facility Agreement, and to take various actions without further order of or application to the Court. However, the DIP Agent must provide the Debtors and various other parties, including the U.S. Trustee, with five (5) business days written notice prior to exercising any enforcement rights or remedies in respect of the Collateral or upon a shorter period of time after notice and a hearing.

53. Stay modification provisions of this sort are ordinary and usual features of DIP financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances. Accordingly, the Court should modify the automatic stay to the extent contemplated by the DIP Facility Agreement and the proposed DIP Orders.

## VI. The Debtors Require Immediate Access to the Cash Collateral and DIP Facility.

54. The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." FED. R. BANKR. P. 4001(b)(2), (c)(2). In examining requests for interim relief under this rule, courts in this jurisdiction generally apply the same business judgment standard applicable to other business decisions. *See Ames Dep't Stores*, 115 B.R. at 36.

55. Bankruptcy Rule 4001(c)(2) governs the procedures for obtaining authorization to obtain postpetition financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than [15] days after service of the motion. If the motion so requests, the court may conduct a hearing before such [15] day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

K&E 20022500

56.     In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions. *See, e.g., Ames Dep't Stores*, 115 B.R. at 36; *Simasko*, 47 B.R. at 449. Under this standard, the Debtors' request for entry of the DIP Orders, in the time periods and for the financing amounts requested herein, is appropriate. Moreover, courts in this jurisdiction have granted similar relief in other chapter 11 cases. *See e.g., In re Corrozi-Fountainview, LLC*, No. 10-11090 (Bankr. D. Del. June 6, 2011); *In re Ambassadors Int'l, Inc.*, No. 11-11002 (Bankr. D. Del. Apr. 28, 2011); *In re Atrium Corp.*, No. 10-10150 (Bankr. D. Del. Mar. 17, 2010); *In re Constar Int'l Inc.*, No. 11-10109 (Bankr. D. Del Mar. 10, 2011); *In re Appleseed's Intermediate Holdings LLC*, No. 11-10160 (Bankr. D. Del. Feb. 23, 2011) *In re ACG Holdings, Inc.*, No. 08-11467 (Bankr. D. Del. Jul. 16, 2008); *In re Hilex Poly Holding Co. LLC*, No. 08-10890 (Bankr. D. Del. May 7, 2008); *In re Holley Performance Prods. Inc.*, No. 08-10256 (Bankr. D. Del. Feb. 12, 2008); *In re Remy Worldwide Holdings, Inc.*, No. 07-11481 (Bankr. D. Del. Oct. 10, 2007); *In re Foamex Int'l Inc.*, No. 05-12685 (Bankr. D. Del. Sept. 20, 2005).

57.     The Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested herein, including authorizing the Debtors to use the Cash Collateral and to borrow up to approximately $50.6 million under the DIP Facility is not granted promptly after the Petition Date. The Debtors have no material source of liquidity other than the DIP Facility. To continue to operate their businesses, maintain operations, and fund their cash management system to a sufficient level, the Debtors require access to the DIP Facility.

58.     Moreover, substantially all of the Debtors' cash is subject to the dominion of the Prepetition Lenders. Thus, the Debtors have insufficient cash to fund operations without immediate use of Cash Collateral and access to the DIP Facility. Access to the DIP Facility also

should allow the Debtors to continue to satisfy obligations arising from the ordinary-course operation of their businesses. The Debtors' ability to procure goods on credit is entirely based on the Debtors' liquidity and the perception of the Debtors' ability to repay and general merchandise vendors for providing their products on credit. The DIP Facility will signal the Debtors' ability to satisfy any and all obligations to vendors and contribute to what the Debtors hope and expect will be a smooth restructuring and sale process.

59. Further, the Debtors anticipate that the commencement of these chapter 11 cases may significantly and immediately increase the demands on their free cash as a result of, among other things, the costs of administering these chapter 11 cases and addressing key constituents' concerns regarding the Debtors' financial health and ability to continue operations in light of these chapter 11 cases. Accordingly, the Debtors have an immediate need for access to liquidity to, among other things, continue the operation of their business, maintain their relationships with customers, meet payroll, pay capital expenditures, procure goods and services from vendors and otherwise satisfy their working capital and operational needs, all of which is required to preserve and maintain the Debtors' enterprise value for the benefit of all parties in interest.

## Request for a Final Hearing

60. Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date, which is no sooner than 14 days after the date of this Motion and no later than 25 days after the Petition Date, to hold a hearing to consider entry of the Final DIP Order and the permanent approval of the relief requested in this Motion.[12] The Debtors also request authority to serve a copy of the signed Interim DIP Order, which fixes the time and date for the filing of objections, if any, to entry of the Final DIP Order, by first class mail upon the notice

---

[12] The DIP Facility Documents require that the Final DIP Order be entered no later than 35 days after the Petition Date.

parties listed below, and further request that the Court deem service thereof sufficient notice of the hearing on the Final DIP Order under Bankruptcy Rule 4001(c)(2).

## **Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

61.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## **Notice**

62.     Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known:  (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the agent for the Debtors' prepetition secured lenders and the agent for the Debtors' proposed postpetition debtor-in-possession financing facility; (c) the indenture trustee for the Debtors' prepetition unsecured noteholders; (d) the top 20 unsecured creditors; and (e) any party that may have a particular interest in this Motion.  As this Motion is seeking "first day" relief, within two business days of the hearing on this Motion, the Debtors will serve copies of this Motion and any order entered in respect to this Motion as required by Local Bankruptcy Rule 9013-1(m).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## **No Prior Request**

63.     No prior request for the relief sought in this Motion has been made to this or any other court.

*[Remainder of Page Intentionally Left Blank]*

40

WHEREFORE, the Debtors respectfully request that the Court enter an order granting the relief requested herein and granting such other further relief as is just and proper.

Dated: October 5, 2011
Wilmington, Delaware

**PACHULSKI STANG ZIEHL & JONES LLP**

_____
Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Kathleen P. Makowski (DE Bar No. 3648)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400
Email:        ljones@pszjlaw.com
              tcairns@pszjlaw.com
              kmakowski@pszjlaw.com

- and -

James A. Stempel (*pro hac vice* admission pending)
Ross M. Kwasteniet (*pro hac vice* admission pending)
Jeffrey D. Pawlitz (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        james.stempel@kirkland.com
              ross.kwasteniet@kirkland.com
              jeffrey.pawlitz@kirkland.com

*Proposed Co-Counsel to the Debtors
and Debtors in Possession*