to the Administrative Agent such amount on a date after such Settlement Date, such Settling Lender shall pay to the Administrative Agent on demand such amount plus interest thereon at the Defaulting Lender Rate until paid in full. A statement of the Administrative Agent submitted to such Settling Lender with respect to any amounts owing under this §2.9.2 shall be prima facie evidence of the amount due and owing to the Administrative Agent by such Settling Lender. If such Settling Lender's Settlement Amount is not made available to the Administrative Agent by such Settling Lender within three (3) Business Days following such Settlement Date, the Administrative Agent shall be entitled to recover such amount from the Borrower on demand, with interest thereon at the rate per annum applicable to the Revolving Credit Loans as of such Settlement Date.

2.9.3    **No Effect on Other Lenders**. The failure or refusal of any Settling Lender to make available to the Administrative Agent at the aforesaid time and place on any Settlement Date the amount of such Settling Lender's Settlement Amount shall not (a) relieve any other Settling Lender from its several obligations hereunder to make available to the Administrative Agent the amount of such other Settling Lender's Settlement Amount, or (b) impose upon any Lender, other than the Settling Lender so failing or refusing, any liability with respect to such failure or refusal or otherwise increase the Commitment of such other Lender.

2.10    **Repayments of Revolving Credit Loans From Concentration Account After Event of Default**. Following the occurrence and during the continuance of an Event of Default, at its election, Administrative Agent may instruct any bank, depositary institution or securities intermediary to liquidate all funds or other assets previously transferred or credited to a Concentration Account, a Restaurant Concentration Account or any other Deposit Account or securities account of the Borrower or any of its Restricted Subsidiaries and transfer the proceeds thereof to Administrative Agent's Account and apply such proceeds to the Obligations in accordance with §13.4.

2.11    **Defaulting Lenders**. The Administrative Agent shall not be obligated to transfer to a Defaulting Lender any payments made by the Borrower to the Administrative Agent for the Defaulting Lender's benefit or any collections or proceeds of Collateral that would otherwise be remitted hereunder to the Defaulting Lender, and, in the absence of such transfer to the Defaulting Lender, the Administrative Agent shall transfer any such payments (A) first, to repay any Swing Line Loans that were required to be, but were not, paid by the Defaulting Lender, (B) second, to the Issuing Lender, to the extent of the portion of a L/C Disbursement that was required to be, but was not, paid by the Defaulting Lender, (C) third, to each non-Defaulting Lender ratably in accordance with their Commitments (but, in each case, only to the extent that such Defaulting Lender's portion of a Loan (or other funding obligation) was funded by such other non-Defaulting Lender), (D) to a suspense account maintained by the Administrative Agent, the proceeds of which shall be retained by the Administrative Agent and may be made available to be re-advanced to or for the benefit of the Borrower as if such Defaulting Lender had made its portion of Loans (or other funding obligations) hereunder, and (E) from and after the date on which all other Obligations have been paid in full, to such Defaulting Lender in accordance with §13.4, as applicable. Subject to the foregoing, the Administrative Agent may hold and, in its discretion, re-lend to the Borrower for the account of such Defaulting Lender the amount of all such payments received and retained by the Administrative Agent for the account

LEGAL_US_W # 69146878.8

of such Defaulting Lender. Solely for the purposes of voting or consenting to matters with respect to the Loan Documents (including the calculation of Commitment Percentage in connection therewith) and for the purpose of calculating the Commitment Fee, such Defaulting Lender shall be deemed not to be a "Lender" and such Lender's Commitment shall be deemed to be zero; provided, however, that the foregoing shall not apply to any of the matters governed by §16.12(a)(i) through (iii). The provisions of this §2.11 shall remain effective with respect to such Defaulting Lender until the earlier of (y) the date on which all of the non-Defaulting Lenders, the Administrative Agent, Issuing Lender, and the Borrower shall have waived, in writing, the application of this §2.11 to such Defaulting Lender, or (z) the date on which such Defaulting Lender makes payment of all amounts that it was obligated to fund hereunder, pays to the Administrative Agent all amounts owing by Defaulting Lender in respect of the amounts that it was obligated to fund hereunder, and, if requested by the Administrative Agent, provides adequate assurance of its ability to perform its future obligations hereunder. The operation of this §2.11 shall not be construed to increase or otherwise affect the Commitment of any Lender, to relieve or excuse the performance by such Defaulting Lender or any other Lender of its duties and obligations hereunder, or to relieve or excuse the performance by the Borrower or Guarantors of their duties and obligations hereunder to the Administrative Agent, Issuing Lender, or to the Lenders other than such Defaulting Lender. Any failure by a Defaulting Lender to fund amounts that it was obligated to fund hereunder shall constitute a material breach by such Defaulting Lender of this Credit Agreement and shall entitle the Borrower, at its option, upon written notice to Agent, to arrange for a substitute Lender to assume the Commitment of such Defaulting Lender, such substitute Lender to be reasonably acceptable to the Administrative Agent. In connection with the arrangement of such a substitute Lender, the Defaulting Lender shall have no right to refuse to be replaced hereunder, and agrees to execute and deliver a completed form of Assignment and Acceptance in favor of the substitute Lender (and agrees that it shall be deemed to have executed and delivered such document if it fails to do so) subject only to being paid its share of the outstanding Obligations (other than Bank Product Obligations, but including (1) all interest, fees, and other amounts that may be due and payable in respect thereof, and (2) an assumption of its pro rata share of its participation in the Letters of Credit); provided, however, that any such assumption of the Commitment of such Defaulting Lender shall not be deemed to constitute a waiver of any of the Administrative Agent's, Lenders' or the Borrower's rights or remedies against any such Defaulting Lender arising out of or in relation to such failure to fund. In the event of a direct conflict between the priority provisions of this §2.11 and any other provision contained in this Credit Agreement or any other Loan Document, it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other. In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this §2.11 shall control and govern.

    **2.12** **Super-Priority Nature of Obligations and Lenders' Liens**. The Borrower (and, by its execution of the Guaranty, each Guarantor) hereby represents, warrants, covenants and agrees that:

        (a)    The priority of the Administrative Agent's and Lenders' Liens on the Collateral owned by the Loan Parties shall be as set forth in the Financing Orders.

(b)    In accordance with Section 364(c)(1) of the Bankruptcy Code, and subject to the Carve-Out, the Obligations shall constitute claims with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113, 1114 or any other provision of the Bankruptcy Code and shall be payable from and have recourse to all Collateral, including all pre- and post-petition property of the Debtors and all proceeds thereof.

(c)    Upon entry of the Interim Order, the Administrative Agent and Lenders will be granted valid and perfected security interests and Liens on the Collateral, subject in each case to the Carve-Out, as follows (i) pursuant to Section 364(c)(2) of the Bankruptcy Code, a first priority perfected Lien on and security interest in all of the Debtors' right, title and interest in, to and under all Collateral that is not otherwise subject to or encumbered by a validly perfected unavoidable security interest or lien on the Petition Date, (ii) pursuant to Section 364(c)(3) of the Bankruptcy Code, a junior perfected Lien on and security interest in all of the Debtors' right, title and interest in, to and under all Collateral that is subject to or encumbered by a validly perfected, unavoidable security interest or Lien on the Petition Date or subject to a Lien or security interest in existence on the Petition Date that is perfected subsequent thereto as permitted by Section 546(b) of the Bankruptcy Code (other than the priming Liens and security interests granted pursuant to clause (iii) below) and (iii) pursuant to Section 364(d)(1) of the Bankruptcy Code, a first priority, senior, priming, perfected Lien on and security interest in all of the Debtors' right, title and interest in, to and under the Collateral that is subject to or encumbered by a validly perfected, unavoidable security interest or Lien on the Petition Date or subsequently perfected thereafter.

**2.13    No Discharge; Survival of Claims**.  The Borrower and, by its execution of the Guaranty, each Guarantor agrees that (a) the Obligations hereunder shall not be discharged by the entry of an order confirming a plan of reorganization in the Chapter 11 Cases (and the Borrower and, by its execution of the Guaranty, each Guarantor, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (b) the super priority administrative claim granted to the Administrative Agent and the Lenders pursuant to the Financing Orders and described in §2.12 and the Liens granted to the Agents pursuant to the Financing Orders and described in §2.12 shall not be affected in any manner by the entry of an order confirming a plan of reorganization in the Chapter 11 Cases.

**2.14    Waiver of any Priming Rights**.  Upon the Effective Date, and on behalf of itself and its estate, and for so long as any Obligations shall be outstanding, the Borrower and each Guarantor hereby irrevocably waives any right, pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the Obligations (or the adequate protection claims and Liens, if any, granted to the Prior Agent or Prior Lenders in the Financing Orders), unless effective upon the granting of any such Lien or claim, the Obligations and adequate protection obligations shall be paid in full in cash and the Commitments terminated.

- 34 -

3. **REPAYMENT OF THE REVOLVING CREDIT LOANS.**

    **3.1    Maturity.** The Borrower shall pay on the Revolving Credit Loan Maturity Date, and there shall become absolutely due and payable on the Revolving Credit Loan Maturity Date (and in each case without further application to or order of the Bankruptcy Court), all of the Revolving Credit Loans outstanding on such date, together with any and all accrued and unpaid interest thereon, any unpaid Fees, any Unpaid Reimbursement Obligations, to provide cash collateral (pursuant to documentation reasonably satisfactory to Administrative Agent) to be held by Administrative Agent for the benefit of the Bank Product Providers in an amount determined by Administrative Agent in its Permitted Discretion, in consultation with the Bank Product Providers, as sufficient to satisfy the reasonably estimated credit exposure with respect to the then existing Bank Products, and to provide cash collateral for the Obligations in respect of Letters of Credit (pursuant to documentation reasonably satisfactory to Administrative Agent, including provisions specifying that the Letter of Credit fee set forth in this Credit Agreement will continue to accrue while the Letters of Credit are outstanding) to be held by Administrative Agent for the benefit of those Lenders with a Commitment or a Letter of Credit Commitment in an amount equal to 105% of the then existing Aggregate Letter of Credit Usage.

    **3.2    Mandatory Repayments of Revolving Credit Loans.**

        (a)    If at any time (i) the sum of (A) the outstanding amount of Revolving Credit Loans, (B) the aggregate Letter of Credit Usage and Unpaid Reimbursement Obligations in respect of New Letters of Credit, and (C) the aggregate outstanding principal amount of all Revolving Credit Loans (as defined in and under the Pre-Petition Credit Agreement) exceeds (ii) the result of (A) the lesser of (1) the aggregate Commitments of the Lenders and (2) the amount of Revolving Credit Loans shown as outstanding at any given time under the 13-Week Budget, subject to any variances permitted under §10, minus (B) the sum of (1) the Bank Product Reserve and (2) the Carve-Out Reserve, then in each such case the Borrower shall immediately pay the amount of such excess to the Administrative Agent for the respective accounts of the Lenders for application: first, to the Revolving Credit Loans; second, to Administrative Agent, to be held by Administrative Agent for the benefit of the Bank Product Providers, as cash collateral in an amount up to the amount the Administrative Agent in its Permitted Discretion, in consultation with the Bank Product Providers, determines to be the credit exposure of Borrower and its Subsidiaries in respect of Bank Products; third, to any Unpaid Reimbursement Obligations; and fourth, to provide to the Administrative Agent cash collateral for Reimbursement Obligations in an amount equal to 105% of the then existing Letter of Credit Usage; provided, however, that if the excess described above results from reserves that the Administrative Agent has established or modified in its Permitted Discretion, then the Borrower shall have three (3) business days to repay such excess. Each payment of Revolving Credit Loans or any Unpaid Reimbursement Obligations shall be allocated among the Lenders, in proportion, as nearly as practicable, to the respective unpaid principal amount of each Lender's Revolving Credit Loans or (as the case may be) each Reimbursement Obligation, with adjustments to the extent practicable to equalize any prior payments or repayments not exactly in proportion.

-35-

(b)     The Parent, the Borrower or the applicable Restricted Subsidiaries shall pay to the Administrative Agent, concurrently with the receipt thereof by such Persons and subject in each case to the Financing Orders:

(i)     Net Cash Sale Proceeds from Asset Sales (other than (A) the sale, lease, license or other disposition of assets in the ordinary course of business consistent with past practice and (B) Permitted Asset Sales), the Borrower shall pay to the Administrative Agent for the respective accounts of the Lenders an amount equal to one hundred percent (100%) of such Net Cash Sale Proceeds;

(ii)     Net Cash Equity Issuance Proceeds (other than the issuance of Capital Stock of the Parent to directors, officers and employees of Parent and its Subsidiaries pursuant to employee stock option plans (or other employee incentive plans or other compensation arrangements) approved by the board of directors or other governing body of such Person) of the Parent, the Borrower, or any of the Borrower's Restricted Subsidiaries, the Parent or the Borrower, as applicable, shall pay to the Administrative Agent for the respective accounts of the Lenders an amount equal to one hundred percent (100%) of such Net Cash Equity Issuance Proceeds;

(iii)     Net Cash Debt Issuance Proceeds of the Parent, the Borrower, or any of the Borrower's Restricted Subsidiaries (other than any Net Cash Debt Issuance Proceeds of Indebtedness permitted pursuant to §9.1), the Borrower shall pay to the Administrative Agent for the respective accounts of the Lenders an amount equal to one hundred percent (100%) of such Net Cash Debt Issuance Proceeds;

(iv)     Net Casualty Proceeds in excess of $250,000 in the aggregate of the Parent, the Borrower or any of the Borrower's Restricted Subsidiaries, the Borrower shall pay to the Administrative Agent for the respective accounts of the Lenders an amount equal to one hundred percent (100%) of such Net Casualty Proceeds;

(v)     The Borrower shall pay to the Administrative Agent for the respective accounts of the Lenders an amount equal to one hundred percent (100%) of any Extraordinary Receipts.

(c)     The Parent, the Borrower or the applicable Restricted Subsidiaries shall pay to the Administrative Agent (for application pursuant to §3.4), concurrently with the receipt thereof by such Persons and subject in each case to the Financing Orders, the proceeds of all accounts and all other Collateral.

**3.3     Optional Repayments of Revolving Credit Loans**. The Borrower shall have the right, at its election, to repay the outstanding amount of the Revolving Credit Loans, as a whole or in part, at any time after repayment in full of all amounts owing under the Pre-Petition Credit Agreement and Pre-Petition Loan Documents, without penalty or premium to be applied in the manner provided for in §3.4. The Borrower shall give the Administrative Agent, no later than 10:00 a.m., California time, at least one (1) Business Day's prior written notice of any proposed prepayment pursuant to this §3.3 of Base Rate Loans, and three (3) Eurodollar Business Days' notice of any proposed prepayment pursuant to this §3.3 of Eurodollar Rate

Loans, in each case specifying the proposed date of prepayment of Revolving Credit Loans and the principal amount to be prepaid. Each such partial prepayment of the Revolving Credit Loans shall be in an integral multiple of $250,000, shall be accompanied by the payment of accrued interest on the principal prepaid to the date of prepayment and shall be applied, in the absence of instruction by the Borrower, first to the principal of Base Rate Loans and then to the principal of Eurodollar Rate Loans. Each partial prepayment shall be allocated among the Lenders, in proportion, as nearly as practicable, to the respective unpaid principal amount of each Lender's Revolving Credit Loans, with adjustments to the extent practicable to equalize any prior repayments not exactly in proportion.

### 3.4 Application of Payments.

 **3.4.1** All payments made pursuant to §3.2 shall be applied first, to all amounts owing under the Pre-Petition Credit Agreement and Pre-Petition Loan Documents until repaid in full; second, to the Revolving Credit Loans (without a permanent reduction of the aggregate amount of the Commitments); third, to Administrative Agent, to be held by Administrative Agent, for the benefit of the Bank Product Providers, as cash collateral in an amount up to the amount the Administrative Agent in its Permitted Discretion, in consultation with Bank Product Providers, determines to be the credit exposure of Borrower and its Subsidiaries in respect of Bank Products; fourth, to any Unpaid Reimbursement Obligations; fifth, to provide to the Administrative Agent cash collateral for Reimbursement Obligations in respect of the Rollover Letters of Credit as contemplated by §4.1; and sixth, to provide to the Administrative Agent cash collateral for Reimbursement Obligations in respect of the New Letters of Credit as contemplated by §4.1. Each payment of Revolving Credit Loans or any Unpaid Reimbursement Obligations shall be allocated among the Lenders, in proportion, as nearly as practicable, to the respective unpaid principal amount of each Lender's Revolving Credit Loans or (as the case may be) each Reimbursement Obligation, with adjustments to the extent practicable to equalize any prior payments or repayments not exactly in proportion.

 **3.4.2** So long as no Event of Default has occurred and is continuing and except as otherwise provided herein with respect to Defaulting Lenders, all principal and interest payments received by the Administrative Agent for application to the Obligations shall be apportioned ratably among the Lenders (according to the unpaid principal balance of the Obligations to which such payments relate held by each Lender) and all payments of fees and expenses received by the Administrative Agent (other than fees or expenses that are for the Administrative Agent's separate account or for the separate account of the Issuing Lender) shall be apportioned ratably among the Lenders having a Commitment Percentage or Obligation to which a particular fee or expense relates. All payments to be made hereunder by the Borrower shall be remitted to the Administrative Agent and all (subject to §3.1) such payments shall be applied as set forth in §3.4.1.

## 4. LETTERS OF CREDIT.

### 4.1 Letters of Credit.

 **4.1.1** Subject to the terms and conditions of this Credit Agreement, the Issuing Lender agrees to issue letters of credit for the account of the Borrower (each, an "L/C")

- 37 -

or to purchase participations or execute indemnities or reimbursement obligations (each such undertaking, an "L/C Undertaking") with respect to letters of credit issued by an Underlying Issuer (as of the Effective Date, the prospective Underlying Issuer is to be Wells Fargo) for the account of the Borrower. Each request for the issuance of a Letter of Credit (a "Letter of Credit Application"), or the amendment, renewal, or extension of any outstanding Letter of Credit, shall be made in writing by an Authorized Person and delivered to the Issuing Lender and Administrative Agent via hand delivery, telefacsimile, or other electronic method of transmission reasonably in advance of the requested date of issuance, amendment, renewal, or extension. Each such request shall be in form and substance satisfactory to the Issuing Lender in its Permitted Discretion and shall specify (a) the amount of such Letter of Credit, (b) the date of issuance, amendment, renewal, or extension of such Letter of Credit, (c) the expiration date of such Letter of Credit, (d) the name and address of the beneficiary thereof (or the beneficiary of the Underlying Letter of Credit, as applicable), and (e) such other information (including, in the case of an amendment, renewal, or extension, identification of the outstanding Letter of Credit to be so amended, renewed, or extended) as shall be necessary to prepare, amend, renew, or extend such Letter of Credit. If requested by the Issuing Lender, the Borrower also shall be an applicant under the application with respect to any Underlying Letter of Credit that is to be the subject of an L/C Undertaking.

The Issuing Lender shall have no obligation to issue, renew or extend a Rollover Letter of Credit other than the deemed issuance of the Rollover Letters of Credit pursuant to §4.4 and any renewals or extensions of such Rollover Letters of Credit. Issuing Lender shall have no obligation to issue, renew or extend a New Letter of Credit if, (I) after giving effect to the issuance of such requested Letter of Credit the Letter of Credit Usage would exceed the Letter of Credit Sublimit, or (II) the Letter of Credit Usage (including with respect to the proposed Letter of Credit) would exceed the result of (1) the lesser of (1) the aggregate amount of the Commitments minus the sum of (x) the aggregate outstanding principal amount of all Revolving Credit Loans (as defined in and under the Pre-Petition Credit Agreement), plus (y) the aggregate outstanding amount of all Unpaid Reimbursement Obligations with respect to New Letters of Credit, plus (z) the outstanding amount of the Revolving Credit Loans, and (2) the amount of New Letters of Credit issued shown as outstanding at any given time under the 13-Week Budget, subject to any variances permitted under §10, minus (B) the sum of (1) the Bank Product Reserve plus (2) the Carve-Out Reserve. Anything to the contrary contained herein notwithstanding, the Issuing Lender may, but shall not be obligated to, issue a Letter of Credit (i) if such Letter of Credit is (A) to be denominated in a currency other than Dollars, (B) supports the obligations of the Borrower or its Subsidiaries in respect of (1) except with respect to the Letter of Credit described on Schedule 4.1 (including any renewals but excluding any modifications increasing the face amount thereof), a lease of real property or (2) an employment contract, or (ii) at any time that one or more of the Lenders is a Defaulting Lender.

Each Letter of Credit (and corresponding Underlying Letter of Credit) shall be in form and substance acceptable to the Issuing Lender (in the exercise of its Permitted Discretion), including the requirement that the amounts payable thereunder must be payable in Dollars. If Issuing Lender is obligated to advance funds under a Letter of Credit, the Borrower immediately shall reimburse such L/C Disbursement to Issuing Lender by paying to the Administrative Agent an amount equal to such L/C Disbursement not later than 11:00 a.m., California time, on the date that such L/C Disbursement is made, if the Borrower shall have received written or telephonic

- 38 -

notice of such L/C Disbursement prior to 10:00 a.m., California time, on such date, or, if such notice has not been received by the Borrower prior to such time on such date, then not later than 11:00 a.m., California time, on the Business Day that the Borrower receives such notice, if such notice is received prior to 10:00 a.m., California time, on the date of receipt, and, in the absence of such reimbursement, the L/C Disbursement immediately and automatically shall be deemed to be a Revolving Credit Loan hereunder and, initially, shall bear interest at the rate then applicable to Revolving Credit Loans that are Base Rate Loans; provided, however, that the L/C Disbursement shall not be deemed to be a Revolving Credit Loan hereunder if, on the date such L/C Disbursement would be converted to a Revolving Credit Loan, the Administrative Agent has actual knowledge that (i) one or more of the applicable conditions precedent set forth in §12 would not be satisfied if there were a request for a Revolving Credit Loan on such date, or (ii) the amount to be reimbursed would exceed the Availability on such date. To the extent an L/C Disbursement is deemed to be a Revolving Credit Loan hereunder, the Borrower's obligation to reimburse such L/C Disbursement shall be discharged and replaced by the resulting Revolving Credit Loan. To the extent an L/C Disbursement is not deemed to be a Revolving Credit Loan hereunder because either clause (i) or clause (ii) of the foregoing proviso is not satisfied, the L/C Disbursement shall accrue interest at the rate then applicable to Revolving Credit Loans that are Base Rate Loans and shall be immediately due and payable by the Borrower without the requirement of notice or demand. Promptly following receipt by Administrative Agent of any payment from the Borrower pursuant to this paragraph, Administrative Agent shall distribute such payment to the Issuing Lender or, to the extent that Lenders have made payments pursuant to §4.1.2 to reimburse the Issuing Lender, then to such Lenders and the Issuing Lender as their interests may appear.

**4.1.2** Promptly following receipt of a notice of L/C Disbursement pursuant to §4.1.1 each Lender agrees to fund its Commitment Percentage of any Revolving Credit Loan deemed made pursuant to the foregoing subsection on the same terms and conditions as if the Borrower had requested such Revolving Credit Loan and Administrative Agent shall promptly pay to Issuing Lender the amounts so received by it from the Lenders. By the issuance of a Letter of Credit (or an amendment to a Letter of Credit increasing the amount thereof) and without any further action on the part of the Issuing Lender or the Lenders with a Commitment, the Issuing Lender shall be deemed to have granted to each Lender, and each Lender shall be deemed to have purchased, a participation in each Letter of Credit (a "Letter of Credit Participation"), in an amount equal to its Commitment Percentage of the Risk Participation Liability of such Letter of Credit, and each such Lender agrees to pay to Administrative Agent, for the account of the Issuing Lender, such Lender's Commitment Percentage of any payments made by the Issuing Lender under such Letter of Credit. In consideration and in furtherance of the foregoing, subject to the proviso to the third sentence in the second paragraph of §4.1.1, each Lender hereby absolutely and unconditionally agrees to pay to the Administrative Agent, for the account of the Issuing Lender, such Lender's Commitment Percentage of each L/C Disbursement made by the Issuing Lender and not reimbursed by the Borrower (the "Unpaid Reimbursement Obligations") on the date due as provided in §4.1.1, or of any reimbursement payment required to be refunded to the Borrower for any reason. If any such Lender fails to make available to Administrative Agent the amount of such Lender's Commitment Percentage of each L/C Disbursement made by the Issuing Lender in respect of such Letter of Credit as provided in this Section, such Lender shall be deemed to be a Defaulting Lender and Administrative Agent (for

- 39 -

the account of the Issuing Lender) shall be entitled to recover such amount on demand from such Lender together with interest thereon at the Defaulting Lender Rate until paid in full.

**4.1.3**    The Borrower hereby agrees to indemnify, save, defend, and hold the Lender Group harmless from any loss, cost, expense, or liability, and reasonable attorneys fees incurred by the Lender Group arising out of or in connection with any Letter of Credit; provided, however, that the Borrower shall not be obligated hereunder to indemnify for any loss, cost, expense, or liability to the extent that it is caused by the gross negligence or willful misconduct of the Issuing Lender or any other member of the Lender Group. The Borrower agrees to be bound by the Underlying Issuer's regulations and interpretations of any Underlying Letter of Credit or by Issuing Lender's interpretations of any L/C issued by Issuing Lender to or for the Borrower's account, even though this interpretation may be different from the Borrower's own, and the Borrower understands and agrees that the Lender Group shall not be liable for any error, negligence, or mistake, whether of omission or commission, in following the Borrower's instructions or those contained in the Letter of Credit or any modifications, amendments, or supplements thereto. The Borrower understands that the L/C Undertakings may require Issuing Lender to indemnify the Underlying Issuer for certain costs or liabilities arising out of claims by the Borrower against such Underlying Issuer. The Borrower hereby agrees to indemnify, save, defend, and hold the Lender Group harmless with respect to any loss, cost, expense (including reasonable attorneys fees), or liability incurred by the Lender Group under any L/C Undertaking as a result of the Lender Group's indemnification of any Underlying Issuer; provided, however, that the Borrower shall not be obligated hereunder to indemnify for any loss, cost, expense, or liability to the extent that it is caused by the gross negligence or willful misconduct of the Issuing Lender or any other member of the Lender Group. The Borrower hereby acknowledges and agrees that neither the Lender Group nor the Issuing Lender shall be responsible for delays, errors, or omissions resulting from the malfunction of equipment in connection with any Letter of Credit.

**4.1.4**    The Borrower hereby authorizes and directs any Underlying Issuer to deliver to the Issuing Lender all instruments, documents, and other writings and property received by such Underlying Issuer pursuant to such Underlying Letter of Credit and to accept and rely upon the Issuing Lender's instructions with respect to all matters arising in connection with such Underlying Letter of Credit and the related application.

Any and all issuance charges, commissions, fees, and costs incurred by the Issuing Lender relating to Underlying Letters of Credit immediately shall be reimbursable by the Borrower to Administrative Agent for the account of the Issuing Lender; it being acknowledged and agreed by the Borrower that the Underlying Issuer also imposes a schedule of charges for amendments, extensions, drawings, and renewals.

**4.2**    **Reliance by Administrative Agent**. To the extent not inconsistent with §4.1, the Administrative Agent shall be entitled to rely, and shall be fully protected in relying upon, any Letter of Credit, draft, writing, resolution, notice, consent, certificate, affidavit, letter, cablegram, telegram, telecopy, telex or teletype message, statement, order or other document believed by it in good faith to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel, independent accountants and other experts selected by the Administrative Agent. The Administrative Agent

-40-

shall be fully justified in failing or refusing to take any action under this Credit Agreement unless it shall first have received such advice or concurrence of the Required Lenders as it reasonably deems appropriate or it shall first be indemnified to its reasonable satisfaction by the Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action. The Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Credit Agreement in accordance with a request of the Required Lenders, and such request and any action taken or failure to act pursuant thereto shall be binding upon the Lenders and all future holders of the Revolving Credit Loans or of a Letter of Credit Participation.

### 4.3 Letter of Credit Fees.

**4.3.1 Issuance Fee.** The Borrower shall pay Administrative Agent for its own account a Letter of Credit fee (in addition to the charges, commissions, fees, and costs set forth in §4.1) which shall accrue at a rate equal to 2.00 percent per annum times the Daily Balance of the undrawn amount of all outstanding Letters of Credit.

**4.3.2 Fronting Fee.** The Borrower agrees to pay the Administrative Agent a fronting fee for its own account for each Letter of Credit issued by the Issuing Lender in the amount agreed to between the Borrower and the Administrative Agent in the Administrative Agent's Fee Letter.

**4.4 Existing Letters of Credit.** The Existing Letters of Credit shall be deemed to have been issued as Rollover Letters of Credit hereunder on the Effective Date, and no request for issuance thereof need be made.

### 5. CERTAIN GENERAL PROVISIONS.

**5.1 Administrative Agent's Fee.** The Borrower shall pay to the Administrative Agent annually in advance, for the Administrative Agent's own account, the Fees set forth in the Administrative Agent's Fee Letter.

### 5.2 Funds for Payments.

**5.2.1 Payments to Administrative Agent.** All payments of principal, interest, Reimbursement Obligations, Fees and any other amounts due hereunder or under any of the other Loan Documents shall be made on the due date thereof to the Administrative Agent in Dollars, for the respective accounts of the Lenders and the Administrative Agent, at the Administrative Agent's Office or at such other place that the Administrative Agent may from time to time designate, in each case on or prior to 11:00 a.m. (California time or other local time at the place of payment) and in immediately available funds.

**5.2.2 No Offset, etc.** All payments by the Borrower hereunder and under any of the other Loan Documents shall be made without recoupment, setoff or counterclaim and free and clear of and without deduction for (a) any taxes, levies, imposts, duties, charges, fees, deductions, withholdings, compulsory loans, restrictions or conditions of any nature now or hereafter imposed or levied by any jurisdiction or any political subdivision thereof or taxing or other authority therein (excluding taxes imposed on or measured by its net income or net profit

- 41 -

(however denominated), and franchise taxes imposed on it (or taxes imposed in lieu of net income taxes or franchise taxes), by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable lending office is located, or the jurisdiction through which it is entering into this Credit Agreement, in each case as a result of a present or former connection between such Person and the Governmental Authority imposing such tax, (b) any branch profits taxes imposed by the United States or any similar tax imposed by any other jurisdiction in which the Borrower is located, and (c) in the case of a Foreign Lender (other than an assignee pursuant to a request by the Borrower under §5.11), any withholding tax that is imposed on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party hereto (or designates a new lending office) or is attributable to such Foreign Lender's failure or inability (other than as a result of a change in law) to comply with §5.2.3, except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from the Borrower with respect to such withholding tax pursuant to §5.2.2, and in the case of a Lender (other than any Lender that is an assignee pursuant to a request by the Borrower under §5.11) that is not a Foreign Lender, any withholding tax that is imposed on amounts payable to such Lender that is attributable to such Lender's failure or inability (other than as a result of a change in law) to comply with §5.2.4 (all these excluded items are collectively called "Excluded Taxes")) all such items, other than Excluded Taxes, being called "Taxes") unless the Borrower is compelled by law to make such deduction or withholding. If any such obligation is imposed upon the Borrower in respect of any Taxes with respect to any amount payable by it hereunder or under any of the other Loan Documents, the Borrower will pay to the Administrative Agent, for the account of the Lenders or (as the case may be) the Administrative Agent, on the date on which such amount is due and payable hereunder or under such other Loan Document, such additional amount in Dollars as shall be necessary to enable the Lenders or the Administrative Agent to receive the same net amount which the Lenders or the Administrative Agent would have received on such due date had no such Taxes been imposed upon the Borrower. The Borrower will deliver promptly to the Administrative Agent certificates or other valid vouchers for all Taxes deducted from or paid with respect to payments made by the Borrower hereunder or under such other Loan Document.

     **5.2.3**    **Non-U.S. Lenders**. Each Lender and the Administrative Agent that is not a U.S. Person as defined in Section 7701(a)(30) of the Code for federal income tax purposes (a "Non-U.S. Lender") hereby agrees that, unless it is not legally able to do so as a result of a change in law occurring after the date that it becomes a party hereto, it shall deliver to the Borrower and the Administrative Agent, as applicable, such certificates, documents or other evidence (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Non-U.S. Lender becomes a Lender under this Credit Agreement (and from time to time thereafter upon the request of the Borrower or the Administrative Agent), as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to withholding, backup withholding or information reporting requirements or when required by the Code or Treasury Regulations issued pursuant thereto, whichever of the following is applicable:

                    duly completed copies of Internal Revenue Service Form W-8BEN claiming eligibility for benefits of an income tax treaty to which the United States is a party;

- 42 -

duly completed copies of Internal Revenue Service Form W-8ECI;

in the case of a Non-U.S. Lender claiming the benefits of the exemption for portfolio interest under section 881(c) of the Code, (x) a certificate to the effect that such Non-U.S. Lender is not (A) a "bank" within the meaning of section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of the Borrower within the meaning of section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Code and (y) duly completed copies of Internal Revenue Service Form W-8BEN; or

any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in United States Federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower to determine the withholding or deduction required to be made.

5.2.4     **U.S. Lenders**.     If the Lender is a U.S. Lender, such Lender shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender hereunder (and from time to time thereafter upon the request of the Borrower or the Administrative Agent, unless it is not legally able to do so as a result of a change in law occurring after the date that it becomes a party hereto) a properly completed and executed copy of any other form or forms, including IRS Form W-9, required under the Code or other applicable U.S. law as a condition to exemption from, or reduction of, United States withholding or backup withholding tax.

5.3     **Computations**.  All computations of interest on the Loans and of Fees shall, unless otherwise expressly provided herein, be based on a 360-day year and paid for the actual number of days elapsed (or, in the case of interest on Base Rate Loans, a 365-day year or, if appropriate, a 366-day year).  Except as otherwise provided in the definition of the term "Interest Period" with respect to Eurodollar Rate Loans, whenever a payment of principal on any Revolving Credit Loan becomes due on a day that is not a Business Day, the due date for such payment shall be extended to the next succeeding Business Day, and interest shall accrue during such extension.

5.4     **Inability to Determine Eurodollar Rate**.  In the event, prior to the commencement of any Interest Period relating to any Eurodollar Rate Loan, the Administrative Agent shall determine in good faith or be notified by the Required Lenders that they have determined in good faith that (a) by reason of circumstances affecting the interbank eurodollar market, adequate and reasonable methods do not exist for ascertaining the Eurodollar Rate that would otherwise determine the rate of interest to be applicable to any Eurodollar Rate Loan during such Interest Period or (b) the Eurodollar Rate determined or to be determined for such Interest Period will not adequately and fairly reflect the cost to the Lenders of making or maintaining their Eurodollar Rate Loans during such period, the Administrative Agent shall forthwith give notice of such determination (which shall be conclusive and binding on the Borrower and the Lenders) to the Borrower and the Lenders.  In such event and for so long as

such circumstances shall continue (i) any Loan and Letter of Credit Request or Conversion Request with respect to Eurodollar Rate Loans shall be automatically withdrawn and shall be deemed a request for Base Rate Loans, (ii) each Eurodollar Rate Loan will automatically, on the last day of the then current Interest Period relating thereto, become a Base Rate Loan, and (iii) the obligations of the Lenders to make Eurodollar Rate Loans shall be suspended until the Administrative Agent determines that the circumstances giving rise to such suspension no longer exist, whereupon the Administrative Agent shall so notify the Borrower and the Lenders.

5.5 **Illegality**. Notwithstanding any other provisions herein, if any future law (or any change in any present law), regulation, treaty or directive or the interpretation or application of such law, regulation, treaty or directive by any governmental or regulatory body charged with the administration thereof shall make it unlawful for any Lender to make or maintain Eurodollar Rate Loans, such Lender shall forthwith give notice of such circumstances to the Borrower and the other Lenders and thereupon, so long as such circumstances shall continue, (a) the commitment of such Lender to make Eurodollar Rate Loans or convert Base Rate Loans to Eurodollar Rate Loans shall forthwith be suspended (but such Lender shall make Base Rate Loans concurrently with the making of, or conversion into, Eurodollar Rate Loans by the Lender not so affected, in each case in an amount equal to the amount of Eurodollar Loans that would have been made or converted into by such Lender at such time in the absence of such circumstances), and (b) such Lender's Revolving Credit Loans then outstanding as Eurodollar Rate Loans, if any, shall be converted automatically to Base Rate Loans on the last day of each Interest Period applicable to such Eurodollar Rate Loans or within such earlier period as may be required by law. The Borrower hereby agrees promptly to pay (without duplication of any payments required by §5.9) to the Administrative Agent for the account of such Lender, upon demand by such Lender, any additional amounts necessary to compensate such Lender for any costs incurred by such Lender in making any conversion in accordance with this §5.5, including any interest or fees payable by such Lender to lenders of funds obtained by it in order to make or maintain its Eurodollar Rate Loans hereunder.

5.6 **Additional Costs, etc.** If any future applicable law (or any change in any present law), which expression, as used herein, includes statutes, rules and regulations thereunder and interpretations thereof by any competent court or by any governmental or other regulatory body or official charged with the administration or the interpretation thereof and requests, directives, instructions and notices at any time or from time to time hereafter made upon or otherwise issued to any Lender or the Administrative Agent by any central bank or other fiscal, monetary or other authority (whether or not having the force of law), shall:

(a) subject any Lender or the Administrative Agent to any Tax with respect to this Credit Agreement, the other Loan Documents, any Letters of Credit, such Lender's Commitment or the Loans; or

(b) materially change the basis of taxation (except for changes in taxes on income or profits) of payments to any Lender of the principal of or the interest on any Loans or any other amounts payable to any Lender or the Administrative Agent under this Credit Agreement or any of the other Loan Documents; or

- 44 -

(c)     impose or increase or render applicable (other than to the extent specifically provided for elsewhere in this Credit Agreement) any special deposit, reserve, assessment, liquidity, capital adequacy or other similar requirements (whether or not having the force of law) against assets held by, or deposits in or for the account of, or loans by, or letters of credit issued by, or commitments of an office of any Lender; or

(d)     impose on any Lender or the Administrative Agent any other conditions or requirements with respect to this Credit Agreement, the other Loan Documents, any Letters of Credit, the Loans, such Lender's Commitment or Letter of Credit Commitment, or any class of loans, letters of credit or commitments of which any of the Loans or such Lender's Commitment or Letter of Credit Commitment forms a part, and the result of any of the foregoing is:

(i)     to increase the actual cost to any Lender of making, funding, issuing, renewing, extending or maintaining any of the Loans or such Lender's Commitment or any Letter of Credit; or

(ii)     to reduce the amount of principal, interest, Reimbursement Obligation or other amount payable to such Lender or the Administrative Agent hereunder on account of such Lender's Commitment, any Letter of Credit or any of the Loans; or

(iii)     to require such Lender or the Administrative Agent to make any payment or to forego any interest or Reimbursement Obligation or other sum payable hereunder, the amount of which payment or foregone interest or Reimbursement Obligation or other sum is calculated by reference to the gross amount of any sum receivable or deemed received by such Lender or the Administrative Agent from the Borrower hereunder;

then, and in each such case, the Borrower will, within five (5) days of demand made by such Lender or (as the case may be) the Administrative Agent at any time and from time to time and as often as the occasion therefor may arise, pay to such Lender or the Administrative Agent such additional amounts as will be sufficient to compensate such Lender or the Administrative Agent for such additional cost, reduction, payment or foregone interest or Reimbursement Obligation or other sum.

5.7     **Capital Adequacy**.     If after the date hereof any Lender or the Administrative Agent determines in good faith that (a) the adoption of or change in any law, governmental rule, regulation, policy, guideline or directive (whether or not having the force of law) regarding capital requirements for banks or bank holding companies or any change in the interpretation or application thereof by a Governmental Authority with appropriate jurisdiction, or (b) compliance by such Lender or the Administrative Agent or any corporation controlling such Lender or the Administrative Agent with any law, governmental rule, regulation, policy, guideline or directive (whether or not having the force of law) of any such entity regarding capital adequacy, has the effect of reducing the return on such Lender's or the Administrative Agent's commitment with respect to any Loans to a level below that which such Lender or the Administrative Agent could have achieved but for such adoption, change or compliance (taking into consideration such Lender's or the Administrative Agent's then existing policies with respect to capital adequacy) by any amount deemed by such Lender or (as the case may be) the

- 45 -

Administrative Agent, in each case determined in good faith, to be material, then such Lender or the Administrative Agent may notify the Borrower of such fact. To the extent that the amount of such reduction in the return on capital is not reflected in the interest payable hereunder, the Borrower and such Lender shall thereafter attempt to negotiate in good faith, within thirty (30) days of the day on which the Borrower receives such notice, an adjustment payable hereunder that will adequately compensate such Lender in light of these circumstances. If the Borrower and such Lender are unable to agree to such adjustment within thirty (30) days of the date on which the Borrower receives such notice, then commencing on the date of such notice (but not earlier than the effective date of any such increased capital requirement), the fees payable hereunder shall increase by an amount that will, in such Lender's reasonable determination, provide adequate compensation. Each Lender shall allocate such cost increases among its customers in good faith and on an equitable basis. For purposes of determining when a change in a law, governmental rule, regulation, policy, guideline or directive (whether or not having the force of law) occurs under this §5.7, each of (a) the Dodd-Frank Wall Street Reform and Consumer Protection Act (including all regulations promulgated with respect thereto), and all requests, guidelines or directives in connection therewith, and (b) all requests, regulations, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities pursuant to Basel III are, in each case, deemed to have gone into effect and been adopted after the date hereof.

**5.8     Certificate.**  Any Lender or the Administrative Agent claiming reimbursement or compensation under §§5.6 or 5.7 shall deliver to the Borrower a certificate setting forth (a) any additional amounts payable pursuant to §§5.6 or 5.7, and (b) the basis for such claim and a calculation of the amount payable to such Lender or the Administrative Agent in connection therewith in reasonable detail. Any such certificate submitted by any Lender or the Administrative Agent to the Borrower, shall be conclusive, absent manifest error, that such amounts are due and owing.

**5.9     Indemnity.**  The Borrower agrees to indemnify each Lender and to hold each Lender harmless from and against any loss, cost or expense (excluding the loss of anticipated profits) that such Lender may sustain or incur as a consequence of (a) default by the Borrower in payment of the principal amount of or any interest on any Eurodollar Rate Loans as and when due and payable, including any such loss or expense arising from interest or fees payable by such Lender to banks of funds obtained by it in order to maintain its Eurodollar Rate Loans, (b) default by the Borrower in making a borrowing or conversion after the Borrower has given (or is deemed to have given) a Loan and Letter of Credit Request or a Conversion Request relating thereto in accordance with §§2.6 or 2.7, or (c) the making of any payment of a Eurodollar Rate Loan or the making of any conversion of any such Loan to a Base Rate Loan on a day that is not the last day of the applicable Interest Period with respect thereto, including interest or fees payable by such Lender to lenders of funds obtained by it in order to maintain any such Loans.

**5.10     Interest After Default.**  During the continuance of an Event of Default, all principal and interest on the Loans and all other amounts payable hereunder or under any of the other Loan Documents shall bear interest at a rate per annum equal to 2% plus the rate of interest then applicable thereto (or, if no rate of interest is then applicable thereto, the Base Rate).

**5.11    Replacement of Lenders**.  If any Lender (an "Affected Lender") (a) makes demand upon the Borrower for (or if the Borrower is otherwise required to pay) amounts pursuant to §§5.2.2, 5.6 or 5.7, (b) is unable to make or maintain Eurodollar Rate Loans as a result of a condition described in §5.5 or (c) defaults in its obligation to make Loans in accordance with the terms of this Credit Agreement or purchase any Letter of Credit Participation, the Borrower may, by notice in writing to the Administrative Agent and such Affected Lender, (i) request the Affected Lender to cooperate with the Borrower in obtaining a replacement Lender reasonably satisfactory to the Administrative Agent and the Borrower (the "Replacement Lender"); (ii) request the non-Affected Lenders to acquire and assume all of the Affected Lender's Loans and Commitment as provided herein, but none of such Lenders shall be under an obligation to do so; or (iii) designate a Replacement Lender approved by the Administrative Agent, such approval not to be unreasonably withheld or delayed.  If any satisfactory Replacement Lender shall be obtained, and/or if any one or more of the non-Affected Lenders shall agree to acquire and assume all of the Affected Lender's Loans and Commitment, then such Affected Lender shall assign, in accordance with §15, all of its Commitment, Loans, Letter of Credit Participations, Revolving Credit Notes and other rights and obligations under this Credit Agreement and all other Loan Documents to such Replacement Lender or non-Affected Lenders, as the case may be, in exchange for payment of the principal amount so assigned and all interest and fees accrued on the amount so assigned, plus all other Obligations (other than Bank Product Obligations) then due and payable to the Affected Lender; provided, however, that (A) such assignment shall be without recourse, representation or warranty and shall be on terms and conditions reasonably satisfactory to such Affected Lender and such Replacement Lender and/or non-Affected Lenders, as the case may be, and (B) prior to any such assignment, the Borrower shall have paid to such Affected Lender all amounts properly demanded and unreimbursed under §§5.6 and 5.7.  Upon the effective date of such assignment, the Borrower shall, upon the request of such Replacement Lender or any non-Affected Lender, issue replacement Revolving Credit Notes to such Replacement Lender or non-Affected Lender (as the case may be), and such institution shall become a "Lender" for all purposes under this Credit Agreement and the other Loan Documents.

**5.12    Mitigation**.  Each Lender shall promptly notify the Borrower and the Administrative Agent of any event of which it has actual knowledge which will result in, and will use reasonable commercial efforts available to it (and not otherwise disadvantageous to such Lender) to mitigate or avoid, any obligation by the Borrower to pay any amount pursuant to, or the occurrence of any circumstances described in §§5.2.2, 5.5, 5.6 or 5.7 (and, if any Lender has given any such notice and thereafter such event ceases to exist, such Lender shall promptly so notify the Borrower and the Administrative Agent).  Without limiting the foregoing, each Lender will designate a different funding office (if available) if such designation will avoid (or reduce the cost to the Borrower of) any event described in the preceding sentence and such designation will not be otherwise disadvantageous to such Lender.

**6.    COLLATERAL SECURITY AND GUARANTIES.**

**6.1    Security of Borrower**.  The Obligations shall be secured by a perfected first priority security interest (subject only to the Carve-Out and Permitted Liens entitled to priority under applicable law) in substantially all of the personal property of the Borrower, whether now owned or hereafter acquired, pursuant to the terms of the Security Documents to

-47-

which the Borrower is a party (provided that the pledge of the Capital Stock of a Foreign Subsidiary shall be limited to 65% of the outstanding Capital Stock of such Subsidiary).

**6.2    Guaranties and Security of the Parent and the Restricted Subsidiaries.** The Obligations shall also be guaranteed pursuant to the terms of the Guaranty. The obligations of the Parent and the Borrower's Restricted Subsidiaries under the Guaranty shall be in turn secured by a perfected first priority security interest (subject only to the Carve-Out and Permitted Liens entitled to priority under applicable law) in substantially all of the personal property of the Parent and each such Restricted Subsidiary, whether now owned or hereafter acquired, pursuant to the terms of the Security Documents to which the Parent or such Restricted Subsidiary is a party (provided that the pledge of the Capital Stock of a Foreign Subsidiary shall be limited to 65% of the outstanding Capital Stock of such Subsidiary).

**6.3    Sun Guaranty.** The Risk Participation Liability (including the Reimbursement Obligations) with respect to the Rollover Letters of Credit and a portion of the Revolving Credit Loans shall also be guaranteed pursuant to the terms of the Sun Guaranty.

**7.    REPRESENTATIONS AND WARRANTIES.**

The Borrower represents and warrants to the Lenders and the Administrative Agent as follows:

**7.1    Corporate Authority.**

**7.1.1    Incorporation; Good Standing.** Each of the Parent and its Subsidiaries (a) is a corporation (or similar business entity) duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation or formation, (b) has, upon entry of the Interim Order (or the Final Order, when applicable) by the Bankruptcy Court, and subject to the terms thereof, all requisite corporate (or the equivalent company) power to own its property and conduct its business as now conducted and as presently contemplated as a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code, and (c) is in good standing as a foreign corporation (or similar business entity) and is duly authorized to do business in each jurisdiction where such qualification is necessary except where a failure to be so qualified could not reasonably be expected to have a Material Adverse Effect.

**7.1.2    Authorization.** Upon entry of the Interim Order (or the Final Order, when applicable) by the Bankruptcy Court, and subject to the terms thereof, the execution, delivery and performance of this Credit Agreement and the other Loan Documents to which the Borrower or any of its Subsidiaries is or is to become a party and the transactions contemplated hereby and thereby (a) are within the corporate (or the equivalent company) authority of such Person, (b) have been duly authorized by all necessary corporate (or the equivalent company) proceedings, (c) do not and will not conflict with or result in any breach or contravention of any material provision of law, statute, rule or regulation to which the Borrower or any of its Subsidiaries is subject or any material judgment, order, writ, injunction, license or permit applicable to the Borrower or any of its Subsidiaries, and (d) do not conflict with any provision of the Governing Documents of, or any agreement or other instrument binding upon, the Borrower or any of its Subsidiaries.

- 48 -

**7.1.3** **Enforceability**. Subject to the entry of the Interim Order (or the Final Order, when applicable) by the Bankruptcy Court, and subject to the terms thereof, the execution and delivery of this Credit Agreement and the other Loan Documents to which the Borrower or any of its Subsidiaries is or is to become a party will result in valid and legally binding obligations of such Person enforceable against it in accordance with the respective terms and provisions hereof and thereof, except as enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or other laws relating to or affecting generally the enforcement of creditors' rights and general principles of equity and except to the extent that availability of the remedy of specific performance or injunctive relief is subject to the discretion of the court before which any proceeding therefor may be brought.

**7.2** **Governmental Approvals**. The execution, delivery and performance by the Borrower and any of its Subsidiaries of this Credit Agreement and the other Loan Documents to which the Borrower or any of its Subsidiaries is or is to become a party and the transactions contemplated hereby and thereby do not require the approval or consent of, or filing with, any governmental agency or authority, or any other third party, other than the Financing Orders, those already obtained, filings to perfect Liens and filings to transfer Real Estate to purchasers thereof.

**7.3** **Title to Properties; Leases**. Except as indicated on Schedule 7.3 hereto, the Borrower and its Subsidiaries own all of the assets reflected in the consolidated balance sheet of the Borrower and its Subsidiaries as at the Balance Sheet Date or acquired since that date (except property and assets sold or otherwise disposed of in the ordinary course of business (or as otherwise permitted hereunder) since that date), subject to no Liens, except Permitted Liens.

**7.4** **Financial Statements**

**7.4.1** **Fiscal Year**. The Parent and each of its Subsidiaries maintains a 52-week fiscal year which ends on the last Sunday of each calendar year, provided, that in any calendar year in which the last Sunday is prior to December 27, the Parent and each of its Subsidiaries maintains a 53-week fiscal year which ends on the first Sunday in the month of January of the following calendar year.

**7.4.2** **Financial Statements**. There has been furnished to the Administrative Agent a consolidated balance sheet of the Borrower and its Subsidiaries for the fiscal year ended December 31, 2010, and a consolidated statement of income and cash flow statement of the Borrower and its Subsidiaries for the fiscal year ended December 31, 2010, certified by [**Ernst & Young LLP**]. Such balance sheet and statement of income have been prepared in accordance with GAAP and fairly present the financial condition of the Borrower and its Subsidiaries as at the close of business on the date thereof and the results of operations for the fiscal year then ended. There are no contingent liabilities of the Borrower or any of its Subsidiaries as of such date involving material amounts, known to the officers of the Borrower, which were not disclosed in such balance sheet and the notes related thereto.

**7.5** **No Material Adverse Changes, etc.** Since the Balance Sheet Date, there has been no event or occurrence (except as disclosed to the Administrative Agent and the

Lenders in writing on or prior to the Effective Date) which has had or could reasonably be expected to have a Material Adverse Effect.

7.6     **Franchises, Patents, Copyrights, etc.**  Except as set forth in <u>Schedule 7.6</u> hereto, the Borrower and each of its Restricted Subsidiaries possesses, or is licensed to use, all franchises, patents, copyrights, trademarks, trade names, licenses and permits, and rights in respect of the foregoing, adequate for the conduct of its business substantially as now conducted without known conflict with any proprietary rights of others, except where such failure to possess, or be licensed to use, could not reasonably be expected to have a Material Adverse Effect.

7.7     **Litigation**.  Except as set forth in <u>Schedule 7.7</u> hereto or pursuant to the Chapter 11 Cases, there are no actions, suits, proceedings or investigations of any kind pending or, to the best of the Borrower's knowledge, threatened against the Parent or any of its Subsidiaries before any Governmental Authority that (a) either in any case or in the aggregate, could reasonably be expected to have a Material Adverse Effect, or (b) which questions or otherwise affects the validity of the transactions contemplated by the Credit Agreement or any of the other Loan Documents or any action taken or to be taken pursuant hereto or thereto.

7.8     **No Materially Adverse Contracts, etc.**  Neither the Parent nor any of its Subsidiaries is subject to any Governing Document or other legal restriction, or any judgment, decree, order, law, statute, rule or regulation that has or could reasonably be expected in the future to have a Material Adverse Effect.  Neither the Parent nor any of its Subsidiaries is a party to any contract or agreement that has or could reasonably be expected, in the judgment of the Borrower's officers, to have a Material Adverse Effect.

7.9     **Compliance with Other Instruments, Laws, etc.**  Neither the Parent nor any of its Subsidiaries is in violation of any provision of its Governing Documents, or any agreement or instrument to which it may be subject or by which it or any of its properties may be bound or any decree, order, judgment, statute, license, rule or regulation, in any of the foregoing cases in a manner that could reasonably be expected to, result in the imposition of substantial penalties, or have a Material Adverse Effect.

7.10    **Tax Status**.  The Parent and its Subsidiaries (a) have filed all federal and all other material tax returns, reports and declarations required by law to have been filed by each of them, (b) have paid all taxes and other governmental assessments and charges shown or determined to be due on such returns, reports and declarations, except those being contested in good faith and by appropriate proceedings and (c) have set aside on their books provisions reasonably adequate for the payment of all taxes for periods subsequent to the periods to which such returns, reports or declarations apply, in each case except for taxes, fees or other charges the nonpayment of which is required or permitted by the Bankruptcy Code.  There are no unpaid taxes in any material amount claimed to be due by the taxing authority of any jurisdiction, and none of the officers of the Borrower with responsibility for such matters know of any basis for any such claim.

7.11    **No Event of Default**.  No Default or Event of Default has occurred and is continuing.

- 50 -

**7.12    Investment Company Act.** Neither the Parent nor any of its Subsidiaries is an "investment company," or an "affiliated company" or a "principal underwriter" of an "investment company," as such terms are defined in the Investment Company Act of 1940.

**7.13    Absence of Financing Statements, etc.** Except with respect to Permitted Liens, there is no financing statement, security agreement, chattel mortgage, real estate mortgage or other document filed or recorded with any filing records, registry or other public office, that purports to cover, affect or give notice of any present or possible future Lien on any assets or property of the Parent or any of its Subsidiaries or any rights relating thereto.

**7.14    Perfection of Security Interest.** Upon entry of the Interim Order (or the Final Order, when applicable) by the Bankruptcy Court, and subject to the terms thereof, all filings, assignments, pledges and deposits of documents or instruments have been made and all other actions have been taken that are necessary under applicable law to establish and perfect the Administrative Agent's security interest in the Collateral. Except as set forth on Schedule 7.14, the Collateral and the Administrative Agent's rights with respect to the Collateral are not subject to any setoff, claims, withholdings or other defenses (other than the Carve-Out and Permitted Liens). The Parent, the Borrower or a Restricted Subsidiary of the Borrower party to one of the Security Agreements is the owner of the Collateral free from any Lien, except for Permitted Liens.

**7.15    Certain Transactions.** Except for arm's-length transactions pursuant to which the Parent or any of its Subsidiaries makes payments in the ordinary course of business upon terms no less favorable than the Parent or such Subsidiary could obtain from third parties, none of the officers, directors, or employees of the Borrower or any of its Subsidiaries is presently a party to any transaction with the Borrower or any of its Subsidiaries (other than in respect of services as employees, officers and directors), including any contract, agreement or other arrangement providing for the furnishing of services to or by, providing for rental of real or personal property to or from, or otherwise requiring payments to or from any officer, director or such employee or, to the knowledge of the Borrower, any corporation, partnership, trust or other entity in which any officer, director, or any such employee has a substantial interest or is an officer, director, trustee or partner.

**7.16    Employee Benefit Plans.**

**7.16.1    In General.** Except as set forth on Schedule 7.16, each Employee Benefit Plan and each Guaranteed Pension Plan has been maintained and operated in compliance in all respects with the provisions of ERISA and all Applicable Pension Legislation and, to the extent applicable, the Code, except as could not result in a material liability to Parent or Borrower. The Borrower has heretofore delivered to the Administrative Agent the most recently completed annual report, Form 5500, with all required attachments, and actuarial statement required to be submitted under §103(d) of ERISA, with respect to each Guaranteed Pension Plan.

**7.16.2    Guaranteed Pension Plans.** Except as set forth on Schedule 7.16, (i) each contribution required to be made to a Guaranteed Pension Plan, whether required to be made to avoid the incurrence of an accumulated funding deficiency, the notice or lien provisions of ERISA, or otherwise, has been timely made, (ii) no waiver of an accumulated funding

deficiency or extension of amortization periods has been received with respect to any Guaranteed Pension Plan, and neither the Parent, the Borrower nor any ERISA Affiliate is obligated to or has posted security in connection with an amendment to a Guaranteed Pension Plan pursuant to ERISA or the Code, (iii) no liability to the PBGC (other than required insurance premiums, all of which have been paid) has been incurred by the Parent, the Borrower or any ERISA Affiliate with respect to any Guaranteed Pension Plan and since January 1, 1996, there has not been any ERISA Reportable Event (other than an ERISA Reportable Event as to which the requirement of 30 days notice has been waived and other than the commencement of the Chapter 11 Cases), or any other event or condition which presents a material risk of termination of any Guaranteed Pension Plan by the PBGC (iv) based on the latest valuation of each Guaranteed Pension Plan (which in each case occurred within twelve months of the date of this representation), and on the actuarial methods and assumptions employed for that valuation, the aggregate actuarial accrued benefit liabilities of all such Guaranteed Pension Plans within the meaning of §4001 of ERISA did not exceed the aggregate fair market value of the assets of all such Guaranteed Pension Plans, disregarding for this purpose the benefit liabilities and assets of the Friendly Pension Plan and any Guaranteed Pension Plan with assets in excess of benefit liabilities, by more than $100,000; and (v) based on the latest valuation of the Friendly Pension Plan (which occurred within twelve months of the date of this representation), and on the actuarial methods and assumptions employed for that valuation, the aggregate actuarial accrued benefit liabilities of the Friendly Pension Plans within the meaning of §4001 of ERISA did not exceed the aggregate fair market value of the assets of such plan by more than [$_____].

**7.16.3** **Multiemployer Plans**. Except as set forth on Schedule 7.16, (i) neither the Parent, the Borrower nor any ERISA Affiliate has, since January 1, 1996, incurred any material liability (including secondary liability) to any Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan under §4201 of ERISA or as a result of a sale of assets described in §4204 of ERISA and (ii) neither the Parent, the Borrower nor any ERISA Affiliate has been notified that any Multiemployer Plan is in reorganization or insolvent under and within the meaning of §4241 or §4245 of ERISA or is at risk of entering reorganization or becoming insolvent, or that any Multiemployer Plan intends to terminate or has been terminated under §4041A of ERISA.

**7.17** **Use of Proceeds**.

**7.17.1** **General**. The Borrower will use the proceeds of the Loans after the Effective Date in a manner consistent with the 13-Week Budget (subject to any variances otherwise permitted under §10) for payment of (a) post-petition operating expenses and other working capital and financing requirements of the Borrower subject to the 13-Week Budget or as otherwise agreed to by the Required Lenders, (b) certain transaction and bankruptcy fees, costs and expenses, (c) the Carve-Out, (d) Pre-Petition claims (including under the Pre-Petition Loan Document) to the extent consistent with the 13-Week Budget, approved by the Required Lenders in their Permitted Discretion and allowed by the Bankruptcy Court and (e) upon entry of the Final Order, to repay all amounts outstanding under the Pre-Petition Credit Agreement and the other Pre-Petition Loan Documents. The Borrower shall not be permitted to use the proceeds of the Loans or proceeds of Collateral: (i) to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to: (A) the interests of the Agents and Lenders or their rights or remedies under this Credit Agreement, the other Loan

- 52 -

Documents or the Financing Orders, or (B) the interests of the Prior Agents and Prior Lenders or their rights or remedies under the Pre-Petition Loan Documents, including, without limitation, for the payment of any services rendered by the professionals retained by the Borrower or any Committee in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration or similar relief (x) invalidating, setting aside, avoiding or subordinating, in whole or in part, the Prior Lender Obligations or the Liens securing same, or the Obligations or the Liens securing same, (y) for monetary, injunctive or other similar relief against any Prior Lender or Prior Agents or any Lender or agent or their respective collateral, or (z) preventing, hindering or otherwise delaying the exercise by any Prior Lender, Prior Agents, Lender or Agents of any rights and remedies under the Financing Orders, the Pre-Petition Loan Documents, the Loan Documents or applicable law, or the enforcement or realization (whether by foreclosure, credit bid, further order of the court or otherwise) by any or all of the Prior Lenders, the Prior Agents, the Lenders and the Agents upon any of their collateral; (ii) to make any distribution under a plan of reorganization in the Chapter 11 Cases; (iii) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body that has not been approved by either the Bankruptcy Court or the Administrative Agent; (iv) to pay any fees or similar amounts to any Person who has proposed or may propose to purchase interests in Borrower or any Guarantor (including so-called "topping fees" and similar amounts) without the prior written consent of the Administrative Agent and the Required Lenders; or (v) to pay any amounts under the Management Agreement, the Subordinated PIK Notes or the Senior Notes. Notwithstanding anything to the contrary in this §7.17.1, the Borrower may pay the fees and expenses incurred by the Committee to the extent authorized by the Bankruptcy Court.

       **7.17.2**   **Regulations T, U and X**.  No portion of any Loan is to be used, and no portion of any Letter of Credit is to be obtained, for the purpose of purchasing or carrying any "margin security" or "margin stock" (as defined in Regulation U of the Board of Governors of the Federal Reserve System as in effect from time to time) or to extend credit to others for the purpose of purchasing or carrying any such margin stock (as defined in Regulation U of the Board of Governors of the Federal Reserve System as in effect from time to time) or for any purpose that violates the provisions of Regulation T, U or X of the Board of Governors of the Federal Reserve System.

       **7.17.3**   **Ineligible Securities**.  No portion of the proceeds of any Loans is to be used, and no portion of any Letter of Credit is to be obtained, for the purpose of knowingly purchasing, or providing credit support for the purchase of, during the underwriting or placement period or within thirty (30) days thereafter, any Ineligible Securities underwritten or privately placed by a Financial Affiliate.

    **7.18**   **Environmental Compliance**.

       (a)     Except as set forth on Schedule 7.18 hereto, to the best of the knowledge of the Borrower, none of the Parent, its Subsidiaries or any operator of the Real Estate or any operations thereon is in violation, or alleged violation, of any judgment, decree, order, law, license, rule or regulation pertaining to environmental matters, including without limitation, those arising under the Resource Conservation and Recovery Act, the

- 53 -

Comprehensive Environmental Response, Compensation and Liability Act of 1980 as amended ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, the Federal Clean Water Act, the Federal Clean Air Act, the Toxic Substances Control Act, or any applicable state, local or foreign law, statute, regulation, ordinance, order or decree relating to health, safety or the environment (hereinafter "Environmental Laws"), which violation could reasonably be expected to have a Material Adverse Effect;

(b)      except as set forth on Schedule 7.18 or as could not reasonably be expected to result in a Material Adverse Effect, neither the Parent nor any of its Subsidiaries has received written notice from any third party including, without limitation, any Governmental Authority, (i) that any one of them has been identified by the United States Environmental Protection Agency as a potentially responsible party under CERCLA with respect to a site listed on the National Priorities List, 40 C.F.R. Part 300 Appendix B; (ii) that any hazardous waste, as defined by 42 U.S.C. §6903(5), any hazardous substances as defined by 42 U.S.C. §9601(14), any pollutant or contaminant as defined by 42 U.S.C. §9601(33) and any toxic substances, petroleum constituents, oil or hazardous materials or other chemicals or substances regulated by any Environmental Laws ("Hazardous Substances") which any one of them has generated, transported or disposed of has been found at any site at which a Governmental Authority has conducted or has ordered that the Parent or any of its Subsidiaries conduct a remedial investigation, removal or other response action pursuant to any Environmental Law; or (iii) that it is or shall be a named party to any claim, action, cause of action, complaint, or legal or administrative proceeding (in each case, contingent or otherwise) arising out of any third party's incurrence of costs, expenses, losses or damages of any kind whatsoever in connection with the release of Hazardous Substances;

(c)      except as set forth on Schedule 7.18 hereto or as could not reasonably be expected to result in a Material Adverse Effect: (i) no portion of the Real Estate currently owned, occupied or operated by the Parent, the Borrower or any of the Restricted Subsidiaries of the Borrower, and to the best of the Borrower's knowledge, previously owned and occupied or operated by the Parent, the Borrower or any Restricted Subsidiaries of the Borrower, has been used for the handling, processing, storage or disposal of Hazardous Substances except in material compliance with applicable Environmental Laws; and no underground tank or other underground storage receptacle for Hazardous Substances is located on any portion of the Real Estate currently owned, occupied or operated by the Parent, the Borrower or any of the Restricted Subsidiaries of the Borrower, and to the best of the Borrower's knowledge, previously owned, occupied or operated by the Parent, the Borrower or any of the Restricted Subsidiaries of the Borrower; (ii) in the course of any activities conducted by the Parent, its Subsidiaries or their operators, no Hazardous Substances have been generated or are being used on the Real Estate except in material compliance with applicable Environmental Laws; (iii) there have been no releases (i.e. any past or present releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, disposing or dumping) or threatened releases of Hazardous Substances on, upon, into or from the Real Estate currently owned, occupied or operated by the Parent or any of its Restricted Subsidiaries, and to the best of the Borrower's knowledge, previously owned and occupied or operated by the Borrower or any Restricted Subsidiaries, which releases would have a Material Adverse Effect; (iv) to the best of the

- 54 -

Borrower's knowledge, there have been no releases on, upon, from or into any real property in the vicinity of any of the Real Estate which, through soil or groundwater contamination, have come to be located on, and which could reasonably be expected to have a Material Adverse Effect; and (v) in addition, any Hazardous Substances that have been generated by the Parent, its Subsidiaries or their operators on any of the Real Estate have been transported in compliance with applicable Environmental Laws; and

(d)     none of the Parent and its Subsidiaries nor any of their respective Real Estate is subject to any applicable Environmental Law requiring the performance of Hazardous Substances site assessments, or the removal or remediation of Hazardous Substances, or the giving of notice to any Governmental Authority or the recording or delivery to other Persons of an environmental disclosure document or statement by virtue of the transactions set forth herein and contemplated hereby, or as a condition to the effectiveness of any other transactions contemplated hereby, in each case, the failure of which could reasonably be expected to have a Material Adverse Effect.

7.19    **Subsidiaries, etc.**  The Borrower has (a) no Restricted Subsidiaries other than those listed on Schedule 7.19(a) hereto (as such Schedule shall be amended for each subsequently acquired or organized Restricted Subsidiary), and (b) no Unrestricted Subsidiaries other than those listed on Schedule 7.19(b) hereto (as such Schedule shall be amended for each subsequently acquired or organized Unrestricted Subsidiary).   Except as set forth on Schedule 7.19(c) hereto, neither the Parent nor any Subsidiary of the Parent is engaged in any joint venture or partnership with any other Person hereto (as such Schedule shall be amended for each subsequently existing joint venture or partnership).   The jurisdiction of incorporation/formation and principal place of the Parent, the Borrower and each Subsidiary of the Borrower is listed on Schedule 7.19(d) hereto.

7.20    **Disclosure**.    None of the factual information heretofore or contemporaneously furnished in writing to the Administrative Agent or any Lender by or on behalf of the Parent or any Subsidiary in connection with any Loan Document or any transaction contemplated hereby contains any untrue statement of a material fact or omits to state a material fact (known to the Parent or any of its Subsidiaries in the case of any document or information not furnished by it or any of its Subsidiaries) necessary in order to make the statements herein or therein, taken as a whole, not misleading.

7.21    **Bank Accounts**.  As of the Effective Date, Schedule 7.21 sets forth the account numbers and location of all deposit accounts and securities accounts (as each of such terms is defined in the Uniform Commercial Code) of the Parent, the Borrower and each of the Borrower's Restricted Subsidiaries.

7.22    **Intentionally Omitted**.

7.23    **The Parent as a Holding Company; SPVs.**  The Parent is a holding company and does not own any material assets (other than the Capital Stock of the Borrower) or engage in any operations or business (other than the ownership of the Borrower and its Subsidiaries).   No SPV has any material liabilities (other than any tax liabilities), owns any

- 55 -

material assets (other than the Real Property listed on <u>Schedule 7.23</u>) or engages in any operations or business (other than the ownership of the Real Property listed on <u>Schedule 7.23</u>).

### 7.24    **Patriot Act and OFAC**.

**7.24.1**    To the extent applicable, the Borrower and each Guarantor is in compliance, in all material respects, with the (a) Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, and (b) the Patriot Act.  No part of the proceeds of the loans made hereunder will be used by the Borrower, any Guarantor or any of their Affiliates, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

**7.24.2**    Neither the Borrower, nor any Guarantor, nor any of their Subsidiaries is in violation of any of the country or list based economic and trade sanctions administered and enforced by OFAC.  Neither the Borrower, nor any Guarantor, nor any of their Subsidiaries (a) is a Sanctioned Person or a Sanctioned Entity, (b) has its assets located in Sanctioned Entities, or (c) derives revenues from investments in, or transactions with Sanctioned Persons or Sanctioned Entities.  No proceeds of any loan made hereunder will be used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Entity.

### 7.25    **Reorganization Matters**.

(a)    The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable law and notice thereof and notice for (x) the motion seeking approval of the Interim Order, (y) the hearing for the approval of the Interim Order and (z) the hearing for the approval of the Final Order has been, or in the case of the Final Order, will be, given, in each case, in accordance with the Bankruptcy Code.  The Borrower shall give, on a timely basis as specified in the Financing Orders, all notices required to be given to all parties specified in the Financing Orders.

(b)    After entry of the Interim Order, and pursuant to and to the extent permitted in the Interim Order and the Final Order, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Cases having priority over all administrative expense claims and unsecured claims against the Borrower and each Guarantor now existing or hereafter arising of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 326, 330, 331, 503(b), 507(a), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(1) of the Bankruptcy Code, subject, as to priority only, to the Carve-Out Amount.

(c)    After entry of the Interim Order and pursuant to and to the extent provided in the Interim Order and the Final Order, the Obligations will be secured by

a valid and perfected first priority Lien on all of the Collateral, subject to the Carve-Out Amount.

(d)     The Interim Order (with respect to the period prior to the entry of the Final Order) or the Final Order (with respect to the period on and after the entry of the Final Order), as the case may be, is in full force and effect and has not been reversed, stayed, modified or amended.

(e)     Notwithstanding the provisions of Section 362 of the Bankruptcy Code and subject to the applicable provisions of the Interim Order or the Final Order, as the case may be, upon the Maturity Date (whether by acceleration or otherwise) of any of the Obligations, the Administrative Agent and Lenders shall be entitled to immediate payment of such Obligations in cash and to enforce the remedies provided for hereunder or under applicable law, without further application to or order by the Bankruptcy Court, subject to the terms of the Loan Documents and the Financing Orders.

## 8.     **AFFIRMATIVE COVENANTS.**

The Borrower covenants and agrees that, so long as any Loan, Unpaid Reimbursement Obligation, Letter of Credit or Revolving Credit Note is outstanding or any Lender has any obligation to make any Loans or the Issuing Lender has any obligation to issue, extend or renew any Letters of Credit:

**8.1     Punctual Payment.** The Borrower will duly and punctually pay or cause to be paid the principal and interest on the Loans, all Reimbursement Obligations, the Letter of Credit Fees, the Commitment Fees, the Administrative Agent's Fee and all other amounts provided for in this Credit Agreement and the other Loan Documents to which the Borrower or any of its Restricted Subsidiaries is a party, all in accordance with the terms of this Credit Agreement and such other Loan Documents.

**8.2     Maintenance of Office.** The Borrower will maintain its chief executive office at 1855 Boston Road, Wilbraham, Massachusetts 01095, or at such other place in the United States of America as the Borrower shall designate upon written notice to the Administrative Agent, where notices, presentations and demands to or upon the Borrower in respect of the Loan Documents to which the Borrower is a party may be given or made.

**8.3     Records and Accounts.** The Borrower will (a) keep, and cause each of its Subsidiaries to keep, true and accurate records and books of account in which full, true and correct entries will be made in accordance with GAAP, (b) maintain adequate accounts and reserves for all taxes (including income taxes), depreciation, obsolescence and amortization of its properties and the properties of its Subsidiaries, contingencies, and other reserves, and (c) at all times engage independent certified public accountants satisfactory to the Administrative Agent as the independent certified public accountants of the Parent and its Subsidiaries and will not permit more than thirty (30) days to elapse between the cessation of such firm's (or any successor firm's) engagement as the independent certified public accountants of the Parent and its Subsidiaries and the appointment in such capacity of a successor firm as shall be satisfactory to the Administrative Agent.

**8.4   Financial Statements, Certificates and Information**. The Borrower will deliver to each of the Lenders:

(a)      as soon as practicable, but in any event not later than one hundred and twenty (120) days after the end of each other fiscal year of the Parent, the consolidated balance sheet of the Parent and its Subsidiaries as at the end of such year, and the related consolidated statement of income and consolidated statement of cash flows for such year, each setting forth in comparative form the figures for the previous fiscal year and all such consolidated statements to be in reasonable detail, prepared in accordance with GAAP, and certified, without qualification and without an expression of uncertainty as to the ability of the Parent or any of its Subsidiaries to continue as going concerns, by independent certified public accountants satisfactory to the Administrative Agent, together with a written statement from such accountants to the effect that they have read a copy of this Credit Agreement, and that, in making the examination necessary to said certification, they have obtained no knowledge of any Default or Event of Default, or, if such accountants shall have obtained knowledge of any then existing Default or Event of Default they shall disclose in such statement any such Default or Event of Default; provided that such accountants shall not be liable to the Lenders for failure to obtain knowledge of any Default or Event of Default;

(b)      as soon as practicable, but in any event not later than forty-five (45) days after the end of each other of the first three fiscal quarters in any fiscal year of the Parent, copies of the unaudited consolidated balance sheet of the Parent and its Subsidiaries as at the end of such quarter, and the related consolidated statement of income and consolidated statement of cash flows for the portion of the Parent's fiscal year then elapsed, all in reasonable detail and prepared in accordance with GAAP, together with a certification by the principal financial or accounting officer of the Parent that the information contained in such financial statements fairly presents the financial position of the Parent and its Subsidiaries on the date thereof (subject to year-end adjustments);

(c)      as soon as practicable, but in any event within thirty (30) days after the end of each month in each fiscal year of the Parent, unaudited monthly consolidated financial statements of the Parent and its Subsidiaries for such month setting forth in comparative form the figures from the actual historical figures for the previous year and a comparison setting forth the corresponding figures from the projected figures set forth in the projections described in §8.4(g) for such period, prepared in accordance with GAAP, together with a certification by the principal financial or accounting officer of the Borrower that the information contained in such financial statements fairly presents the financial condition of the Parent and its Subsidiaries on the date thereof (subject to quarter-end and year-end adjustments);

(d)      simultaneously with the delivery of the financial statements referred to in subsections (a) and (b) above, the Compliance Certificate;

(e)      concurrently with the financial statements delivered pursuant to clause (c) hereof, a monthly same store sales report for all of the Borrower's currently operating restaurants on a consolidated basis, including per person check average and

- 58 -

average customer counts, setting forth in comparative form the figures from the actual historical figures for the previous year;

(f)      commencing by 5:00 p.m. (California Time) on October 14, 2011 and continuing thereafter on each Friday immediately preceding the beginning of each fiscal month until the Revolving Credit Loan Maturity Date, the Borrower shall provide an updated 13-Week Budget (covering the period beginning on the Sunday immediately preceding the Friday that such 13-Week Budget is delivered) in form and substance reasonably acceptable to the Administrative Agent. It is hereby understood and agreed that such 13-Week Budget shall not become the applicable 13-Week Budget unless the Administrative Agent shall have delivered a notice of approval of such 13-Week Budget to the Borrower; provided, that if the Administrative Agent does not deliver a notice of approval to Borrower, the previously delivered 13-Week Budget shall continue to constitute the applicable 13-Week Budget until a 13-Week Budget is agreed to among Borrower and the Administrative Agent in accordance with this section;

(g)      commencing by 5:00 p.m. (California Time) on October 14, 2011 and continuing on each Friday thereafter until the Revolving Credit Loan Maturity Date, the Borrower shall provide a variance report in the form of Exhibit F (the "Variance Report") setting forth actual cash receipts and disbursements of the Borrower and its Subsidiaries for the prior week and setting forth all the variances, on a line-item basis, from the amount set forth for such week as compared to (i) the initial 13-Week Budget on a weekly and cumulative basis and (ii) the 13-Week Budget then in effect on a weekly and cumulative basis; each such Variance Report to include explanations for all material variances and shall be certified by the principal financial or accounting officer of the Borrower as being prepared in good faith and fairly presenting in all material respects the information set forth therein. Neither the delivery of a Variance Report, nor the acceptance thereof by the Administrative Agent, shall excuse, waive or cure a default under §10;

(h)      not less than once during any twelve-month period, account numbers and location of all deposit accounts and securities accounts (as each of such terms is defined in the Uniform Commercial Code) of the Parent, the Borrower or any of the Borrower's Restricted Subsidiaries not otherwise listed on Schedule 7.21;

(i)      concurrently with the financial statements delivered pursuant to clause (c) hereof, account receivable agings reports;

(j)      from time to time such other financial data and information (including accountants, management letters) as the Administrative Agent or any Lender may reasonably request;

(k)      as soon as practicable, but in any event within two (2) Business Days upon the effectiveness thereof, copies of any amendments or modifications to the Governing Documents of the Borrower or any Guarantor; and

(l)      as soon as practicable, but in any event within two (2) Business Days after the filing thereof, copies of all monthly reports as well as all pleadings,

- 59 -

motions, applications, judicial information or other information with respect to the Borrower and each Guarantor's financial condition filed by or on behalf of the Borrower or a Guarantor with the Bankruptcy Court or provided or served by the Borrower or a Guarantor to or upon the United States Trustee (or any monitor or interim receiver, if any, appointed in the Chapter 11 Cases) or any Committee, at the time such document is filed with the Bankruptcy Court, or provided or served by the Borrower or a Guarantor to or upon the United States Trustee (or any monitor or interim receiver, if any, appointed in the Chapter 11 Cases) or any Committee, to the extent such document has not otherwise been provided pursuant to an order of the Bankruptcy Court establishing notice procedures in the Chapter 11 Cases or otherwise.

### 8.5    Notices.

**8.5.1    Defaults**.  The Borrower will promptly notify the Administrative Agent and each of the Lenders in writing of the occurrence of any Default or Event of Default, together with a reasonably detailed description thereof, and the actions, if any, the Borrower proposes to take with respect thereto.  If any Person shall give any notice or take any other action in respect of a claimed default (whether or not constituting an Event of Default) under this Credit Agreement or a material default under any other note, evidence of indebtedness, indenture or other obligation to which or with respect to which the Borrower or any of its Subsidiaries is a party or obligor, whether as principal, guarantor, surety or otherwise, the Borrower shall forthwith give written notice thereof to the Administrative Agent and each of the Lenders, describing the notice or action and the nature of the claimed default.

**8.5.2    Environmental Events**.    The Borrower will give notice to the Administrative Agent and each of the Lenders (a) of any violation of any Environmental Law that could reasonably be expected to have a Material Adverse Effect that the Parent or any of its Subsidiaries reports in writing or is reportable by such Person in writing (or for which any written report supplemental to any oral report is made) to any Governmental Authority no later than ten (10) days after such material violation is reported or reportable, and (b) within ten (10) days of becoming aware thereof, of any inquiry, proceeding, investigation, or other action, including a notice from any Governmental Authority of potential environmental liability, of any Governmental Authority that could reasonably be expected to have a Material Adverse Effect.

**8.5.3    Notification of Claim against Collateral**.  The Borrower will, within ten (10) days of becoming aware thereof, notify the Administrative Agent and each of the Lenders in writing of any material setoff, claims, withholdings or other defenses to which any of the Collateral, or the Administrative Agent's rights with respect to the Collateral, are subject.

**8.5.4    Notice of Litigation and Judgments**.  The Borrower will, and will cause each of its Subsidiaries to, give notice to the Administrative Agent and each of the Lenders in writing within twenty (20) days of becoming aware of any litigation or proceedings threatened in writing or any pending litigation and proceedings affecting the Parent or any of its Subsidiaries or to which the Parent or any of its Subsidiaries is or becomes a party involving an uninsured claim against the Parent or any of its Subsidiaries that could reasonably be expected to have a Material Adverse Effect on the Parent and its Subsidiaries, taken as a whole, and stating the nature and status of such litigation or proceedings.  The Borrower will, and will cause each of

- 60 -

its Subsidiaries to, give notice to the Administrative Agent and each of the Lenders, in writing, in form and detail satisfactory to the Administrative Agent, within twenty (20) days of any judgment not covered by insurance, final or otherwise, against the Parent or any of its Subsidiaries in an amount in excess of $1,000,000.

### 8.6    Legal Existence; Maintenance of Properties.

**8.6.1    Legal Existence.** The Borrower will do or cause to be done all things necessary to preserve and keep in full force and effect its legal existence, rights and franchises and those of its Subsidiaries (other than (x) Restricted Subsidiaries which are either merged into the Borrower or other Restricted Subsidiaries as permitted by §9.5.1 or (y) the dissolution of any SPV).

**8.6.2    Maintenance of Properties.** The Borrower (a) will cause all of its properties and those of its Subsidiaries useful and necessary (as determined by the Borrower in a commercially reasonable manner) in the conduct of its business or the business of its Subsidiaries to be maintained and kept in good condition, repair and working order (ordinary wear and tear excepted) and supplied with all necessary equipment, and (b) will cause to be made all necessary repairs, renewals, replacements, betterments and improvements thereof, all as in the judgment of the Borrower may be necessary so that the business carried on in connection therewith may be properly and advantageously conducted at all times.

**8.7    Insurance.** At the Borrower's expense, the Borrower shall maintain insurance respecting each of the Parent's and its Subsidiaries' assets wherever located, covering loss or damage by fire, theft, explosion, and all other hazards and risks as ordinarily are insured against by other Persons engaged in the same or similar businesses. The Borrower also shall maintain (with respect to each of the Parent and its Subsidiaries) business interruption, public liability, and product liability insurance, as well as insurance against larceny, embezzlement, and criminal misappropriation. All such policies of insurance shall be with responsible and reputable insurance companies and in such amounts as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated and located and in any event in amount, adequacy and scope reasonably satisfactory to the Administrative Agent. All property insurance policies covering the Collateral are to be made payable to the Administrative Agent for the benefit of the Administrative Agent and the Lenders, as their interests may appear, in case of loss, pursuant to a standard loss payable endorsement with a standard non contributory "lender" or "secured party" clause and are to contain such other provisions as the Administrative Agent may reasonably require to fully protect the Lenders' interest in the Collateral and to any payments to be made under such policies. All certificates of insurance are to be delivered to the Administrative Agent, with the loss payable and additional insured endorsement in favor of the Administrative Agent and shall provide for not less than 30 days (10 days in the case of non-payment) prior written notice to the Administrative Agent of the exercise of any right of cancellation. If the Borrower fails to maintain such insurance, the Administrative Agent may arrange for such insurance, but at the Borrower's expense and without any responsibility on the Administrative Agent's part for obtaining the insurance, the solvency of the insurance companies, the adequacy of the coverage, or the collection of claims. The Borrower shall give the Administrative Agent prompt notice of any property or casualty loss exceeding $500,000 to the extent that such loss is not covered by its casualty or business interruption insurance. Upon

the occurrence and during the continuance of an Event of Default, the Administrative Agent shall have the sole right to file claims under any insurance policies, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.

**8.8     Taxes**.  Subject to any necessary approvals of the Bankruptcy Court in the Chapter 11 Cases, the Borrower will, and will cause each of its Subsidiaries to, duly pay and discharge, or cause to be paid and discharged, before the same shall become overdue, all taxes, assessments and other governmental charges imposed upon it and its Real Estate, sales and activities, or any part thereof, or upon the income or profits therefrom, as well as all claims for labor, materials, or supplies that if unpaid might by law become a Lien or charge upon any of its property; provided that any such tax, assessment, charge, levy or claim need not be paid if the validity or amount thereof shall currently be contested in good faith by appropriate proceedings and if the Borrower or such Subsidiary shall have set aside on its books adequate reserves with respect thereto; and provided further that the Borrower and each Subsidiary of the Borrower will pay all such taxes, assessments, charges, levies or claims forthwith upon the commencement of proceedings to foreclose any Lien that may have attached as security therefor.

### 8.9     Inspection of Properties and Books, etc.

**8.9.1     General**.  The Borrower shall permit the Lenders, through the Administrative Agent or any of the Lenders' other designated representatives, to visit and inspect any of the properties of the Borrower or any of its Restricted Subsidiaries, to examine the books of account of the Borrower and its Restricted Subsidiaries (and to make copies thereof and extracts therefrom), and to discuss the affairs, finances and accounts of the Borrower and its Restricted Subsidiaries with, and to be advised as to the same by, its and their officers, all at such reasonable times and during normal business hours as the Administrative Agent or any Lender may reasonably request upon reasonable prior notice.  The Administrative Agent shall be permitted to conduct up to two (2) commercial finance exams, including without limitation any audit (whether conducted by the Administrative Agent or an outside examiner), all at such reasonable times and during normal business hours as the Administrative Agent may reasonably request upon reasonable prior notice; provided that (y) prior to the occurrence of an Event of Default, the Borrower shall only be obligated to pay up to $30,000 in the aggregate in any fiscal year for such commercial finance exams, and (z) after the occurrence and during the continuance of an Event of Default, the foregoing limitation on the number of commercial finance exams that may be conducted the Administrative Agent shall no longer be applicable and the Borrower shall pay the expenses for all such commercial finance exams.

**8.9.2     Appraisals**.  The Borrower will (a) deliver to the Administrative Agent any appraisal reports obtained by the Borrower in the ordinary course of its business, or (b) if an Event of Default shall have occurred and be continuing, upon the request of the Administrative Agent, obtain and deliver to the Administrative Agent appraisal reports in form and substance and from appraisers reasonably satisfactory to the Administrative Agent, stating (i) the then current fair market, orderly liquidation and forced liquidation values of all or any portion of the equipment or real estate owned by the Borrower or any of its Restricted Subsidiaries, and (ii) the

- 62 -

then current business value of each of the Borrower and its Restricted Subsidiaries. After the occurrence and during the continuance of an Event of Default, all such appraisals shall be conducted at the expense of the Borrower.

**8.9.3  Environmental Assessments**. In the event (a) an Event of Default shall have occurred and be continuing with respect to any release or threat of release of Hazardous Substances or (b) the Administrative Agent has a reasonable basis to believe that (i) there has been a release or threat of release of Hazardous Substances in or under the Mortgaged Properties in violation of applicable Environmental Laws and such release or threat of release could reasonably be expected to result in a Material Adverse Effect, or (ii) the use and operation of the Mortgaged Properties is not in compliance with Environmental Laws and such noncompliance could reasonably be expected to result in a Material Adverse Effect, the Administrative Agent may, from time to time, in its discretion for the purpose of identifying the presence of such release or threatened release of Hazardous Substances, obtain one or more environmental assessments or audits of such Mortgaged Property prepared by a hydrogeologist, an independent engineer or other qualified consultant or expert approved by the Administrative Agent to evaluate or confirm (a) whether any Hazardous Materials are present in the soil or water at such Mortgaged Property and (b) whether the use and operation of such Mortgaged Property complies with all Environmental Laws. Environmental assessments may include without limitation detailed visual inspections of such Mortgaged Property including any and all storage areas, storage tanks, drains, dry wells and leaching areas, and the taking of soil samples, surface water samples and ground water samples, as well as such other investigations or analyses as the Administrative Agent deems appropriate. After the occurrence and during the continuance of an Event of Default, all such environmental assessments shall be conducted at the expense of the Borrower.

**8.9.4  Communications with Accountants**. Upon the occurrence and continuance of a Default, the Borrower authorizes the Administrative Agent and, if accompanied by the Administrative Agent, the Lenders to communicate directly with the Parent's or the Borrower's independent certified public accountants and authorizes such accountants to disclose to the Administrative Agent and the Lenders any and all financial statements and other supporting financial documents and schedules including copies of any management letter with respect to the business, financial condition and other affairs of the Parent or any of its Subsidiaries. At the request of the Administrative Agent, the Borrower shall deliver a letter addressed to such accountants instructing them to comply with the provisions of this §8.9.4.

**8.10  Compliance with Laws, Contracts, Licenses, and Permits**. The Borrower will, and will cause each of its Subsidiaries to, comply with (a) the applicable laws and regulations wherever its business is conducted, including all Environmental Laws, (b) the provisions of its Governing Documents, (c) all agreements and instruments by which it or any of its properties may be bound and (d) all applicable decrees, orders, and judgments, except, in the case of each of the foregoing clauses (a) through (d), where the failure to so comply could not reasonably be expected to result in a Material Adverse Effect. If any material authorization, consent, approval, permit or license from any officer, agency or instrumentality of any government shall become necessary or required in order that the Parent or any of its Subsidiaries may fulfill any of its obligations hereunder or any of the other Loan Documents to which the Borrower or such Subsidiary is a party, the Borrower will, or (as the case may be) will cause

such Subsidiary to, immediately take or cause to be taken all reasonable steps within the power of the Borrower or such Subsidiary to obtain such authorization, consent, approval, permit or license and furnish the Administrative Agent and the Lenders with evidence thereof.

**8.11** **Employee Benefit Plans**. The Borrower will (a) promptly upon request of the Administrative Agent, furnish to the Administrative Agent a copy of the most recent actuarial statement required to be submitted under §103(d) of ERISA and Annual Report, Form 5500, with all required attachments, in respect of each Guaranteed Pension Plan, (b) promptly upon receipt or dispatch, furnish to the Administrative Agent any material notice, report or demand and any notice, report or demand sent or received in respect of a Guaranteed Pension Plan under §§302, 4041, 4042, 4043 (other than as set forth on <u>Schedule 7.16</u>), 4063, 4066 and 4068 of ERISA, or in respect of a Multiemployer Plan, under §§4041A, 4202, 4219, 4242, or 4245 of ERISA, and (c) promptly upon receipt or knowledge of the PBGC seeking a ruling from a court of competent jurisdiction that it is entitled to enforce any lien arising with respect to the Friendly Pension Plan with such lien having priority over any of the liens created under the Loan Documents or with respect to the Friendly Pension Plan, furnish to the Administrative Agent all motions and other pleadings related to such efforts by the PBGC.

**8.12** **Use of Proceeds**. The Borrower will use the proceeds of the Loans and obtain Letters of Credit solely for the purposes set forth in §7.17.1.

### 8.13    Future Guarantors, Mortgages.

**8.13.1** The Borrower will, and will cause each Restricted Subsidiary to, execute any documents, agreements and instruments, and take all further action that may be required under applicable law, or that the Administrative Agent may reasonably request, in order to effectuate the transactions contemplated by the Loan Documents and in order to grant, preserve, protect and perfect the validity and first priority (subject to Permitted Liens) of the Liens created or intended to be created by the Loan Documents. The Borrower will cause any subsequently acquired or organized Restricted Subsidiary to execute a Guaranty (or a supplement thereto) and each applicable Loan Document in favor of the Administrative Agent. In addition, from time to time, the Borrower will, at its cost and expense, promptly secure the Obligations by pledging or creating, or causing to be pledged or created, perfected Liens with respect to such of its and its Restricted Subsidiaries' assets and properties as the Administrative Agent shall designate (excluding Real Estate, except pursuant to §8.13.2, and subject to the limitations set forth in §6.1 and §6.2, the Security Agreement and the Stock Pledge Agreement).

**8.13.2** Promptly upon reasonable request by the Administrative Agent, the Borrower will, and will cause each Restricted Subsidiary to, execute and deliver such mortgages, deeds of trust, or deeds to secure debt, as applicable and in each case in form and substance reasonably satisfactory to the Administrative Agent, necessary to grant and perfect a security interest and lien in favor of the Administrative Agent over all of the owned Real Estate; <u>provided</u>, that the Administrative Agent may file such mortgages, deeds of trust, and deeds to secure debt, as applicable, only after the occurrence of an Event of Default.

**8.14** **Bank Accounts**. The Borrower will, and will cause each of its Restricted Subsidiaries to (a) establish one or more depository accounts (the "<u>Concentration Accounts</u>"),

which Concentration Accounts shall be under the control of the Administrative Agent for the benefit of the Lenders and the Administrative Agent, in the name of the Borrower, pursuant to one or more agreements in form and substance reasonably satisfactory to the Administrative Agent (the "Concentration Account Agreements"), (b) cause all cash proceeds of accounts receivable to be deposited only in the restaurant concentration depository accounts ("Restaurant Concentration Accounts") with financial institutions which have entered into agency account agreements and, if applicable, lock box agreements (collectively, "Agency Account Agreements") in form and substance satisfactory to the Administrative Agent, or the Concentration Accounts; provided, that the Borrower and its Restricted Subsidiaries may have up to $200,000 on deposit with financial institutions which have not entered into such an Agency Account Agreement, (c) direct all depository institutions with Restaurant Concentration Accounts to cause all funds of the Borrower and its Restricted Subsidiaries held in such Restaurant Concentration Accounts to be transferred daily to, and (except for transfers to the Administrative Agent) only to, the Concentration Accounts, and (d) at all times ensure that immediately upon the Borrower's or any of its Restricted Subsidiaries' receipt of any funds constituting or cash proceeds of any Collateral, all such amounts shall have been deposited in a Restaurant Concentration Account or a Concentration Account; provided, that the Borrower and its Restricted Subsidiaries may have up to $200,000 on deposit with financial institutions which have not entered into an Agency Account Agreement or a Concentration Account Agreement. Notwithstanding anything to the contrary herein, the Borrower may maintain flex spending accounts, medical disbursement accounts, medical insurance accounts, gift card accounts, workers' compensation accounts and payroll accounts in the ordinary course of business and deposit funds in such accounts, provided that in all cases the aggregate amount of funds on deposit in each such account shall not exceed the amount reasonably necessary to fund such account. On and at all times after the Effective Date, all amounts in any deposit account of the Borrower or its Restricted Subsidiaries under the control of the Administrative Agent (including pursuant to a Agency Account Agreement or other Control Agreement) shall be transferred daily to the Administrative Agent's Account or such other account of the Administrative Agent as the Administrative Agent may designate from time to time for application pursuant to the terms hereof; provided, however, that this sentence shall not apply to amounts used to pay payroll and or expenses relating to the Carve-Out.

**8.15 Good Standing Certificates.** On or before the date that is 30 days after the Effective Date, the Borrower will deliver to the Administrative Agent certificates of status with respect to each of the Borrower and each Guarantor, each dated within 15 days of the Effective Date, such certificates to be issued by the appropriate officer of the jurisdictions (other than the jurisdiction of organization of such Person) in which its failure to be duly qualified or licensed could reasonably be expected to result in a Material Adverse Effect, which certificates shall indicate that such Person is in good standing in such jurisdictions.

**8.16 Further Assurances.** The Borrower will, and will cause each of its Subsidiaries to, cooperate with the Lenders and the Administrative Agent and execute such further instruments and documents as the Lenders or the Administrative Agent shall reasonably request to carry out to their reasonable satisfaction the transactions contemplated by this Credit Agreement and the other Loan Documents (including, but not limited to, any replacement Revolving Credit Notes to replace any Revolving Credit Notes lost by any Lender in an amount equal to such lost Revolving Credit Note). Without limiting the foregoing, the Borrower will,

- 65 -

and will cause each of its Subsidiaries to, provide reasonable cooperation and assistance to Advisors, if any, hired by or on behalf of the Administrative Agent (or its counsel), to the extent reasonably requested by such Advisors, in connection with the performance by such Advisors of the services for which they are engaged.

**8.17    Franchise Matters**.    The Borrower will, and will cause each of its Subsidiaries to (a) comply with all of its material obligations under Franchise Agreements to which it is a party; (b) appear in and defend any action challenging the validity or enforceability of any Franchise Agreement, except for such actions which, individually or in the aggregate, have not had and could not reasonably be expected to result in a Material Adverse Effect; and (c) provide Franchisees with current franchise disclosure documents or UFOCs or other disclosure statement of similar import as required by 16 C.F.R. 436.

**8.18    Meetings with Lenders**.    On a monthly basis (or more frequently at the reasonable request of the Administrative Agent or Required Lenders) the Borrower will hold a meeting (at a mutually agreeable location and time or telephonically) with management of the Borrower to which all Lenders will be invited regarding the financial results and operations of the Borrower and monitoring any developments in the Chapter 11 Cases.

## 9.    CERTAIN NEGATIVE COVENANTS.

The Borrower covenants and agrees that, so long as any Loan, Unpaid Reimbursement Obligation, Letter of Credit or Revolving Credit Note is outstanding or any Lender has any obligation to make any Loans or the Administrative Agent has any obligations to issue, extend or renew any Letters of Credit:

**9.1    Restrictions on Indebtedness**.    The Borrower will not, and will not permit any of its Subsidiaries to, create, incur, assume, guarantee or be or remain liable, contingently or otherwise, with respect to any Indebtedness other than:

(a)    Indebtedness to the Lenders and the Administrative Agent arising under any of the Loan Documents;

(b)    endorsements for collection, deposit or negotiation and warranties of products or services, in each case incurred in the ordinary course of business;

(c)    Intentionally Omitted;

(d)    Indebtedness in respect of Interest Rate Agreements or derivative contracts, in each case entered into prior to the Effective Date and entered into in the ordinary course of business and not for speculative purposes or as an arbitrage of rates;

(e)    Indebtedness existing on the date hereof and listed and described on Schedule 9.1 hereto, and any Refinancing Indebtedness of such Indebtedness;

(f)    Indebtedness existing on the date hereof of any Subsidiary of the Borrower owing to the Borrower;

(g)     unsecured Indebtedness of a Restricted Subsidiary of the Borrower to the Borrower which Indebtedness (i) shall not be forgiven or otherwise discharged for any consideration other than payment in full in cash (provided, that only the amount repaid in part shall be discharged); and (ii) shall be evidenced by one or more promissory notes which shall be delivered in pledge to the Administrative Agent pursuant to a Loan Document;

(h)     unsecured Indebtedness of (i) the Borrower owing to any Restricted Subsidiary, or (ii) any Unrestricted Subsidiary owing to the Borrower in an aggregate principal amount not exceed $50,000 and existing prior to the Effective Date;

(i)     unsecured Indebtedness in respect of guarantees made in the ordinary course of business by the Borrower or any of its Restricted Subsidiaries in respect of Indebtedness of any Restricted Subsidiary of the Borrower permitted hereunder;

(j)     unsecured Indebtedness existing as of the Effective Date in respect of guarantees made in the ordinary course of business by the Borrower or any of its Restricted Subsidiaries of Indebtedness of Franchisees of the Borrower or any Restricted Subsidiary in an aggregate principal amount not to exceed $5,000,000;

(k)     unsecured Indebtedness incurred by the Borrower or any of its Restricted Subsidiaries to finance the payment of property, casualty and specialty insurance premiums in the ordinary course of the Borrower's business which is repaid within 18 months of its incurrence, provided that such Indebtedness does not exceed $7,500,000 in the aggregate at any one time outstanding;

(l)     Indebtedness in respect of the Sale-Leaseback Transaction existing as of the Effective Date;

(m)     Indebtedness evidenced by the Subordinated PIK Note and any Refinancing Indebtedness of such Indebtedness; provided that, in addition to the requirements set forth in the definition of "Refinancing Indebtedness", (i) interest on such Refinancing Indebtedness shall only be payable in kind on the same terms as those contained in the Subordinated PIK Note as of the date hereof; (ii) the principal of such Refinancing Indebtedness shall not amortize; and (iii) such Refinancing Indebtedness shall be subject to the terms of an intercreditor and subordination agreement in favor of Administrative Agent on the same terms as the Intercreditor and Subordination Agreement or with such modifications as the Administrative Agent may approve;

(n)     Indebtedness existing as of the Effective Date that is evidenced by the Senior Notes in an aggregate principal amount not to exceed $7,804,000;

(o)     Indebtedness consisting of (i) unsecured guarantees and indemnities incurred in the ordinary course of business with respect to surety and appeal bonds, performance bonds, bid bonds, appeal bonds, completion guarantee and similar obligations; and (ii) unsecured guarantees arising with respect to customary indemnification obligations to purchasers in connection with Asset Sales or other dispositions permitted under §9.5.2;

- 67 -

(p)     unsecured Indebtedness incurred in respect of netting services, overdraft protection, and other like services, in each case, incurred in the ordinary course of business;

(q)     **[Indebtedness of the SPVs existing as of the Effective Date and arising under the FFCA Loan Agreement]**;

(r)     Indebtedness under the Pre-Petition Credit Agreement; and

(s)     other unsecured Indebtedness existing as of the Effective Date and not described in clauses (a) through (r) in an aggregate amount not to exceed $750,000 at any time outstanding.

Notwithstanding the foregoing, and except for the Carve-Out, no Indebtedness under subsections (b) through (s) shall be permitted to have an administrative expense claim status under the Bankruptcy Code senior to or pari passu with the super priority administrative expense claims of the Administrative Agent and the Lenders (or the adequate protection claims, if any such claims, of the Prior Agents and Prior Lender) as set forth herein and in the Financing Orders.

**9.2     Restrictions on Liens**.

**9.2.1     Permitted Liens**.  The Borrower will not, and will not permit any of its Subsidiaries to:

(a)     create or incur or suffer to be created or incurred or to exist any Lien upon any of its property or assets of any character whether now owned or hereafter acquired, or upon the income or profits therefrom;

(b)     transfer any of such property or assets or the income or profits therefrom for the purpose of subjecting the same to the payment of Indebtedness or performance of any other obligation in priority to payment of its general creditors;

(c)     acquire, or agree or have an option to acquire, any property or assets upon conditional sale or other title retention or purchase money security agreement, device or arrangement;

(d)     suffer to exist for a period of more than thirty (30) days after the same shall have been incurred any Indebtedness or claim or demand against it that if unpaid might by law or upon bankruptcy or insolvency, or otherwise, be given any priority whatsoever over its general creditors; and

(e)     sell, assign, pledge or otherwise transfer any receivables, with or without recourse;

provided that the Borrower or any of its Subsidiaries may create or incur or suffer to be created or incurred or to exist:

- 68 -

(i)      Liens in favor of the Borrower on all or part of the assets of any Subsidiary of the Borrower securing Indebtedness owing by such Subsidiary of the Borrower to the Borrower;

(ii)      Liens to secure taxes, assessments and other government charges in respect of obligations not overdue or Liens on properties to secure claims for labor, material or supplies in respect of obligations not overdue or in respect of obligations the non-payment of which is permitted by the Bankruptcy Code;

(iii)      deposits or pledges made in connection with, or to secure payment of, workmen's compensation, unemployment insurance, old age pensions or other social security obligations;

(iv)      Liens on properties in respect of judgments or awards that have been in force for less than the applicable period for taking an appeal so long as execution is not levied thereunder or in respect of which the Borrower or any Subsidiary shall at the time in good faith be prosecuting an appeal or proceedings for review and in respect of which a stay of execution shall have been obtained pending such appeal or review;

(v)      Liens of carriers, warehousemen, mechanics and materialmen, and other like Liens on properties in respect of obligations not yet delinquent or subject of a Permitted Protest;

(vi)      encumbrances on Real Estate consisting of easements, rights of way, zoning restrictions, restrictions on the use of real property and defects and irregularities in the title thereto, landlord's or lessor's liens and other minor Liens and, in each case, including those exceptions which appear on any Title Policy (as defined in the Pre-Petition Credit Agreement);

(vii)      Liens (A) existing on the date hereof and listed on Schedule 9.2 hereto, or (B) securing any extension, renewal or replacement of any obligations secured by any such Lien; provided, that (x) in respect of Liens permitted pursuant to clause (A) hereof, no such Lien shall encumber any additional property and the amount of Indebtedness secured by such Lien is not increased from that existing on the Effective Date (as such Indebtedness may have been permanently reduced subsequent to the Effective Date), and (y) in respect of Liens permitted pursuant to clause (B) hereof, such Lien shall only cover the same assets which originally secured the obligations being extended, renewed or replaced;

(viii)      Intentionally Omitted;

(ix)      Liens on each Mortgaged Property as and to the extent permitted by the Mortgage (as defined in the Pre-Petition Credit Agreement) applicable thereto [(including under the FFCA Mortgage Financing)];

(x)      Liens in favor of the Administrative Agent for the benefit of the Lenders and the Administrative Agent under the Loan Documents and the Financing Orders;

- 69 -

(xi)    the interests of lessors under operating leases and non-exclusive licensors under license agreements;

(xii)    Liens arising by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights and remedies as to deposit accounts or other funds maintained with a depository institution;

(xiii)    Liens incurred or deposits made to secure the performance of bids, trade contracts (other than for borrowed money), leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of alike nature incurred in the ordinary course of business;

(xiv)    Liens arising in the ordinary course of business out of consignment or similar arrangements for the sale of goods; provided that a consignee waiver or bailee letter or similar document reasonably acceptable to the Administrative Agent shall be provided to the Administrative Agent;

(xv)    Liens securing Indebtedness described in §9.1(l);

(xvi)    Liens, including any replacement or adequate protection Liens, arising under or in connection with the Pre-Petition Credit Agreement and under the Pre-Petition Loan Documents;

(xvii)    Liens consisting of the licensing of patents, trademarks, copyrights and other intellectual property rights on a non-exclusive basis in the ordinary course of business;

(xviii)  Liens held by Sundae Group (or any successor-in-interest) to secure the Indebtedness evidenced by the Subordinated PIK Note and any Refinancing Indebtedness of such Indebtedness that is permitted hereunder, so long as such Liens are subject to the provisions of the Intercreditor and Subordination Agreement or, in the case of such Refinancing Indebtedness, a replacement therefor on the same terms or with such modifications as the Administrative Agent may approve;

(xix)    Liens on amounts deposited in connection with obtaining worker's compensation or other unemployment insurance;

(xx)    Liens for taxes, assessments or governmental charges or levies where nonpayment of the obligations secured thereby is permitted by the Bankruptcy Code;

(xxi)    Liens arising under Section 303(k) of ERISA or Section 430(k) of the Code as described on Schedule 7.16;

(xxii)  Deposits held by utilities securing the Borrower's obligations thereto, and otherwise permitted by the Bankruptcy Court, in an aggregate amount not to exceed $900,000 at any time; and

LEGAL_US_W # 69146878.8